FILED

2020 Nov-24  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ERICA MARIE CAGLE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:18-cv-00201-AKK** |
| | ) | |
| **MADISON COUNTY,** | ) | |
| **ALABAMA, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION TO STRIKE ERRATA[1]
## TO DEPOSITION OF PLAINTIFF ERICA CAGLE

Defendants herein move to strike the errata to deposition of Plaintiff Erica

Cagle. The errata, attached as exhibit 1, includes changes to substantive, material

testimony.

1.  Federal Rule of Civil Procedure 30(e)(1)(B) allows a deponent 30 days

to review a transcript and "if there are changes in form or substance, to sign a

statement listing the changes and the reasons for making them."

2.  In her August 21, 2020 deposition, Plaintiff outlined a series of allegedly

harassing or offensive conduct. After each description, counsel asked whether she

reported the conduct or not. In at least 19 instances, Plaintiff reported that she had

---

[1] Defendants do not seek to strike Plaintiff's ministerial corrections to Cagle Dep. 132:16; 137:10; 184:23; 193:20; and 235:21. Cagle's deposition transcript is attached at Exhibit 2.

*not* reported the conduct. In her errata, Plaintiff has changed her response in each of these instances. *See* Exh. 1, Errata. And she has also attempted to add testimony summarizing her efforts to report conduct she had previously testified she had *not* reported. *Id.*

3.     In a case alleging hostile work environment, the failure to report any purportedly harassing conduct is material to Defendants' affirmative defenses. First, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998). Plaintiff's failure to report virtually any of the supposedly objectionable conduct bears on whether she actually perceived the conduct to be offensive.

4.     Second, an employer is not liable where 1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998). Plaintiff's failure to report allegedly offensive conduct, and thus, her failure to take advantage of the protections

provided in Defendants' sexual harassment policy are also material to Defendants' defense.

5.     In the errata, although she characterizes her changes as "clarifying" her testimony, even a cursory review demonstrates that Plaintiff is attempting to fundamentally alter her responses after the fact.  Plaintiff's altered responses are in bold and italics below.

| CITATION | ORIGINAL TESTIMONY | ERRATA |
|---|---|---|
| Cagle Dep. 20:11-22. | Q: Did you relay that conversation with anybody after the meeting? <br> A: Probably so. <br> Q: Who? <br> A: I don't remember…. <br> Q: But sitting here today, you don't remember anyone's name? <br> A: No. | Q: Did you relay that conversation to anybody after the meeting? <br> *A: Chris Stephens.* |
| Cagle Dep. 21:14-22:9. | Q: Did you ever report his comments to anybody at the Sheriff's Office? <br> A: Report it as in, like, tell on him? <br> Q: Yes. <br> A: No. <br> Q: Did you ever report his comments to anyone at Madison County? <br> A: No. <br> Q: Did you ever report his comments to anyone at Madison County Personnel Board? <br> A: Not that I remember. <br> A: Well, it's my opportunity to ask you what you know today. Is | Q: Did you ever report his comments to anybody at the Sheriff's Office? <br> A: Report it as in, like, tell on him? <br> Q: Yes. <br> *A: I did tell Chris Stephens, but I did not make a formal report.* |

| | | |
|---|---|---|
| | there anything that would refresh your memory?<br>A: No. | |
| Cagle Dep.<br>42:12-44:11 | Q: Anyone else make you feel uncomfortable during your time in the basement?<br>A: I mean, I was in a room with no exit except one door and no windows, so I felt uncomfortable often.<br>Q: Well, it's my opportunity to kind of ask you who was --<br>A: And that's fine. I'm just telling<br>you the answer.<br>Q: -- who was making you uncomfortable.<br>A: I mean, the deputies would stop by, so male deputies.<br>Q: Which ones particularly? We talked about Jermaine. He wasn't a deputy at that time. Who else?<br>5 A (No response.)<br>Q: If you need to take a break, you're welcome to.<br>MS. RILEY: Give us a second.<br>(Whereupon, a break was taken.)[2]<br>Q: What was my last question?<br>(QUESTION READ BY REPORTER)<br>A: I can't name specific names. I'm very -- I haven't been back to this courthouse except once since I left, and I'm just having, like, some major PTSD, so I will figure out the individual names. | |

---

[2] Plaintiff's responses here were given even *after* she had an opportunity to discuss her testimony with her counsel.

|  | Q: Well, what would allow you to do that, Ms. Cagle?<br>A: I mean, a list of the deputies at that time.<br>Q: But as you're sitting here today, you don't remember anybody else in the basement who made you feel uncomfortable?<br>A: They came so often, and there are at least -- there's over 100 deputies, there's over 400 detention officers, so it's -- I'm drawing a blank on the names.<br>Q: All right. So I just want to be clear, though. Sitting here today at the deposition in your litigation, you don't remember the name of a single other deputy who made you feel uncomfortable when your office was located in the basement?<br>A: Okay. That's correct. | Q: But as you're sitting here today, you don't remember anybody else in the basement who made you feel uncomfortable?<br>*A: Matt Lane. Brian Hughes. Brent Patterson. Gary Cross. Brent Beavers. Tim Whisant. Justin Watson. Steve Watson.* |
|---|---|---|
| Cagle Dep. 132:222-133:1. | Q: Did you ever report any of that commentary to anyone?<br>A: No, ma'am. | Q: Did you ever report any of that conduct to anyone?<br>*A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 135:23-136:3. | Q: Okay. And did you report— you received the pictures. You had proof. Did you report that to anybody?<br>A: I did not. | Q: Okay. And did you report— you received the pictures. You had proof. Did you report that to anybody?<br>*A: I did not make a formal report, but I did tell Kerry Phillips and Gary Cross, as explained.* |
| Cagle Dep. 139:11-13. | Q: And did you report any of those comments to anyone?<br>A: No. | Q: And did you report any of those comments to anyone? |

|  |  | *A: I did not make a formal report, but I did tell Kerry Phillips.* |
|---|---|---|
| Cagle Dep. 151:6-8. | Q: And did you report any of those comments?<br>A: No, ma'am. | Q: And did you report any of those comments?<br>*A: I told Gary Cross, Jones's supervisor. I did not make a formal report.* |
| Cagle Dep. 153: 2-4 | Q: And did you ever report these conversations?<br>A: No, ma'am. | Q: And did you ever report these conversations?<br>*A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 154:14-16.. | Q: And did you ever report any of these comments?<br>A: No, ma'am. | Q: And did you ever report any of these comments?<br>*A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 156:9-11 | Q: And did you report any of these comments to anyone?<br>A: No, ma'am. | Q: And did you report any of these comments to anyone?<br>*A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 158:11-13.. | Q: Did you report that commentary to anybody?<br>A: No. | Q: Did you report that commentary to anybody?<br>*A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 158:14-22. | Q: Okay. And let me be clear and give you an opportunity to change any answers. When I say "report to anyone," I mean anyone at the Sheriff's Office, Madison County, Madison County Personnel Board, or Madison County Personnel Department, okay? So do you need to change any of your answers?<br>A: No, ma'am. | Q: Okay. And let me be clear and give you an opportunity to change any answers. When I say "report to anyone," I mean anyone at the Sheriff's Office, Madison County, Madison County Personnel Board, or Madison County Personnel Department, okay? So do you need to change any of your answers? |

|  |  | *A: I never made any formal reports.* |
|---|---|---|
| Cagle Dep. 159-23-160:1. | Q: Did you report that to anybody? <br> A: No, ma'am. | Q: Did you report that to anybody? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 167:22-168:1. | Q: Okay.  And did you report it to anybody else? <br> A: No, ma'am. | Q: Okay.  And did you report it to anybody else? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 172:2-4. | Q: And did you report any of those comments? <br> A: No, ma'am. | Q: And did you report any of those comments? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 175:4-6. | Q: Okay.  And did you report anything like this? <br> A: No. | Q: Okay.  And did you report anything like this? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 179:1-7. | Q: Did you tell Gary Cross, please, I don't want to hear it? <br> A: I don't recall exactly what I said to him, but I did say that I thought a lot of Pete Roth and I just couldn't imagine that being the case, but it was just conversation. | Q: Did you tell Gary Cross, please, I don't want to hear it? <br> *A: Gary Cross was a supervisor, and I let him know that his comments were offensive and gross.* |
| Cagle Dep. 181:13-15. | Q: Did you ever report that kind of discomfort to anyone? <br> A: No, ma'am. | Q: Did you ever report that kind of discomfort to anyone? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |
| Cagle Dep. 182: 18-20. | Q: Did you report his comment to anyone? <br> A: No. | Q: Did you report his comment to anyone? <br> *A: I did not make a formal report, but I did tell Kerry Phillips.* |

| Cagle Dep. 386:6-9. | (Line 6) Q: And you didn't quit in 2016 after<br>(Line 7) you were touched inappropriately,<br>(Line 8) allegedly [*sic*], by Jones and Patterson?<br>(Line 9) A: Correct | Plaintiff's Altered Response to Line 7:<br>*I discussed several incidents with Kerry Phillips that were offensive, as I have clarified in this errata sheet. I used words like dirty, nasty, and gross, when I told him about these incidents, and sometimes I told him that I had to leave my work area because of the incident. I did not make formal reports, but I believe these conversations were complaints, and something should have been done.* |

6.    The Eleventh Circuit has held that the submission of an errata sheet that makes material changes to deposition testimony is improper. *Norelus v. Denny's, Inc.*, 628 F. 3d 1270, 1281 (11th Cir. 2010); *see also Jacobs v. Chadbourne*, 733 Fed. Appx. 483, 486 (11th Cir. 2018) (stating that district court would not have been in error for ignoring changes in errata sheet because they "were not merely corrective changes but instead substantive changes that contradicted [plaintiff's] deposition testimony") (citing *Norelus*).    As the Circuit has noted, "Rule 30(e) cannot be interpreted to allow one to alter what has been said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination." *Norelus*, 628 F. 3d at 1270, quoting

*Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) (internal quotations omitted).

7.   Courts in this district have also determined that material changes to an errata are improper.  In *Cook v. Trinity Universal Insurance, Company of Kansas*, 2007WL 9717431, 7:06 CV-2029-LSC, at *6 (N.D. Ala. Dec. 13, 2007), the court granted, in part, a motion to strike an errata sheet where the altered testimony bolstered the party's case, rather than "simply corrected inaccuracies."  As the court held, a deponent's "answer of 'no' does not reflect any confusion that should have been 'clarified' by the substitution of the exact opposite answer."  *Id*.  This is particularly the case here where Plaintiff specifically agreed that if she did not understand a question, she would let counsel know.  Cagle Dep. 8:9-12.

8.   Further, at various points in the deposition, Plaintiff had no issues understanding the word "report" when she testified that she did, in fact, tell her supervisors or others about allegedly offensive conduct.

| CITATION | ORIGINAL TESTIMONY | ERRATA |
|---|---|---|
| Cagle Dep. 39:16-20; 41:7-12 | Q: Did you ever − other than Kevin Turner, did you **report** him to anybody at the Sheriff's Office?<br>A: I believe I reported him to Chief Stevens. …<br>Q: And you said you **reported** him to Chief Stevens?<br>A: Yes.<br>Q: How did you **report** him? | No changes reported. |

| | A: I just told him that Nettles made me feel uncomfortable when he would stop by. | |
|---|---|---|
| Cagle Dep. 117:7-15. | Q: And did you **report** this reserve deputy to anyone in your chain of command? A: I came back into the office and I let Ms. Barbara know, who was the Sheriff's secretary, and the then Patrol Captain, Jackie East, was in the office and it was – Barbara and I told him and he went to talk to this reserve deputy and he took me with him. | No changes reported. |
| Cagle Dep. 136:4-8. | Q: And did you **report** to anybody just the general conversation that you understand was happening about this person? A: I think Kerry Phillips and I had a conversation about it. … | No changes reported. |
| Cagle Dep. 167:6-14. | Q: Okay.   And did you ever **report** any of these comments? A: Kerry Phillips was aware of this.  I talked to – I talked to him in depth about Judge Coats because they went to church together and she set he and his wife up, so he was somebody that I could – I talked to him about different things that were said about her. | No changes reported. |
| Cagle Dep. 218:21-219:3. | Q: Did you ever – other than Mike Jones screaming at you, which you **reported** to Sheriff Dorning, did you ever **report** Mike Jones' conduct towards you? | No changed reported. |

| | A: To Gary Cross.  I believe I answered that.  But that was his supervisor. | |
|---|---|---|

9.     Similarly, in *McCarver v. PPG Industries, Inc.*, 243 F.R.D. 668, 669 (N.D. Ala. 2007),  the court granted a motion to strike an errata, holding that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Id.* (quoting *Thorn vs. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000).  And in *Lindsey v. 3M Company*, 2020 WL 1479170, No. 5:15-cv-01750-AKK, at *3 (N.D. Ala. Mar. 26, 2020) (*J. Kallon*), this court cited *Norelus* and *Jacobs* with approval in holding that an errata could not be used to add factual allegations to a complaint.  The court noted in its decision that "errata sheets cannot be used to make material, substantive changes, except where there is a clerical error or the like." *Id.* (quoting *Norelus*).

Conclusion

As the testimony herein reveals, Plaintiff is not attempting to correct clerical errors in her errata.  Rather, apparently realizing the legal import of her testimony that she did *not* report the vast majority of conduct she now alleges was sexually harassing, she has altered her testimony in substantive, material ways.   This subversion of the discovery process should be rejected.  Defendants request that their motion to strike Plaintiff's errata be granted.

_/s/ Grace Graham_

Grace Graham (ASB-3040-A64G)
One of the Attorneys for Defendant.
Madison County, et al.

Ellis, Head, Owens, Justice & Arnold
113 North Main Street
P. O. Box 587
Columbiana, Alabama 35051
Phone: 205.669.6783
Fax: 205.669.4932
ggraham@wefhlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon each of the

below listed, via email, this the 24th day of November, 2020:

Kerri Johnson Riley
Attorney at Law
120 Holmes Avenue, Ste. 403
Huntsville, AL 35801
Phone: 256-535-0800
Email: kjr@kerrijohnsonriley.net

_/s/ Grace Graham_
Of Counsel

# EXHIBIT 1

# Errata



## ERRATA SHEET

| Page No. | Line No. | Correction |
|---|---|---|
| | | *PLEASE SEE ATTACHED* |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

ERICA CAGLE DEPOSITION - August 21, 2020 - ERRATA SHEET

| PG | LINE | CORRECTION | REASON |
|---|---|---|---|
| 20 | 15 | Chris Stephens | I recalled after my deposition. |
| 21 | 18 | I did tell Chris Stephens, but I did not make a formal report. | Clarifies my testimony. |
| 44 | 4 | Matt Lane<br>Brian Hughes<br>Brent Patterson<br>Gary Cross<br>Brent Beavers<br>Tim Whisant<br>Justin Watson<br>Steve Watson | I recalled some names after the deposition. |
| 132 | 16 | tenure | Misspelled. |
| 133 | 1 | I did not make a formal report but I did tell Kerry Phillips. | Clarifies my testimony. |
| 136 | 3 | I did not make a formal report, but I did tell Kerry Phillips and Gary Cross, as explained. | Clarifies my testimony. |
| 137 | 10 | I was never required to put anything in writing, not even when I went to personnel or to Jeff Rich, the County Attorney. | I was cut off and didn't finish my answer. |
| 139 | 13 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 149 | 15 | tenure | Misspelled. |
| 151 | 8 | I told Gary Cross, Jones's supervisor. I did not make a formal report. | Clarifies my testimony. |
| 153 | 4 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |

1

| 154 | 16 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 156 | 11 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 158 | 13 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 158 | 22 | I never made any formal reports. | Clarifies my testimony. |
| 160 | 1 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 168 | 1 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 172 | 4 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 174 | 21 | tenure | Misspelled. |
| 175 | 6 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 179 | 3 | Gary Cross was a supervisor, and I let him know that his comments were offensive and gross. | I recalled more after my deposition. |
| 181 | 15 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 182 | 20 | I did not make a formal report, but I did tell Kerry Phillips. | Clarifies my testimony. |
| 184 | 23 | tenure | Misspelled. |
| 193 | 20 | tenure | Misspelled. |
| 235 | 21 | not intentionally | Clarifies my testimony. |

| 386 | 7 | I discussed several incidents with Kerry Phillips that were offensive, as I have clarified in this errata sheet. I used words like dirty, nasty, and gross, when I told him about these incidents, and sometimes I told him that I had to leave my work area because of the incident. I did not make formal reports, but I believe that these conversations were complaints, and something should have been done. | This clarifies and supplements my testimony. At the end of my deposition I could not think of all the times that I had complained, or whether we had already talked about everything. |



## SIGNATURE OF WITNESS

I hereby certify that I have read the foregoing pages, and it constitutes a true and correct transcription of my testimony given in the matter, and indicated on the attached errata sheet.

DONE AND SIGNED this the 25ᵗʰ day of _September_, 2020.

_Erica Cagle_
_____
WITNESS SIGNATURE

Erica Cagle
_____
PRINT WITNESS SIGNATURE

SUBSCRIBED AND SWORN to before me, the undersigned authority on this the 25ᵗʰ day of September, 2020.

_April Madry_
_____
NOTARY PUBLIC
M. C. E. - 03-02-2022

# EXHIBIT 2

**Erica Marie Cagle's
Deposition Transcript**

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

NORTHEASTERN DIVISION

ERICA MARIE CAGLE,

    Plaintiff,

v.      5:18-CV-00201-AKK

THE MADISON COUNTY, ALABAMA

SHERIFF'S OFFICE, et al.,

    Defendants.

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED

by and between the parties through their

respective counsel, that the deposition of

*******************************************

ERICA CAGLE

*******************************************

may be taken before Joe Paul Moore,

Commissioner, at 100 North Side Square,

Huntsville, Alabama, on August 21st, 2020,

beginning at 10:18 A.M.

IT IS FURTHER STIPULATED AND

## Page 2

1   AGREED that the signature to and the reading

2   of the deposition by the witness is waived,

3   the deposition to have the same force and

4   effect as if full compliance had been had

5   with all laws and rules relating to the

6   taking of depositions.

7        IT IS FURTHER STIPULATED AND

8   AGREED that it shall not be necessary for

9   any objections to be made by counsel to any

10   questions, except as to the form or leading

11   questions, and that counsel for the parties

12   may make objections and assign grounds at

13   the time of trial, or at the time said

14   deposition is offered in evidence, or prior

15   thereto.

16        IT IS FURTHER STIPULATED AND

17   AGREED that notice of filing of the

18   deposition by the Commissioner is waived.

19

20

21

22

23

## Page 3

### I N D E X

WITNESS:

ERICA CAGLE

EXAMINATION BY       PAGE

Ms. Graham........................ 6

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | 2010 Acknowledgement Form | 62 |
| 2 | 2015 Acknowledgement Form | 63 |
| 3 | 2017 Acknowledgement Form | 64 |
| 4 | Counseling Acknowledgement | 66 |
| 5 | Sexual Harassment Document | 67 |
| 6 | Madison County Handbook | 74 |
| 7 | 2015 Handbook | 77 |
| 8 | 2016 Handbook | 80 |
| 9 | Harassment Training Document | 82 |
| 10 | Complaint | 85 |
| 11 | Handwritten Notes | 173 |
| 12 | Text Messages | 209 |
| 13 | Text Messages | 232 |

## Page 4

### I N D E X (CONTINUED)

DEFENDANT'S EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 14 | Counseling Statement | 303 |
| 15 | 201 File | 329 |
| 16 | Internal Affairs Letter | 344 |
| 17 | Disciplinary Documents | 366 |
| 18 | Resignation | 383 |

Page 5

1    A P P E A R A N C E S
2    APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
4        KERRI JOHNSON RILEY, P.C.
5        BY: Ms. Kerri Johnson Riley
6        120 Holmes Avenue, Suite 403
7        Huntsville, Alabama 35801
8
9    APPEARING ON BEHALF OF THE DEFENDANT(S):
10
11   ELLIS, HEAD, OWENS, JUSTICE & ARNOLD
12       BY: Ms. Grace Graham
13       113 North Main Street
14       PO Box 587
15       Columbiana, Alabama 35051
16
17   ALSO PRESENT:
18       Mr. Jermie Howell
19       Mr. Jeff Rich
20       Mr. Blake Dorning
21       Mr. Kerry Phillips
22
23

Page 6

1                ERICA CAGLE,
2    being first duly sworn, was examined and
3    testified as follows:
4
5        COURT REPORTER:  Usual stipulations?
6        MS. GRAHAM:  Yes.
7        MS. RILEY:  She will read and sign.
8
9    EXAMINATION BY MS. GRAHAM:
10       Q  Could you please state your name?
11       A  Erica Cagle.
12       Q  Is that your full name?
13       A  Erica Marie Cagle.
14       Q  Have you ever had your deposition
15   taken before?
16       A  Yes.
17       Q  When?
18       A  Approximately three years ago.
19       Q  What was the purpose of your
20   deposition?
21       A  It was a case out of Florida.
22       Q  What was the subject?
23       A  I was assaulted by a massage

Page 7

1    therapist.
2        Q  So you were suing that massage
3    therapist?
4        A  He was arrested, and so his attorney
5    deposed me.
6        Q  So you were the victim in that case?
7        A  Yes.  Yes, ma'am.
8        Q  Do you understand today that you're
9    under oath?
10       A  Yes.
11       Q  That means you're sworn to tell the
12   truth?
13       A  Yes.
14       Q  Now, we're in an informal setting
15   here with the court reporter, but your
16   answers have the same force and effect as
17   if we were in a courtroom with a judge.  Do
18   you understand that?
19       A  Yes.
20       Q  So you're prepared to answer my
21   questions today?
22       A  Yes, ma'am.
23       Q  Is there anything that would prevent

Page 8

1    you from giving me your full attention
2    today?
3        A  No, ma'am.
4        Q  Are you taking any medications or
5    other substances that would prevent you
6    from giving full, complete, and truthful
7    answers to my questions?
8        A  No, ma'am.
9        Q  Now, I'm going to ask you, if you
10   don't understand a question that I ask,
11   would you just let me know?
12       A  Sure.
13       Q  And if you need to take a break,
14   would you let me know that as well?
15       A  Yes.
16       Q  But I do ask that you answer a
17   pending question before we take that break.
18       A  Okay.
19       Q  Now, for purposes of the court
20   reporter -- you may already know this since
21   you've done a deposition, but it's very
22   helpful to let me finish my question before
23   you answer.

Page 9

1    A  Okay.
2    Q  That way, the record will be clear.
3    A  Yes, ma'am.
4    Q  Now, have you ever used any other
5    names than Erica Marie Cagle?
6    A  No.
7    Q  Do you have any nicknames?
8    A  No.
9    Q  What's your date of birth?
10   A  5/21/1985.
11   Q  Where were you born?
12   A  I was born here in Huntsville.
13   Q  How old are you today?
14   A  35.
15   Q  What's your current address?
16   A  55 Summerlyn Way Southeast, Gurley,
17   35748.
18   Q  How close is that to Huntsville?
19   A  It's actually considered Huntsville
20   City Schools, so it's just a little pocket
21   over the mountain.
22   Q  Okay.  How long have you lived at
23   that address?

Page 10

1    A  Three years, approximately.
2    Q  Where did you live previously?
3    A  Downtown in Artisan Apartments.
4    Q  How long were you at that downtown
5    Artisan Apartments address?
6    A  Approximately two years.
7    Q  Where did you live before that?
8    A  I owned a home in South Huntsville.
9    Q  How long did you live there?
10   A  Probably approximately four years.
11   My parents lived across the street, so if
12   you add it all up, a while.
13   Q  Did anyone live with you at any of
14   those residences we just talked about?
15   A  No, ma'am.
16   Q  Have you ever been married?
17   A  Yes.
18   Q  Are you currently married?
19   A  I'm currently married, yes.
20   Q  What's your spouse's name?
21   A  Alex, A-l-e-x, Alexander Gornik,
22   G-o-r-n-i-k, as in Nancy, i-k.
23   Q  And when did you get married?

Page 11

1    A  August 31st, 2018.
2    Q  You're about to come up on the
3    anniversary.  Congratulations.
4    A  Thank you.
5    Q  What's your spouse's occupation?
6    A  Finance for missile defense.
7    Q  Do you have any children?
8    A  No.
9    Q  Are you currently employed?
10   A  Yes.
11   Q  Where?
12   A  Nation Law Firm, N-a-t-i-o-n.
13   Q  What do you do there?
14   A  I am the paralegal.
15   Q  When did you start working there?
16   A  2018.  Approximately March.
17   Q  Was that after you finished your
18   employment with the Sheriff's Department?
19   A  That's correct.
20   Q  Did you work anywhere between the
21   end of your employment with the Sheriff's
22   Office and Nation Law Firm?
23   A  I have had a substitute teaching

Page 12

1    license since approximately 2008, 2009, so
2    I've had that, so I might have subbed
3    during that time.  I can't remember.  But
4    no other than that.
5    Q  Would you have reported that income
6    on your taxes?
7    A  Yes.
8    Q  How did you prepare for this
9    deposition today?
10   A  I prepared with my attorney.
11   Q  Did you review any documents?
12   A  I reviewed a few, yes.
13   Q  What were they?
14   A  My Third Amended Complaint and the
15   EEOC investigator's report.
16   Q  Anything else?
17   A  The documents 74 and 76 motion.
18   That's all I know what it's called.
19   Q  Was that the docket number?
20   A  It was the documents 74 and 76.
21   Q  Okay.
22   MS. RILEY:  According to someone's
23   filing system, which possibly was mine, so

Page 13

1  --
2        THE WITNESS: Okay. I thought that
3  was the technical term.
4        MS. RILEY: It might be the court
5  filing.
6        Q  Do you remember the name of document
7  74?
8        A  No, I do not remember the name.
9        Q  Do you remember the substance of
10  document 74?
11        A  It was -- oh, gosh. It was the
12  compliance information. It was what the
13  Judge had finalized of what would move
14  forward most recently.
15        Q  Okay. And do you remember the
16  substance of document 76?
17        A  The same.
18        Q  Now, I'm not asking about anything
19  you said to your counsel about this case,
20  but have you spoken with anyone else in
21  preparation for your deposition today?
22        A  No.
23        Q  Have you spoken with or signed any

Page 14

1  agreement with reporters?
2        A  No, ma'am.
3        Q  Now, when were you first employed
4  with the Sheriff's Office?
5        A  I started March 1st of 2010.
6        Q  What was that application process
7  like?
8        A  I applied online for -- or I found
9  the position online, and I believe that I
10  applied online and I may have printed it
11  out and brought it up here.
12        Q  What position were you applying for?
13        A  It was called accounting clerk or
14  something that made me think of, like,
15  numbers because I had went to school for
16  accounting, so it was -- I believe it was
17  accounting clerk.
18        Q  And were you working anywhere at the
19  time you applied?
20        A  I was an intern at Huntsville
21  Hospital.
22        Q  Was that paid?
23        A  No, ma'am.

Page 15

1        Q  When did you -- did you graduate
2  from college?
3        A  I did.
4        Q  When was that?
5        A  It was 2008.
6        Q  Would your job with the Sheriff's
7  Office have been your first paid job
8  outside of college?
9        A  Yes, ma'am.
10        Q  How did you hear about the job with
11  the Sheriff's Office?
12        A  I believe I was just searching
13  online.
14        Q  Were you interviewed?
15        A  Yes.
16        Q  Who interviewed you?
17        A  I believe that at the time, Chief
18  Deputy Chris Stevens.
19        Q  Anyone else?
20        A  Not that I remember.
21        Q  Do you remember what they asked you
22  in the interview?
23        A  No.

Page 16

1        Q  And you were offered the position?
2        A  Yes.
3        (Brief interruption.)
4        Q  I think my last question was, you
5  were offered the position?
6        A  Yes.
7        Q  Did you accept?
8        A  I did.
9        Q  And what were your work hours?
10        A  8:00 to 4:00 Monday through Friday.
11        Q  And did that remain consistent
12  during your entire tenure?
13        A  Yes. But I want to make a
14  correction. I ended up having an interview
15  by Sheriff Dorning.
16        Q  Oh, okay.
17        A  Yes.
18        Q  So you were interviewed by Chief
19  Deputy Chris Stevens?
20        A  First, yes.
21        Q  Okay. And then --
22        A  And then maybe a couple days later,
23  a week later, I had an interview by Sheriff

Page 17

```
 1   Dorning.
 2       Q  Okay.  Do you remember anything that
 3   was said during your interview with Sheriff
 4   Dorning?
 5       A  I remember some of the prep, that it
 6   seemed like I was being offered the job and
 7   told about the atmosphere, yes.
 8       Q  Was there anything during that
 9   interview process either with Chief Deputy
10   Stevens or Sheriff Dorning that caused you
11   any concern?
12       A  Yes.
13       Q  What?
14       A  Sheriff Dorning set the atmosphere
15   by saying that it was a men's dominant type
16   of atmosphere and that I was going to
17   probably endure -- or not probably -- I
18   would endure, like, a men's dominant type
19   of atmosphere and to, like, kind of have a
20   hard shell to that.
21       Q  Okay.  So I want to understand
22   exactly what was said.
23       A  Okay.
```

Page 18

```
 1       Q  So he's interviewing you for the
 2   position.
 3       A  It was more of like a follow-up type
 4   of -- like, I had initially been
 5   interviewed, and this was kind of like a
 6   follow up because he was the ultimate
 7   answer to whether or not I could have the
 8   job.
 9       Q  And where did this meeting with
10   Sheriff Dorning take place?
11       A  It was in his office on the second
12   floor of the courthouse.
13       Q  Here at this building?
14       A  Yes.
15       Q  And how long did the meeting last?
16       A  I don't remember.
17       Q  Was it less than 30 minutes?
18       A  It was less than an hour, probably.
19       Q  And so he -- I want to know exactly
20   what he said to the best of your memory
21   about this male-dominant environment.
22       A  He said that men were going to do
23   what they were going to do in the
```

Page 19

```
 1   department and that it was male dominant
 2   and that I was probably going to receive,
 3   like, male-dominant type of interactions
 4   with the deputies and just preparing for
 5   that type of atmosphere.
 6       Q  Did you ask him what he meant by
 7   that?
 8       A  I don't believe I did.
 9       Q  What did you think he meant?
10       A  I knew it to mean that I was going
11   to have to endure things that might be
12   uncomfortable and offensive by the male --
13   the deputies is what I assumed at first.  I
14   didn't -- wasn't familiar with the chain of
15   command and, like, different positions.  I
16   just knew --
17       Q  Just to be specific, what did you
18   think would be done that would make you
19   uncomfortable?
20       A  That I would probably be hit on as,
21   you know, for dates or about my looks or
22   just that type of thing, like, being hit --
23   solicited, if that's the word, for dates or
```

Page 20

```
 1   things like that.
 2       Q  Did he actually say anything like
 3   that to you in the interview?
 4       A  He did not say the dates, no, he did
 5   not.
 6       Q  Did you take any notes of your
 7   interview with him?
 8       A  Not that I remember.
 9       Q  Did you record that conversation?
10       A  No, I did not.
11       Q  Did you relay that conversation with
12   anybody after the meeting?
13       A  Probably so.
14       Q  Who?
15       A  I don't remember.  I mean, it was a
16   decade ago, so -- I mean, I remember the
17   setting of the workplace, and I probably
18   just mentioned it to friends, but I don't
19   know.  I don't know.
20       Q  But sitting here today, you don't
21   remember anyone's name?
22       A  No.
23       Q  Would that be documented in any kind
```

Page 21

1  of text message or writing to your friends?
2  A Not that I can recall.
3  Q Did he offer you a position during
4  that meeting?
5  A Yes.
6  Q Did you accept?
7  A I did.
8  Q So you accepted despite your concern
9  regarding his comments about a
10  male-dominated environment?
11  A I did.
12  Q Why?
13  A I wanted a job.
14  Q Did you ever report his comments to
15  anybody in the Sheriff's Office?
16  A Report it as in, like, tell on him?
17  Q Yes.
18  A No.
19  Q Did you ever report his comments to
20  anyone at Madison County?
21  A No.
22  Q Did you ever report his comments to
23  anyone at Madison County Personnel Board?

Page 22

1  A Not that I remember.
2  Q Well, it's my opportunity to ask you
3  what you know today. Is there anything
4  that would refresh your memory?
5  A No.
6  Q So sitting here today, you don't
7  think you reported his comments to the
8  Madison County Personnel Board?
9  A Correct.
10  Q Okay. Did you start your job
11  shortly after that interview with Sheriff
12  Dorning?
13  A Yes.
14  Q And what were your job duties?
15  A I was hired under the accounting
16  clerk, I believe is what it was, but I
17  think that from a duty standpoint, I was
18  the Chief Deputy's secretary, and I did a
19  lot of pistol permits.
20  Q Okay. Now, I'm going to ask you to
21  explain to me this whole concept of chain
22  of command, so who was in your chain of
23  command when you started your job?

Page 23

1  A The Chief Deputy and the Sheriff.
2  Q Who was the Chief Deputy at that
3  time?
4  A Chris Stevens.
5  Q Okay. So it would have been the
6  Chief Deputy and then the Sheriff?
7  A Yes.
8  Q And did that change over time?
9  A Yes.
10  Q To what?
11  A It changed into the second position
12  I ended up with at this job, and it ended
13  up -- I don't think there was anybody in
14  between. It ended up Kerry Phillips.
15  Q Okay. So was Kerry Phillips'
16  designation Chief Deputy?
17  A He was an interim. I don't think he
18  was the Chief Deputy -- he was not the
19  Chief Deputy at the time. He filled the
20  office at the time. When Chris Stevens
21  stepped down, Kerry Phillips was put in the
22  office. I don't know if his title was
23  changed. I don't think that it was. He

Page 24

1  was a lieutenant, I think, at the time.
2  Q All right. But you reported to him?
3  A Yes.
4  Q And was there anyone above him in
5  the chain of command?
6  A The Sheriff.
7  Q Okay. Well, I'm just going to
8  ask -- you have allegations against
9  Jernigan in the lawsuit.
10  A Yes.
11  Q Did he come into your chain of
12  command at some point?
13  A Yes, he did. When Kerry Phillips
14  was the interim and then, ultimately,
15  Sheriff Dorning chose Jernigan as his new
16  Chief Deputy.
17  Q Okay. So when Sheriff Dorning made
18  that designation, would your chain of
19  command have been Phillips, Jernigan, and
20  then Sheriff Dorning?
21  A Yes.
22  Q Was there anyone else that you
23  reported to during your tenure with the

Page 25

1  Sheriff's Office?
2      A  I don't believe so.
3      Q  Now, I want to get back to your job
4  duties.  You mentioned being a secretary to
5  the Chief Deputy.
6      A  Yes.
7      Q  Or, I guess, to Phillips.
8      A  It was Chris Stevens.
9      Q  First.
10     A  Yes.
11     Q  Okay.
12     A  And then I moved to a different
13  position is when he ended up my supervisor.
14     Q  Okay.  So let's talk about your
15  first position and your job duties for that
16  position.
17     A  Okay.
18     Q  Can you describe them to me?
19     A  95 percent of it was pistol permits.
20  I worked in the Sheriff's actual office on
21  the second floor, so it was myself and his
22  -- and the Sheriff's secretary, and we did
23  pistol permits almost all day.  And so as

Page 26

1  far as being the Chief's assistant, here
2  and there I would maybe do some paperwork
3  for him.  I can't even remember anything
4  specific of it, but file for him.
5  Otherwise, mostly pistol permits.
6      Q  Okay.  So explain to me what one
7  would do if one did a pistol permit.
8      A  Okay.  We would have an application
9  process and they would turn in applications
10  and we would have to send them off for a
11  background check to our Records Department
12  for a background check and it was a process
13  of receiving it back as that the person
14  could or could not get the pistol permit
15  and they would come in and pay us.  We were
16  the only office at the time where you could
17  get a pistol permit in Madison County.
18     Q  So were you the person who
19  interacted with a member of the public?
20     A  Yes.
21     Q  And so you said that was 95 percent
22  of that first position?
23     A  Yes.

Page 27

1      Q  And five percent was what?
2      A  I mean, I would do clerical work,
3  filing, answer the phone.  A lot of -- that
4  was the main phone number for the Sheriff's
5  Department, so we would just get random
6  calls about different things and -- I mean,
7  just clerical, like answer the phone,
8  filing.  It was mostly just pistol permits.
9      Q  What kind of paperwork would you do?
10     A  I can't remember.  I remember typing
11  some things sometimes.  I typed for the
12  Sheriff once to somebody that was a
13  Commissioner at one time, and now he -- Mo
14  Brooks there -- some letter I would type
15  because I typed faster than them to Mo
16  Brooks -- I believe it was Mo Brooks -- and
17  just little stuff like that.  And it was
18  rare for me to do an actual, like, letter
19  or anything.  It was mostly pistol permits.
20     Q  Okay.  Now, you've mentioned two
21  different positions that you held, so let's
22  -- what was the second position?
23     A  The second position was Accountant,

Page 28

1  and I don't recall if it had a number with
2  it at that time.
3      Q  Okay.  And I'm going to ask you the
4  same question.  What were your job duties
5  as accountant?
6      A  So I had the general fund budget of
7  the Sheriff's Department.
8      Q  What does that mean, you had it?
9      A  So there were two of us in
10  Accounting, and one lady had the Sheriff's
11  discretionary fund, so that was a separate
12  type of money situation, and I had the
13  budget that -- I maintained the budget that
14  was given by the Commission to our office.
15     Q  And when you say you maintained it,
16  what kind of things specifically?
17     A  If -- let's say the fleet services
18  needed a new set of tires.  They would send
19  in a request to ask to have money allocated
20  for new tires.  So I would watch the budget
21  money as far as, like, tires or cars or
22  just different lines of money.
23  (Whereupon, an off-the-record discussion was

Page 29

1  held.)
2  Q So let's talk about -- so you
3  maintained the general fund budget. Did
4  you pay invoices?
5  A Yes.
6  Q How would people get invoices to
7  you?
8  A I would often go -- our biggest
9  invoice producer, I guess, is our fleet --
10  or the fleet services of the Sheriff's
11  Department. They were the ones who needed
12  the most. And so I would go pick those up
13  from the fleet services office.
14  Q And once you got the invoice, would
15  it have to be approved before paid?
16  A No. They were approved before the
17  purchase.
18  Q Now, where was your office located
19  at the beginning?
20  A At the beginning, it was in the
21  Sheriff's Office on the second floor.
22  Q Of this building?
23  A Yes.

Page 30

1  Q Okay. And did that change over
2  time?
3  A Yes. In January of 2012 when I
4  received the Accountant position, I was
5  moved to the basement of the courthouse.
6  Q And did that change again over time?
7  A It did.
8  Q Where?
9  A I was then moved back to the second
10  floor in what was previously the Records
11  Department. It was turned to our offices
12  and Civil, their Civil Division.
13  Q Okay. Now, when you first started
14  in the location that you described, who
15  would be located next to you in those
16  offices?
17  A In my first position?
18  Q Yes.
19  A It was myself and Barbara Clardy.
20  That was the Sheriff's -- that was the
21  Sheriff's secretary. We had some part-time
22  workers. They changed in and out. There
23  was a few of those. And one side was the

Page 31

1  Chief, and one side was the Sheriff, but we
2  were in one little pod kind of situation.
3  Q You and Barbara?
4  A Barbara and I were in the open part
5  of the -- when you walked in, we were what
6  the public saw first, me and her, and to
7  the side were two offices coming off of
8  that open area. One was the Chief; one was
9  the Sheriff.
10  Q Okay. And that would be Chief Chris
11  Stevens?
12  A Until he stepped down, yes.
13  Q And the configuration in the
14  basement, what did that look like?
15  A It was no windows and to the far
16  east side, I guess is how you would say it,
17  the east side of the hallway.
18  Q Who was located in proximity to you?
19  A Maintenance was at the far other
20  side and nobody else. There was a lady
21  that worked with me in there.
22  Q Who was that?
23  A At the time, it was Sheila Mooring.

Page 32

1  She may have --
2  Q Anyone else work with you in that
3  location?
4  A She left. I don't know how she
5  left, retired or what it was, and the
6  Sheriff's daughter worked with me.
7  Q Who's the Sheriff's daughter?
8  A Her name is Meghin, and it's
9  M-e-g-h-i-n.
10  Q What is her last name?
11  A At the time, it was actually Cagle
12  like mine, but -- yeah.
13  Q You don't know today?
14  A She's married to Elliff,
15  E-l-l-i-f-f.
16  Q Okay. And then you referenced one
17  more move to a different location.
18  A So I moved back to the second floor.
19  There was a little remodel up there, I
20  guess to make offices, and I moved up
21  there.
22  Q And who was in close proximity
23  there?

Page 33

1    A  It was Meghin -- that Meghin and I,
2  and I say "that Meghin" because there's
3  another one that came in.  That Meghin and
4  I were in one office together at each side
5  of the office.  So it was like an oversized
6  office.  I was in one side, and she was in
7  the other.  And then in a separate office
8  was Kerry Phillips, and then in another
9  separate office was Joe Rice, who was over
10  the Civil Division.
11    Q  What does the Civil Division do?
12    A  They serve papers, civil papers.
13    Q  Now, the first location, how often
14  would deputies visit that location?
15    A  Often.
16    Q  What does "often" mean?
17    A  Several times a week.
18    Q  So several times a week, an
19  individual deputy would come in for some
20  reason or another?
21    A  They would often come by to talk to
22  me.
23    Q  Who was that?

Page 34

1    A  I mean, I would have to have the
2  list almost.  I mean, the one that
3  particularly comes to mind first is Drew
4  Lane.
5    Q  Is he a friend of yours?
6    A  I didn't know him until I started
7  working here.
8    Q  Did he become a friend of yours?
9    A  Semi.
10    Q  Did he ever do anything to make you
11  feel uncomfortable?
12    A  Yes.
13    Q  What?
14    A  He called the office phone after he
15  left and tried to solicit a date and Ms.
16  Barbara, the Sheriff's secretary, overheard
17  it and let his mother know, who also worked
18  for the Sheriff's Department.
19    Q  When did that happen?
20    A  That was probably within the first
21  week or two weeks of my employment.
22    Q  Did you decline his date?
23    A  I did.

Page 35

1    Q  Did he --
2    A  He was married.
3    Q  Did you -- did he make any other
4  solicitation to you?
5    A  No.  He made a comment about not
6  liking how that was handled, but no.
7    Q  Did you report his conduct to anyone
8  at the Sheriff's Office?
9    A  Just Ms. Barbara.
10    Q  Did you report his conduct to anyone
11  at Madison County?
12    A  No.
13    Q  Did you report his comment to anyone
14  at the Madison County Personnel Board?
15    A  No.
16    Q  And what would they come into that
17  office to do?  What were they there for?
18    A  If they were in the courthouse for
19  other reasons, they would just stop by.
20    Q  You said several times a week?
21    A  Uh-huh.
22    Q  Do you think you saw deputies five
23  days a week?

Page 36

1    A  Yes.
2    Q  Okay.  Now, when you went to the
3  second location in the basement --
4    A  Yes.
5    Q  -- how often would deputies come
6  there for business or other reasons?
7    A  More than they did when I was in the
8  Sheriff's Office because the Sheriff was
9  sort of a deterrent to them at that time.
10    Q  And did they have any business when
11  they visited the basement?
12    A  Sometimes.
13    Q  What would that business have been?
14    A  Talk to Sheila about money to go to
15  a training school or something.  Something
16  money related.  Maybe a pay question.  I
17  did the payroll as well.
18    Q  So that was an official business
19  purpose for them?
20    A  I think often the question didn't --
21  wasn't something that somebody would stop
22  by that -- so, I mean, yes.
23    Q  So they'd stop by to socialize with

Page 37

1    you?
2        A  Yes, they did.
3        Q  Did anyone make you feel
4    uncomfortable?
5        A  Yes.
6        Q  Who?
7        A  They all did to the point -- well,
8    to the point of that the policy became that
9    the door be locked.
10       Q  Who made that policy?
11       A  To my knowledge, Sheriff Dorning.
12   It could have been the Chief Deputy.  I'm
13   not really sure.
14       Q  And why was that policy made?
15       A  So that they couldn't just come in
16   and out.  They would have to call first.
17       Q  Did you request that that door be
18   locked?
19       A  I did not.
20       Q  Who did?
21       A  I do not know.
22       Q  When did the door get to be locked
23   as a policy?

Page 38

1        A  Probably -- I don't know.
2        Q  What's your best guess?
3        A  Maybe a year into -- maybe six
4    months to a year into being in that
5    location.
6        Q  In the basement?
7        A  That's correct.
8        Q  So it wasn't locked due to anything
9    that you complained about?
10       A  I mean, I did complain.  It wasn't
11   to the Sheriff's -- I mean, well, he's
12   actually the current Sheriff now is who I
13   -- yes and no.
14       Q  Tell me what you mean.
15       A  I complained about one particular
16   person that did not -- does not work for
17   the Sheriff's Department.  He did and now
18   he does not and didn't at the time that he
19   was coming down there.  So his boss was
20   Kevin Turner, who is now the Sheriff.
21       Q  Who are you talking about
22   specifically?
23       A  Jermaine Nettles.

Page 39

1        Q  He was not an employee of the
2    Sheriff's Department?
3        A  He was initially, and then he took a
4    job for the DA's office.
5        Q  Did he have any business coming to
6    the basement, official business?
7        A  No.
8        Q  And I'm sorry.  What was his name
9    again?
10       A  Jermaine, J-e-r-m-a-i-n-e, Nettles.
11       Q  What did he do that made you
12   uncomfortable?
13       A  He would solicit dates and talk
14   about different, like, bars and locations
15   that -- and he would lick his lips a lot.
16       Q  Did you ever -- other than Kevin
17   Turner, did you report him to anybody at
18   the Sheriff's Office?
19       A  I believe I reported him to Chief
20   Stevens.
21       Q  When was that?
22       A  I don't -- when it happened is what
23   I would know.  I don't know the timeframe.

Page 40

1        Q  How many times do you think he
2    solicited you for dates?
3        A  Five to ten.
4        Q  How many times did he lick his lips?
5        A  Constantly.
6        Q  Did you think that was directed
7    towards you?
8        A  Yes.
9        Q  Could it have been a tick he had?
10       A  No.  I've seen him outside of that
11   office.
12       Q  How many times did he invite you for
13   drinks or do other things to make you
14   uncomfortable?
15       A  Every visit.
16       Q  How often was that?
17       A  I answered that.  Five to ten times
18   that he stopped by.
19       Q  And what period of time are we
20   talking about?  Just when you were in the
21   basement?
22       A  Yes.
23       Q  How long were you in the basement?

Page 41

1     A  I don't recall.
2     Q  Do you think it was more than a
3  year?  You mentioned a period of six months
4  to a year?
5     A  Yeah.  I'm thinking it was probably
6  a year -- a year or two years.
7     Q  And you said you reported him to
8  Chief Stevens?
9     A  Yes.
10    Q  How did you report him?
11    A  I just told him that Nettles made me
12  feel uncomfortable when he would stop by.
13    Q  What did you say precisely about why
14  he made you uncomfortable?
15    A  I said that he would solicit dates
16  or try to hit on me, ask me for dates to go
17  to a strip club called Boomers.  I mean, he
18  would tell me how I looked or how he felt
19  like I looked, I guess, and that is what I
20  told Chief Stevens.
21    Q  And what was Chief Stevens'
22  response?
23    A  He told me that he talked to Kevin

Page 42

1  Turner about that.
2     Q  Do you have any reason to doubt that
3  he did talk to Kevin Turner?
4     A  No.
5     Q  After he told you that, did the
6  conduct from Jermaine cease?
7     A  It did, coupled with the door being
8  locked.
9     Q  So that resolved your issue of
10  feeling uncomfortable with Jermaine?
11    A  With him, yes.
12    Q  Anyone else make you feel
13  uncomfortable during your time in the
14  basement?
15    A  I mean, I was in a room with no exit
16  except one door and no windows, so I felt
17  uncomfortable often.
18    Q  Well, it's my opportunity to kind of
19  ask you who was --
20    A  And that's fine.  I'm just telling
21  you the answer.
22    Q  -- who was making you uncomfortable.
23    A  I mean, the deputies would stop by,

Page 43

1  so male deputies.
2     Q  Which ones particularly?  We talked
3  about Jermaine.  He wasn't a deputy at that
4  time.  Who else?
5     A  (No response.)
6     Q  If you need to take a break, you're
7  welcome to.
8     MS. RILEY:  Give us a second.
9     (Whereupon, a break was taken.)
10    Q  What was my last question?
11    (QUESTION READ BY REPORTER)
12    A  I can't name specific names.  I'm
13  very -- I haven't been back to this
14  courthouse except once since I left, and
15  I'm just having, like, some major PTSD, so
16  I will figure out the individual names.
17    Q  Well, what would allow you to do
18  that, Ms. Cagle?
19    A  I mean, a list of the deputies at
20  that time.
21    Q  But as you're sitting here today,
22  you don't remember anybody else in the
23  basement who made you feel uncomfortable?

Page 44

1     A  They came so often, and there are at
2  least -- there's over 100 deputies, there's
3  over 400 detention officers, so it's -- I'm
4  drawing a blank on the names.
5     Q  All right.  So I just want to be
6  clear, though.  Sitting here today at the
7  deposition in your litigation, you don't
8  remember the name of a single other deputy
9  who made you feel uncomfortable when your
10  office was located in the basement?
11    A  Okay.  That's correct.
12    Q  All right.  Then you mentioned a
13  move to a different location.
14    A  Yes.
15    Q  And that was on what floor?  Please
16  remind me.
17    A  The second floor.
18    Q  Okay.  And what reason would
19  deputies have to go in and out that
20  location?
21    A  The Civil Division was in there, and
22  there were deputies assigned to the Civil
23  Division in the courthouse.  Also that fell

Page 45

1    under that were the courthouse deputies
2    that would be assigned to the courthouse
3    and the courthouse security.
4       Q  So what business would they have in
5    that location?
6       A  Their supervisor.
7       Q  So they would come to see their
8    supervisor for one reason or another?
9       A  They could, yes.
10      Q  And how often would they be in and
11   out that location?
12      A  Multiple times a day all day.
13      Q  And remind me, at that time, this is
14   when Phillips sat in proximity to you?
15      A  Yes, ma'am.
16      Q  Okay.  And who else was there?
17      A  There was a sergeant.  I named it
18   earlier.
19      Q  Joe Rice?
20      A  Yes, Joe Rice.  Sorry.
21      Q  All right.  And then there was
22   another -- was there another woman?
23      A  That was with me, it was -- it was

Page 46

1    initially Meghin Dorning.
2       Q  And did that change over time, the
3    woman you're talking about?
4       A  Yes.
5       Q  And who did it change to?
6       A  Megan -- I can't remember her last
7    name.
8       Q  And what was her role?
9       A  She took Meghin Dorning's spot over
10   the discretionary funds.
11      Q  Okay.  I want to go back for a
12   minute to your meeting with the Sheriff
13   that you testified to earlier.
14      A  Yes.
15      Q  Was there anyone else present during
16   that conversation?
17      A  I believe the Chief Deputy was in
18   there for some -- some of the time.  I
19   don't recall if it was all of the time.
20      Q  Was anyone else there?
21      A  Not that I recall.
22      Q  Okay.  So did you have any other
23   locations during your tenure with the

Page 47

1    Sheriff's Office?
2       A  No.
3       Q  Now, in terms of your duties, did
4    you ever arrange escorts for funerals?
5       A  Yes.
6       Q  Can you tell me when that started?
7       A  It started -- it started when I was
8    in my first location here, so 2010 when I
9    -- I got it pretty quickly on when I got
10   hired.
11      Q  And who gave you that task to
12   fulfill?
13      A  I don't recall who -- how I ended up
14   with that.  It was somebody else's
15   responsibility first, and it got to me.  I
16   don't know how.
17      Q  So you don't remember if Chief
18   Stevens came to you and said, hey, Ms.
19   Cagle, you need to do this?
20      A  I don't -- I don't recall, no.
21      Q  Okay.  But you think it occurred
22   shortly after you were employed?
23      A  I think so, yes.

Page 48

1       Q  Okay.  And what does it involve,
2    arranging an escort?
3       A  It was all of the part-time jobs, so
4    anything that a deputy was requested to do
5    outside of his normal deputy
6    responsibilities.  So it was funeral
7    escorts, or sometimes they would go to a --
8    like, a woman's house that just recently
9    divorced, if they were splitting up, and
10   they would just sit outside to make sure
11   the split of property between the two would
12   be -- would go, I guess, civilly.  I mean,
13   it was to work birthday parties, weddings,
14   anything that somebody wanted a security
15   person there that was approved by the
16   Department.  So it would -- the way that I
17   took it on -- I wasn't given much direction
18   at all.  I don't remember any direction
19   being given on how to do it, but I used my
20   cell phone to send it as text messages so
21   that I would have an answer back from the
22   deputy or whoever I initiated the -- like,
23   can you do this escort.  If they would

Page 49

1   respond to me, I would have it in writing
2   so that if they didn't show up or
3   something, I would have it like that.  So I
4   did those by text message.
5       Q  Okay.  How did you know what the
6   jobs were?
7       A  So a funeral home, for instance,
8   would call me and say we have a funeral on
9   Saturday that starts at 3:00.  We need four
10  -- I think four deputies were required, so
11  we need deputies is what they would say, to
12  come about 3:30 when the funeral would end,
13  and they would take them from the funeral
14  home to the burial plot.
15      Q  How did they know to call you?
16      A  I think eventually, it came to --
17  whoever had it before me, I think they were
18  probably still calling -- I think it might
19  have been the Records Department that had
20  it before me, and it ended up they started
21  filing them over to me, transferring them
22  over to me.
23      Q  How did you decide who to select to

Page 50

1   do the job?
2       A  There were only some people signed
3   up to do it.  You didn't have to be on the
4   list.  I remember being given a three-ring
5   binder.  I don't -- I think it had the list
6   of the ones who wanted to be asked to be --
7   to do those jobs, and I would have to go
8   down the list.  Some say that they didn't
9   want to do escorts because it was paid less
10  than other jobs, so I knew who -- I had to
11  get used to who would do escorts, who would
12  not, who would do weddings, who would not.
13  It was just a -- I had to make it my own,
14  kind of.
15      Q  So deputies could sign up to be
16  considered for these extra jobs?
17      A  Yes, ma'am.
18      Q  And how did you make sure it was
19  allocated fairly?
20      A  I just had to go down a list.  At
21  first, there wasn't a real way to decide.
22  I just had to go down the list as best I
23  could what I was given.  And the system was

Page 51

1   changed when Kerry Phillips became my boss.
2       Q  How did it change?
3       A  I believe he sent out new sign-up
4   sheets for the deputies and gave them maybe
5   a week or so to sign and get them back over
6   to us, and we would go -- we tried to
7   maintain going down a list.
8       Q  So did you ever set up an escort for
9   the funeral or any secondary job after your
10  work hours?
11      A  Yes.
12      Q  So that would be after 4:00 o'clock
13  Monday through Friday?
14      A  Yes.
15      Q  How often did you do that during
16  your tenure?
17      A  Probably five times a week.
18      Q  So five times a week, you would get
19  a request after 4:00 o'clock Monday through
20  Friday?
21      A  Approximately, yes.  It was a very,
22  very active responsibility.
23      Q  And, I mean, did you always keep a

Page 52

1   list with you about who to ask?  How did
2   you do that after hours?
3       A  Well, I had pictures of the list.  I
4   had to take screenshots of the list.  But I
5   did the best that I could.  I mean, I can't
6   say that it stayed, you know, on the thing.
7   He tried to keep it on target, I tried to
8   keep it on target.  Sometimes people
9   wouldn't respond to my text message, and
10  I'd just have to move on.  I mean, it just
11  -- there was no clean cut way, really.
12      Q  Did anyone ever complain that you
13  weren't allocating the jobs fairly?
14      A  Not to me.
15      Q  Anyone -- well --
16      A  Maybe to Kerry Phillips.  I'm not
17  really sure.
18      Q  Okay.  Do you know who that would
19  have been?
20      A  No, ma'am.
21      Q  Okay.  Were you compensated for that
22  work?
23      A  That's a hard question to answer.

Page 53

1    Q  What do you mean?
2    A  I started doing those without
3    compensation, yes.
4    Q  So you weren't paid anything
5    additional to take these phone calls after
6    hours or take these text messages after
7    hours?
8    A  Not until I was -- I mean, this may
9    not even be considered as compensation, but
10   eventually, they paid for my phone bill for
11   a plot of time in the middle of my
12   employment.
13   Q  Okay.  So that didn't start at the
14   beginning, paying for your phone bill?
15   A  No.
16   Q  So these text messages that you
17   would receive for escorts or other security
18   arrangements, they were sent to your
19   personal cell phone?
20   A  Yes.
21   Q  Was that just listed on a list of
22   contacts with the Sheriff's Office?
23   A  My cell phone?

Page 54

1    Q  Yes.
2    A  I'm sorry.  I don't understand.
3    Q  Well, I'm trying to figure out,
4    like, do you have a list of everybody's
5    cell phone number in the --
6    A  I ended up almost with every single
7    deputy's phone number for -- especially the
8    ones that were signed up for part-time
9    jobs.
10   Q  Okay.  So in your personal -- this
11   is your personal cell phone at the
12   beginning?
13   A  Yes, ma'am.
14   Q  And you're taking on this function
15   of escorts and secondary jobs?
16   A  Uh-huh.
17   Q  But did you also have personal
18   conversations on that cell phone?
19   A  Yes.
20   Q  Okay.  Now, you said at some point,
21   your cell phone got paid for.  Can you
22   explain to me what happened?
23   A  When I moved down to the Accounting

Page 55

1    position in 2012, it was recommended by the
2    lady I worked with at the time, Sheila, why
3    don't you -- why isn't your cell phone paid
4    while you're doing those jobs or whatever,
5    and I don't recall if I asked or she asked,
6    but it was approved for it to be paid for
7    by the Department.
8    Q  So you don't remember who asked?
9    A  No.  She probably mentioned it to
10   the Chief or the Sheriff.
11   Q  And did they -- was the entire cost
12   of your cell phone service paid?
13   A  Yes, ma'am.
14   Q  So that would have included -- I'm
15   just going to -- would it include minutes
16   to talk?
17   A  They had -- to my understanding, it
18   was some kind of unlimited plan.  I don't
19   know the details of it.
20   Q  All right.  So you had minutes,
21   texts, and data?
22   A  Yes, I did.  It was on the plan of
23   all of the work phones, not just mine by

Page 56

1    itself.
2    Q  Okay.  But you kept the cell phone
3    that you had purchased personally?
4    MS. RILEY:  You're not
5    communicating.  I hate to interrupt, but --
6    Q  Well, are you having trouble
7    answering that question?
8    A  I don't understand that question.
9    Q  Okay.  Was it your personal cell
10   phone that was paid for by the Sheriff's
11   Office?
12   A  Yes.  I -- it was my cell phone and
13   my number.
14   Q  Okay.  So your number didn't change?
15   A  No, ma'am.
16   Q  And the cell phone didn't change?
17   A  No.
18   Q  The only thing that changed --
19   A  I upgraded my cell phone, so I don't
20   know if you're saying, like, did my actual
21   phone change as I upgraded.
22   Q  Well, let me ask it this way:  Did
23   the Sheriff's Office issue you a cell

Page 57

1  phone?
2      A No.
3      Q Okay. Did they ever issue you a
4  cell phone?
5      A No.
6      Q Now, do you remember about what time
7  that payment started being made by the
8  Sheriff's Office?
9      A I answered that in some of my
10  interrogatories, if I -- if you wanted me
11  to look at that.
12      Q Do you remember sitting here today?
13      A No.
14      Q All right. Do you know if the
15  Sheriff's Office had paid for any other
16  employee's personal cell phone service?
17      A I do not know.
18      Q Is it your understanding that
19  deputies got issued a cell phone from the
20  Sheriff's Office?
21      A Yes.
22      Q And were cell phones also issued to
23  certain upper-level staff, the Chief

Page 58

1  Deputy, Sergeants?
2      A I don't know about issued. I know
3  they had cell phones paid for, yes.
4      Q But you don't know if those cell
5  phones were the property of the Sheriff's
6  Office or if it was a situation like yours?
7      A Correct, I don't know.
8      Q Now, the time you worked for the
9  Sheriff's Office, who did you consider your
10  employer to be?
11      A I considered it to be the Madison
12  County Commission and Madison County
13  Sheriff's Office.
14      Q Do you mean both?
15      A Both.
16      Q Who was in your chain of command
17  that worked for Madison County?
18      A In my chain of command?
19      Q Yes.
20      A Chain of command, nobody. I mean,
21  Personnel Department was at the top of my
22  chain of command.
23      Q Do you mean you reported to them?

Page 59

1      A I have, yes.
2      Q In what context?
3      A I reported to them about incidents
4  of the Department.
5      Q Like what?
6      A I reported to them regarding the Tim
7  Clark incident.
8      Q Anything else that you reported to
9  them?
10      A I had to speak to their department
11  often for my particular job
12  responsibilities, yes.
13      Q What do you mean specifically?
14      A If I had to open a new slot for our
15  Department, I had to ask Personnel to
16  approve that opening and I had to ask other
17  employees of the Commission for permission
18  and money allocation for those positions.
19      Q Can you give me an example of that?
20      A If one deputy leaves or retires, it
21  opens up a slot. The slot is numbered and
22  named by the Personnel Department and the
23  Commission. So I would file paperwork that

Page 60

1  was provided and required by the Commission
2  and Personnel saying we had this deputy
3  leave, I would like for this spot to be
4  open on your website for hiring, or before
5  the website, it was just the slot open.
6      Q Okay. Anything else in terms of
7  reporting to Madison County or the
8  Personnel Board?
9      A If I had a check problem, they made
10  my check, so any kind of payroll issue of
11  myself or anybody in the Department, I had
12  to report that to the Commission.
13      Q Anything else?
14      A I'm sure there is, but I can't think
15  of it at the moment.
16      Q Would anything refresh your memory?
17      A Maybe along the way.
18      Q But sitting here right now, you
19  don't remember anything else?
20      A A lot -- my job consisted more with
21  dealing with Personnel and the Commission
22  than necessarily asking Sheriff Dorning.
23      Q Okay. Well, you've described two

| Page 61 |
|---|

1  specific examples. Do you have any other
2  ways in which you --
3      A  Well, there was constant turnover in
4  hiring, so I was constantly asking -- every
5  position. A dispatcher, a deputy, a
6  records clerk. If we promoted somebody, it
7  went through Personnel and the Commission.
8  If we wanted more money or needed more
9  money or needed money moved from what they
10  called one line -- like, might been a line
11  for tires and this line is for gas and I
12  had more money in gas than I did in tires,
13  I would have to ask them to move that money
14  for me.
15      Q  Ask who?
16      A  I would have to ask the Commission
17  for that particular. Any payroll questions
18  went through them. Hiring. I talked to
19  them at least every single day of my -- of
20  that second position.
21      Q  And that second position, was that a
22  promotion for you?
23      A  I got a raise, yes.

| Page 62 |
|---|

1      Q  Okay.
2      A  Yes.
3      Q  Now, as an employee of the Sheriff's
4  Office, was it your obligation to comply
5  with all the office's policies and
6  procedures?
7      A  To my -- yes.
8      Q  And did you also have to comply with
9  the Madison County Employee Handbook?
10      A  Yes.
11  (Whereupon, Defendant's Exhibit No. 1 was
12  marked for identification and the same is
13  attached hereto.)
14      Q  Ms. Cagle, can you identify Exhibit
15  1?
16      A  Employee Acknowledgement Form.
17      Q  And what name is printed at the
18  bottom?
19      A  It is my name and the Personnel
20  worker, Pam Flory.
21      Q  Okay. Well, let me just ask, first
22  your name is printed, isn't it?
23      A  Oh, I'm sorry. Yes, my name is

| Page 63 |
|---|

1  printed.
2      Q  And whose signature is in the
3  employee line there?
4      A  That is my signature.
5      Q  And what's the date?
6      A  3/11/10.
7      Q  Okay. And I'm going to direct your
8  attention to the last paragraph of this
9  form. I'm going to read it into the
10  record. "I have received the Handbook, and
11  I understand that it is my responsibility
12  to read and comply with the policies
13  contained in this Handbook and any
14  revisions that may be made to it."
15      Now, is that what you were agreeing
16  with when you signed this from?
17      A  Yes, ma'am.
18  (Whereupon, Defendant's Exhibit No. 2 was
19  marked for identification and the same is
20  attached hereto.)
21      Q  Okay. And what is Exhibit 2 in
22  front of you, Ms. Cagle?
23      A  It reads the same, "Employment

| Page 64 |
|---|

1  Acknowledgement Form."
2      Q  Okay. And whose employee name is
3  printed at the bottom?
4      A  That is my name.
5      Q  And who is the signature?
6      A  That's my signature.
7      Q  What is the date of the document?
8      A  7/21 of 2015.
9      Q  And who is the witness on this
10  document?
11      A  That is Kerry Phillips.
12      Q  And I'm going to direct your
13  attention again to that last paragraph. It
14  says, "I have received the Handbook, and I
15  understand that it is my responsibility to
16  read and comply with the policies contained
17  in this Handbook and any revisions that may
18  be made to it."
19      So in signing to this
20  acknowledgement, were you agreeing with
21  that statement?
22      A  Yes, ma'am.
23  (Whereupon, Defendant's Exhibit No. 3 was

Page 65

1    marked for identification and the same is
2    attached hereto.)
3       Q  Okay.  And, Ms. Cagle, I'm going to
4    ask you to identify document -- or Exhibit
5    3.
6       A  Employee Acknowledgement Form.
7       Q  And whose employee name is printed
8    at the bottom?
9       A  That is my name.
10      Q  Is that your signature at the
11   bottom?
12      A  Yes, ma'am.
13      Q  Who's the witness on this document?
14      A  It's Kerry Phillips.
15      Q  And what's the date of this
16   document?
17      A  2/9/2017.
18      Q  And that last paragraph, I'm going
19   to read it again into the record.  "I have
20   received the Handbook, and I understand
21   that it is my responsibility to read and
22   comply with the policies contained in this
23   Handbook and any revisions that may be made

Page 66

1    to it."
2          So in signing this document, were
3    you agreeing with that statement?
4       A  Yes.
5       Q  Now, did you ever receive any
6    training during your tenure with the
7    Sheriff's Office?
8       A  I received training from the -- from
9    Personnel when I first got hired, and I
10   received training from the Commission.
11   None -- I went on one training trip for the
12   Sheriff's Department, yes, that I can
13   recall.
14      Q  Okay.  So I'm going to just ask you
15   to be a little more specific.  Did you ever
16   receive any training on sexual harassment?
17      A  No.
18   (Whereupon, Defendant's Exhibit No. 4 was
19   marked for identification and the same is
20   attached hereto.)
21      Q  Ms. Cagle, can you identify this
22   document marked as Defendant's 4?
23      A  New Employee Counseling

Page 67

1    Acknowledgement.
2       Q  And I want to direct your attention
3    to the middle of the page, and I'm going to
4    just read it to you.  "I have received a
5    copy of the Madison County Sexual
6    Harassment Policy."  Do you see that?
7       A  Yes, ma'am.
8       Q  And whose initials follow that
9    statement?
10      A  Those are mine.
11      Q  And is that your name printed at the
12   bottom?
13      A  Yes, ma'am.
14      Q  And is that your signature at the
15   bottom of this page?
16      A  Yes, ma'am.
17      Q  What's the date of this document?
18      A  3/11/2010.
19   (Whereupon, Defendant's Exhibit No. 5 was
20   marked for identification and the same is
21   attached hereto.)
22      Q  Ms. Cagle, I'm handing you what's
23   been marked as Exhibit 5, and I'd just like

Page 68

1    for you to take a minute and look at at
2    least the first page of this document.  I'm
3    going to ask you about that first.  And at
4    the top of that page, it says, "This is to
5    certify that the employee listed below
6    attended and completed the Madison County
7    Sheriff's Department Harassment Training."
8    Do you see that statement?
9       A  Yes, ma'am.
10      Q  And whose name is printed below that
11   statement?
12      A  That is my name.
13      Q  And is that your signature?
14      A  It is.
15      Q  And then there's a line for date
16   training was completed.  What date is on
17   there?
18      A  7/13/2016.
19      Q  Would that refresh your memory about
20   any training that you received?
21      A  I remember this sheet.
22      Q  Do you have any reason to question
23   that you signed this sheet after you

Page 69

1    actually completed training?
2        A  Ask me that question again.
3        Q  Okay.  Do you have any reason to
4    question that your signature was actually
5    affirming that you had received training on
6    harassment?
7        A  I signed this sheet.
8        Q  Are you saying that you did not
9    receive any training on sexual harassment
10   at the Sheriff's Office?
11       A  That's correct.
12       Q  Not at all?
13       A  No, I did not.
14       Q  So your statement here that you're
15   certifying is actually a lie?
16       A  I was asked to sign it.
17       Q  By whom?
18       A  Kerry Phillips.
19       Q  And did you note for him that you,
20   in fact, did not receive any training?
21       A  Yes, I did.
22       Q  What was his response?
23       A  I believe he needed to turn -- I

Page 70

1    don't remember his response.
2        Q  Okay.  And so would that have
3    happened the date you signed this document,
4    your conversation with Mr. Phillips?
5        A  Yes.
6        Q  Do you remember where you were when
7    you had that conversation?
8        A  One of our offices, mine or his.
9        Q  Would this be when you were on the
10   second floor of this building?
11       A  Yes, ma'am.
12       Q  Did he just approach you and hand
13   you the form?
14       A  I don't recall if that's how it
15   happened.  I just -- he would often leave
16   stuff on my desk to sign.  I don't know if
17   this was -- if he called me in his office
18   to sign or -- I don't remember the
19   logistics.
20       Q  Do you remember any portion of the
21   conversation you had with him?
22       A  I remember telling him that I would
23   sign it, yes, but I did not have the

Page 71

1    training.
2        Q  And why would you sign something
3    certifying you had training that you, in
4    fact, did not have?
5        A  He needed to turn this sheet in.
6        Q  Do you know if any training actually
7    took place at the Sheriff's Office?
8        A  I do not know.
9        Q  Do you know if anyone else received
10   this training?
11       A  I don't know.
12       Q  Okay.  Let's look at the second page
13   of this document.
14       A  Okay.
15       Q  What is the title of that page up
16   there on the second --
17       A  Acknowledgement of Process for
18   Reporting Harassment.
19       Q  Okay.  And I'm going to direct your
20   attention to the bottom.  Whose name is
21   that in print?
22       A  That is my name.
23       Q  And whose signature?

Page 72

1        A  It is my signature.
2        Q  And what's the date of that page?
3        A  7/13/2016.
4        Q  And I'm going to direct your
5    attention to the second paragraph of that
6    page.  Does that inform you as an employee
7    to whom you should report issues of sexual
8    harassment?
9        A  The second paragraph starting with
10   "Anyone who believes"?
11       Q  Yes, ma'am.
12       A  I'll have to read it.  So yes, to
13   talk to Personnel.
14       Q  Who else?
15       A  Pam Flory.  I've talked to Jermie
16   and Pam Flory.  Kevin Jones, I don't know
17   that I've -- I mean, I've talked to him,
18   but probably not about that.  So yes, I'm
19   aware of that.
20       Q  So is the purpose of this to tell
21   employees to whom they should report sexual
22   harassment?
23       MS. RILEY:  Object to the form.

Page 73

1    Q  You can still answer.
2    A  Ask me the question again.  I'm
3  sorry.
4    Q  Well, let me say it this way:  In
5  reading this paragraph, does it inform you
6  as an employee to whom to report instances
7  of sexual harassment?
8    A  Yes.
9    Q  And I wanted to direct your
10  attention to the last paragraph at the
11  bottom, if you'd just read that to
12  yourself.  Now, that reads, "There is no
13  chain of command when it comes to reporting
14  harassment of any kind.  Employees are not
15  obligated to notify their direct supervisor
16  before contacting the County Administrator
17  or the Personnel Director to file a claim
18  of harassment."
19    Does that -- would that have
20  informed you as an employee that you were
21  not obligated to go to your direct
22  supervisor first to report sexual
23  harassment?

Page 74

1    A  Yes.
2    Q  In fact, there was no chain of
3  command when it came to reporting sexual
4  harassment?
5    A  I see the paragraph, and I can read
6  that, yes.
7    Q  Okay.  And by signing it, did you
8  understand that process in July of 2016?
9    A  I understood what I read and signed,
10  yes, ma'am.
11  (Whereupon, Defendant's Exhibit No. 6 was
12  marked for identification and the same is
13  attached hereto.)
14    Q  Okay.  I'm going to represent to
15  you, Ms. Cagle, just for purposes of
16  brevity, I have excerpted this document to
17  deal just with the provisions dealing with
18  sexual harassment, so we're going to talk
19  about this.  What is the title of Exhibit
20  6?
21    A  Madison County, Alabama Employee
22  Handbook of Rules, Policies and Procedures.
23    Q  What's the date of this document?

Page 75

1    A  That it was adopted on February 2nd,
2  2006.
3    Q  Okay.  And I want to direct your
4  attention -- and I'm going to refer, if you
5  look on the bottom right of this document,
6  do you see that Defendants number there?
7    A  Yes.
8    Q  Just so everybody's clear and the
9  record's clear, that's the page number I'm
10  going to refer to, okay?
11    A  Okay.
12    Q  So if you would refer your attention
13  to Defendants 584, and you see there "703,
14  Sexual and Other Unlawful Harassment"?
15    A  Yes.
16    Q  And then I'm going to direct your
17  attention to the following page, Defendants
18  585, last paragraph.  Can you read that
19  last paragraph and tell me to whom
20  employees were directed to report issues of
21  sexual harassment?
22    A  Do you want me to read it out loud
23  or to myself?

Page 76

1    Q  Just answer that question as to whom
2  they were expected to report sexual
3  harassment.
4    A  Okay.  The then Personnel Director,
5  the then Administrator.
6    Q  What were their names?
7    A  Felicia McDonald and Howard Baites.
8    Q  And if for any reason those people
9  could not accept the complaint or the
10  employee couldn't talk to them, were there
11  other people identified to whom sexual
12  harassment complaints could be directed?
13    A  If those two were not available, it
14  says that the Commission Chairman at the
15  time, Mike Gillespie, or one of the
16  Commissioners, Faye Dyer, could be
17  contacted.
18    Q  Did you ever contact any of these
19  people about any concerns you had?
20    A  I think they might have -- no.  They
21  didn't work here -- they might have worked
22  here when I first started.  I'm not really
23  sure, but.

## Page 77

1    Q Okay. And I want to direct your
2  attention to the sentence that begins after
3  the mention of Commissioner Faye Dyer. Can
4  you find that, please?
5    A Yes, ma'am.
6    Q Okay. It says, "Employees who
7  believe that he or she is being sexually
8  harassed will be requested to make a signed
9  written statement of allegations." Do you
10 see that?
11   A Yes.
12   Q So in signing the acknowledgement
13 that we talked about earlier, Exhibit 1,
14 were you acknowledging that you had read
15 and you were willing to abide by this
16 policy that we've discussed here?
17   MS. RILEY: Object to the form.
18   A Yes.
19 (Whereupon, an off-the-record discussion was
20 held.)
21 (Whereupon, Defendant's Exhibit No. 7 was
22 marked for identification and the same is
23 attached hereto.)

## Page 78

1    Q And I'm going to represent to you
2  again that I've excerpted this document to
3  include those provisions related to sexual
4  harassment or equal employment.
5    A Okay.
6    Q Can you tell me the title of Exhibit
7  7?
8    A It is Madison County Employee
9  Handbook Adopted by the Madison County
10 Personnel Board on June 11th, 2015.
11   Q And was that during your employment
12 with the Sheriff's Office?
13   A Yes, ma'am.
14   Q Okay. Now, I'm going to direct your
15 attention again to that number at the
16 bottom right that's Cagle 913 -- or
17 actually, it begins on 912. I apologize.
18   If you look at that last paragraph
19 on 912, and we're going to go into the top
20 of 913, just take a minute, and my question
21 is going to be similar to the last one.
22 Does this document direct employees to whom
23 to make complaints of sexual harassment?

## Page 79

1    A Yes. So it first lists the
2  Personnel Director, Jermie Howell, the
3  Deputy Personnel Director, Pam Flory, and
4  then the County Administrator, Kevin Jones.
5    Q Okay. And if for some reason that
6  person is unable to report to those
7  individuals, are there alternatives
8  identified?
9    A Yes. Madison County Commission
10 Chairman, Dale Strong.
11   Q And I'm going to direct your
12 attention to the sentence right after
13 Chairman Dale Strong is identified, and I'm
14 going to read it into the record.
15 "Employees who believe that he or she is
16 being sexually harassed will be requested
17 to make a signed written statement of the
18 allegations." Do you see that?
19   A Yes, ma'am.
20   Q So in signing the acknowledgement
21 identified in Exhibit 2, were you
22 acknowledging to abide by and comply with
23 the policies and procedures identified in

## Page 80

1  Exhibit 7?
2    A Yes.
3    MS. RILEY: Object to the form.
4    A Yes.
5  (Whereupon, Defendant's Exhibit No. 8 was
6  marked for identification and the same is
7  attached hereto.)
8    Q Okay. And I'm going to again
9  represent to you, Ms. Cagle, that I've
10 excerpted this document just to deal with
11 issues related to sexual harassment.
12 What's the title of Exhibit 8?
13   A "Madison County Employee Handbook
14 Adopted by the Madison County Personnel
15 Board on December 15th, 2016."
16   Q And was that during your tenure with
17 the Sheriff's Office?
18   A Yes, ma'am.
19   Q Okay. I'm going to direct your
20 attention to Defendants 668, and we're
21 going to look at that top paragraph there.
22   A Okay.
23   Q And does this portion of the

Page 81

1    handbook inform employees to whom to report
2    issues of sexual harassment?
3        A  Yes, it does.
4        Q  Who does it identify?
5        A  Personnel Director, Jennie Howell,
6    Deputy Personnel Director, Pam Flory, or
7    County Administrator, Kevin Jones.
8        Q  And that sentence following Kevin
9    Jones, does it also make clear to an
10   employee that there's no chain of command
11   for reporting harassment activity?
12       A  Yes.
13       Q  And I'm going to just look at that
14   next sentence and read it into the record.
15   "Employees who believe that he or she is
16   being sexually harassed will be requested
17   to make a signed written statement of the
18   allegations."  And I'm going to ask you if
19   the acknowledgement that you signed in
20   Exhibit 3 means that you agreed to abide by
21   these policies as demonstrated in Exhibit
22   8.
23       MS. RILEY:  Object to the form.

Page 82

1        A  Yes.
2    (Whereupon, Defendant's Exhibit No. 9 was
3    marked for identification and the same is
4    attached hereto.)
5        Q  Okay.  I want to get back to the
6    training issues, Ms. Cagle.  I want to just
7    question you a little bit more about that.
8        Now, I think you testified earlier,
9    and you correct me if I misstate anything,
10   that you have never received sexual
11   harassment training with the Sheriff's
12   Office.
13       A  I did not receive this training and
14   none other -- no other sexual harassment
15   training of that Department.
16       Q  Okay.  By the Sheriff's Office?
17       A  By the Sheriff's Department, yes.
18       Q  Okay.  Have you received any sexual
19   harassment training through Madison County?
20       A  I saw the form that I signed on the
21   -- when I went -- they have some kind of
22   requirement.  I don't remember them
23   speaking of sexual harassment at all, but I

Page 83

1    signed, you know, something acknowledging
2    that I had read the handbook, but no
3    training.
4        Q  No training?
5        A  No training.
6        Q  Okay.  So did you ever receive any
7    training facilitated by the Madison County
8    Personnel Board?
9        A  Sexual harassment training?
10       Q  Yes, ma'am.  I'm sorry.
11       A  No.
12       Q  Let me ask it again so it'll be
13   clear.  Have you ever received any training
14   on sexual harassment facilitated through
15   the Madison County Personnel Board?
16       A  No.
17       Q  Okay.  And I just want to have you
18   take a look at Exhibit 9.  What is the
19   title of this document on that first page?
20       A  It is Madison County Sheriff's
21   Office Harassment Policy Training, July
22   2016.
23       Q  And July 2016 would have been the

Page 84

1    same month that you signed the
2    acknowledgement that you received training?
3        A  Yes.
4        Q  Do you recall any kind of PowerPoint
5    like this being provided to you, directed
6    to you, or explained to you?
7        A  No.
8        Q  Okay.  I want to direct your
9    attention to Defendants 720, and I'm going
10   to refer you to sort of the item next to
11   number 1 there at the top of the page.  Do
12   you see that?  I'll just give you a second
13   to read it.  And I'm going to put it into
14   the record.  It says, "Report any type of
15   harassment to the Personnel Office
16   immediately.  There is no chain of command
17   requirement with harassment."  Do you see
18   that?
19       A  Yes, ma'am.
20       Q  Is that statement consistent with
21   the Madison County Handbook that we just
22   went over, three of them?
23       A  Yes.

Page 85

1      Q  Okay.  And I'm going to direct your
2    attention to number 2 there.  It says,
3    "Each employee involved will be asked to
4    provide a written statement."  Is that
5    statement consistent with the Madison
6    County Handbooks that we just went over,
7    the three exhibits?
8      A  Yes.
9    (Whereupon, Defendant's Exhibit No. 10 was
10   marked for identification and the same is
11   attached hereto.)
12     Q  Okay.  I'm going to hand you your
13   complaint that you referenced you reviewed
14   earlier in this deposition, and we're going
15   to go over it.
16     A  Okay.
17     Q  And so I've given it to you so we
18   can reference --
19       MS. RILEY:  Excuse me.  Are you
20   good?
21       THE WITNESS:  Yes.
22     Q  Do you need to take a break?
23     A  No.  I'm okay.

Page 86

1    (Whereupon, an off-the-record discussion was
2    held.)
3      Q  So my purpose in giving this to you
4    and making it an exhibit is just ease of
5    reference.  We can refer to certain
6    paragraphs and certain allegations that
7    have been made, at least on your behalf by
8    your attorney, and ask if you agree with
9    them, okay?
10     A  Okay.  Uh-huh.
11     Q  Okay.  I'm going to refer your
12   attention to paragraph 25.
13   (Whereupon, an off-the-record discussion was
14   held.)
15       (Whereupon, a break was taken.)
16     Q  I just want to clarify one thing.
17   Were you ever, during your tenure with the
18   Sheriff's Office, offered training
19   facilitated by the Madison County Personnel
20   Department?
21     A  What kind of training?
22     Q  Sexual harassment.
23     A  Not that I can remember, no, ma'am.

Page 87

1      Q  Okay.  And I want to refer your
2    attention back to Exhibit 9 for a second.
3      A  Okay.
4      Q  Do you know if this was distributed
5    -- do you know if this was distributed to
6    employees of the Sheriff's Department?
7      A  I do not recall.  I thought it was
8    some kind of, like, online -- I'm not sure.
9    I didn't get this, so --
10     Q  Well, when you say you didn't get
11   this, you're referring to the paper, or
12   you're referring --
13     A  I didn't get the training at all, so
14   I don't know how this was distributed.
15     Q  Okay.  So you didn't view any
16   training?
17     A  No.
18     Q  You weren't given in-person
19   training?
20     A  No.
21     Q  You didn't go and do a video
22   training?
23     A  No.

Page 88

1      Q  But you signed the form -- and let's
2    just get the right exhibit -- Exhibit 5.
3    Now, I believe your testimony was you were
4    asked to sign that form by Kerry Phillips?
5      A  Yes.
6      Q  Was he asking you to sign the form
7    in lieu of actually viewing or taking any
8    training?
9      A  I can't assume what he thought.  I
10   just know that I told him that I didn't
11   have that training and I was signing it for
12   him.
13     Q  Okay.  Are you saying he directed
14   you to sign the form after you informed him
15   you had not taken the training?
16     A  He asked me to sign the paper, and I
17   told him I didn't have the training.
18     Q  And did you make any effort to
19   actually do the training after you signed
20   the form and validated you took it?
21     A  No.
22     Q  Why would you sign for something
23   that you actually didn't do?

Page 89

1    A  I was asked to sign.  I thought that
2  he needed to turn -- I took it as he needed
3  to turn this in to Personnel.
4    Q  And why would you not feel obligated
5  to at least view the training that you had
6  certified you had?
7    A  I don't know.
8    Q  So you never went back and looked at
9  it?
10    A  No.  I don't -- no, I did not.  I
11  don't know if it was something to view or
12  read.  I don't even know.
13    Q  You never went back and asked
14  somebody, hey, I said I took this training
15  and I need to take it?
16    A  No.
17    Q  Okay.  Let's look at paragraph 25 of
18  your Third Amended Complaint, which is
19  Exhibit 10, and I'm just going to go
20  through some of the allegations in this
21  complaint and ask you if you agree with
22  them and then ask you what -- if you agree
23  with them, what you mean by them, okay?

Page 90

1    A  Okay.
2    Q  So in paragraph 25, it says,
3  "Females, including Cagle, were expected to
4  flirt and signal sexual availability with
5  their demeanor and conversation."  Do you
6  see that?
7    A  Yes, ma'am.
8    Q  Do you agree that that describes
9  your employment with the Sheriff's Office?
10    A  Yes.
11    Q  And what do you mean by "flirt"?
12    A  You -- the females of the Department
13  were expected to almost be submissive to
14  the male deputies or the male employees of
15  the Department, so you -- as a female, you
16  would have to almost seem available to them
17  or submissive or that you were kind of like
18  their property.
19    Q  Whoever told you you needed to do
20  that?
21    A  It's not often that someone has to
22  verbally tell you something.  I understood
23  that when I first got hired and I was told

Page 91

1  that this would be the atmosphere and as
2  well as a policy that was formed by the
3  Sheriff's Department known as "Plausible
4  Deniability."  That was something that I
5  was told -- they refer to it as "PD" a lot.
6  That's in its short form, but it was meant
7  to not tell higher-ups.  It was from the
8  bottom to the top of the chain and
9  everywhere between, but if I -- if I wanted
10  to tell a higher-up, for example, it would
11  often be, you know, discouraged because the
12  higher-ups wanted to use plausible
13  deniability to get away with whatever
14  incident was happening or occurring.
15    Q  So you had a lot to say there, so
16  we're just going to go through each thing,
17  okay?
18    A  Okay.
19    Q  So I think you said there was an
20  atmosphere where females should be
21  submissive?
22    A  Yes.
23    Q  And you referenced your belief that

Page 92

1  that was the atmosphere based on the
2  comments you testified about that Sheriff
3  Dorning had told you in your interview; is
4  that right?
5    A  In the follow-up interview and
6  ultimately hire, yes.
7    Q  Okay.  Is there any other reason you
8  reached the conclusion that females were to
9  be submissive?
10    A  Well, the atmosphere began right
11  upon my employment.
12    Q  What do you mean by that?
13    A  The deputies coming in and
14  soliciting dates and disregarding if they
15  were married or not and the plausible
16  deniability that I was made aware of early
17  on in my employment.
18    Q  And who made you aware of plausible
19  deniability?
20    A  It started in the Sheriff's Office.
21  He's the -- Sheriff Dorning's the one that
22  told me what it was.  I don't remember the
23  actual conversation that led to that, but I

Page 93

1   had never heard of plausible deniability,
2   but it was to protect people in the chain
3   and throughout the Department from if they
4   were questioned, let's say, for example,
5   from the media or somebody in the
6   Commission, they could say they didn't
7   know.  That was their plausible deniability
8   if they didn't know about the incidents
9   occurring.
10   Q  Okay.  So you said you had a
11   conversation with Sheriff Dorning.  When
12   was that?
13   A  That was within the first six months
14   of my employment.
15   Q  Where did it take place?
16   A  It was -- the most I talked to him
17   was in our office, so I believe it to be in
18   our office.
19   Q  In your office?
20   A  The open area of our offices.
21   Q  Okay.  And who was present?
22   A  I can't say for sure.  Ms. Barbara
23   was there often, so if I had to guess, it

Page 94

1   would be her.
2   Q  Do you remember her being present
3   for that conversation?
4   A  No, ma'am, I don't the remember
5   specifics.
6   Q  And how did this come up?
7   A  Something -- some conversation was
8   happening and somebody said something about
9   PD or plausible deniability and I've never
10   heard of that before, so I asked what it
11   meant.  So it was told to me that it was
12   meant to keep somebody out of the loop so
13   that they could plausibly deny something
14   that was going on if they weren't told the
15   information.
16   Q  Okay.  So I just want to understand.
17   I'm talking about your conversation with
18   Sheriff Dorning.
19   A  Yes.
20   Q  Okay.  So --
21   A  Okay.
22   Q  -- did you go to him and ask him
23   what it meant?

Page 95

1   A  No.  They would -- there was a lot
2   of talking that would go on in our office,
3   so I think it was just an open
4   conversation.
5   Q  Okay.  And the only people you
6   remember being there sitting here today are
7   you and Sheriff Dorning?
8   A  I just know that we had the
9   conversation about that subject.
10   Q  Okay.  And was he talking about
11   sexual harassment allegations?
12   A  I don't remember exactly what the
13   subject was.  It was -- I just understood
14   it as kind of putting a stop to anywhere in
15   the Department feeling comfortable telling
16   higher-ups because they wanted to have the
17   deniability.
18   Q  Yes, but about what?
19   A  About wrecks that were happening
20   with deputies, about sexual harassment,
21   about the hostile work environment, the
22   retaliation that was going on, the --
23   anything, any subject that could keep them

Page 96

1   from having to say that they knew about it
2   and answer to it.
3   Q  All right.  So did he -- in that
4   conversation, did he specifically tell you
5   anything like, we don't want to hear about
6   sexual harassment complaints?
7   A  He did not -- I do not recall him
8   specifically saying "sexual harassment,"
9   no.
10   Q  And even if you did not report it
11   through your chain of command, we've
12   already established that you could have
13   reported it to other people within Madison
14   County or the Madison County Personnel
15   Department.
16   A  Yes, ma'am.
17   Q  Now, you also say in there you have
18   to signal sexual availability, in paragraph
19   25.  What do you mean by that?
20   A  You kind of have to comply with --
21   if, for example, they would come up --
22   several -- well, I can think of two that
23   would come up behind me and just massage my

Page 97

1    shoulders and my arms and my head and hair,
2    and so you kind of had to signal or give
3    off that you were accepting of that and
4    available for them to treat you like
5    property.
6        Q  Okay.  So you were signalling sexual
7    availability to the two people you
8    referenced?
9        A  I felt that it was offensive, but
10   you almost have to take it, although you
11   feel it's offensive.
12       Q  Who told you you had to take it?
13       A  Well, if we're being technical, the
14   Sheriff when I was on my second interview.
15       Q  Okay.  So your feeling that you had
16   to take it stems primarily or entirely from
17   the conversation with the Sheriff during
18   your second interview?
19       MS. RILEY:  Objet to the form.
20       A  Primarily and -- I mean, it set the
21   stage for my employment, yes, ma'am.
22       Q  Did anybody tell you you needed to
23   take it after you spoke with the Sheriff?

Page 98

1        A  Aside from actually taking it and
2    living it, I mean, I experienced it myself,
3    so I was -- I was taking it.
4        Q  Well, did anybody tell you you
5    needed to do that?
6        A  I don't recall if anyone actually
7    told me I had to take it, no.
8        Q  Sitting here today, you don't
9    remember any other statements made by
10   anyone that you reported to?
11       A  No.
12       Q  Okay.  You also state in paragraph
13   25 that females needed to acquire a male
14   protector.  Do you see that?
15       A  Yes, ma'am.
16       Q  Do you agree with that statement?
17       A  Yes, I do.
18       Q  Who was your male protector?
19       A  I didn't have a male protector.
20       Q  Okay.  Who did?
21       A  There are some females that did more
22   sexually, I guess, than other females would
23   choose, and that -- that created a

Page 99

1    protector situation.  So, for example,
2    Rebecca McMurray that's in this, she was
3    having a strong relationship with a captain
4    of the Department, so he protected her in
5    that -- in that manner through the
6    Department.
7        Q  Who else?
8        A  We have a female named -- or they
9    have a female named Melissa Webster that
10   has a similar situation where she has --
11   you know, gets more involved than maybe
12   another female, but she does that and
13   creates a protector environment.
14       Q  What do you mean?
15       A  It was -- so if the higher-up deputy
16   is married but having a sexual relationship
17   with one of the females here -- so we'll
18   use Rebecca McMurray as the example -- the
19   male in the situation, Captain Charles
20   Berry, he was married, and so he's having
21   the affair with Rebecca and in order to, I
22   guess, not tell his wife or however that
23   worked, he protected everything she did.

Page 100

1    He changed her evaluations, he, you know,
2    kept her from getting in trouble, he gave
3    her -- you know, you just get, like, better
4    treated.
5        Q  How do you know he changed her
6    evaluations?
7        A  Because it was known.  He admitted
8    to it, and he --
9        Q  To you?
10       A  Not me particularly, but Kerry
11   Phillips, and we discussed it.
12       Q  You discussed that with Mr.
13   Phillips?
14       A  Yes.  And there was two -- I mean,
15   it was admitted he also changed another
16   female's, the other female that I just told
17   you about, Melissa Webster, so.
18       Q  You mean Captain Berry --
19       A  Yes.
20       Q  -- also changed Melissa Webster's
21   evaluation?
22       A  Yes.
23       Q  How do you know that?

Page 101

1    A  It was told to us by the other
2  employees of that office, and Kerry
3  Phillips and I had a conversation about it
4  as well.
5    Q  What was in that conversation?
6    A  We just discussed that it wasn't,
7  like, fair or normal for that to happen,
8  for -- you know, I probably said to Kerry
9  that I thought that mine should be better
10  than he gave me and that he needed to
11  change it like they changed hers.  That's
12  how I remember the conversation.
13    Q  Do you think Rebecca McMurray or
14  Melissa Webster were coerced into any sort
15  of sexual relationship?
16    A  I can't say why they would -- I
17  can't say how they feel or why they would
18  do --
19    Q  Well, do you think they, in your
20  words from your complaint, felt they needed
21  to acquire a male protector?
22    A  It was -- I can only speak from my
23  own, you know, experience with it is that

Page 102

1  you almost feel like you have to have --
2  you feel like you almost have to have a
3  protector or to give in to certain things
4  to be protected from other people in the
5  Department because the whole Department --
6  or the Department as a whole was just so
7  sexually driven and sexually charged and
8  sexually hostile.
9    Q  Now, so you listed two females.
10  What other females --
11    A  Well, we didn't have many, and we
12  didn't have any in supervision.  Gosh.  I
13  feel like I've got something in my eye, and
14  I don't even wear makeup, so.
15    Q  Whenever you need to take a break --
16    A  Yeah, it's okay.  I don't --
17    Q  -- you -- I mean -- you let me know,
18  okay?
19    A  Okay.  There weren't -- there aren't
20  -- I don't know how many females they have
21  now, but at the time, there just weren't
22  that many females on the enforcement side
23  is how we would call it.  There's

Page 103

1  enforcement side and the jail side.  And --
2    Q  But I want to be clear.  My question
3  is just very specific.
4    A  Okay.
5    Q  You said females need to acquire a
6  male protector.
7    A  Yes.
8    Q  And you've given me two that you
9  think fit that description.
10    A  Yes.  Uh-huh.
11    Q  Who else?
12    A  I don't know.  Julie Rosenberg.
13    Q  What is Julie's situation that you
14  know about?
15    A  She came from the jail side, and
16  when she was on the jail side, she became
17  in some kind of relationship with her then
18  superior.  His last name was Hancock.  I
19  don't remember his first name.  And she
20  felt like she needed -- she told me -- I
21  worked -- I ended up working with her as
22  well, and she told me that she, like, felt
23  like she had to -- she didn't say the

Page 104

1  sexual part or anything, but she had to
2  acquire this relationship with him at the
3  jail as a protector.  Like, she felt like
4  she was vulnerable otherwise to other
5  solicitations, to other -- because she was
6  single at the time.
7    Q  And she ended up working with you in
8  the courthouse?
9    A  She got transferred at some point to
10  our side, yes, ma'am.
11    Q  Did she have a protector in the
12  courthouse?
13    A  I do not know.  I don't recall any,
14  no, ma'am.
15    Q  Any other females?
16    A  I can't think of any at the moment.
17  I did bring a list of comments that were,
18  like, said in front of me and subjects that
19  were said in front of me that I could
20  reference for names from earlier, if you --
21    Q  Sure.  If you've got it, look at it.
22  Sure.
23    A  Okay.  So I can think of Gary Cross

Page 105

1   was --
2      Q  My question is females, females that
3   --
4      A  Oh, I'm sorry.  Okay.  This was --
5      MS. RILEY:  I think she's changed
6   subjects to --
7      A  I'm sorry.
8      Q  No, no, no.  I want to stick with
9   that, and let's finish out that.
10     A  Okay.  I can't think of any more
11  females at the -- at --
12     Q  During your tenure.
13     A  Right off the top of my head, no.
14     Q  And just to be clear, you never
15  acquired a male protector?
16     A  I don't feel like I had acquired a
17  male protector in that sense.  The only
18  determent I may have had is when I worked
19  in the actual Sheriff's Office and him just
20  being in that office.  That's --
21     Q  Like, his presence?
22     A  Just that they -- the name is on the
23  door.

Page 106

1      Q  Okay.  Now, it says also in
2   paragraph 25, "Those females who did not
3   play the game with the males suffered
4   ostracization, lack of cooperation, were
5   referred to as sexually derogatory and
6   demeaning terms, and given fewer
7   opportunities for training and
8   advancement."  Do you agree with that
9   statement?
10     A  Yes.
11     Q  Okay.  And how would you be
12  ostracized?  Let's start with you.  How
13  were you ostracized, in your view?
14     A  I mean, I just wasn't part of the
15  protection or the clique-ish type of
16  situation that was made if I didn't make --
17  you know, I didn't partake in the -- all
18  the sexual activity that I believed to be
19  happening or the comments that I heard, you
20  know, the whole sexual -- sexually-driven
21  environment.  I just -- if you didn't play
22  along in that, then you just weren't part
23  of the protected clique.

Page 107

1      Q  How were you unprotected during your
2   tenure?
3      A  Well, I guess we'll get to how many
4   times I've, you know, reported things and
5   been retaliated against and I helped
6   another female deputy and when I -- when I
7   helped her, I feel like I was, like, put on
8   the ostracization list or the black -- the
9   blackball list for standing up for her.
10     Q  Well, did you ever receive a bad
11  review?
12     A  I don't know about bad.  It wasn't
13  what -- I mean, I -- it wasn't, like,
14  awesome, and I felt like I did awesome.
15  But there were things that were -- like,
16  things like the -- I really ended up liking
17  the -- doing the -- talking to the escort
18  people.  I didn't necessarily like after
19  hours stuff, but I -- that was attempted to
20  be taken away from me and --
21     Q  You objected?
22     A  I did.
23     Q  So you wanted to do that?

Page 108

1      A  I liked talking to outside people
2   because it gave me networking outside of
3   the Department.
4      Q  Let me ask you about that.  And I
5   asked you earlier were you compensated for
6   that work, and we talked about your phone.
7   Do you remember that?
8      A  Yes.
9      Q  Okay.  Were you allowed to take a
10  long lunch to make up for time that you
11  spent arranging escorts or secondary jobs?
12     A  Sometimes.
13     Q  Were you allowed to come in late or
14  leave early in order to make up for that
15  time?
16     A  Sometimes.
17     Q  And you didn't have to take a leave
18  to do an extended lunch or come in late or
19  leave early?
20     A  To, like, fill out a leave sheet or
21  something?
22     Q  Yes.
23     A  No, ma'am, I don't think I've ever

Page 109

1  done that.
2      Q  Okay.  What opportunities for
3  training and advancement do you feel you
4  were denied during your tenure?
5      A  I wasn't given any training.  There
6  was a training that was set up or was said
7  to be for myself and the girl that I worked
8  with at that time.  I believe it was Julie
9  Rosenberg.  There was supposed to be
10  something in the works where we went and --
11  with our training -- their Training
12  Division, and I don't know what it was
13  supposed to be, but it never came to
14  fruition.
15      Q  So who did go to that training?  Who
16  was selected for that training?
17      A  It was supposed to be the girls in
18  our office, which was just Julie and I.
19      Q  Okay.  But who got to attend that
20  training?
21      A  Nobody.
22      Q  So it wasn't --
23      A  It never came to fruition at all.

Page 110

1      Q  Okay.  So no one got to attend that
2  training?
3      A  No.  It was just told to us that it
4  would -- it would be something offered and
5  it was going to be offered soon and it
6  never came to fruition.
7      Q  Was there any training or
8  advancement opportunities that were offered
9  to others and not to you, from your
10  perspective?
11      A  I don't know.  I don't know.
12      Q  Okay.  Were there any other females
13  that you worked with who you feel did not
14  have a protector and were consequently
15  treated badly?
16      A  Yes.  Marina Garcia.
17      Q  Okay.  Who else?
18      A  I think that Sonya Massey thought
19  that she had a friend in her supervisor,
20  and he ended up turning and sexually
21  harassing her.  I'm not sure of the details
22  of that, but -- so I'd say that she did not
23  have a protector.

Page 111

1      Q  Anyone else?
2      A  I can't think of any.
3      Q  Okay.  Now, in paragraph 27, you
4  say, "Females, particularly those without
5  male protectors --" I'm going to let you
6  turn to it so you can read with me, okay?
7      A  Okay.
8      Q  So let's go back to paragraph 27.
9  "Females, particularly those without male
10  protectors, were more harshly disciplined
11  than males for similar infractions of
12  workplace rules."  Do you agree with that
13  statement?
14      A  Yes.
15      Q  Okay.  Who are you comparing in that
16  statement specifically?
17      A  Well, a couple come to mind which
18  lead me to two different females that -- so
19  on the list that you just made, I would say
20  that Shelby Holt did not have a protector
21  and that ties into this, that she was more
22  harshly disciplined than the male, which
23  was Stacey Rutherford, at the time.  She

Page 112

1  was more harshly disciplined than him.
2      Q  And what was the offense they were
3  being disciplined for?
4      A  She was claiming sexual harassment
5  by him, and he was her supervisor.  And she
6  ultimately -- she didn't work there
7  anymore.  I don't know if she got fired.  I
8  don't remember if she got fired.  And he is
9  still currently working there.
10      Q  Okay.  But just so that I'm clear,
11  we're talking about -- so we're comparing
12  males and females, it seemed to me, in your
13  statement, and you're saying females were
14  more harshly disciplined.  So in the
15  situation you just described, what was
16  Shelby Holt accused of doing?
17      A  She -- I was saying she didn't have
18  a protector.  I'm sorry if I'm getting
19  confused.
20      Q  That's okay.
21      A  But she -- she accused her
22  supervisor, Stacey Rutherford, of sexual
23  harassment, and I -- she made the

Page 113

1  accusation and ended up not working there
2  and I don't know if it was from a
3  discipline standpoint or -- I believe it to
4  be how she was treated because of the
5  accusation.
6     Q  Okay.  Well, now, I'd like to focus
7  on your statement here in paragraph 27 when
8  you talk about discipline.
9     A  Okay.
10     Q  So what situations are you referring
11  to in that statement where a male and a
12  female are accused of similar offenses, but
13  they're disciplined much more harshly than
14  the male?
15     A  Okay.  Can I just take a second to
16  read the --
17     Q  Sure.
18     A  Okay.  Okay.  So one that comes to
19  mind is Marina Garcia.  She didn't have a
20  male protector, and she -- when she made
21  her initial allegation, she was moved out
22  of what she described as her favorite
23  position at the Department and she was

Page 114

1  moved to a position that she did not like
2  at all, and a male that -- I mean, for -- I
3  don't know of any males that have -- I
4  can't compare apples to apples almost
5  because males weren't turning people in for
6  sexual harassment.  So to me, when I --
7  what I mean by this is that women who were
8  turning -- or making accusations of sexual
9  harassment were treated terribly.
10     Q  Okay.  So I just want to be -- just
11  to clarify for my own purposes, do you know
12  of a situation where a male and a female
13  deputy, for example, would be accused of an
14  infraction --
15     A  Okay.
16     Q  -- and the male got less punishment
17  than the female for the same infraction?
18     A  There were car wrecks, and the
19  policy says that you -- it was something
20  along the lines of having to park your car
21  for two weeks and ride with somebody.  I
22  don't know the exacts of it.  But a female
23  would get into a wreck like that -- I

Page 115

1  believe Shelby Holt was one of the ones
2  that got into a wreck -- and then you would
3  have Ken Williams who also got into a
4  wreck.  He didn't have to park his car and
5  wait -- or ride with somebody or whatever
6  the policy was, but Shelby did have to park
7  her car.  Or --
8     Q  How do you know that?
9     A  Because often, there was a report --
10  not often.  There was supposed to be a
11  report made of each wreck, and it went into
12  their 201 file that I -- I was the keeper
13  of the 201 file.
14     Q  So you actually -- part of your
15  duties was to administer 201 files?
16     A  I filed stuff into them, yes, ma'am.
17     Q  So you had access to them?
18     A  Yes, ma'am.
19     Q  Okay.  So are there any
20  circumstances in that example that differed
21  for Shelby as opposed to Ken?  Is there any
22  reason for difference?
23     A  Not that I know of.

Page 116

1     Q  Okay.  Any other situations?
2     A  I can't think of any particular ones
3  off the top of my head, no.
4     Q  Okay.  All right.  We're going to
5  move to paragraph 28A.
6     A  Okay.
7     Q  And this talks about unwelcome and
8  offensive sexual comments and/or sexual
9  innuendo directed to you.  Do you see that?
10     A  Yes, ma'am.
11     Q  And the first one listed there is,
12  "Upon informing a deputy of her position as
13  the Chief's assistant, quote, what kinds of
14  things do you assist him with, end quote
15  --"
16     A  Yes, ma'am.
17     Q  "-- with a tone and facial
18  expression suggestive of sexual activity."
19     A  Yes, ma'am.
20     Q  Who said that to you?
21     A  It was a reserve deputy.  I do not
22  recall his name.  He was helping here at
23  the courthouse for a case.  Sometimes they

Page 117

1   would have the reserve deputies come up as
2   extra security.
3       Q   When did that happen?
4       A   It happened while I was still in my
5   initial position, and it was really early
6   on.  Probably within the first week or two.
7       Q   And did you report this reserve
8   deputy to anyone in your chain of command?
9       A   I came back into the office and I
10  let Ms. Barbara know, who was the Sheriff's
11  secretary, and the then Patrol Captain,
12  Jackie East, was in the office and it was
13  -- Barbara and I told him and he went to
14  talk to this reserve deputy and he took me
15  with him.
16      Q   And what was that conversation like?
17      A   He told him that -- I don't remember
18  exactly, but something along the lines of
19  not making those comments to me and that he
20  would take his reserve badge.
21      Q   Did you have any other problems with
22  that reserve deputy?
23      A   Aside from him coming into the

Page 118

1   office and it being awkward, no, ma'am.
2       Q   Okay.  Now, the next thing you talk
3   about is -- in paragraph 28A -- "quote,
4   your hair looks a mess.  Did you get some,
5   end quote, referring to sex."
6       A   Uh-huh.
7       Q   Who said that to you?
8       A   That was Gary Cross.
9       Q   When did he say that?
10      A   It was, I believe, in my third
11  location.  That's where he came by the most
12  to talk to me.  So within the last couple
13  years of my employment, so between 2015 and
14  2017.
15      Q   Is that as specific as you think you
16  can get?
17      A   I think so.  I mean, it happened
18  often.
19      Q   Well, now, this is one statement, so
20  we're talking about this statement.
21      A   Well, he's made that statement --
22      Q   To you more than once?
23      A   -- more than -- yes, ma'am.

Page 119

1       Q   And so is that all during this
2   period of 2015 to 2017?
3       A   Yes, ma'am.
4       Q   How many times did he make the
5   statement?
6       A   That particular statement?
7       Q   Yes.
8       A   Approximately five times.
9       Q   Okay.  And did you report his
10  conduct to anyone in your chain of command?
11      A   I did not.
12      Q   Did you report it to anyone?
13      A   He was the supervisor.
14      Q   Well, was he your supervisor?
15      A   No.
16      Q   Okay.  So I'm asking in your chain
17  of command, which you explained to me
18  earlier, so if that's changed, let me know,
19  but did you --
20      A   Yeah.
21      Q   -- report it to anyone in your chain
22  of command?
23      A   No.

Page 120

1       Q   And did you report it to anyone at
2   the Madison County Personnel Department?
3       A   No.
4       Q   Madison County Personnel Board?
5       A   No.
6       Q   Did you report it to anyone in
7   Madison County?
8       A   Not to my knowledge, no.
9       Q   Okay.  Number 3 there, quote, those
10  pants make your ass nice, end quote.  Who
11  said that to you?
12      A   The same person, Gary Cross.
13      Q   Okay.  Did he say that once or more
14  than once?
15      A   He has said it several dozen times.
16      Q   And is it all in that same period,
17  2015 to 2017?
18      A   Yes.
19      Q   And did you report any of those
20  comments to anyone in your chain of
21  command?
22      A   No.
23      Q   What about anyone at the Madison

Page 121

```
 1    County Personnel Department?
 2        A  No.
 3        Q  Madison County Personnel Board?
 4        A  No.
 5        Q  Anyone at Madison County?
 6        A  Not that I remember.
 7        Q  Okay.  We have here a statement,
 8    quote, you need to work out more because
 9    your ass is getting bigger, end quote.  Who
10    made that statement to you?
11        A  The same person.
12        Q  Okay.  The same period of time?
13        A  Yes.
14        Q  How often?
15        A  That comment, probably just the one
16    time.
17        Q  And did you report that to anyone?
18        A  No.
19        Q  Okay.  You have here, "Please wear
20    those workout shorts every day so I can see
21    them on you."  Who made that comment to
22    you?
23        A  The same person.
```

Page 122

```
 1        Q  2015 to 2017?
 2        A  Uh-huh.
 3        Q  And did you report that to anyone?
 4        A  No.
 5        Q  Okay.  Now, were these comments by
 6    Gary Cross -- I want to focus on them for a
 7    minute -- were they made during work hours
 8    or after work hours?
 9        A  During.
10        Q  Okay.  So were they made here in the
11    office?
12        A  Some were maybe made after hours
13    because I would work out at the gym, and
14    sometimes he would be there as well.
15        Q  Okay.  Did you ever text Gary Cross?
16        A  Text him?
17        Q  Yes.
18        A  Yes.
19        Q  Okay.  Did you ever socialize with
20    Gary Cross?
21        A  Yes.
22        Q  How?
23        A  Oh, just -- I've never -- I've been
```

Page 123

```
 1    one place with him, yes, in a group.
 2        Q  Where is that?
 3        A  Some restaurant.  I don't remember
 4    the name.  It was in Cullman.
 5        Q  And what was your response to Gary
 6    Cross when he would make these comments to
 7    you?
 8        A  I would just --- I felt like I
 9    couldn't do anything about them, so I
10    didn't say much except brush them off.
11        Q  Okay.  Are there any other unwelcome
12    and offensive sexual comments and/or sexual
13    innuendo directed to you during your tenure
14    with the Sheriff's Office?
15        A  I mean, comments and conversations
16    and all that were constant, so I made a
17    giant list of just even subjects that were
18    talked about around me.
19        Q  Well, talking about is a different
20    thing.  You've divided it up --
21        A  In my small office to me where I
22    could hear.
23        Q  Okay.  I want to know what was said
```

Page 124

```
 1    to you, okay?  That's what we're talking
 2    about right now.  Directed to you is how
 3    you've divided this up in your complaint.
 4        A  Okay.  I mean --
 5        Q  So is there anything else that you
 6    remember being directed to you during your
 7    tenure with the Sheriff's Office?
 8        A  I mean, I can remember tons of
 9    comments directed to me, but your follow-up
10    question is going to be who, and I just
11    can't remember over a decade what each one
12    was.
13        Q  Well, unfortunately, you're the one
14    who's brought this litigation, so you're
15    going to have to be as specific as you can
16    get, and if there's anything that would
17    refresh your memory, you're going to have
18    to tell me, okay?
19        So we've talked about comments in
20    28A directed to you.  I want to know if
21    there are any others.
22        A  Yes.
23        Q  Okay.  What?
```

Page 125

1    A There's comments about my toenail
2  polish and toes.  That was Stan Bice.
3    Q Stan who?
4    A Stan Bice.
5    Q Okay.  What was said about your
6  toenail polish and toes?
7    A It was to my understanding that he
8  had, like, some kind of foot fetish.  I
9  don't -- I mean, he would say he liked the
10  color of my toenail polish or that I had
11  good feet or -- yeah, good feet and he
12  liked my feet and made comments a lot.
13    Q Okay.  So he liked your feet.
14    A Yeah.
15    Q He liked your toenail polish.
16  Anything else?
17    A I mean, not from him.
18    Q And when did he make those comments?
19    A I don't know.
20    Q And did you ever report Mr. Bice to
21  anyone?
22    A No.
23    Q Okay.  What other comments were

Page 126

1  directed to you?
2    A Can I reference my --
3    Q Sure.
4    MS. RILEY:  I was going to suggest
5  you mark them -- mark them when you talk
6  about them so we don't repeat them.
7    A Well, if I don't remember the
8  person, I guess I'm just not even going to
9  --
10    Q No, you should tell me.  This is
11  your opportunity to testify.
12    A Okay.  Well, I mean, camel toes and
13  moose knuckles were referenced.  Are you --
14  I mean, those are what pants can often make
15  the front of a female look like.
16    Q Who said that to you?
17    A It was talked about a lot.  I don't
18  remember exactly.
19    Q Was that directed to you in terms of
20  your appearance?
21    A It has been directed to me, yes,
22  ma'am.
23    Q How many times?

Page 127

1    A Probably just two or three.
2    Q Do you remember who made those
3  comments to you?
4    A No.
5    Q Was it a deputy?
6    A A male worker that was -- it was
7  probably likely a deputy because they made
8  up most of the male employment.
9    Q Okay.  Was it anyone in your chain
10  of command who made that comment to you?
11    A Anyone in my chain of command?
12    Q Yes.
13    A No, ma'am.
14    Q Okay.  Was it a supervisor?
15    A Gary Cross has said that before, and
16  I don't know if it was about me or the girl
17  that was in the office with me because it
18  was often said -- more often said about her
19  than it was me.  Her pants fit her
20  differently than mine did, and so her front
21  was discussed a lot and her back was
22  discussed a lot.  They would reference her
23  backside as long and flat and disgusting.

Page 128

1    Q Did you ever report any of those
2  comments to anyone?
3    A I don't -- I don't think so.  I
4  mean, I was made to -- what I did turn in
5  turned into a disaster.
6    Q Well, we're going to talk about
7  that, but my question is, did you ever
8  report these --
9    A No, I did not.
10    Q No.  Okay.  What else?
11    A My weight was often referred to, it
12  looked like I gained or lost, just
13  depending on the timeframe.
14    Q Did you take that to be a sexual
15  comment?
16    A I mean, I took it as offensive
17  sexually just naming my appearance that way
18  because it was often related to, like, my
19  butt looking bigger or smaller or, you know
20  -- so it was tied in that way with my
21  weight.  It's like if I gained a little bit
22  of weight, my butt looked bigger.
23    Q And who made those comments to you,

Page 129

1    Ms. Cagle?
2       A  I don't recall.
3       Q  How many times did someone comment
4    about your weight during your tenure with
5    the Sheriff's Office?
6       A  Probably a dozen times.  I was
7    really known for working out, so it was
8    like a subject of something that I would
9    discuss probably, you know, as working out,
10   and so that was something I guess they felt
11   was -- I would care about or be offended.
12   I don't know.  It was a subject of what I
13   did in my life as far as working out, so
14   the comments were made, I guess, to, I
15   don't know, make conversation, but they
16   were offensive.
17      Q  And did you ever report your
18   discomfort to anyone?
19      A  On that, I don't think so.
20      Q  Okay.  And I forgot if I -- do you
21   remember who made those comments to you?
22      A  No.  A lot of conversations that
23   were had about different stuff that I made

Page 130

1    mention, I didn't report it to Kerry
2    Phillips.  We would discuss them, though, a
3    lot of things that were said during that
4    time.  So, I mean, I don't know if that
5    means that I reported -- I mean, I would
6    talk to him about a lot of stuff that was
7    talked about in our office.
8       Q  Well, give me an example about the
9    things we've talked about.
10      A  Well, like, as the people that
11   talked about Julie, he and I would discuss
12   that a lot.
13      Q  Well, I want to know about --
14      A  I'm saying that they would say these
15   things to me about her, and so he and I
16   would discuss things that were made --
17   comments that were made about her.
18      Q  And what did you say to him?
19      A  I mean, we would just talk about how
20   it would -- those comments would be brought
21   up out of nowhere.  People just felt a
22   certain type of way about her, so they
23   would come in and make those kind of

Page 131

1    comments.
2       Q  And what was -- what did he say in
3    response to that conversation?
4       A  I don't know.  I think he would just
5    listen to me harp about it being offensive.
6    I mean --
7       Q  Did you ever tell him you wanted to
8    make a formal complaint?
9       A  No, ma'am.
10      Q  Okay.  You've got a list.  Do you
11   want to go through your list?
12      A  I mean, it's, like, so much, and I
13   mean --
14         MS. RILEY:  Take your time and
15   breathe.  Do you need a break?  Because we
16   need to not rush.  She gets to find out
17   this information, and I want you to -- I
18   want you tell her.  So we can take a break.
19   We can have lunch.
20      A  I feel frustrated because I can't
21   remember each instance and person.
22         MS. GRAHAM:  Well, let's take a
23   break.

Page 132

1       (Whereupon, a break was taken.)
2       Q  You have a list there, so why don't
3    we go through your list, okay?
4       A  Okay.  So the next one that I put
5    down was that male deputies, mostly, or
6    male workers of the Department, if they
7    didn't like each other, they would comment
8    about each other having a small penis, so
9    that was, you know, if so and so didn't
10   like the other deputy, he probably acts
11   that way because he has a small penis,
12   like, just small penis talk.
13      Q  And who would have made those
14   comments?
15      A  It was made by several deputies
16   along my ten years, and I can't remember
17   exactly which ones, but that was a thing
18   all the way through my ten years.
19      Q  How often would you hear a comment
20   like that?
21      A  A couple times a month, probably.
22      Q  Did you ever report any of that
23   commentary to anyone?

Page 133

1    A  No, ma'am.
2    Q  Okay.
3    A  Female parts, butts, breasts, legs,
4  faces, always evaluated, whether it be that
5  there was a new female hire, people --
6  somebody would see the female hire, for
7  instance, and if she was attractive, they
8  would, like, kind of disseminate that
9  information to other deputies, like, we
10  have a new DO, detention officer, that's
11  coming in that's good looking and, you
12  know, this and that.  So it was always,
13  like, what the female -- females of the
14  Department looked like and the ones coming
15  in and --
16    Q  And who would -- who made those
17  comments?
18    A  Well, one example, a female -- and I
19  don't know if she still works over there or
20  how long she was there, but there was a
21  female detention officer hired, and she was
22  a lot girlier than most detention officers.
23  I mean, she was a tiny, tiny thing as --

Page 134

1  you know, my stature, and so it was against
2  what normally is hired as a detention
3  officer.  Like, I would be scared if I was
4  her.  But it was told instantly that there
5  was a detention officer and she was good
6  looking and so they found pictures of --
7  and I submitted those -- pictures of --
8  that they got off of some of her social
9  media.  I think she was into, like, maybe
10  bodybuilding, but she wasn't big.  I mean,
11  like, she was just cut, I guess.  And so
12  they would disseminate those, like, this
13  girl was being hired, and this is what she
14  looks like.  I mean, it was like vultures.
15    Q  Did you receive those pictures?
16    A  I received one, maybe -- there were
17  several of those that went around.  I want
18  to say there was probably five total that
19  somebody picked off of a social media and
20  it went around and I think -- I don't know
21  if all five were sent to me, but at least,
22  like, one to three, and I submitted those.
23  They came from Gary Cross.

Page 135

1    Q  And what was -- so he sent them to
2  you?
3    A  He didn't send them to me because I
4  asked or anything.  Everybody was talking
5  about this new girl.  I never saw her in
6  her actual form, just those pictures, and I
7  said, I -- I didn't do that hiring for the
8  jail side.  It was somebody else.  And he
9  -- I said, there's a new girl being hired.
10  And, anyways, later, he sent a text message
11  and said, here is the pictures that were
12  being sent around of the new hire.
13    Q  What was your response to those
14  pictures?
15    A  I don't think I responded to the
16  pictures at all.
17    Q  So it offended you to have them
18  disseminate those pictures?
19    A  I mean, she was being evaluated, and
20  so that was offensive.  I mean, she had --
21  to my understanding, she didn't even have a
22  clue that this was all going on.
23    Q  Okay.  And did you report -- you

Page 136

1  received the pictures.  You had proof.  Did
2  you report that to anybody?
3    A  I did not.
4    Q  And did you report to anybody just
5  the general conversation that you
6  understood was happening about this person?
7    A  I think that Kerry Phillips and I
8  had a conversation about it.  Again, Gary
9  Cross was a supervisor, and I just -- was
10  just made to believe --
11    Q  What kind of conversation did you
12  have with Gary Cross?
13    A  I think we discussed how they were
14  acting in regards to this new hire, how her
15  pictures were already being sent around.
16    Q  Did you put anything in writing?
17    A  No.
18    Q  And earlier, you said you discussed
19  the situation with Kerry Phillips.  Do you
20  remember that testimony?
21    A  What was the -- I don't remember --
22    Q  One of the comments about your
23  weight --

## Page 137

```
1       A Oh, about Julie.
2       Q Or Julie. I'm sorry. Julie. Yes.
3       A Okay. Julie --
4       Q Well, my question is, did you -- you
5   said you discussed it with him.
6       A Yes, I did.
7       Q Yes. And did you put your --
8   anything in writing?
9       A No. I was never required to put
10  anything in writing, not even when I --
11      Q Well, did you offer to put anything
12  in writing?
13      A No.
14      Q Okay. Let's go to your list.
15      A Okay. Let's see. Where was I at?
16  Oh, clothing references on -- so there's a
17  -- it was either too tight or too baggy or,
18  like, the female shouldn't wear that. For
19  instance, there was a -- there's a female
20  that still works there named Melody Brown
21  -- Melody Brown, I believe is her name.
22  She has a bigger figure, and so people
23  would make comments about that she
```

## Page 138

```
1   shouldn't wear as tight of pants as she
2   wore. And it was also known about her and
3   she has told me -- she has told me directly
4   that she has a problem with her having
5   erect nipples all the time. She said, I've
6   tried to cover them with Band-Aids, shirts,
7   bra, you name it, I've tried it, and they
8   still show. And she told me that there's
9   different patterns that you can wear to rid
10  that or whatever, but -- she said that, but
11  also, males would make those comments about
12  her nipples being shown through her shirt
13  all the time.
14      Q To you?
15      A Yeah. It would be made -- she used
16  to be in the courthouse also. She's not
17  anymore, but when she was, there was more
18  conversation about it because she was seen
19  more by people that would also talk to me.
20      Q And how many times did you hear
21  comments about this person?
22      A Oh, God. Dozens.
23      Q During your tenure?
```

## Page 139

```
1       A Yes.
2       Q So more than 20?
3       A More than 20, yes.
4       Q More than 30?
5       A Probably not. And she -- I mean,
6   some of those were her -- she felt insecure
7   about it is why she was telling me about
8   it, but other people noticed it and would
9   -- men would notice it and comment on it a
10  lot.
11      Q And did you report any of those
12  comments to anyone?
13      A No.
14      Q Okay. Next?
15      A We talked about my toes and the
16  toenail polish.
17      Q Yeah. Don't repeat anything because
18  we're trying to get through.
19      A Right. Well, he -- he said that to
20  another female that did turn him in for
21  that same --
22      Q And who was that female?
23      A She was a dispatcher. Oh, God. I
```

## Page 140

```
1   can't think of her name at the moment, but
2   she -- I don't -- she turned him in for
3   those comments, and I don't know the manner
4   that she -- I don't know if she had to
5   write something or what. I just know that
6   he had -- got, like, a verbal reprimand.
7   He got something. I don't know what it
8   was, but --
9       Q And did that resolve? Did he make
10  additional comments to you after that
11  verbal reprimand or discipline?
12      A Yes.
13      Q He did?
14      A Yes.
15      Q But you still didn't report him?
16      A I did not.
17      MS. RILEY: Are we talking about
18  Gary Cross?
19      THE WITNESS: No. Stan --
20      MS. GRAHAM: Stan Bice.
21      MS. RILEY: Stan Bice?
22      THE WITNESS: Yes.
23      MS. RILEY: Sorry.
```

Page 141

1    Q  Okay.  What's next?

2    A  The deputy uniforms were always

3  discussed as very hot, and it was always --

4  I don't know who started the joke or how it

5  started, but among the Sheriff's

6  Department, they would say that they're --

7  I'm just going to say exactly what they

8  said.  They said that they're -- they're so

9  hot that their nuts are stuck to their leg

10  and need a spatula to get them off.

11    Q  And how many times was that comment

12  made in your hearing?

13    A  Between ten and 20 times throughout

14  the --

15    Q  Throughout your tenure?

16    A  Yes.

17    Q  Okay.  And did you ever report that

18  comment to anybody?

19    A  No, ma'am.  It was said in the

20  presence of supervision and -- I mean, it

21  was a thing among everybody in the

22  Department, all the males that had to wear

23  the particular hot -- or what they deemed

Page 142

1  as hot uniform.

2    Q  What supervisors was that said in

3  front of?

4    A  I mean, it was said in our offices

5  loud enough for Kerry Phillips to hear.

6    Q  Do you know he heard?

7    A  No, I don't.

8    Q  Okay.  Who else?

9    A  I can't think particularly.  It was

10  said so often and it was almost just like a

11  running joke, I guess, is how they would

12  view it, a running --

13    Q  Do you find that offensive?

14    A  It formed a picture in my head, so

15  yes.

16    Q  Okay.  Did you ever tell them, hey,

17  don't talk like that in front of me?

18    A  No.

19    Q  Did you ever tell any of the people

20  we've talked about, hey, I don't want to

21  hear that?

22    A  No.

23    Q  Okay.  Let's go on.

Page 143

1    A  Okay.  Let's see.  If there was --

2  since I worked in the courthouse, there was

3  a lot of strange -- you know, people we

4  didn't know, like people just there for

5  court or getting married or whatever, and

6  there would be evaluations by -- if I'm

7  just standing out in the open area where

8  the public is and any deputy is around,

9  they would evaluate, say, a stranger coming

10  up the stairs, just a woman, and they would

11  say, oh, I bet she has a hairy vagina or a

12  stinky vagina or a fat vagina or just --

13  always an evaluation of females.  And

14  particularly, like, if they were disgusted

15  by it, they would say certain -- like, if

16  the person wasn't attractive to them, they

17  would describe it one way, and if they

18  were, they'd, you know, say different

19  stuff.  So it was always an evaluation of

20  the woman's parts.

21    Q  And who made those comments?

22    A  It was numerous deputies, I can't

23  think of any particularly, and it was along

Page 144

1  my whole time of working in the courthouse.

2    Q  How many times did you hear comments

3  like that in your tenure?

4    A  I mean, probably for just -- I would

5  say 50, 100 times.

6    Q  That's a big difference.  Could you

7  be more specific?

8    A  I would say close to 100 times.  I

9  mean, it was an evaluation all the time.

10  They would particularly say that if

11  somebody -- this is a gross one.

12    Q  Well, let me just stop you there

13  because I want to finish this particular

14  category of comments you've talked about.

15    A  Okay.

16    Q  Did you report your discomfort to

17  anyone?

18    A  No.

19    Q  Were any supervisors around when

20  these comments were made?

21    A  I don't recall if they were.  I mean

22  -- I mean, Gary Cross being a supervisor,

23  he was one of the biggest evaluators of

Page 145

1  female parts and looks and big boobs, small
2  boobs.
3      Q  And what was his rank?
4      A  He was then -- I don't know if he's
5  been promoted, but he was then a sergeant
6  on patrol.
7      Q  Okay.  And just so I'm clear because
8  you know better than I, how does that rank
9  work?  It goes from deputy to --
10     A  I think there's some -- yes, deputy
11  on -- I think there's some that can go in
12  the middle.  I'm not really sure, but he's
13  above the deputies, so he's the supervisor
14  of his shift if he's on patrol.
15     Q  Okay.  And then who would be above
16  him?  Would that be a lieutenant?  I'm just
17  trying --
18     A  He has a -- he would have a
19  lieutenant on the shift, yes.
20     Q  Okay.
21     A  So he then was on first shift, so I
22  guess he would have a lieutenant on the
23  first shift.

Page 146

1      Q  And then who is above a lieutenant
2  in the chain of command, if you know?
3      A  Yeah.  I know patrol as a whole has
4  a -- like a commander, a captain commander,
5  so maybe the Lieutenant goes to the
6  Captain, I think.
7      Q  All right.  And let's go to your
8  next category.
9      MS. RILEY:  Erica, I'm going to give
10  you -- I'll just say it on the record
11  because it's okay.  I don't know if you're
12  using general terms or using the exact
13  offensive term that was used.  I'm not --
14     THE WITNESS:  Yeah.  Oh, I'm saying
15  "vagina," yes, to be not offensive.
16     MS. RILEY:  Well, and that was in my
17  mind, and so to be fair to Counsel, we're
18  not going to ask you to just say every foul
19  thing that was said, but if a different
20  word was used than vagina, which is the --
21  I guess, the physically correct term --
22     THE WITNESS:  Yeah.
23     Q  No, I want to know what happened, so

Page 147

1  you need to tell me.
2      MS. RILEY:  She wants to know the
3  actual -- if it's the "P" word that was
4  used, you need to tell her it was the "P"
5  word.
6      A  Yeah.  It was rarely -- I can't
7  recall an incident where it was actually
8  the word "vagina."  It was -- the term that
9  was used probably 100 percent of the time
10  was "pussy."
11     Q  Okay.  And that's in the issue where
12  they're evaluating women?
13     A  Yes.
14     Q  All right.  So --
15     MS. RILEY:  And you mentioned men's
16  penises also, and I can't imagine the word
17  "penis" was actually used.
18     A  No.  They would say "dick."
19     MS. GRAHAM:  Okay.  Let her testify,
20  okay?
21     MS. RILEY:  I will.  I just --
22     Q  So we'll go back to that where they
23  talk about small penis.  Is that what

Page 148

1  you're --
2      A  Yeah.  They would call it --
3      Q  What did they actually say?
4      A  They -- the most term used was
5  "dick."  I don't recall "penis" being used.
6  That's just what I wrote down for myself.
7      Q  Okay.  So next?
8      A  To follow up on that last about the
9  vaginas, one of the nasty comments that was
10  made about somebody that wasn't attractive
11  to them was that their vagina was like a --
12  was probably like a grilled cheese sandwich
13  pulling apart.
14     Q  And how many times did you hear that
15  comment?
16     A  Or their pussy was like a -- oh,
17  gosh.  Again, it's almost like they would
18  have the same jokes and resay them, so I
19  probably heard that five to ten times over
20  my tenure, and no, I didn't --
21     Q  And who was saying that?
22     A  Just deputies that --
23     Q  Do you remember anyone in

Page 149

1  particular?
2     A  No, ma'am.
3     Q  And did you report that to anyone?
4     A  No, ma'am.
5     Q  Did you tell them that that made you
6  uncomfortable?
7     A  No, ma'am.
8     Q  Okay.
9     A  Let's hand.  Little -- little hands
10  were referred to mean that you have a
11  little dick.  They would talk about that.
12     Q  How many times did you hear that
13  kind of comment?
14     A  Probably just a handful, three to
15  five times over the ten years.
16     Q  And who was saying that?
17     A  Just male deputies.
18     Q  Do you remember anyone in
19  particular?
20     A  No, ma'am.
21     Q  Did you ever report those comments?
22     A  No.
23     Q  Were they ever said in front of a

Page 150

1  supervisor?
2     A  I don't remember.
3     Q  Okay.
4     A  Hair was always a part of a female's
5  evaluation.  Long hair could be pulled
6  sexually.  Short hair made you look like a
7  man.  Sometimes I would cut my hair a
8  little shorter, and there would be a
9  comment made to me just about, like, that
10  wasn't as easy to be pulled sexually.
11     Q  Who made that comment to you?
12     A  I believe Mike Jones was the one --
13  he said about the hair being pulled in
14  relation to the massage that he offered
15  that I'm sure you'll get to.
16     Q  Yes.  And so how many times did you
17  hear that comment made during your tenure?
18     A  10 to 20.  It would just be part of
19  the evaluation, so I'm only guessing, you
20  know, as part of, you know --
21     Q  And did anyone else that you can
22  remember make a comment like that?
23     A  No, ma'am -- I mean, I know that

Page 151

1  others did.  I just can't remember who
2  particularly.
3     Q  And were any supervisors involved in
4  those conversations?
5     A  I don't know.
6     Q  And did you report any of those
7  comments?
8     A  No, ma'am.
9     Q  Okay.
10     A  There were a lot of talk about
11  swingers of the Department.  Particularly,
12  they would say that Brent Patterson was
13  part of a swingers, and I don't
14  particularly, you know, like, maybe feel a
15  way about swingers, just that, but they
16  would get into detail about what went on
17  during swinging and how their different
18  partners would do different things and --
19  or allegedly that Brent Patterson would be
20  involved in these swinging things, and so
21  they would have conversations just how
22  shocked they were that he would be involved
23  in swinging and the details that went into

Page 152

1  that.  So this was just normal conversation
2  but offensive in terms of, like, the
3  details.
4     Q  So Brent never -- Brent Patterson
5  never made that comment to you?
6     A  No.
7     Q  Okay.  Who was making the comments?
8     A  Gary Cross talked about it a lot,
9  and he -- and he would -- he didn't think
10  that Brent's now ex-wife was attractive,
11  and so it would be mixed into, like, I
12  wouldn't swing with them because she is --
13  he would call her ugly and that his penis
14  -- or dick would be limp, you know, if he
15  had to swing with them and just
16  conversations like that.
17     Q  And how often were those kind of
18  comments made to you?
19     A  In regards to the swingers, probably
20  five to ten times over the tenure.
21     Q  We talked about Gary Cross.  Were
22  any other supervisory personnel involved in
23  those conversations?

Page 153

1    A  Not that I -- not that I remember.
2    Q  And did you ever report these
3  conversations?
4    A  No, ma'am.
5    Q  Okay.
6    A  Let's see.  I mean, a lot of this
7  is, like, the -- just part of the
8  evaluation, whether or not the person would
9  have sex with whoever, the new -- the new
10  hire or the stranger out in the hall, so as
11  part of the evaluation, is she ugly, do I
12  like her hair, would I have sex with her,
13  so it would -- comment -- like, Gary said,
14  I wouldn't have sex with her with your
15  dick.
16    Q  To another deputy or to another
17  person?
18    A  No.  He was talking to me, but I
19  think it's just a phrase or something
20  because I've heard that a couple of times
21  there if it wasn't something -- a female
22  that they felt was attractive.
23    Q  All right.  So how many -- you said

Page 154

1  Gary made these kinds of comments.  Who
2  else?
3    A  I can't think of anybody else.
4    Q  Okay.  And how often were these
5  comments made during your tenure?
6    A  As part of the evaluation, a couple
7  dozen times.  I mean --
8    Q  So more than 20?
9    A  I would say more than 20.  20 to 30.
10    Q  Okay.  And were any supervisors
11  involved in these comments other than
12  Sergeant Cross?
13    A  Not that I remember.
14    Q  And did you ever report any of these
15  comments?
16    A  No, ma'am.
17    Q  Okay.
18    A  If you got a promotion -- for
19  instance, when I got promoted, they want to
20  relate it to that you're doing something
21  sexually for somebody because that's -- or
22  for a male in the Department because that
23  was kind of how it felt in the Department.

Page 155

1  So if you got promoted, it was, who are you
2  fucking?
3    Q  Who made that comment to you?
4    A  Well, the lady that asked me how I
5  got promoted, her name is Rhoda, Rhoda
6  Kellum, and she -- I was offended by --
7  just the fact of that I actually put in for
8  that, I guess, somebody would take as a
9  promotion, I put in for that, and I was the
10  only one that put in for it, so I was just
11  offended that it would be connected
12  sexually, so.
13    Q  Other than Rhoda, did anyone else
14  imply --
15    A  I mean, it was just a general thing
16  of the Department.  If any -- if a female
17  got anything good, a new -- I mean,
18  anything, if it happened, it was because of
19  the protector or the person that she was
20  having relationship with.  That's why or
21  allegedly why she got whatever she got.
22    Q  And were any supervisors involved in
23  any kind of comments like that?

Page 156

1    A  Not that I remember.
2    Q  And how many times did you hear a
3  comment that would fit in that category?
4    A  I'd say back to several dozen over
5  the ten years.
6    Q  Several dozen?
7    A  I would say probably 40 to 50 times
8  over the span.
9    Q  And did you report any of these
10  comments to anyone?
11    A  No, ma'am.
12    Q  Now, what is Rhoda's -- Rhoda
13  Kellum's position?
14    A  She -- she left before I left, and
15  she -- I think she retired.  She was a
16  records -- like a clerk in records.
17    Q  All right.
18    A  Whenever Shelby accused Stacey
19  Rutherford of sexual harassment, somebody
20  got word, and I don't know who it ended up
21  in the Department got word of specifics
22  that he made to her regarding putting
23  Alka-Seltzer on her vagina, so that was

Page 157

1  just blown up, talked about non-stop about
2  Alka-Seltzer and vaginas and did that
3  really work and make girls, you know, more
4  excited, if you will.  I mean, it was like
5  a constant conversation about this
6  Alka-Seltzer allegation and a female's
7  vagina.
8      Q  Now, when were those -- when did
9  that start?
10     A  When what --
11     Q  You said it started after a specific
12  person --
13     A  So Shelby accused him of -- Stacey
14  Rutherford, her supervisor, sexually -- for
15  sexual harassment within the last probably
16  two and a half years of my employment,
17  sometime in there.
18     Q  And so it was after that that this
19  conversation took place?
20     A  Because in the allegation -- I never
21  saw the allegation, but in the -- somebody
22  passed the information around that when she
23  alleged the sexual harassment, it included

Page 158

1  that he was offering to put Alka-Seltzer on
2  her.
3      Q  And how often did you hear comments
4  like that?
5      A  Oh, gosh.  It was the subject for a
6  little bit until the next occurrence, but
7  it was probably 20 times.
8      Q  Were any supervisors involved in
9  that kind of commentary?
10     A  Not that I can remember.
11     Q  Did you report that commentary to
12  anybody?
13     A  No.
14     Q  Okay.  And let me be clear and give
15  you an opportunity to change any answers.
16  When I say "report to anyone," I mean
17  anyone at the Sheriff's Office, Madison
18  County, Madison County Personnel Board, or
19  Madison County Personnel Department, okay?
20  So do you need to change any of your
21  answers?
22     A  No, ma'am.
23     Q  Okay.

Page 159

1      A  Let's see.  I don't know.  There --
2  I mean, there would be conversations about
3  sexual positions being difficult in the
4  patrol cars.  It was just something that
5  was talked about.  I mean, I don't -- it
6  was just regular conversation of the
7  Department.
8      Q  And who made those comments?
9      A  Well, Rebecca McMurray discussed it,
10  but I believe she was telling me about
11  maybe not her own experience but somebody
12  saying it around her.  That's how it was
13  initiated, but it was always discussed.  I
14  mean, it was almost like regular -- all of
15  these are almost like regular conversation.
16     Q  And so how many times did you hear
17  discussions surrounding that category of
18  commentary?
19     A  Probably 15 to 20 times.
20     Q  And were any supervisors involved in
21  that discussion?
22     A  Not that I remember.
23     Q  Did you report it to anybody?

Page 160

1      A  No, ma'am.
2      Q  Okay.
3      A  At some point probably two years
4  before I left, there was a lot of deputies
5  saying that they were going to a new
6  hormone doctor, and the hormone doctor, I
7  don't know, like, what he gave or what, but
8  it was making them, as they would say, like
9  a teenager again sexually.  And so one
10  particular person that mentioned this
11  doctor and said that it -- about the
12  teenager and he was almost like a --
13  reborn, like, sexually, like, he just
14  couldn't control was Joe Rice, and he was a
15  supervisor.
16     Q  What was his rank?
17     A  He was a sergeant of the Civil
18  Division.  He's actually still in the
19  courthouse now.
20     Q  Okay.  So he was commenting about
21  this hormone therapy?
22     A  And there was a -- yeah.  There was
23  a doctor that they -- I don't know who

Page 161

1    initiated it, but from how I understood the
2    conversation is that a lot of deputies have
3    started going to that doctor is how I
4    understood it.
5        Q  And did you have that conversation
6    with Joe Rice?
7        A  I had that conversation.  He
8    explained the hormone doctor and said about
9    the sexually -- about how it's making him
10   particularly feel more sexually active and
11   that others were feeling the same way,
12   other males.
13       Q  Did you -- other than your
14   discussions with Joe Rice, did you discuss
15   anything like that with anybody else?
16       A  Julie, the girl that I worked with
17   in my office, he had also made, according
18   to her, several comments of the like to her
19   and so she told me that she was offended by
20   it and so her and I discussed it and that
21   was it.
22       Q  Okay.  Did anyone else make these
23   kind of comments to you?

Page 162

1        A  No, ma'am.
2        Q  Were any supervisors -- well, Joe
3    you said is a sergeant, right?
4        A  Yes.
5        Q  And any other supervisors involved?
6        A  Not that I can remember.
7        Q  And did you report any of these
8    comments to anyone?
9        A  No.
10       Q  Did Julie?
11       A  I don't know.  She had a text stream
12   of it that she kind of showed me of him
13   saying some sexual things to her.  I don't
14   remember exactly what it was, but it was
15   along the lines of, like, him basically
16   wanting to, like -- we had all ate at a big
17   conference table.  We had ordered
18   Steak-Out, everybody, and he was messaging
19   her -- this is what she told me, that he
20   was messaging her about how he wanted to,
21   like, kind of come across the table on her
22   sexually.
23       Q  But that didn't happen to you?

Page 163

1        A  No.  She discussed it with me and
2    showed me the message and said she was
3    offended, but I don't know if she reported
4    anything.
5        Q  Okay.
6        A  I kind of want to say that she did
7    or told me that she went to Personnel.  I
8    don't know that to be --
9        MS. RILEY:  And what's Julie's last
10   name?
11       THE WITNESS:  It's Rosenberg now.
12   It was Stone when I initially started
13   there.
14       Q  Okay.  What else?
15       A  So there is a judge in the building,
16   Judge Linda Coats.  She is a friend of
17   mine, but she would come down for coffee in
18   our office every -- every weekday morning,
19   she comes to -- she might still do that.
20   And they would always discuss how
21   unattractive she was.  They would say that
22   she was like Mother Goose.  So it was Rice
23   and Gary Cross and -- I can't think of

Page 164

1    other particular deputies, but they would
2    say, you know, comments about her stature
3    and she didn't have a butt -- or an ass, I
4    guess, is what they said, and that
5    it was alleged that she liked police
6    officers.  I don't know if she did or not.
7    I don't -- I don't know if she did or not,
8    but they would say, oh, I would never do
9    that, you know, I would never have sex with
10   her, you know, just sexual related comments
11   about Judge Coats happened a lot because
12   she was in our offices a lot.
13       Q  So you mentioned those were made by
14   Joe Rice?
15       A  Brent Patterson, Joe Rice --
16       Q  Who else?
17       A  -- and Gary Cross.  They would try
18   to hide from her a little bit.  Joe was a
19   little nicer to her, but Brent Patterson
20   and Gary Cross would try to hide from her
21   and say that they were just disgusted by
22   her and they would never have sex with her
23   and, you know, just tons of comments like

Page 165

1   that.
2       Q  Anybody else make comments like that
3   about the judge?
4       A  No -- I mean, I don't -- I can't say
5   that no one else made comments like that
6   because she was often talked about.  It was
7   said that before -- now, this was told to
8   me.  I don't remember who told, but it was
9   -- in the Department, it was told she would
10  accept sexual favors from Sheriff's
11  Department male employees when she was in
12  private practice, not as a judge.  So in
13  lieu of payment, it was said that she would
14  -- she would accept sexual -- like, sexual
15  relationships with different deputies.
16      Q  Do you remember who said that to
17  you?
18      A  No, I don't, and the one that was --
19  the deputy that it was said about
20  particularly I believe has passed away.  He
21  was a captain there before I was, but they
22  said that it happened more.  Pete Hose, who
23  is now, I believe, a lieutenant, he was a

Page 166

1   client of hers, and people would say that
2   he -- again, I don't know if it's true, but
3   they would say that he gave sexual favors
4   for her to represent him in some family
5   stuff I believe she did.
6       Q  So we've got Rice, Cross, and
7   Patterson making comments about the judge's
8   appearance.
9       A  Yes.
10      Q  And then you have another set of
11  comments talking about her purported quid
12  pro quo arrangement?
13      A  Yes.  They would talk, yes, sexually
14  about her and what she would accept and
15  that they wouldn't have sex with her and
16  just --
17      Q  And who talked about her arrangement
18  to exchange sexual favors for these --
19      A  Gary Cross told me initially about
20  the Captain that had -- he's since passed
21  away.  I don't remember his name.  But it
22  was then said that Pete Hose -- Gary --
23  Gary Cross told me that Pete Hose also gave

Page 167

1   sexual favors for her to represent.
2       Q  Anybody else talk about this that
3   you know?
4       A  Not that I can think of at the
5   moment.
6       Q  Okay.  And did you ever report any
7   of these comments?
8       A  Kerry Phillips was aware of this.  I
9   talked to -- I talked to him in depth about
10  Judge Coats because they went to church
11  together and she set he and his wife up, so
12  he was somebody that I could -- I talked to
13  him about different things that were said
14  about her.
15      Q  Okay.  And when you had that
16  conversation, were you talking to him in
17  the role of I feel offended by the
18  comments?
19      A  Not necessarily.  I was not
20  reporting it to him for him to tell, no,
21  ma'am.
22      Q  Okay.  And did you report it to
23  anybody else?

Page 168

1       A  No, ma'am.
2       Q  Okay.  What else?
3       A  Wife swap -- there was a whole
4   fiasco about one deputy that was married to
5   a girl that worked at Dispatch, another
6   deputy that had a girlfriend, this deputy
7   started cheating with this guy's wife, so
8   they swapped, and so they would talk
9   sexually about, like -- well, Gary was on
10  the SWAT team at that time with one of the
11  deputies, and he would say, you know, I
12  wouldn't trade, you know, that body for
13  that body, you know, she's not attractive
14  and she doesn't have boobs or -- I'm sure
15  he said boobs or titties.  So they would
16  discuss the wife swapping and the
17  girlfriend and then evaluate whether or not
18  they would approve --
19      Q  So Gary Cross made these kind of
20  comments?
21      A  Yes.
22      Q  Who else?
23      A  That's all I can think of at the

Page 169

1    moment.
2        Q  And any other supervisors involved?
3        A  No, ma'am.
4        Q  And did you ever report any of these
5    comments?
6        A  No, ma'am.
7        Q  And how many -- I didn't ask you.
8    How many times did you hear comments like
9    that?
10       A  The wife swap thing happened and it
11   was kind of the subject for, like, a couple
12   weeks, so I probably heard discussions
13   about it 20 times.
14       Q  In two weeks?
15       A  Yeah.  It was like the hot -- it was
16   to the point of people saying they were
17   going to make T-shirts about -- because
18   there's a show about swapping wives or
19   something and they were going to make
20   T-shirts about them swapping wives.
21       Q  And I didn't ask you, I don't
22   believe, so I'm going to follow up.  The
23   comments about the judge, how many times

Page 170

1    did you hear that during your tenure?
2        A  Maybe 50 to 60 times.
3        Q  Okay.  Anything else on your list?
4        A  And that was not during my whole
5    tenure.  She got more into my presence and
6    my -- you know, she wasn't a judge the
7    whole time I worked there, so when she
8    ended up at the courthouse was more when
9    she was visible and that's when it
10   initiated comments like that.
11       Q  Okay.  So at some point during your
12   time --
13       A  Yes.
14       Q  -- at the Sheriff's Office, she
15   became a judge, and that's when these
16   comments started?
17       A  Yes, ma'am.
18       Q  Okay.
19       A  And then the only other things I had
20   were part of evaluating a female.  They --
21   whether or not you could see panty lines
22   was discussed a lot.  Like, Julie Rosenberg
23   that I worked with, like I said, her pants

Page 171

1    didn't fit, I guess, the way that some male
2    deputies thought they should, so if you
3    could see her panty lines, they would say
4    about her panty lines or that she should
5    wear a thong or something like that.  And
6    they would always reference women's period
7    times, like menstrual cycles, and if you
8    were in a -- seemed in a bad mood, then you
9    were -- are you on your period?  Is that
10   tampon stuck too far?  Like, just anything
11   along that period line.
12       Q  Were you ever asked that?
13       A  I was, but I can't think of who
14   asked me that.  That was also pretty
15   common.
16       Q  Okay.  How often were you asked
17   that?
18       A  Oh, gosh.  If I answered the phone
19   in the wrong way, I was asked if I was on
20   my period.  Probably 50 to 60 times.
21       Q  And just to be clear, you don't
22   remember who either asked you or other
23   women?

Page 172

1        A  Not particularly, no.
2        Q  And did you report any of those
3    comments?
4        A  No, ma'am.
5        Q  Do you remember if a supervisor
6    participated in those kinds of comments?
7        A  Oh, man.  I can't remember if they
8    did or not.
9        Q  Okay.  Is that your whole list?
10       A  Yes.
11       Q  I'd like to enter that as an
12   exhibit.
13       A  Okay.
14       Q  So we talked about everything on --
15       A  And I wrote at the -- this at the
16   top are my comments on the -- that are in
17   this on my Third Amended Complaint.  I just
18   put those comments.  That's what that is at
19   the top.
20       Q  Okay.  So let's let him mark it.
21   I'm going to ask -- you can clarify that.
22       A  Okay.
23   (Whereupon, Defendant's Exhibit No. 11 was

Page 173

1  marked for identification and the same is
2  attached hereto.)
3      Q So I'm just going to hand you back
4  Exhibit 11. Now, these are your
5  handwritten notes?
6      A Yes, ma'am.
7      Q And the testimony you've given about
8  the conduct that you allege has occurred at
9  the Sheriff's Office, you were relying on
10  Exhibit 11 to testify about that?
11      A Yes, ma'am.
12      Q Okay. And does the incidents that
13  you've discussed correspond with paragraph
14  28A through J of your complaint?
15      A Correspond -- yes, ma'am. They were
16  in addition to -- they were things that I
17  could think of were in my presence in
18  addition to what was put into that.
19      Q Okay. So let's go through some
20  other things that are in your complaint,
21  and I'm going to refer your attention to
22  28B, part 2, "Sexually explicit comments
23  regarding a female's perceived sexual

Page 174

1  attractiveness mimicking vomiting and
2  gagging." Who did that?
3      A I can't think of anybody particular
4  because it was pretty -- or it was often
5  discussed as -- like, mimicking someone
6  giving oral sex to a male would be vomiting
7  and gagging and also, that would mimic them
8  being unattracted to whatever female was
9  being evaluated at the time.
10      Q Okay. But you don't remember who
11  made those kind of comments?
12      A No, not -- I don't remember a
13  particular person, no.
14      Q And do you remember if any
15  supervisors made comments like that?
16      A I do not.
17      Q Okay. And how many times were you
18  exposed to those comments, in your memory?
19      A I think that referring to that and
20  the evaluation type of thing, I mean, it
21  happened constantly during my -- my ten
22  years there.
23      Q So does this fit along with your

Page 175

1  testimony earlier about just evaluating
2  females?
3      A Evaluating, yes, ma'am.
4      Q Okay. And did you report anything
5  like this?
6      A No.
7      Q Okay. You have also there on page
8  10 in 28B "Detailed and explicit
9  description of video footage of a female
10  arrestee who was allowed to sit on hood of
11  a car and finish performing a sex act on
12  herself in public."
13      A Yes, ma'am.
14      Q Do you agree with that statement?
15      A Yes, ma'am.
16      Q Okay. Who were you talking about
17  there?
18      A So at some point, there was an
19  arrest made, a female arrest made, and
20  because they had just gotten -- the
21  deputies had just gotten body cameras, it
22  was recorded -- or it could have been the
23  car recording, I'm not sure, but the

Page 176

1  arrestee, the female, was put on the hood
2  maybe while they searched the car -- I
3  don't know those details, but the female
4  was put on the hood, and it went around the
5  Department as detailed gossip that she was
6  allowed to pleasure herself and all the way
7  to until she was finished pleasuring
8  herself.
9      Q And who talked about that in your
10  presence?
11      A Oh, my goodness. I can't remember
12  anybody particular because it was -- it was
13  the topic of that time, and the video -- I
14  did not see the video, but the video was
15  watched by anybody that could get a hold of
16  it.
17      Q When did this happen?
18      A It was in the last three years of my
19  employment. I'm only guessing.
20      Q And how many discussions do you
21  recall hearing about it?
22      A I mean, there were several
23  discussions. I discussed it with Kerry

Page 177

1  Phillips, even, and it was in -- I mean, we
2  just discussed, like, why the deputies
3  would be -- I mean, why the deputies were
4  all excited about this video and trying to
5  watch it.
6      Q  And did you discuss it with him with
7  an effort to say, this makes me
8  uncomfortable, or were you just saying --
9      A  I mean, we were discussing it
10  because it was uncomfortable.
11     Q  Okay.  Did you -- were you making an
12  allegation of sexual harassment?
13     A  I was not.  We were just discussing
14  how it was awful.
15     Q  All right.  We have here in 28C
16  overheard by you "Detailed and sexually
17  explicit description of a deputy being
18  caught on camera having sex with a store
19  clerk."  What's that about?
20     A  There -- Deputy Pete Roth was
21  allegedly -- I didn't see it or the footage
22  -- caught at a convenience store, to my
23  understanding, in the county limits, and

Page 178

1  they thought they locked the door is what I
2  was told.  Gary Cross told me this story.
3  Was told that the door was locked, or they
4  thought the door was locked at the
5  convenience store, and he and the female
6  clerk were having sex behind the cashier's
7  desk, or the counter, and so it was just
8  described to me that he got caught having
9  sex and that I think it was told to me that
10  he and his wife -- just the details about
11  them getting into a fight afterwards and --
12     Q  So this was a conversation between
13  you and Gary Cross?
14     A  Yes.  He was telling me about that
15  incident which occurred before I started
16  working there, so he was just volunteering
17  the information.
18     Q  Why did you find that offensive?
19     A  Because I thought a lot of Pete
20  Roth, actually, and I just -- imagining --
21  I just didn't want to have a
22  conversation about his, like, sexual
23  activity and a store clerk.

Page 179

1      Q  Did you tell Gary Cross, please, I
2  don't want to hear it?
3      A  I don't recall exactly what I said
4  to him, but I did say that I thought a lot
5  of Pete Roth and I just couldn't imagine
6  that being the case, but it was just
7  conversation.
8      Q  Is this a conversation that happened
9  once or more than once?
10     A  Just once.
11     Q  Okay.  And did you report the
12  conversation to anyone?
13     A  No, ma'am.
14     Q  Okay.  Have we addressed this
15  "Detailed and sexually explicit
16  descriptions of having sexual relations
17  with coworkers" in paragraph 28C?
18     A  So a lot of -- is it incestuous
19  relationships?  Is that the word -- would
20  go on in the Sheriff's Department.  A lot
21  of it was discussed.  Particularly, Rebecca
22  McMurray would give me, like, very vivid,
23  explicit descriptions of her sexual

Page 180

1  encounters with different people -- or
2  different deputies of the Department.
3      Q  How many times did she describe that
4  to you?
5      A  Oh, gosh.  Probably 15 times,
6  approximately.
7      Q  Did you ever share any sexual
8  experiences you had with her?
9      A  I did not.
10     Q  Did you ever tell her, please,
11  don't?
12     A  I told her it was TMI, too much
13  information, and a lot of people have told
14  her TMI, but she was just very explicit.
15     Q  And did you ever report her comments
16  to anyone?
17     A  No.
18     Q  Okay.  Anybody else that would fit
19  into this category?
20     A  There was a lot of -- there was
21  always a lot of conversations about who has
22  hooked up with -- or who has had sexual
23  relationships with different people in the

45 (Pages 177 to 180)

Page 181

1  Department.  I can't say particularly right
2  off the top of my head, but it was talked
3  about a lot.  I think it happened a lot.
4      Q  How often do you think you heard
5  such conversations?
6      A  Oh, my goodness.  Over the
7  ten years, 100, whether it be that they
8  wanted to have the sexual relations or
9  would or wouldn't or did, allegedly.  I
10  mean, who knows if they did or didn't.  But
11  the sexual conversations about each other
12  was rampant.
13      Q  Did you ever report that kind of
14  discomfort to anyone?
15      A  No, ma'am.
16      Q  Okay.  We're moving on to 28D.
17      A  Okay.
18      Q  "Descriptions of the size of their
19  private parts."  Who talked to you about
20  that?
21      A  In that particular one, it was Dan,
22  D-a-n, De Jong, but it's spelled D-e
23  J-o-n-g, and he no longer works there.  He

Page 182

1  was over seven foot tall, very noticeably,
2  and he would refer to his self as being a
3  tricycle, indicating that his -- his penis
4  was as long as his legs.
5      Q  Did he make that comment to you?
6      A  He made it to me and Julie in the
7  same office.
8      Q  Was a supervisor there?
9      A  Nobody was in there with us.
10      Q  Did he do that once, twice?  How
11  many times?
12      A  He's probably made that -- a comment
13  or one of the like of his penis being large
14  and having three legs probably three to
15  five times in our office.
16      Q  During your tenure?
17      A  Yes.
18      Q  Did you report his comment to
19  anyone?
20      A  No.
21      Q  Okay.  I think we've discussed E.
22  Why don't you take a minute to read it, and
23  tell me if you have anything to add.

Page 183

1      A  We've discussed the evaluation type
2  of -- yes.
3      Q  Okay.  And let's go on to F, and I'm
4  going to let you read that also and tell me
5  if -- this is --
6      A  Oh, okay.
7      Q  -- paragraph 28F in your Third
8  Amended Complaint, and tell me if there's
9  anything we haven't discussed that's
10  identified there.
11      A  I hope I'm reading the right F about
12  detailed and sexually explicit discussion
13  of photographs.
14      Q  Yes, ma'am.
15      A  Yes.  We have not talked about this
16  particular --
17      Q  Okay.
18      A  The Dispatch supervisor -- to my
19  understanding, she's still the Dispatch
20  supervisor.  Her name is Theresa Hocken,
21  H-o-c-k-e-n.  And it was talked about prior
22  to her even becoming a supervisor, so I
23  would go -- I would say that probably my

Page 184

1  whole ten years because she was there
2  before me, it was always discussed that she
3  sent out pictures of fruits inside of her
4  vagina, her own fist, and I -- Gary Cross
5  showed me the fist one, and it appears to
6  be in her office at -- she's at the 911
7  Center, and it was just always talked about
8  that there are several pictures going
9  around of her and sexual acts that she's
10  doing with herself.
11      Q  And so Gary Cross discussed this
12  with you.  Who else?
13      A  Oh, gosh.  There was a guy that
14  worked for her -- John Sheldon.  He -- no,
15  he left before I did.  It was -- he
16  discussed it a lot and said that she
17  couldn't write people up or felt like she
18  couldn't write people up because people
19  have these pictures of her.  So it was just
20  discussed all the time.
21      Q  Well, can you be more specific?
22      A  I know -- it was discussed
23  constantly throughout my ten years.  I

Page 185

1    mean, it was discussed, the pictures, the
2    fruits, her office, not her office, her
3    soliciting sexual acts to Gary.  Gary
4    claimed that she wanted to have sex with
5    him and that she wrote him text messages
6    about wanting to have sex with him.  So she
7    was discussed --
8        Q  But you can't remember anybody other
9    than Gary Cross -- or I'm sorry.  John
10   Sheldon?
11       A  Yeah, John Sheldon.  I know that
12   some of the females there have talked about
13   it, but I don't remember their name.  It
14   was just discussed all the time.  But yes,
15   I understand that that's not that specific.
16   It just happened so often.
17       Q  And did you ever report any of these
18   discussions or comments to anyone?
19       A  No.
20       Q  Okay.  Well, let's go on.  "Sexually
21   explicit descriptions of a female
22   coworker's erect private parts."  Does that
23   refer to the previous --

Page 186

1        A  Yes, ma'am, it does.
2        Q  So you don't have anything to add
3    with respect to that?
4        A  No, ma'am.
5        Q  Okay.  "Detailed and sexually
6    explicit discussions of the desirability of
7    having sex with a coworker with speculation
8    regarding the appearance and
9    characteristics of her private parts."  Is
10   that --
11       A  That we've discussed, yes, ma'am.
12       Q  Okay.  Deputy Chief Jernigan
13   commented to you that the security code
14   6969, referencing a sex act, should be
15   assigned to a coworker while she was on her
16   honeymoon.  Tell me about that.
17       A  We got a new security system, and
18   the offices on the second floor, when he
19   was the Chief Deputy, I don't think -- I
20   never used it, but we had to come up with a
21   -- our own security code to unlock and
22   lock.  Again, I never used it.  Sheriff
23   Dorning's daughter was on vacation at that

Page 187

1    time -- on her honeymoon, actually, and so
2    he said, what should we assign for Meghin
3    to have as her security code, and he said
4    -- he wrote it down too.  He said, let's do
5    6969.  And the part-time pistol permit
6    worker, Laura Southerland witnessed him
7    saying that, heard him saying it.  She was
8    standing up front actually doing a pistol
9    permit.  The person wasn't standing there.
10   I don't know if she was, like, just looking
11   over an application or what, but she was
12   standing up and heard him say that, and she
13   -- when he walked away, she said, that was
14   -- that was awkward or, like, that was --
15   she didn't say "inappropriate," but
16   "awkward" or something about it being
17   offensive.
18       Q  When did this happen?
19       A  Whenever -- well, I'd have to see
20   when Meghin went on her honeymoon.
21       Q  So you can't be more specific than
22   that?
23       A  No, because Jernigan wasn't there

Page 188

1    that long, and it was pretty early on in
2    him being there, so whenever he got
3    there -- maybe 2016 is when he got there.
4    I'm not really sure.  But it was early on
5    and -- because Meghin didn't work with me
6    on the second floor for very long, that
7    Meghin didn't.
8        Q  And when did he get in there in your
9    tenure?  Do you recall?
10       A  At the very end.  Probably the last
11   two -- maybe one and a half, two years.
12       Q  Okay.  So sometime in your last
13   two years --
14       A  Yes.
15       Q  -- you think this comment happened?
16       A  Yes, ma'am.
17       Q  And I hate to be obtuse, but how do
18   you know he was referring to a sex act?
19       A  I assume that because I know what 69
20   refers to, and the way that 69 is written
21   out also depicts what it refers to.
22       Q  And did he say anything other than
23   6969?

47  (Pages 185 to 188)

## Page 189

1    A He said we should give her 6969
2  because she's on her honeymoon.
3    Q Anything else?
4    A Not that I can recall.
5    Q And was that the end of the
6  conversation?
7    A It was.
8    Q So he just walked away?
9    A He did.
10   Q And did you report his comments to
11 anyone?
12   A No, ma'am.
13   Q All right. Let's move on to 28G.
14   A Uh-huh.
15   Q I'm going to ask you to read it and
16 see if there's anything here that you
17 haven't already discussed. I don't want to
18 make it overly long, so you let me know.
19   A We've discussed the new hires and
20 the -- yes.
21   Q Okay. So everything in G, you've
22 already told me about your experience?
23   A Aside from you having labels as

## Page 190

1  crazy or other derogatory labels if you
2  rejected the men, the male deputies'
3  advances. We haven't -- I mean, haven't
4  discussed, like, this, but otherwise, we've
5  discussed this one.
6    Q All right. So were you ever labeled
7  crazy or referred to in a derogatory manner
8  for rejecting male attention?
9    A I was never -- I never heard it
10 directly to me, no. No one called me crazy
11 that I'm -- like, to me.
12   Q Okay. And do you know of any other
13 females who were called crazy or referred
14 to in a derogatory manner?
15   A I know that Marina was referred to
16 as crazy for even initiating her complaint
17 and that it was crazy for her to feel
18 offended about them making -- about her
19 supervisors making comments about her being
20 married to a Hispanic -- Hispanic men. I
21 say "men" because it was two different men.
22   Q And anything else?
23   A No, ma'am.

## Page 191

1    Q Okay. And did you -- well, I guess
2  she reported -- Marina reported that
3  herself?
4    A Yes, she did.
5    Q Okay. Let's go to H and -- well,
6  wait. Let me see if there's anything --
7  let me go to I first, okay? This is sort
8  of a catchall.
9    A Okay.
10   Q Well, no. I'm sorry. It says,
11 "Cagle experienced constantly being hit on
12 by males, despite her prior rejection of
13 all advances." Have we discussed this
14 category?
15   A As far as, yes, I was hit on and,
16 you know, made advances toward my whole ten
17 years, and they were rejected.
18   Q Okay. Did you ever date anyone at
19 the Sheriff's Office?
20   A Yes, I did.
21   Q Who?
22   A His name was -- is Matthew
23 Scratchard. It's Scratch and then a-r-d.

## Page 192

1    Q Okay. How long did you date him?
2    A Just about the majority of the time,
3  so seven years.
4    Q Did people know you were dating?
5    A Yes.
6    Q Anyone make a comment to you about
7  you dating him?
8    A I mean, they would say that he was
9  -- Mike Jones told me that -- that Matt was
10 lucky and just, I mean, comments like that.
11   Q Did you ever tell Matthew about your
12 experiences?
13   A Yes. Uh-huh. Yes, ma'am.
14   Q What did he say?
15   A I mean, he felt offended, but I
16 asked him to, you know, not do anything to
17 lose his job because I just didn't want him
18 to lose his job and make it more awkward
19 for me at work.
20   Q Why would he lose his job?
21   A I mean, I feel like if he questioned
22 certain people, like, maybe Mike Jones
23 because Mike and the Sheriff were good

Page 193

1    enough friends that the Sheriff cooked at
2    his wedding, that it might result in him
3    being retaliated against.
4        Q  Is that the basis for your feeling
5    that his job was at risk?
6        A  I mean, I thought that I was at risk
7    because it was set up for the atmosphere to
8    be that way and that if I shook any leaves
9    or shook any trees or however you --
10   stirred the pot, that it would result
11   badly.
12       Q  And so based on that feeling, you
13   asked him not to report these things?
14       A  Based on what --
15       MS. RILEY:  Object to the form.
16       A  -- the Sheriff told me to begin
17   with, based on what I experienced, based on
18   me telling and it resulting the way that it
19   did, just based on everything I had
20   experienced over the ten years.  It was --
21   I knew that this was going to be his --
22   he's still there.  He's -- he's a
23   supervisor and a SWAT team leader, and --

Page 194

1        Q  Who was -- was he on the SWAT team
2    when you dated him?
3        A  He -- not from the very start, but
4    quickly -- fairly quickly on, he was put on
5    the SWAT team, yes.
6        Q  Who else was on the SWAT team?
7        A  Oh, gosh.  There's, like --
8        Q  Was Gary -- well, let me ask this:
9    Was Gary Cross on the SWAT team?
10       A  He was probably half the time I
11   worked at the -- but he got put off for
12   some reason, and I don't remember why.
13       Q  Were Gary and Matt friends?
14       A  Yes.
15       Q  Did they socialize together?
16       A  Some.  They would get -- some of the
17   SWAT people would -- they get together
18   weekly, and I don't know if Gary went with
19   them all the time, but they did socialize,
20   yes.
21       Q  And did you go to those weekly
22   events?
23       A  I was invited, like, the first time

Page 195

1    when I first started working there, I guess
2    to, like, meet people.  That's how I met
3    Matt, actually, and he was not on SWAT
4    then, but he was invited to go, and so I
5    would see them sometimes, yes.
6        Q  And who would you see at these
7    gatherings?
8        A  Matt, unfortunately, was one of the
9    main ones because he likes to drink and --
10   let's see.  Who would be the main ones
11   then?  Chuck Zeissler -- Charles Zeissler
12   is his name.  He would be with them a lot.
13   It was -- a lot of the times, it was just
14   Matt and Chuck and some of the reserve
15   deputies that they had on SWAT.  Gary would
16   meet them sometimes, but then he was off
17   SWAT, so I don't know what happened with
18   that.
19       Q  Well, I mean, did you ever express
20   to Matthew that Gary Cross is making you
21   really uncomfortable?
22       A  Yes, I did.
23       Q  And did that impact his friendship

Page 196

1    with Gary Cross?
2        A  Yes.  There were spurts of times
3    that it impacted it, and he would -- I
4    think Matt felt like he had to kind of
5    endure some of it only because he wanted to
6    move up the SWAT thing and Gary was at one
7    time a supervisor on SWAT, so.
8        Q  Did Matt tell you that, or is that
9    just what you're inferring?
10       A  No, he was very visibly offended by
11   a lot of stuff that happened.
12       Q  No.  Did he tell you he -- I think
13   your comment was he felt like he couldn't
14   say anything because he wanted to move into
15   that.
16       A  We've discussed -- we discussed that
17   on -- probably four or five times,
18   different incidents that would happen we
19   would discuss, and if it was Gary, yes,
20   Matt would -- I don't know exactly what he
21   said, but he would say to the extent of
22   feeling like he couldn't say something
23   because Gary was his supervisor.

Page 197

1    Q  Now, I do want to clarify something.
2    You've been talking about your ten years at
3    the Sheriff's Office, and I just -- I
4    wanted to --
5    A  Yes.  Tenure, I think.
6    Q  Oh, okay.  Tenure.
7    A  I'm sorry.  I'm sorry.
8    Q  Okay.
9    A  I was there, like, seven and a half
10   years.  I apologize.
11   Q  Okay.  So "tenure" is what you meant
12   to say?
13   A  Tenure, yeah.  I took it from you
14   when you first said it and -- I'm sorry.
15   (Whereupon, an off-the-record discussion was
16   held.)
17   Q  So we've talked about a lot of
18   things --
19   A  Yes.
20   Q  -- and I want to refer your
21   attention to paragraph 28H on page 11 which
22   refers to unwanted and offensive dominant
23   touching.  Who touched you in a way that

Page 198

1    was offensive to you?
2    A  Particularly, Mike Jones and Brent
3    Patterson.  They would -- my desk in the
4    office that a lot -- that this particular
5    stuff occurred was -- my back was to the
6    door, and they would come up and massage,
7    like, my head, my shoulders, my arms.
8    Q  Okay.  Now, we're going to get into
9    that in detail.
10   A  Right.
11   Q  Is there anybody else who would fit
12   into this category?
13   A  Oh, not that I can think of at the
14   moment.
15   Q  Okay.  And then the last question I
16   have, I think, on this subject is 28J on
17   page 12, which says, "Other unwanted and
18   offensive sexual comments and actions."  So
19   I really need to know here, is there
20   anything else that we haven't already
21   discussed that you felt was unwanted,
22   offensive to you?
23   A  I tried to list a lot that I -- you

Page 199

1    know, I am sure that I could come up with
2    more.  I can't think of it at the moment,
3    but I know that there was probably more
4    along those -- the tenure.
5    Q  Well, unfortunately, this is my only
6    opportunity --
7    A  Right.
8    Q  -- unless we keep this deposition
9    open and we depose you again, so I do need
10   to know if there's anything else that you
11   have not mentioned already.
12   A  Right.  I can't think of anything
13   that -- I can't think of anything that I
14   haven't mentioned already or that we won't
15   go over.
16   Q  Yes.  And I will leave out the
17   touching.  We're going to talk about that.
18   A  Okay.
19   Q  And there's other allegations about
20   your complaints.
21   A  Yes, ma'am.
22   Q  We're going to talk about that.
23   A  Okay.

Page 200

1    MS. GRAHAM:  All right.  Well, I
2    think it's a good time to take a break.
3    (Whereupon, a break was taken.)
4    Q  Now, I want to direct your
5    attention, Ms. Cagle, to a subject we
6    started to talk about was unwanted and
7    offensive touching right before the break.
8    Do you recall that?
9    A  Yes.
10   Q  Okay.  And who touched you in a way
11   that was offensive to you?
12   A  Mike Jones, Brent Patterson.
13   Q  Anyone else?
14   A  Not that I can think of.
15   Q  Okay.  I want to talk about Mike
16   Jones first, okay?
17   A  Okay.
18   Q  When did the touching start?
19   A  The last few years of my employment,
20   he was more often than not assigned to work
21   the courthouse, so I had more interaction
22   with him, so that's when it occurred.
23   Q  But nothing before that time?

Page 201

1      A Not that I can remember.
2      Q Okay. Where did he touch you
3  physically on your body?
4      A He has touched my arms, shoulders,
5  and probably my left leg.
6      Q Left leg where?
7      A Just on my thigh area. There was a
8  chair right beside my desk that was beside
9  my left leg.
10     Q So did he sit in the chair?
11     A Yes, he did.
12     Q And put his hand on your leg?
13     A Yes.
14     Q Did he rub it or anything?
15     A I don't recall rubbing. Just like a
16  hard --
17     Q Pat?
18     A Not a pat because it stayed, but
19  like a touch, I guess, just a constant
20  touch. Not just a quick touch.
21     Q How long did he touch you there on
22  your leg?
23     A I don't recall. Probably just a

Page 202

1  minute or so.
2      Q And is that the only time he touched
3  your leg?
4      A That's all I can recall.
5      Q The rest of the time, it was upper
6  body, shoulders?
7      A Yes, ma'am, and head. He would do
8  in your hair.
9      Q Okay. And where did this touching
10  occur? Like, in your office?
11     A Yes, ma'am.
12     Q Always in your office?
13     A As far as I can remember, yes.
14     Q And why would he be in your office
15  area?
16     A He didn't have anything pertaining
17  to my office directly, but he worked
18  security in the courthouse.
19     Q Did he have any official business in
20  your office?
21     A Not in my office, no. I mean, I'm
22  sure during his employment at some point,
23  he has had, but during those times that he

Page 203

1  interacted with me and the touching, he had
2  no official business.
3      Q So during that time period, your
4  last couple of years, how many times did
5  Deputy Jones touch you in a way that was
6  unwelcome?
7      A Five to ten.
8      Q Did you ever tell him, cut it out?
9      A No. I just, like, shrugged it --
10  physically -- or physically moved to shrug
11  off the massaging, and I declined any
12  further invites that he also had.
13     Q What invites are you referring to?
14     A He has said -- probably five to
15  seven times, he has asked me about wanting
16  to give me a massage, like a full body
17  massage is how he indicated it, and
18  indicated further that he wanted it to be
19  that I should be naked and how much he
20  would enjoy giving me a full body massage
21  and that it could be -- he knew a place in
22  the courthouse if I was interested.
23     Q Anything else?

Page 204

1      A Just the same kind of advances about
2  massages were a majority of what he would
3  solicit to me.
4      Q Did you ever say, no, I'm not
5  interested in a massage or anything of that
6  type?
7      A I always said I was not going to --
8  I never had the massage, so I never -- I
9  always said, like, no, I'm good -- I mean,
10  like, I told him no, but I don't know what
11  form of no. Like, he would say he could
12  come to my house. No, I got blah, blah,
13  blah to do or whatever. And -- or he would
14  say the courthouse. Like, no, I don't need
15  you to give me a massage. Like, that kind
16  of thing.
17     Q Did you take any other steps to
18  avoid him?
19     A I told his supervisor, which was
20  Gary Cross at the time.
21     Q When did you tell Gary Cross about
22  this?
23     A I told him during the time of it

Page 205

1    happening, so within the last year and a
2    half, two years of my employment. Gary and
3    I had discussed it a few times.
4        Q  And how did you discuss it?
5    Verbally in person?
6        A  Verbally in person, yes.
7        Q  Did you ever discuss it on text
8    message?
9        A  I did -- not to Gary. I told a
10   female that worked across the hall from us,
11   Beth McNair, I told her because I -- and I
12   provided these messages. I asked her to
13   let me know if Mike was working on
14   particular times because I -- for example,
15   I said, hey, I need to distribute mail in
16   the courthouse. That was one of my -- I
17   would take to Personnel and stuff. And I
18   would say, is he in the courthouse because
19   I don't want to go out if he is, and she
20   would tell me if he was in the courthouse
21   or leaving for a little bit so that I could
22   go do my job.
23       Q  Did you ask any other coworkers to

Page 206

1    intervene on your behalf?
2        A  I asked Julie that worked in the
3    physical office with me, I asked her if he
4    came in there while she was in there, if
5    she would stay if at all possible so that I
6    wasn't by myself.
7        Q  Did she comply with that request?
8        A  I don't -- yes, she said that she
9    would. I don't know if we were put into
10   that position.
11       Q  Did anyone ever see Mike Jones
12   massage you?
13       A  Julie.
14       Q  Anyone else?
15       A  I don't think so.
16       Q  Okay. Now, I want to get back to
17   your conversation with Gary Cross. What
18   did you tell him?
19       A  I told him that Mike comes in
20   soliciting the massages and the --
21   soliciting the full body massage as well as
22   the actual shoulder massaging stuff and
23   that I feel awkward around him and that I

Page 207

1    was going to try to avoid him as best I
2    could when they assigned him to the
3    courthouse.
4        Q  What was Gary Cross' response?
5        A  Nothing, really. I mean, he just
6    listened to me. He didn't give any advice
7    or anything.
8        Q  How many times do you think you had
9    that conversation with him?
10       A  We probably had it three times.
11       Q  Did you tell anyone else about Mike
12   Jones' behavior towards you?
13       A  I think just him and Beth and Julie.
14   I may have had a conversation with Kerry
15   Phillips about it. A lot of -- you know, I
16   didn't even have -- our office didn't even
17   have full walls, so it was, like, hard for
18   it to be that people didn't hear or know
19   what was going on, so.
20       Q  Okay. Well, there are a couple of
21   things in that statement. You said you may
22   have. Do you remember a conversation with
23   Kerry Phillips about this or not?

Page 208

1        A  I do not.
2        Q  Okay. So other than Sergeant Cross,
3    did you complain to anyone else or report
4    this behavior with anyone else?
5        A  Besides Sergeant Cross and Beth and
6    Julie, no.
7        Q  Okay. Anyone else?
8        A  Not that I can remember, no.
9        Q  Okay. Why did you feel comfortable
10   complaining to Sergeant Cross but not to
11   anyone else?
12       A  I -- where this fell in the times
13   that I -- this came after the Tim Clark
14   incident that I'm sure we'll get into, so I
15   attempted this route, to go to his direct
16   supervisor, which was Gary Cross.
17       Q  Do you know if Gary Cross took any
18   action in response to your --
19       A  I do not know. I don't know of any
20   that happened.
21       Q  I'm just a little confused because
22   Gary Cross was identified by you repeatedly
23   making statements that made you

Page 209

1    uncomfortable.
2        A  Yes.
3        Q  So why did you feel comfortable
4    going to him and --
5        A  It wasn't that I felt comfortable,
6    necessarily.  I felt like he was Mike's
7    direct supervisor, so I had attempted other
8    means of situations that have occurred
9    prior to the Mike Jones -- this Mike Jones
10   incidence, so going to, let's say,
11   Personnel didn't come out favorably on my
12   side, so I've tried all these other
13   attempts, well, I tried his direct
14   supervisor.  That was in the stuff as his
15   chain of command.
16       Q  Did Mike Jones' behavior cease?
17       A  No.
18       Q  Did it go on throughout your tenure,
19   the remainder of your tenure?
20       A  The remainder of my -- there were
21   comments, texts.  I provided the texts.
22   (Whereupon, Defendant's Exhibit No. 12 was
23   marked for identification and the same is

Page 210

1    attached hereto.)
2        Q  Ms. Cagle, these are text messages
3    provided by your attorney to us in
4    discovery, and you see some language up
5    there, "Former Sheriff Blake Dorning"?
6        A  Yes.
7        Q  I'd just like you to glance through
8    Exhibit 12.  So all of these text messages
9    would be between you and Blake Dorning?
10       A  Yes.  Yes.
11       Q  And I have looked at the materials
12   that you submitted recently, and there are
13   text messages for a time period, and then
14   there will be gaps in time period.  How did
15   you select the text messages that you gave
16   to your attorney to send to us?
17       A  Well, it depends on the person.  For
18   him, it was all of them.  He was not a --
19   he's not a texter, and "him" being Sheriff
20   Blake Dorning.
21       Q  Okay.  What about Gary Cross?  How
22   did you determine which text messages to
23   give to your attorney to give to us?

Page 211

1        A  I believe I gave all -- I believe I
2    gave all of his.  I am not 100 percent
3    sure.  But if that was what was asked,
4    that's what I -- and he was in my office
5    more so than he would text.  He would sit
6    for hours.
7        Q  What about Brent Patterson?
8        A  He had two different phones, and I
9    am pretty sure that that has all been given
10   to you.
11       Q  So no gaps in your text messaging?
12       A  None to my knowledge.
13       Q  Okay.
14       A  And he also ended up with an office
15   outside of mine, so a lot of his was
16   verbal.
17       Q  When was that?
18       A  He got moved up there towards the
19   end.
20       Q  So who was in your office at that
21   point?
22       A  So it ended up me, Julie, Kerry
23   Phillips, and Brent Patterson.

Page 212

1        Q  Where was Joe Rice?
2        A  Joe Rice got moved to the Sheriff's
3    Office that I started in because Sheriff
4    Dorning got new offices down the street.
5    That has now switched back, but he moved
6    offices out of the courthouse.
7        Q  Okay.  I just want to direct your
8    attention -- I'm going to look at that
9    number at the bottom right, Cagle 17 -- it
10   looks like 171.
11       A  171?
12       Q  Yes, ma'am.
13       A  Okay.
14       Q  And does this identify a text
15   message from you to Sheriff Blake on June
16   6th, 2017 at 6:52 p.m.?
17       A  June 6th, 2017, yes, ma'am.
18       Q  And I just want to direct your
19   attention to the bottom of this text and
20   with the sentence beginning with
21   "Lieutenant Brooks."  Do you see that?
22       A  Yes, ma'am.
23       Q  So it says, "Lieutenant Brooks got

Page 213

1  called about it on his vacation. Mike
2  Jones has screamed at me about it and
3  everything else."
4      A  Uh-huh.
5      Q  Is that the same Mike Jones that you
6  are alleging touched you inappropriately?
7      A  Yes.
8      Q  So why did you feel comfortable
9  complaining to Sheriff Blake about Mike
10  Jones screaming at you but not about him
11  touching you inappropriately?
12      A  Well, this was me informing him of
13  what happened at the gym because it had
14  escalated to a point of Mike actually -- I
15  mean, he was screaming at me through the
16  phone outside of work. So, I mean, it was
17  just me informing him because it had been
18  told to Lieutenant Brooks somehow, I don't
19  remember how, and that Mike had screamed at
20  me over the gym, and Mike answered directly
21  to the Sheriff at that time.
22      Q  Okay. So you went directly to
23  Sheriff Blake?

Page 214

1      A  I did, because that was his direct
2  supervisor.
3      Q  And you made him aware that Mike
4  Jones --
5      A  For the gym only.
6      Q  And you made him aware, that is,
7  Sheriff Blake, that Mike Jones had acted
8  inappropriately?
9      A  That he had screamed at me, yes.
10      Q  And when did he scream at you? Was
11  that the same day, June 6th, 2017?
12      A  Yes.
13      Q  So that day, you went straight to
14  the Sheriff and complained?
15      A  The day that -- yes. I sent the
16  text message.
17      Q  Now, on the next page, Cagle 172,
18  how did the Sheriff respond to your text
19  message?
20      A  We'll talk soon. Thank you for
21  striving for ownership. This will be
22  worked on.
23      Q  Okay. How did you feel about that

Page 215

1  response?
2      A  I mean, it sounds good, but it
3  didn't happen.
4      Q  What do you mean?
5      A  I mean, nothing was ever done to
6  Mike.
7      Q  Okay. Did he ever scream at you
8  again?
9      A  I don't recall.
10      Q  Would you have access to any sort of
11  conversations between Sheriff Blake Dorning
12  and Mike Jones about this incident?
13      A  No.
14      Q  So you don't know if he talked to
15  him or not about it?
16      A  Well, nothing changed with Mike
17  Jones and his ability to get to me in my
18  office, so --
19      Q  Well, I'm talking about him --
20      A  -- one can only assume.
21      Q  -- screaming at you. I'm talking
22  about him screaming at you. And you said
23  -- I thought your testimony was you don't

Page 216

1  recall him doing that again.
2      A  Right. Okay. That's fine.
3      Q  Is that right? Is that your
4  testimony?
5      A  That's right.
6      Q  Okay. Is there any other way in
7  which Mike Jones made you feel
8  uncomfortable?
9      A  He has stood behind me in the gym
10  while I'm trying to work out to show me how
11  to work out and do a squat particularly so
12  his body is touching up next to mine while
13  my then boyfriend, Matt, was also in there
14  and did get offended by that. The whole
15  atmosphere is hit or miss on which person,
16  which incident you feel like you can turn
17  in because it's such a bad environment and,
18  you know, sexually driven environment, so
19  it just was another incident of Mike Jones
20  and me having -- and me being offended by
21  his actions.
22      Q  Let me talk about the gym. Where is
23  the gym?

Page 217

1      A  It is connected to where the patrol
2  deputies and the investigators and Records
3  and Fleet.
4      Q  Is this a gym run by the -- by whom?
5      A  It's the Sheriff's Department's gym.
6      Q  So you were able to use it as a
7  Sheriff's Office employee?
8      A  Yes.  Other people did too, but yes.
9      Q  And how often would you go there?
10     A  At one chunk of time there towards
11 the end, I had -- was a member of another
12 gym too, so two to three times every other
13 week for the last couple years.
14     Q  Did you go before work, during work,
15 after work?
16     A  I would go either at lunch or after
17 work.
18     Q  So when you went at lunch, would you
19 change at your office and then go to the
20 gym?
21     A  Yes.
22     Q  What did you wear to the gym?
23     A  Gym clothes.

Page 218

1      Q  Like what?
2      A  Shorts or, like, gym leggings, I
3  guess is what you would call them --
4      Q  And so did you work --
5      A  Workout pants.
6      Q  Excuse me.
7      A  Sorry.  Workout pants, I guess is
8  the official thing that I should call it.
9      Q  Okay.  And so you would change into
10 those clothes and wear them out of your
11 office here to the gym?
12     A  Yes, or change at the gym.
13     Q  Okay.  And then when you worked out,
14 would you change at the gym or come back to
15 your office to change out?
16     A  I came back to the office.  If I
17 changed at the office, I -- if I changed to
18 go there, then I changed back at my office.
19 If I changed at the gym, then I changed
20 back into my clothes at the gym.
21     Q  Did you ever -- other than Mike
22 Jones screaming at you, which you reported
23 to Sheriff Dorning, did you ever report

Page 219

1  Mike Jones' conduct towards you?
2      A  To Gary Cross.  I believe I answered
3  that.  But that was his supervisor.
4      Q  I'm sorry.  You did answer that.
5  Anyone else?
6      A  Besides the two girls that I
7  mentioned, no.
8      Q  Okay.  Let's move on to Sergeant
9  Patterson.
10     A  Okay.
11     Q  Now, when did Sergeant Patterson
12 subject you to unwanted and offensive
13 touching?
14     A  He got moved to our office area
15 maybe a year before I left, approximately a
16 year, and so I was in close proximity to
17 him at that point, and that is when it
18 occurred and he would massage my shoulders
19 and stuff.  And he told me that the Sheriff
20 called him -- after one of the incidents,
21 Sheriff Dorning called him, is what Brent
22 told me, and said that he had witnessed
23 that and that he needed to not do that

Page 220

1  because it was probably offensive.
2      Q  Okay.  So as to when it started,
3  that would be 2016?
4      A  Yes.
5      Q  Do you have a month?
6      A  I don't know when he was moved up
7  there because I was already up there.
8      Q  Okay.  And how would he touch you
9  physically on your body?
10     A  He would massage my shoulders, neck,
11 and probably the lower part of my head.
12     Q  How many times did he do that?
13     A  Ten to 15 times.
14     Q  Did you ever tell him, cut it out?
15     A  No.
16     Q  Where were you physically located
17 when this touching occurred?
18     A  I was at my desk.
19     Q  Always at your desk?
20     A  Yes.
21     Q  Now, his statement about Sheriff
22 Dorning, let me -- what did he tell you
23 Sheriff Dorning said?

Page 221

1       A He said that -- I guess Sheriff was
2   in the office with us at one of the times
3   Brent was behind -- behind my chair
4   massaging my shoulders, and he said that
5   the Sheriff called and told him that I
6   would probably think that that was
7   inappropriate, but Brent still -- I mean,
8   it still happened after that.  He almost
9   told me as if it was kind of like a joke.
10      Q But the Sheriff didn't talk to you
11  about it?
12      A No.
13      Q Do you know whether that's true or
14  not?
15      A I don't.
16      Q Did you ever socialize with Brent
17  Patterson?
18      A Yes.  My friend started dating
19  Brent.
20      Q Well, let me divide these questions
21  between -- before 2016, okay?  So let's
22  talk before you allege he started touching
23  you, okay?

Page 222

1       A Okay.
2       Q Just so we can get those two time
3   periods straight.  Did you work with him
4   from 2010 to 2016?
5       A He worked at a different building,
6   so not directly or anything, no.
7       Q Did you have any kind of
8   relationship with him in that pre-2016 --
9       A He's asked me to do a couple of
10  things.  Like, I think he had me, like,
11  help on a PowerPoint at one time or
12  something like that, but not near as -- it
13  was very sporadic until he was in closer
14  proximity.
15      Q All right.  So did you socialize
16  with him in that pre-2016 time period?
17      A I don't believe so, no.
18      Q Never went out to dinner with him?
19      A No.
20      Q Drinks?
21      A Not before he started dating my
22  friend.  Okay.
23      Q Had you ever texted with him outside

Page 223

1   of work?
2       A If I did, it had to do with work or
3   a part-time job prior to him dating my
4   friend.
5       Q Did you ever date him?
6       A No.
7       Q Did you ever have any sexual
8   relationship with him whatsoever?
9       A No.
10      Q In that pre-2016 time period, did he
11  date any of your friends?
12      A No.  He was married.
13      Q Okay.  Would you -- how would you
14  characterize your relationship with him
15  prior to the time period when he allegedly
16  touched you inappropriately?
17      A I would say that I saw him
18  sporadically, and it wasn't -- it was -- he
19  was a coworker, and he -- I just knew that
20  his dad was the previous Sheriff and that
21  was as much as I had to know about him, I
22  guess.
23      Q Would you say you had a closer

Page 224

1   relationship with him than with other
2   officers or deputies at the Sheriff's
3   Office?
4       A Closer relationship?  Not closer,
5   no.
6       Q Okay.  Now, when did he start dating
7   your friend?
8       A I think that it was about the time
9   he was moved up there.  He was -- he had
10  just gotten divorced, so 2016.
11      Q Was that around the same time he
12  started touching you inappropriately?
13      A Yes.
14      Q Did you warn your friend not to date
15  him?
16      A She's been -- yes.  She's been
17  warned a few times.
18      Q What did you say to her
19  specifically?
20      A I mean, I was -- he's charming, but
21  it was not real.  It was a fake charm is
22  what I found out after getting to know him
23  better.  And yes, she was aware of what he

Page 225

1  did, yes.
2      Q  So you told her he touched you
3  inappropriately?
4      A  Yes.
5      Q  And she dated him anyway?
6      A  Yes.
7      Q  Did y'all ever socialize together,
8  the three of you?
9      A  Yes.
10     Q  When?
11     A  Oh, throughout the -- I think they
12  only dated a short amount of time, say,
13  three to five months, maybe, they dated,
14  and during that time, she asked me to go
15  to, like, a little cover band concert with
16  them. I took my husband. And, I mean,
17  I've been around him just sporadically with
18  her. I've not been with him without her
19  in, like, a hanging out setting.
20     Q  Who was your husband then?
21     A  The same person.
22     Q  Okay. I thought you married him in
23  2018.

Page 226

1      A  He wasn't my -- he was my boyfriend.
2  I'm sorry. I'm sorry.
3      Q  Okay.
4      A  He was just my boyfriend at the
5  time.
6      Q  Okay. So you went to a cover band
7  with them? What else?
8      A  To dinner.
9      Q  How many times?
10     A  Lunch or dinner. Actually -- yeah,
11  lunch. We went to lunch a couple times,
12  probably. They liked just going by their
13  self, so I'd say three or four -- three
14  times with me, maybe, to lunch, and then
15  dinner, five times.
16     Q  Any other socializing?
17     A  Not that I can recall besides just
18  eating dinner, going by his apartment with
19  her. I mean --
20     Q  Meaning -- what do you mean by that,
21  going by his apartment?
22     A  Well, he lived right downtown, and
23  if she wanted to stop by and see him, she

Page 227

1  would ask me to go.
2      Q  And you would go up to his apartment
3  with her?
4      A  Yes, uh-huh.
5      Q  Why would you spend that much time
6  with somebody who's sexually harassing you?
7      A  Well, he -- initially, upon them
8  hanging out and the relationship starting,
9  he didn't do that, but as he started doing
10  things, even to her, like cheating on her,
11  it -- he started getting more touchy with
12  me and then I ended up kind of -- I was out
13  the door, so.
14     Q  Well, I mean, just to be clear, at
15  the same time that he was inappropriately
16  touching you, you were spending some time
17  with him socializing with him.
18     A  I understand what you're saying.
19     Q  Is that true or not?
20     A  It's true.
21     Q  Did you ever text him outside the
22  office?
23     A  Yes.

Page 228

1      Q  Was it only about work?
2      A  No.
3      Q  Did you ever discuss his
4  relationship with your friend, Morgan?
5      A  Yes.
6      Q  What kinds of things would you talk
7  about on that subject?
8      A  He would usually be saying sorry for
9  something that he did to her, so I would
10  suggest to him ways that he could make up
11  for -- she was mad at him a lot, so it was
12  a lot of me telling him how to make up or
13  try to get her not to be mad.
14     Q  Why would you try to do that if he's
15  sexually harassing you?
16     A  She liked him. I mean --
17     Q  Well, you didn't care --
18     A  I mean, I cared about myself, of
19  course, but it was the environment that I
20  had become accustomed to. Like, I wasn't
21  going to tell on the guy whose dad was the
22  previous Sheriff and he's the one talking
23  to the media as the point of contact and he

Page 229

1    is friends with everybody in the Department
2    and the City and everything else.  It just
3    -- I just couldn't take a risk on that.
4        Q  Well, I'm not talking about telling
5    on him right now.  I'm talking about
6    actively trying to ensure that your friend
7    continue to date him.  Why would you do
8    that?
9        A  Well, I mean, it would be hard for
10   me to explain my friend to you, and she's
11   not a part of this lawsuit, so I -- it's
12   situational with her.  She dates not good
13   picks often.
14       Q  Well, that may be her choice, but
15   why would you choose to actively work to
16   keep them together?
17       A  I chose to be nice to him because
18   she liked him and she is my friend.
19       Q  Well, no.  You described actually
20   giving him advice on how to remain in a
21   relationship.  That's more than being nice.
22       A  Yes, because that's ultimately what
23   she wants.

Page 230

1        MS. RILEY:  I'm going to object to
2    this.  We're getting pretty far afield and
3    pretty into arguing with the witness now.
4        MS. GRAHAM:  Well, you can object,
5    and you're welcome to do that.  Your
6    objection is noted.
7        Q  Now, please answer the question.
8        MS. RILEY:  Let me object to the
9    form of the question.
10       MS. GRAHAM:  Great.
11       MS. RILEY:  Well, there's a
12   relevancy issue.
13       MS. GRAHAM:  And your objection is
14   noted.
15       MS. RILEY:  Go ahead, the best you
16   can.
17       A  So I don't remember the question.
18   Can you ask me again?
19       MS. GRAHAM:  Can you read it back?
20       (Record read.)
21       A  Okay.  So yes, she continued to like
22   him, so in an effort to make her happy, I
23   gave him advice.  It was often based on

Page 231

1    what she recommended or wanted.
2        Q  Even though your experience with him
3    was that he was sexually harassing you?
4        A  Well, my experience with him is
5    separate from her experience with him.
6        Q  So you didn't care enough about your
7    friend to make sure she didn't date him?
8        MS. RILEY:  Object to the form.
9    Argumentative.  You don't have to answer
10   that.
11       Q  Yes, you do, actually.  You do.  You
12   do have to answer.
13       MS. RILEY:  Well, we can let the
14   judge decide that.
15       MS. GRAHAM:  Well, then I'm going to
16   have to keep the deposition open.
17       MS. RILEY:  That one is just --
18   we're arguing with the witness at this
19   point.
20       MS. GRAHAM:  No.  I'm trying to
21   understand, and I'm entitled to question
22   her about it.  So your objection is noted.
23   You're giving instructions to the witness,

Page 232

1    and you know you're not permitted to do
2    that.  You're not permitted to make
3    speaking objections.  You're permitted to
4    object.  If you want to direct her not to
5    answer, you can, but you're not permitted
6    to say more than that.
7        MS. RILEY:  And those are the two
8    things I have done.
9        MS. GRAHAM:  No.  You've done quite
10   more than that.  You've directed her.
11       Q  All right.  So let me just make sure
12   we're clear.  You gave him advice on how to
13   reunite with your friend?
14       A  I gave him advice from -- because
15   that's what she wanted.
16       Q  Even though he was sexually
17   harassing you?
18       A  My situation with him is separate
19   than her situation with him.
20   (Whereupon, an off-the-record discussion was
21   held.)
22   (Whereupon, Defendant's Exhibit No. 13 was
23   marked for identification and the same is

Page 233

1  attached hereto.)
2      Q So I've given you what's marked as
3  Exhibit 13, and first I just want to ask
4  you, at the top there, it says -- it's
5  showing messages sent, received between
6  January 1st, 2015 and June 19th, 2020.
7      A Yes.
8      Q And is that what you intended to
9  provide?
10     A I mean, I believe that's what I was
11 asked to provide. I feel -- I attempted to
12 comply with what I was asked for, so if
13 that was it, I can't recall.
14     Q Okay. Well, did you, in fact,
15 collect messages from January 1st, 2015
16 through June 19th, 2020?
17     A Yes. This is from a system that
18 printed this out for me.
19     Q Okay. First I want to know if you
20 continued your texting with Brent Patterson
21 after your tenure here at the Sheriff's
22 Office.
23     A No.

Page 234

1      Q So you didn't have any text messages
2  after August --
3      A I haven't --
4      Q Let me finish.
5      A Oh, I'm sorry.
6      Q -- August of 2017?
7      A Not to my knowledge, no.
8      Q So when it says "Collecting messages
9  sent and received between January 1st, 2015
10 and June 19th, 2020," that's not referring
11 to messages with Brent Patterson?
12     A No. It had me put in, like, a --
13 just a start date, and I think it just did
14 it to -- that's the day it was printed, I
15 believe. So it just did the whole -- that
16 range from the day I printed it to the
17 start -- from the start date to the day I
18 printed it.
19     Q Okay. Well, let's take a look at
20 13, and I see the messages beginning on
21 March 2nd, 2016. Do you see that?
22     A The top of this first page?
23     Q Yes.

Page 235

1      A Yes.
2      Q And if you just kind of flip
3  through, I see some messages from May of
4  2016, June of 2016, and then I do see a
5  break here between June of 2016 and
6  December of 2016. Do you believe you
7  texted him in those dates?
8      A June to December. Like I said, I
9  backed this up to a system that printed
10 this out. If there's a mistake, I don't
11 know of it, and I -- if it's not in here, I
12 don't think it happened.
13     Q All right. Did you delete any of
14 your text messages?
15     A It was not -- like, no intentional
16 gap was put into these messages at all like
17 so.
18     Q Okay. Did you delete any of your
19 text messages?
20     A Not to my knowledge, no. I mean, I
21 -- no.
22     Q Okay. Now, when -- you may have
23 answered this already. When in 2016 did he

Page 236

1  begin to sexually harass you, if you can
2  recall?
3      A I just -- I don't know exactly when
4  he was moved to our area, and that's when
5  it occurred is when he moved to our office
6  area.
7      Q Well, you were actively texting him
8  March through June of 2016. Is that a fair
9  statement?
10     A Yes.
11     Q Okay. And then in December, it
12 starts up again. I see December 6th on
13 Cagle 1437. You're asking him, I think,
14 about either a funeral escort or an outside
15 job; is that right?
16     A Which part are we at? I'm sorry.
17     Q Cagle 1437 beginning in December
18 6th, 2016.
19     A Okay. I asked if he was -- I said,
20 "Funeral today at 2:20"? Is that --
21     Q Yes.
22     A Okay. Yes. That was -- that's how
23 I sent out funeral escorts.

Page 237

1  Q Okay.  And then on the next page,
2  Cagle 1438, I believe that's you wishing
3  him a Merry Christmas at the top of the
4  page?
5  A Yes.  I believe it went to all -- it
6  went to most contacts, but yes.
7  Q What does that mean?  What does that
8  mean?
9  A Like, you can send a bulk.
10  Q Okay.  And then those continue
11  through 2017 there on the same page.
12  A Yes.
13  Q And I see he's asking you about some
14  bar stools there.
15  A Yes.
16  Q And you responded at the bottom,
17  "Yes, I like those.  Did you get a place?"
18  A Yes.
19  Q Is that work-related, that comment?
20  A No -- well, actually, kind of.
21  Q How?
22  A Because I was the one that got him a
23  place based on him being a deputy.  That

Page 238

1  was also part of my part-time job
2  responsibilities.
3  Q Get him a -- you're talking about a
4  residence?
5  A That's right.
6  Q Why would it be your job to get him
7  a home?
8  A Because apartment buildings and --
9  apartments are the only ones I've known to
10  do it, maybe condos, but they would have
11  deputies live there as security and they
12  would get a discount, so a lot of them
13  would ask me if I had been made aware of
14  any openings, and I was made aware of an
15  opening for him.  I'm -- I was made aware
16  of probably a couple of openings that I was
17  able to tell him about, like I would any of
18  the deputies that asked me.
19  Q Why would you do a favor for him and
20  try to help him get a place?
21  A That was my job.
22  Q Okay.  And so the part about you
23  liking the bar stools, is that part of your

Page 239

1  job?
2  A No.
3  Q Later, the next page, Cagle 1439,
4  you advise him in the middle of the page,
5  January 28th, 2017, "Will stay positive.
6  It's a new adventure."  Do you see that?
7  A Yes.
8  Q Is that job-related?
9  A I don't know.  It -- I don't know.
10  I don't know.
11  Q Well, he's referring earlier to
12  moving to Jones Farm tomorrow.  Does that
13  help refresh your memory?
14  A Oh, yes.  So that was just, I guess,
15  him moving to a new location.
16  Q So you were saying, if I could
17  characterize it, good luck?
18  A Yes.
19  Q Okay.  He asked you, "Who wants a
20  47-year-old divorced man" there next.
21  A Yes.
22  Q And your response was, "You'll get
23  out there and be surprised."

Page 240

1  A Yes.
2  Q Is this before or after he was
3  dating your friend, Morgan?
4  A If -- I will look through these
5  messages and can probably tell when he was
6  moved up there.  He might have not been
7  moved up there until 2017, the year that I
8  left, but I cannot -- I don't think he was
9  dating her when he moved to his first
10  apartment, but I'm not actually sure.
11  Q Okay.  Later on the next page, Cagle
12  1440, in the middle of the page, he says,
13  "You seriously need to come see my pad."
14  A Uh-huh.
15  Q And you respond "Yep."
16  A Uh-huh.
17  Q Why would you want to see his pad if
18  he's sexually harassing you?
19  A I don't think that "yep" would
20  indicate that I wanted to see his pad.
21  Q What does it indicate?
22  A Like, yeah, that's -- okay.  Like,
23  nice message.  Thanks for the invite.  Not

Page 241

1  like, hey, yeah, when? You know, I just
2  said, "Yep."
3  Q  Okay. So "yep" to you doesn't mean
4  "yes"?
5  A  I mean, not yes as in yes, I'm on my
6  way. It was just like, yeah, that's a
7  great offer.
8  Q  Well, no. That's not what it says.
9  It says, "Yep."
10  A  Well, I sent the text, so I know
11  what I meant.
12  Q  Well, how would he know what you
13  meant from "Yep"?
14  A  Well, he obviously didn't think that
15  I meant that I was interested in seeing his
16  pad when he responded that he was being for
17  real.
18  Q  Okay. You again offer him a job or
19  a position with a funeral February 24th,
20  2017. He accepts.
21  A  Uh-huh.
22  Q  The next page, Cagle 1441, you say
23  something about a person named Corey in the

Page 242

1  hospital with walking pneumonia.
2  A  Yes.
3  Q  Who were you referring to?
4  A  He was a deputy that was in the
5  Training Division.
6  Q  Why would you need to tell Brent
7  Patterson that?
8  A  Because they -- I want to say Corey
9  and -- oh, he was in -- so Brent and Corey
10  had the same boss, and it was just
11  something to tell him because it was his --
12  a close employee with him.
13  Q  Why would you take on that role?
14  There were other people who surely could
15  inform him of this fact.
16  A  I mean, I'm nice. I don't know.
17  Q  Even with you're sexually harassers?
18  A  I was nice to him.
19  Q  Later, in the middle of the page, I
20  think this is your text to him. You say,
21  "Brent, seriously, you're pulling some
22  bullshit, and you're going to regret it."
23  A  Yes.

Page 243

1  Q  What were you referring to?
2  A  He had presumably done something to
3  Morgan, and every time he would make her
4  mad, he would try to get me in his office
5  and talk for hours about it and I knew he
6  was going to regret it because he --
7  MS. RILEY: Did you get that?
8  COURT REPORTER: Going to regret it?
9  A  Yeah. He would always regret making
10  her mad, or if she stopped talking to him,
11  he would regret it, and I was the person
12  that he would try to use as the middle
13  person to get back in good graces with her.
14  Q  What was he doing to Morgan?
15  A  I mean, which time?
16  Q  Well, whichever you're referring --
17  A  He cheated on her, he --
18  Q  Whatever you're referring to in this
19  text.
20  A  I don't know what I'm referring to
21  in that text.
22  Q  Okay. Well, what kinds of things
23  did he do that he would then need to come

Page 244

1  to you and try to get back together with
2  her?
3  A  He would -- he cheated on her with
4  other women, he would just go off the radar
5  without having, like, said anything to her,
6  and then she'd get mad that she hadn't
7  heard from him. Just, they got into
8  arguments fairly often.
9  Q  Do you feel like you were the
10  go-between between them?
11  A  Yes. I think it made it easier for
12  him because I was in that office in his
13  proximity.
14  Q  On the next page, Cagle 1442, you
15  say at the top, "I don't really want to get
16  into that type discussion right now."
17  A  Uh-huh.
18  Q  What were you talking about?
19  A  Well, let's back up.
20  Q  Okay.
21  A  This is him saying -- so whatever
22  happened the day before, July 13th,
23  whatever I'm saying or referencing to that

Page 245

1   he did that he was going to regret from
2   her, he's trying to get me to meet and call
3   him in regards to whatever that was.
4       Q   Okay.
5       A   So instead of -- he probably called
6   the work phone as well and probably called
7   my phone as well, but that's me responding
8   to these messages of him asking me to meet
9   up and talk.
10      Q   Okay.  You go on in that message to
11  say in the third sentence, "I am very
12  passionate about those I stick my neck out
13  for."  Who were you talking about there?
14      A   Morgan or him.
15      Q   How did you stick your neck out for
16  Brent Patterson?
17      A   Well, initially, I didn't know him
18  on a personal level, and when Morgan, my
19  friend, became interested in him, I only
20  knew decent things about him at that point,
21  and so I didn't object to her dating -- or
22  say anything -- anything bad about him and
23  her attempting to date him.

Page 246

1       Q   What would you have to say that was
2   bad at that point?
3       A   No.  I'm saying at that point, I
4   didn't know him on a personal level to say
5   anything bad.
6       Q   Well, how is that sticking your neck
7   out?
8       A   Telling my -- my beautiful, young
9   friend to take on a recently divorced older
10  gentleman that was a police officer after
11  everything she knew about the Department,
12  that's -- I stuck my neck out.
13      Q   Is that what you meant in this text?
14      A   I could only assume.
15      Q   Okay.  Any other ways you stuck your
16  neck out for Brent Patterson?
17      A   I can't recall anything at the
18  moment.
19      Q   Now, later in that text, you say:
20  "I have stuck up for everything and wish
21  you both the best."
22      A   Yes.
23      Q   Stuck up for what?  What did you

Page 247

1   mean there?
2       A   I -- every time he would -- I assume
3   on this particular message that I am saying
4   that some of the things that he would make
5   her mad about, I would give her, like, a
6   maybe it was this, maybe he did fall asleep
7   and didn't text you that night.  So I stuck
8   up for certain situations so that they
9   could be happy.
10      Q   I still just would like to know why
11  you felt the desire to do that when he's
12  sexually harassing you.
13      A   He's offending me.  She likes him.
14  I mean, that's just the -- it's two
15  separate things.  I had a job that I had to
16  keep with him.  She didn't.
17      Q   Are you saying that your job was
18  contingent on you trying to resolve his
19  relationship issues with your friend?
20      A   No.  My job was contingent on not
21  telling on people like Brent Patterson.
22      Q   Well, I'm not suggesting you're
23  telling on him to your job.  I'm talking

Page 248

1   about --
2       A   Well, you're asking why I would do
3   anything --
4       Q   -- your conversation -- let me
5   finish, please.  I'm talking about
6   conversations with your friend.
7       A   I'm sorry.  Why would I have
8   conversations with --
9       Q   No.  I'm just -- it is one thing not
10  saying anything, and there's another thing
11  to stick up for him when he's done
12  something wrong.
13      A   I stuck up --
14          MS. RILEY:  Object to the form.  I
15  didn't hear a question.
16      Q   You were answering.  Go ahead.
17      A   I stuck up for him until I got to
18  know him better is how I felt and she liked
19  him and I felt like I had to take what he
20  was doing from a work standpoint.  So my
21  work standpoint is separate from who she
22  was attracted to.
23      Q   Okay.  I want to direct your

Page 249

1    attention to Cagle 1444, and this was --
2    and direct your attention to the bottom of
3    the page, sent July 20th, 2017.
4        A  Yes.
5        Q  And you tell him, in part, "You're
6    literally messing up your entire life."
7        A  Uh-huh.
8        Q  What did you mean by that?
9        A  Can I read the message?
10       Q  Sure.  Sure.
11       A  Okay.  I am almost certain that I am
12   referring to him being in some
13   relationships with married females.
14       Q  Was there anyone in particular you
15   were talking about?
16       A  At that time, I don't believe that I
17   knew about the one that I ended up
18   knowing -- I don't know her particularly --
19   I mean, specifically, but -- like, I
20   wouldn't know if she was sitting here, I
21   mean, but I don't know that if I -- if I
22   was referencing her yet in this
23   relationship.

Page 250

1        Q  Now, you say also in this message,
2    in part, in the third line, "You're brave
3    as hell to treat good people badly and
4    expect them to stay between the lines of
5    loyalty for you."
6        A  Uh-huh.
7        Q  What did you mean by that?
8        A  I think I meant that people know
9    about all of his relationships with married
10   women, and I think that he trusted Morgan
11   with a lot of information that could get
12   out and that he was taking a chance on her
13   getting upset enough to tell it.
14       Q  And then at the end, you say, "You
15   have absolutely no concept of the degree of
16   shit that could hit the fan.  If you do
17   people shitty, prepare for it to come back
18   to you ten folds."
19       A  That's right.
20       Q  Were you threatening him?
21       A  No.  I was just letting him know.  I
22   mean, you've named all the nice messages
23   that I've sent, so obviously, you're saying

Page 251

1    I'm being nice to him and that's -- I was
2    trying to let him know that he got out of a
3    marriage and kind of started going crazy
4    with women, I guess.
5        Q  Were you saying this because you
6    cared about him?
7        A  No.  I just am nice.  I care about
8    Morgan.  That's who I cared about.
9        Q  Well, I mean, so you would
10   characterize this statement as nice: "If
11   you do people shitty, prepare for it to
12   come back to you ten folds."
13       A  I think that that's -- I mean, I
14   would want a friend to tell me the same
15   thing, like, to keep me in line, yes.  I
16   wasn't threatening him.
17       Q  With that kind of language?
18       A  Well, he asked me to come talk to
19   him right after that, so I don't think he
20   has took it that way either.
21       Q  Let's look at Cagle 1445.  At the
22   bottom there, there's a text from Brent
23   Patterson, and he says to you, "I'm sorry

Page 252

1    for being such a disappointment to you.  I
2    understand your expectations of me, and I
3    know I haven't held myself to standards.  I
4    know the person I am, and I need to realize
5    I do have it good.  Just need to get my
6    shit together.  I do appreciate your tough
7    love, except when you get mad.  Dayum."
8    D-a-y-u-m.
9        So was it your take on this that he
10   perceived your efforts as caring about him
11   and trying to get him in line?
12       A  I think that that's what he said in
13   the text message.
14       Q  Okay.  And you respond to him, "Your
15   meanest to the people you expect more from
16   and care about."
17       A  Uh-huh.
18       Q  So you were telling him you cared
19   about him?
20       A  I cared about their situation, yes.
21       Q  Well, it talks about people that you
22   care about.
23       A  I cared about her, but I'm not going

Page 253

1  to necessarily text to him that I couldn't
2  care much less about him, but I cared about
3  him in relation to my friend, yes.
4      Q  Why would you text him at all?
5      A  Because he's texting me, and he's
6  right outside of my office.
7      Q  But is any of this work-related?
8      A  No, but he was the supervisor, so.
9      Q  He wasn't your supervisor, was he?
10     A  No.  He's in the office with me.
11     Q  Did you ever report any of these
12 text messages, to the extent they made you
13 feel uncomfortable, to anyone?
14     A  No.
15     Q  Okay.  I just want to make sure we
16 close that.  Did anyone else ever touch you
17 in a way you found offensive during your
18 tenure at the Sheriff's Office?
19     A  The ones that I have named I can
20 remember, those are the ones I can remember
21 at this time.
22     Q  Well, would anything refresh your
23 memory?

Page 254

1      A  Not that I can think of.  I mean, if
2  something comes up in the rest of our -- I
3  will correct myself.
4      Q  Now, we talked about some
5  socializing after hours with some people in
6  the Sheriff's Office.
7      A  Uh-huh.
8      Q  Did you socialize after hours with
9  anyone else, any of the folks we've
10 discussed?
11     A  That we've discussed?  I believe --
12 I mean, I've worked out with some people
13 after hours, a female, Megan Wimms.
14 There's people in the gym -- I mean, I did
15 not go on, like, dates or any kind of that
16 socializing, so, I mean, that's --
17     Q  When I say "socialize," let me be
18 clear.  Dinner, lunch, drinks after work.
19     A  So just the group that kind of goes
20 with Matt, so when I dated Matt, there
21 would be people around sometimes, and Brent
22 with Morgan and they had, like, Christmas
23 parties for work and stuff.

Page 255

1      Q  And that was, like, for everyone?
2      A  For the different divisions.
3      Q  And so you would attend?
4      A  I think I went, like, once or twice.
5      Q  Okay.  I'm going to direct your
6  attention -- we are going to go back to
7  your amended complaint, so that was Exhibit
8  10, I think.
9      A  Is it 10?  Okay.
10     Q  And I want you to look at paragraph
11 29.
12     A  Okay.
13     Q  And at the last sentence there, you
14 say, "On information and belief, Jernigan
15 had a history of sexual harassment of which
16 the employer knew or should have known."
17     A  Yes.
18     Q  Do you agree with that statement?
19     A  I -- yes, I do.  I know that -- what
20 I was told, yes, ma'am.
21     Q  Okay.  What were you told about
22 Jernigan?
23     A  I was told that he was released -- I

Page 256

1  don't know if he was forced to resign or
2  what -- from the FBI that he worked at
3  prior to coming to our Department because
4  of sexual harassment allegations.  I don't
5  know if they came to fruition or what they
6  were.
7      Q  Who told you that?
8      A  Matt told me that, that -- my
9  boyfriend during that time.  He told me
10 that because he had went to some training
11 on the arsenal and was told that by people
12 that worked with Jernigan prior to him
13 coming to our Department.
14     Q  That had worked with him in his
15 previous position?
16     A  Yes.
17     Q  Did anyone else tell you that?
18     A  Kerry Phillips and I had discussed
19 it before because it was a rumor that
20 everybody had heard in the Department.
21 It's been brought up several times.  And my
22 last -- my attorney that was before her, he
23 got sick or something, and he said that he

Page 257

1  verified it.  And I don't know how he did
2  or what.  I never saw that, but he said
3  that he did.
4      Q  What was your discussion with Kerry
5  Phillips about it?
6      A  Kerry Phillips and I weren't fond of
7  Jernigan.  He -- Kerry Phillips was very
8  vocal with me about not liking Jernigan
9  either, and so we would just discuss the
10  rumors that we've heard about him.  It was
11  like when there was an open position for
12  Chief, there were rumors just flying
13  everywhere about who it was going to be or
14  who it could be, and when it ended up him,
15  then it kind of went from there that people
16  heard this rumor, and Kerry Phillips heard
17  it from somebody, I think he said maybe at
18  his church or something, even, so it was
19  something that was discussed a lot.
20      Q  So it's a rumor; is that right?
21      A  Because I don't know it.
22      Q  I was going to ask you, do you have
23  any proof that that's true?

Page 258

1      A  None except that my attorney said
2  that he verified it.
3      Q  Your first attorney?
4      A  Yes.
5      Q  Did he show you any documents?
6      A  No, ma'am.
7      Q  Okay.  I want to refer your
8  attention to paragraph 30 of your Third
9  Amended Complaint.
10      A  Yes.
11      Q  And we're again talking about
12  Jernigan here.  I think we've discussed the
13  6969 comment; is that correct?
14      A  Yes.
15      Q  Okay.  You also say, "In regard to
16  Deputy Shelby Holt, he said, man, what I
17  would do to that."
18      A  Yes.
19      Q  And whispered to you that he wished
20  he had known she was changing clothes to
21  exercise so that he could have walked in on
22  her.
23      A  So these are actually two separate

Page 259

1  occasions that I think just are -- it's
2  written out a little confusing.
3      Q  Okay.  So why don't you explain to
4  me what happened.
5      A  So the Deputy Shelby Holt one,
6  Charles -- Chuck Zeissler, or Charles
7  Zeissler, he -- he told me himself that he
8  and Dave Jernigan were talking in the
9  parking lot of the investigations building
10  where the gym also was kind of behind it,
11  and Zeissler told me that Shelby was coming
12  through there to go to the gym or coming
13  out of the gym and Jernigan said to
14  Zeissler, man, what I would do to that in
15  regards to Shelby Holt.
16      Q  Oh, so this is not something
17  Jernigan said to you?
18      A  No.
19      Q  Were you present when he said this
20  to the other person?
21      A  No.
22      Q  Okay.  Anything else about that
23  incident?

Page 260

1      A  No.
2      Q  Okay.  So this would be, obviously,
3  after Jernigan became Chief Deputy?
4      A  Yes.
5      Q  Okay.  And then you said there was a
6  second incident.
7      A  Yeah.  So the second part, Megan
8  Wimms, who came after Meghin Dorning, she
9  -- she and I were in the office that I told
10  you we shared and I was changing to go to
11  the gym and she answered the phone.  So our
12  desks looked at opposite ends.  Like, I
13  looked at one wall, she looked at the other
14  like this.  And he called while I was
15  changing, and she -- he said, I was just
16  seeing if y'all were there.  I needed to
17  come over there, like, maybe to get
18  something signed.  I don't know why he
19  needed to come.  But he -- she said, Erica
20  is changing, and he was on speakerphone is
21  normally how we would answer, so he said
22  that he wished she hadn't have told that I
23  was changing so that he could have just

Page 261

1    walked in.
2        Q  So was the conversation on
3    speakerphone?
4        A  Yes, ma'am.
5        Q  In your office?
6        A  Yes.
7        Q  Okay.
8        A  Yes.
9        Q  So you're saying you overheard it --
10       A  Yes.
11       Q  -- because it was on speakerphone?
12       A  Yes.
13       Q  And how did Megan respond?
14       A  I mean, she just looked at me -- she
15   got off the phone -- it happened -- the
16   conversation was quick, and so she got off
17   the phone with her, and we just looked at
18   each other like, that was really awkward.
19       Q  Did you say anything to him?
20       A  To him, no.
21       Q  And did you ever report his
22   statement to anyone?
23       A  No.

Page 262

1        Q  All right.  Paragraph 31 -- I'm
2    sorry.  Let me go back.
3        A  Okay.
4        Q  When did that -- when was that
5    statement made, to the best of your memory?
6        A  Maybe 2016.  Like I said, I don't
7    think he was there but a couple of years
8    that I was there, so.
9        Q  Okay.  So let's do move on to
10   paragraph 31, and it refers to a wall
11   poster which the allegations say read,
12   "Notice.  Sexual harassment in this area
13   will not by reported, however, it will be
14   graded."
15       A  Yes.
16       Q  Where was that located?
17       A  That was located in Lieutenant
18   Salamonski's office at the investigations
19   building that was the one right by the gym.
20       Q  So it was not in your office?
21       A  No.
22       Q  Separate location?
23       A  Yes.

Page 263

1        Q  Did you ever personally see this
2    sign?
3        A  No.
4        Q  How do you know it was there?
5        A  Marina -- as soon as -- the way that
6    she conveyed it to me was that when she saw
7    it or was -- read it, she let me know.
8        Q  So about what time period was that?
9        A  Oh, it was around the time of her
10   having made her sexual harassment
11   allegation, so 2015 -- 2014, 2015.
12       Q  And did you -- did she report the
13   presence of this sign, if you know?
14       A  I believe so because he was made to
15   take those down.
16       Q  Okay.  It's not something you
17   reported?
18       A  I did not.
19       Q  Okay.  I want to talk about Tim
20   Clark now.
21       A  Okay.
22       Q  Do you need a break?
23       A  No.

Page 264

1        Q  Okay.  Now, where did Tim Clark work
2    in relation to where you worked, if you
3    could explain that to me?
4        A  Initially, he had an office -- his
5    office was in the jail.  If I remember
6    correctly, that was his initial office, but
7    he was considered -- like, he was a
8    building maintenance person, so he was at
9    all the buildings, so if any kind of --
10   like, even like a light repair, he would
11   have that, like, set up to be fixed.  Like,
12   so he did -- for any of our offices here,
13   he did the reconstruction of our -- the
14   office I ultimately ended up in on the
15   second floor.  He -- he was just -- he did
16   the air conditioners, the lights, the --
17   all the building maintenance type of stuff.
18       Q  So did he have a home office, or was
19   he just always moving around?
20       A  I've never -- I've never seen his
21   office, and I -- so I don't know if he did
22   for sure, but I thought that he had one in
23   the jail, if he did, but he wasn't rarely

Page 265

1    there. He was moving around.
2         Q   Okay. And so where would you see
3    him in terms of your job duties?
4         A   He came up here a lot when he was
5    remodeling a portion of our offices on the
6    second floor, and he had to turn in
7    invoices to me and request purchase orders
8    from me fairly often.
9         Q   So he would bring those to your
10   office?
11        A   Yes.
12        Q   And then he would request, you said
13   purchase orders?
14        A   Yes. Yes.
15        Q   And about what period of time was
16   this?
17        A   He wasn't there the whole time I
18   worked there. He was probably there the
19   last maybe three years that I worked there.
20   And so he was put into that position
21   instantly, so I dealt with him the entire
22   time that he worked there.
23        Q   When you say "there," what are you

Page 266

1    referring to?
2         A   When I worked at the Sheriff's
3    Department.
4         Q   Okay.
5         A   So the entire time I worked at the
6    Sheriff's Department, he didn't work there,
7    so the latter part of -- when -- I'd say
8    the latter three years he worked there, I
9    dealt with him.
10        Q   Okay. Did you deal with him -- so
11   the first part of your tenure, the first
12   four years?
13        A   He didn't work there.
14        Q   Okay. So you're saying Tim Clark
15   did not work for the Sheriff's Office --
16        A   Right. I'm sorry. He came in at
17   the end of my working there, the end few
18   years.
19        Q   Okay.
20        MS. RILEY:  Grace -- hey, Jeff, you
21   know you're on our witness list.
22        MR. RICH:  Why?
23        MS. RILEY:  Why?

Page 267

1         MR. RICH:  Uh-huh.
2         MS. RILEY:  Because Erica spoke to
3    you about some of her complaints.
4         MS. GRAHAM:  Well, I mean, he
5    represents the County.
6         MR. RICH:  So what's your point?
7         MS. RILEY:  I hear you. Just
8    letting you know. I didn't know if you
9    were signing in to the case in a
10   representative capacity or not because
11   you're on the witness list. It's called
12   the rule, the rule of exclusion of
13   witnesses, Jeff.
14        MR. RICH:  I don't believe that
15   applies in --
16        MS. RILEY:  Well, I'm just bringing
17   it up.
18        Q   Okay. So I think what I understood
19   you to say is Tim Clark was not an employee
20   of the Sheriff's Office for the first four
21   years that you worked there?
22        A   For the first -- I'm estimating the
23   first four, yes.

Page 268

1         Q   And then he came to work, and that's
2    when you had your interaction with him?
3         A   Yes, ma'am.
4         Q   Okay. And so what were those
5    interactions with him like?
6         A   Well, initially, when I worked in
7    the basement, which was my second -- he
8    started working here, and I was in the
9    basement office, so that could give a --
10   kind of a timeframe. He initially would
11   come by there, and he would ask me to go to
12   what he said was his favorite place in
13   town, which was Furniture Factory, which is
14   a bar, and so he would try to get me to
15   hang out with him outside of work hours.
16        Q   And how did you respond to that?
17        A   I didn't go or I just said I wasn't
18   available or couldn't go.
19        Q   Did you tell him you weren't
20   interested?
21        A   I mean, I don't know if I said those
22   exact words, but I said that I wasn't
23   interested -- or I didn't want to hang out,

Page 269

1    you know, outside of work.
2        Q  What else -- how else did he
3    interact with you?
4        A  Well, work-wise, he had to ask -- if
5    it was for the enforcement side of the
6    Sheriff's Department, he had to ask me for
7    purchase orders in order to do, like,
8    building maintenance.
9        Q  Well, let's look at paragraph 32 of
10   your Third Amended Complaint.
11       A  Okay.
12       Q  And you talk about Tim Clark in that
13   paragraph.
14       A  Uh-huh.
15       Q  And you say at the end of it, he
16   made multiple attempts to convince you to
17   date him or his son, including invitations
18   to bars, restaurants, improper text
19   messages, and visits to your office when he
20   had no legitimate purpose.  So I want to
21   talk about those instances.
22       A  Okay.
23       Q  So you say he invited you to the

Page 270

1    Furniture Factory?
2        A  That's the particular place I
3    remember, but he asked to hang out outside
4    of work hours on probably five to ten
5    occasions.  I don't know if Furniture
6    Factory was specifically said each time.
7        Q  Okay.  What about improper text
8    messages?
9        A  If -- he -- if I said -- like, in
10   the basement, there was a big TV.  If there
11   was, like, a tornado or something,
12   everybody would come down from the
13   Sheriff's Office to my office because it
14   was underground and safe.  And anyways,
15   there was a TV in there, so when the
16   reconstruction was being done for our --
17   what ended up my last office here, I said,
18   well -- like, something like, will there be
19   a TV in there, which I think was said that
20   there would be, but he would say, like, I
21   owed him, and he would say, you owe me,
22   you'll have to go get drinks or, you know,
23   I owed him, like, hanging out with him

Page 271

1    outside of work for things I was asking for
2    for work.
3        Q  Okay.  What other kind of
4    communications did you have with him that
5    you considered improper?
6        A  I mean, he would come in in person
7    and just -- I mean, he was just always
8    trying to solicit date -- like, dates.  And
9    then about his son.
10       Q  Okay.  How many -- you said about
11   five to ten occasions, he invited you out?
12       A  That was at the basement, and then
13   the incidence come up and he was then not
14   allowed -- or not supposed to come bring me
15   anything anymore or be in person with me.
16       Q  Okay.  Well, let me just ask just to
17   be clear.  How many times did he ask you
18   out socially?
19       A  Probably five to ten times.
20       Q  Okay.  And you mentioned an incident
21   involving his son.  Tell me about that.
22       A  So I was asked by probably the Fleet
23   Service Manager to come -- I would go down

Page 272

1    there and get invoices from them that I had
2    to pay.  They would stack them up in a
3    thing on their desk.  And when I went down
4    there one time, miraculously, Tim's son was
5    also down there eating with Tim in the
6    fleet services -- or it's kind of like a
7    garage type of thing.  And he said -- he
8    didn't tell me the son was in, like, a -- I
9    don't know if it was an office, if it had a
10   door, but a separate little room from the
11   main garage area, and he said, come here,
12   I've got an invoice in here to give you or
13   whatever.  He had, like, a -- he pulled it
14   out of a drawer that looked like it didn't
15   have anything else in it.  But his son was
16   in there eating, and he tried to, like,
17   initiate conversation between me and his
18   son to the point of him walking out of that
19   little area -- "him" being Tim.  Tim walked
20   out and left me and son sitting there.  So
21   I'm in, like, a chair kind of like this and
22   the son's eating and he's just like, you
23   know, my dad's told me about you and blah,

Page 273

1  blah, blah.  And he comes back in and I end
2  up leaving from the fleet services and Tim
3  gave his son my phone number, which the son
4  texts me and put his name in the text to
5  let me know who he was, but I didn't
6  respond to it and I provided those text
7  messages.
8       Q  Why did you think he was trying to
9  set you up with his son?
10      A  Because he would say that -- I mean,
11 he would say things about, like, us being,
12 like, a cute couple or able to be together
13 or, I mean, something along those lines of
14 that son was -- I want to say he was maybe
15 recently divorced and had a small child and
16 that it would be a good setup type of
17 conversation.
18      Q  So Tim Clark made those comments to
19 you?
20      A  Yes.
21      Q  How many times?
22      A  The son's thing was pretty quickly,
23 so I'd say he mentioned the son two or

Page 274

1  three times, and the son attempted to text
2  and --
3       Q  And what was your response when he
4  said that?
5       A  To which person?
6       Q  When he was talking to you about his
7  son and --
8       A  Oh, I would listen to what he would
9  say about his son, but it was also known
10 that I had a boyfriend at the Department,
11 and Tim was aware of him.
12      Q  How do you know Tim was aware of
13 that?
14      A  I -- just common sense.
15      Q  Well --
16      A  I mean, it was very known.  I went
17 to his Christmas parties for the
18 Department, and I -- I mean, we were always
19 together.
20      Q  Did you ever tell Tim you had a
21 boyfriend?
22      A  I don't recall if I had to or not.
23 And Tim has seen me and Matt together

Page 275

1  around the Department a lot.
2       Q  What do you mean "together"?
3       A  Like, just walking.  I mean, because
4  Tim would be at the shop a lot of the
5  times, and all the bays are -- the bay
6  doors are open and Matt and I would go work
7  out sometimes or I would bring him lunch or
8  anything of the sort.  It was a known -- it
9  was known that Matt was my boyfriend at the
10 Department.
11      Q  Well, you don't know for sure Tim
12 knew that, do you?
13      A  No.  I mean -- no.
14      Q  In what other ways did Tim make you
15 feel uncomfortable?
16      A  Aside from what we have discussed,
17 until we talk about the actual incident,
18 just his advances and trying to hook me up
19 with his son and those kind of things were
20 prior to the actual incident we've
21 discussed.
22      Q  All right.  Did you ever tell him to
23 cut it out?

Page 276

1       A  I told him I didn't want to hang out
2  after hours.
3       Q  Did you ever tell him to stop asking
4  you?
5       A  I can't recall.
6       Q  All right.  And let's talk about the
7  incident that led to your complaint.  Can
8  you tell me about it?
9       A  So they -- it was -- there's usually
10 about two mechanics that are actually
11 inmates of the jail and they would work on
12 patrol cars for the Department and they
13 would be at the fleet services -- it's not
14 really an office.  I guess it's like a --
15 it's like a garage, like a car mechanic
16 type of garage.  And so there would always
17 be a turnover of inmates that would work as
18 mechanics or clean -- car cleaners and the
19 like.  And one -- I was nice to all of the
20 inmates, but one particular one, he went by
21 the name Preston, I thought that was his
22 name, and I would talk to him some, but
23 then it was just a little bit like normal

Page 277

1  and somebody called him Clayton and I said,
2  who's Clayton?  I thought your name was
3  Preston.  And he said, that's my last name.
4  And I said, oh, my childhood best friend
5  that my mom actually asked if she could
6  adopt, her last name was Preston.  And he
7  said -- I said -- he said, that's kind of a
8  -- kind of a common name, so I said, her
9  name's Christina, though, and she got in a
10 bad car wreck, and he said, that's my first
11 cousin.  So it initiated a little bit of
12 conversation about her because I had a long
13 -- several years of being real close with
14 her and her family, but I didn't know him.
15 So anyways, I think Tim --
16    Q  But this was an -- to be clear, this
17 was an inmate at the jail?
18    A  He was not at the jail.  He was at
19 where I go to do my job.
20    Q  But he's a prisoner who's on loan
21 from the jail?
22    A  He's an inmate, yes.
23    Q  Okay.

Page 278

1    A  There's probably ten of them at a
2  time there or more.  Two were living there
3  at the time overnight, and he was one of
4  them.
5       So Tim apparently oversaw or I guess
6  he saw that I was talking to Preston maybe
7  more than he thought was necessary.  I'm
8  not sure why -- what he thought because I
9  can't answer to that.  But when I wasn't
10 there, he brought the inmate in to a
11 separate section of that garage that I
12 guess you could use as an office and told
13 -- said to him what's in the quotes.
14    Q  What's that?
15    A  I can tell you what he said or read
16 this quote because they're different.
17    Q  You tell me what he said.
18    A  Okay.  He said, I know you're
19 fucking Erica.
20    Q  Okay.  How do you know he said that
21 to him?
22    A  The non-inmate employee that worked
23 there called me immediately and told me

Page 279

1  that.
2    Q  Who is that?
3    A  It was Dustin Hunt.
4    Q  How did he know?
5    A  Because he heard it, and the inmate
6  came out and told him.
7    Q  Well, I thought you said they were
8  in an office when they had this
9  conversation.
10    A  Well, it's a separate section.  I
11 said I don't know if you could call it an
12 office.
13    Q  So he said he overheard it?
14    A  Yes, he overheard it, and the inmate
15 came out and told him what had happened.
16    Q  And then he called you?
17    A  He called me, yes.
18    Q  What did he tell you?
19    A  He asked me -- I believe he asked me
20 not to say anything because he felt
21 jeopardized but said that he had to let me
22 know that it happened because I guess he
23 just felt like he needed to let me know.

Page 280

1    Q  And what did you do?
2    A  I -- I told Kerry Phillips.
3    Q  What concerned you about him asking
4  an inmate about his relationship with an
5  employee?
6    A  Because it was like -- that was,
7  like, a big false allegation about me.
8    Q  Well, no.  It was a question about
9  you.
10    A  No.  He said to him, I know you're
11 fucking Erica, so that's not really a
12 question.  It was a statement.
13    Q  Okay.  And what did you think that
14 you needed to do?
15    A  I tried to do one of my -- an
16 option.  I went to my direct supervisor.
17    Q  Okay.  And when was this, Ms. Cagle?
18    A  2014.
19    Q  Would that have been shortly after
20 Tim Clark started working for the Sheriff's
21 Office?
22    A  I had moved from the basement to --
23 I was in my third office.  I don't know

Page 281

1  because I don't know exactly -- he wasn't
2  hired by my side, so I wasn't part of his
3  hiring, and I don't know exactly when he
4  was hired.
5      Q  Okay.  So you said you complained;
6  is that right?
7      A  I went and told Kerry Phillips what
8  had happened, yes.
9      Q  And tell me about that conversation.
10     A  Kerry was also the guy who called
11 me's supervisor, Dustin, so I said -- I
12 just told Kerry exactly what Dustin called
13 and told me and that I just was bothered by
14 the allegation to -- of my -- you know,
15 what he was saying about me.
16     Q  What else happened in that
17 conversation with Kerry Phillips?
18     A  I believe that Kerry told me that he
19 was going to have to tell -- I don't know
20 if he said he had to tell Personnel or --
21 and/or Jernigan.
22     Q  Was that okay with you?
23     A  Uh-huh.

Page 282

1      Q  Did you make any other statements in
2  the meeting?
3      A  I think that we ended up talking
4  about it a couple of times, but on the
5  initial meeting, I think that I just told
6  him what had happened and how I just was
7  really offended by the statement.
8      Q  Did you complain about Tim Clark's
9  other conduct that we've talked about
10 today?
11     A  Kerry was already aware of those, so
12 I don't know that it was brought back up.
13     Q  How was he already aware of them?
14     A  He also didn't think fondly of Tim
15 Clark, and so he and I would discuss
16 different things that Tim has just done in
17 the Department.  Kerry thought that Tim
18 stole some money at one point, and so we
19 would discuss different bad characteristics
20 of Tim.
21     Q  So in those prior conversations,
22 were you going to Kerry Phillips in order
23 to complain about Tim Clark and his conduct

Page 283

1  towards you?
2      A  Well, Kerry Phillips was a captain
3  at the time, so I believe that it was -- it
4  should have been accepted to him in his
5  supervisory capacity.
6      Q  So if Kerry Phillips' notes from
7  that day indicate that it was that day that
8  you discussed Tim's conduct with you
9  regarding asking you out, setting you up
10 with his son, would that be incorrect?
11     A  I didn't understand your question.
12     Q  If Kerry's notes from the day you
13 complained about Tim Clark asking the
14 inmate if he was having sex with you, if
15 his notes from that day indicated that that
16 was the day you discussed with him Tim's
17 other conduct, asking you out for a date or
18 trying to set you up with his son, would
19 those notes be incorrect?
20     A  I don't know that they would be
21 incorrect, but it wouldn't say -- does it
22 indicate that was the first time that I
23 talked to him about that?

Page 284

1      Q  Well, that's what I'm trying to
2  figure out.
3      A  I don't believe that that was the
4  first time.  So if it says that, I would
5  say that's incorrect, yes.
6      Q  Okay.  How many times did you talk
7  to Kerry about Tim Clark's conduct before
8  the day you made the complaint about his
9  comment to the inmate?
10     A  I would say that I talked to Kerry
11 about Tim -- and I'm answering your
12 question -- probably 20 to 30 times just
13 discussing Tim's conduct, but with the
14 direct allegations to myself, I would say
15 we discussed it two or three times.
16     Q  And that's before the day you
17 complained about the --
18     A  Yes.
19     Q  -- comment about the inmate?
20     A  Yes, ma'am.
21     Q  Okay.  Or comment to the inmate, I
22 should say.
23         And did you put any kind of

Page 285

1 discussion in writing -- and I want to talk
2 about the -- we're talking about the period
3 before Tim Clark confronted the inmate.
4     A Uh-huh.
5     Q Did you put any kind of complaint in
6 writing about Tim Clark?
7     A No. I was never asked to.
8     Q Well, we discussed the policy.
9     A Well, it says that they should ask
10 you to.
11     Q Well, did you offer to?
12     A I didn't know I was supposed to
13 offer.
14     Q Okay. Did you ever report that
15 conduct to anyone other than Kerry
16 Phillips?
17     A About Tim? Not reporting to a
18 supervisor. I talked to a lady I worked
19 with at the time in the basement, Sheila.
20     Q Did you ever report it to anybody
21 designated in the Madison County Handbook
22 to receive complaints of sexual harassment?
23     A So prior to the -- okay. No.

Page 286

1     Q Okay. So then we get to the day you
2 complained about Tim Clark's discussion
3 with the inmate.
4     A Yes.
5     Q And I want to go back and just
6 understand again, you went to Kerry
7 Phillips about that?
8     A What I remember is I went straight
9 from the phone call to him, yes.
10     Q Okay. Do you remember what time of
11 day that was?
12     A No, I do not.
13     Q Okay. And I just want to know
14 everything you told him in that
15 conversation.
16     A Like I said, we ended up having to
17 talk about that incident a couple of times
18 that day because it transpired into
19 additional things that I'm sure you will
20 want to discuss. So the initial
21 conversation was me telling him what had
22 happened and that Dustin was the one that
23 told me, and I think he indicated to me

Page 287

1 that we would -- he would have to tell
2 either -- I don't know if he went to
3 Personnel or Jernigan or both or how he
4 went to -- I didn't even see him talk to
5 them. But, again, we talked a couple times
6 that day about the same subject.
7     Q All right. Let's talk about the
8 second conversation you had with him. What
9 transpired then?
10     A So somewhere in there, and I don't
11 know if this is what you're trying to get
12 to, is that I indicated to him that I was
13 going to talk to an attorney.
14     Q What else did you talk about?
15     A To him? To Kerry Phillips?
16     Q Yes.
17     A I just said that I just felt like I
18 needed to protect myself because it was a
19 hefty allegation, statement.
20     Q Were you asked to make a written
21 statement?
22     A No.
23     Q Never?

Page 288

1     A I don't think so. I mean, if I was
2 asked to, I believe I would have written
3 it, so if -- if I was asked, then you would
4 have one.
5     Q Did you ever offer to make a written
6 statement about your complaints?
7     A No.
8     Q Did you talk to Kerry Phillips at
9 any other time about this issue?
10     A That same day, it ended up that
11 Kerry had talked to, I guess, Jernigan who
12 asked to confiscate my phone, and so I --
13 Kerry and I discussed why that was
14 happening. Kerry didn't know. I suggested
15 to him that it was because I had talked to
16 an attorney, and he suggested to me that
17 apparently, simultaneously of me talking to
18 Kerry Phillips initially about what --
19 about the incident, the inmate was being
20 searched at the fleet services garage and
21 they found what ended up being an iPod and
22 they -- Kerry Phillips suggested to me that
23 it might be thought of that I was

Page 289

1   communicating with the inmate or he was
2   trying to communicate with me via what
3   ended up being an iPod.
4       Q So that's what he communicated to
5   you the day --
6       A That's what he suggested was likely
7   the reason my phone was being taken, yes.
8       Q Okay. What was your response?
9       A Well, that there was no
10  communication, first of all, and I felt
11  like that was a retaliation for me turning
12  in somebody that was good friends with the
13  Sheriff and that he built a house of his.
14      Q Could they have wanted to check
15  whether you had text messages between you
16  and the son?
17      A Why? No, I don't think so.
18      Q Well, it was part of your
19  allegations, wasn't it, that he had tried
20  to set you up with his son and his son had
21  texted you after that?
22      A Not in this particular -- no. This
23  allegation did not fall on the heels of the

Page 290

1   son.
2       Q What do you mean "did not fall on
3   the heels of the son"?
4       A The son saying -- I don't know where
5   it happened in the year, but it wasn't,
6   like, the next day that this happened with
7   the inmate. I don't know how long it was,
8   but the two shouldn't be combined. They
9   were two separate incidents.
10      Q Well, you didn't want them to check
11  to see about the text messages?
12      A If I said or allege -- or if I
13  turned in Tim Clark for a statement that he
14  admitted to saying, why would I think that
15  someone's taking my phone to see if I had
16  communicated with his son?
17      Q Well, you said in your testimony, I
18  believe, that you had previously complained
19  about Tim Clark and all of the things that
20  he had done and how he'd conducted himself,
21  including setting you up with his son.
22      A So I should be treated as, like, a
23  criminal investigation because they all go

Page 291

1   together?
2       Q Well, don't they need evidence about
3   who sent text messages to whom if that's
4   one of your allegations?
5       A That wasn't an allegation at the
6   time.
7       Q Well, you said you had made that
8   complaint before to Kerry Phillips.
9       A And you asked me if I had reported
10  it to him in that manner, and I told you
11  that he was a supervisor, so he should have
12  taken it in that manner, but he obviously
13  did not.
14      Q Okay. So you're upset with him not
15  investigating at the time you first said
16  it, but now you're upset that they're going
17  to investigate it when you come back and
18  complain again about Tim Clark?
19      A I'm really confused or you're
20  confused.
21      Q Well, let's just talk about it,
22  then.
23      A Okay.

Page 292

1       Q Okay? Because --
2       A Because these are --
3       Q Because you're saying --
4       A -- totally different things.
5       Q You're saying, I thought, that you
6   went to Kerry Phillips and complained about
7   Tim Clark's conduct towards you in terms of
8   asking you out and setting you up with his
9   son.
10      A We had discussed it, uh-huh.
11      Q Okay. And you're saying nothing
12  happened as a result of that discussion?
13      A That's correct.
14      Q Okay. Then you went back and
15  complained to Kerry Phillips about Tim
16  Clark having the conversation with the
17  inmate.
18      A Time later.
19      Q How much later?
20      A I don't know. I mean, I don't even
21  know that they were in the same few months.
22  They just weren't back to back that I can
23  recall it being back to back, like --

Page 293

1    Q  So did you want them to investigate
2  whether Tim Clark had acted inappropriately
3  with you and also whether Tim Clark had had
4  an inappropriate conversation with an
5  inmate?
6    A  For this?  I went to Kerry Phillips
7  particularly for this statement.  That's
8  what I wanted -- I went to him for that
9  statement at that time.
10    Q  So you wanted them to forget the
11  previous conversation you had with Kerry
12  Phillips?
13    A  Well, even so, if they took my phone
14  to see if I communicated with his son, what
15  would that have to do with sexual
16  harassment as far as from me?  Why would my
17  phone need to be taken to see if I talked
18  to his son?
19    Q  Because they have custody over --
20  like, you're their employee, so if they get
21  your --
22    A  But the phone wasn't theirs.
23    MS. RILEY:  Object to the form.

Page 294

1  Please, one at a time.
2    Q  So you're the employee --
3    MS. RILEY:  One at a time.
4    Q  -- and they're attempting to
5  investigate and derive evidence from your
6  statement that Tim Clark tried to set you
7  up with his son and his son sent text
8  messages to you.  How would they confirm
9  that?
10    A  That was not part of that
11  allegation.  Again, like, I don't know how
12  to say that clearer or maybe you're trying
13  to back me into a corner, but that's just
14  not the same thing.  It's different --
15  different times, different allegations,
16  different details, different days,
17  different everything, so --
18    Q  Well, okay.  Let me ask this:  So
19  did you want them to investigate Tim
20  Clark's conduct to you prior to him having
21  that conversation with the inmate?
22    A  I wanted them to investigate why he
23  would bring an inmate in and allege that

Page 295

1  I'm fucking him.  That's -- that's what I
2  wanted.
3    Q  Okay.  So tell me about the phone.
4  So you were -- so let me just -- so you
5  were not asking when you complained about
6  Tim Clark that they investigate his conduct
7  towards you that had occurred before he had
8  the conversation with the inmate?
9    A  I did not ask Kerry Phillips that
10  day to investigate anything prior, no.
11    Q  Okay.  So when did they take away
12  your phone?
13    A  That day, the same day.
14    Q  The same day you made the complaint?
15    A  That's right.
16    Q  And how did that happen?
17    A  Kerry told me that Jernigan asked
18  Kerry to take -- to take my phone from me
19  and bring it to him.
20    Q  What time of day was that?
21    A  It was close to the end of the day
22  because it was a Friday.  I just know that
23  because of knowing that I wouldn't have

Page 296

1  communication over the weekend.
2    Q  So the phone was confiscated on a
3  Friday?
4    A  Yes.
5    Q  Do you think that was the day you
6  made the complaint?
7    A  Yes.
8    Q  And did you -- so you were without
9  your phone for a weekend?
10    A  Yes.
11    Q  When you say you couldn't
12  communicate, what do you mean?
13    A  I had no, like, cell phone of my
14  own.  And I had told them that my mom was
15  dying of pancreatic cancer and I needed to
16  talk to her over the -- that was my means
17  of talking to her.
18    Q  Well, where was your mom at the
19  time?
20    A  She was at her house.
21    Q  Is that here in Huntsville?
22    A  Yes.
23    Q  So you could have visited your mom?

Page 297

1    A  Well, obviously.
2    Q  So it wasn't your only means of
3  communicating with your mom.
4    A  No.  My mom was dying in the bed, so
5  showing up was not -- that was -- would be
6  tacky.
7    Q  To see your mom?
8    A  My mom didn't like when people just
9  showed up.
10    Q  So when was your phone returned to
11  you, Ms. Cagle?
12    A  The following Monday.
13    Q  What time?
14    A  Jernigan came in fairly -- or maybe
15  around 8:30 or 9:00 o'clock that morning,
16  and he asked Kerry -- or called Kerry or
17  asked Kerry somehow to have Kerry and I
18  come over to his office.  And he talked to
19  me for a little bit and then gave me my
20  phone in a manila envelope -- or, like, the
21  taller ones.
22    Q  Would anything have prevented you
23  from calling your mom from another phone?

Page 298

1    A  I was given another phone by a
2  supervisor of the Department.
3    Q  Oh, okay.  So could you have called
4  your mom on that phone?
5    A  Well, he gave it to me against what
6  he was supposed to do.
7    Q  How do you know that?
8    A  Because he told me that.
9    Q  Who was that?
10    A  His name is Steve Watson.
11    Q  Okay.  So you got -- your phone was
12  taken, and you were given another phone
13  from the Department?
14    A  No.  I was given his phone.
15    Q  What do you mean "his phone"?
16    A  His -- I think it was the Department
17  phone.  He had a Department phone and a
18  personal phone.
19    Q  So over the weekend, you had a cell
20  phone?
21    A  He ended up -- he probably gave it
22  to me Saturday of the weekend.
23    Q  All right.  So you got your phone

Page 299

1  back on Monday.
2    A  Uh-huh.
3    Q  What else happened?
4    A  I don't -- in the meeting?  For the
5  rest of the day?  I don't know what you're
6  asking.
7    Q  You had a meeting?  What happened in
8  the meeting?
9    A  He just said that he was giving my
10  phone back and that he claimed that he
11  didn't go through the phone.  He didn't
12  really say much -- oh, he said that I had
13  to remove my phone from the County bill.
14    Q  Who said that?
15    A  Jernigan.
16    Q  Okay.  Did he tell you why?
17    A  In whatever form he said, it was in
18  lieu of the incident that had occurred.
19    Q  I'm sorry.  What does that mean?
20    A  I mean, whatever occurred -- I mean,
21  the incident initiated this process of
22  whatever criminal style investigation that
23  they were doing, and he said because of

Page 300

1  that, that I didn't need to be on the
2  County bill.  I mean --
3    Q  Well -- okay.  There's how you
4  perceive what somebody says and there's
5  what they say --
6    A  Well, it happened, so --
7    Q  -- so I want to know exactly --
8    A  -- I didn't perceive it.
9    Q  I want to know exactly what he said
10  to you, to the best of your memory.
11    A  He said that I had one week -- or I
12  think a working week, so five days, to have
13  my number removed from the County bill.
14    Q  And did he say why?
15    A  I don't remember him saying -- I
16  know that he did say why.  I don't remember
17  how he said why, but it was because of the
18  allegations made.
19    Q  What else did he say?
20    A  It was just a few minutes of a
21  meeting.  There wasn't much more said.  I
22  can't remember anything particular.
23    Q  Did you say anything?

Page 301

1      A  No.  I think I just cried or
2    something.
3      Q  Okay.  And what was the next thing
4    that happened after that?
5      A  I just went back to my office and
6    worked.
7      Q  And so was the phone actually --
8    what happened with the bill?
9      A  I had to contact the person that was
10   over our phones at the time, and he had to
11   take me -- go with me to Verizon because
12   although the number was mine initially,
13   they had to sign to kind of -- to give back
14   the rights to that number.
15     Q  What does that mean?
16     A  I guess it's a Verizon policy.
17   Like, the number -- when I got on their
18   bill, it was kind of like I was giving them
19   that number -- ownership to that number,
20   and so technically, they could have said
21   that I couldn't have that number back
22   because I had given it to them, but he --
23   they signed some forms that said that it

Page 302

1    was okay for me to take that number back to
2    a personal account with them.
3      Q  How much money was the -- were
4    Defendants paying for you to -- the
5    Sheriff's Office paying for you to have a
6    cell phone per month?
7      A  I have no idea.  It was part of a --
8    we would get a bill that was about this
9    thick of all the phones and numbers and
10   there was iPads and different stuff on it,
11   so it was a portion of that bill, and I
12   don't know how much it was.
13     Q  And after that, you had to pay your
14   own phone bill?
15     A  Yes, ma'am.
16     Q  Your own phone bill for your
17   personal phone?
18     A  Uh-huh.
19     Q  Do you know what happened to Tim
20   Clark in terms of any discipline?
21     A  I was familiar with one of the
22   exhibits that was a disciplinary of his
23   from that incident.

Page 303

1      Q  Let's take a look at this and see if
2    this is what you're talking about.
3      A  Okay.
4    (Whereupon, Defendant's Exhibit No. 14 was
5    marked for identification and the same is
6    attached hereto.)
7      Q  What is this document, Exhibit 14?
8      A  A counseling statement, Employee
9    Counseling Statement.
10     Q  Who's it directed to?
11     A  The employee name on this counseling
12   statement is Tim Clark.
13     Q  What type of counseling statement is
14   it?
15     A  "Corrective Action" is what is
16   marked.
17     Q  Okay.  And if you look at the
18   details of the counseling, one of the
19   things they tell this employee is,
20   "Inappropriate comments about other
21   employees cannot and will not be tolerated,
22   especially to an inmate.  There are no
23   circumstances in which it is okay to

Page 304

1    discuss an employee with an inmate."  Do
2    you see that?  The bottom of the first
3    paragraph there under "Details of
4    Counseling."
5      A  Okay.  Yes.
6      Q  So they were telling him what he did
7    was wrong?
8      A  Uh-huh.
9      Q  Is that a yes?
10     A  Yes.
11     Q  And then they also had some
12   directions for him in terms of his
13   interaction with you in the second
14   paragraph there.  It says, "In the future,
15   employee will not have any face-to-face
16   contact with Erica Cagle and will minimize
17   any telephone, text messaging, and/or
18   e-mail contact with her."
19     A  Uh-huh.
20     Q  "All purchase order requests for
21   Patrol will be sent via e-mail to
22   Lieutenant Kerry Phillips for approval and
23   forwarding to Erica Cagle."

Page 305

1    So is it fair to say they were
2  trying to make sure you didn't have
3  additional uncomfortable contact with Tim
4  Clark?
5    A  It's fair to say that they typed
6  that, but that's not how it went, yes.
7    Q  Okay.  What do you mean by that, Ms.
8  Cagle?
9    A  The process of him only sending
10  purchase orders through Kerry Phillips is
11  not how it went.  He still called our
12  office phone.
13    Q  Well, it doesn't say he can't call
14  your office.  It says minimize any
15  telephone contact.
16    A  Okay.  Well, it just -- it looks
17  good in writing, but it's just not how the
18  process went.
19    Q  Well, did you have any other
20  face-to-face contact with him?
21    A  Yes.
22    Q  When?
23    A  We would often run into each other

Page 306

1  even in the parking lot of the fleet
2  services, gym, and the investigations
3  office.  He would be in the basement of the
4  courthouse.  He would be in the courthouse.
5    Q  Well, is that part of his job?
6    A  I don't know what he was doing up
7  here.
8    Q  You don't know it wasn't part of his
9  job to be in those locations, do you?
10    A  I don't -- I don't know.
11    Q  And when you ran into him, would you
12  talk to him?  What would you do?
13    A  No, I did not talk to him.
14    Q  Did he try to talk to you?
15    A  No.  I think he just tried to do a
16  nice wave one time, but no.
17    Q  Okay.  Now, you said he would call
18  your office.  What was he calling about?
19    A  He still had to have purchase orders
20  and invoices and a lot of purchases that
21  still went through our office.
22    Q  Okay.  So that was work-related?
23    A  Yes.

Page 307

1    Q  Did he ever text you any messages
2  after this point?
3    A  I don't think so.
4    Q  Did he ever have any e-mail contact
5  with you after this point?
6    A  Work-related.
7    Q  All work-related?
8    A  As far as I can think, yes.
9    Q  Okay.  Now, it says, "All purchase
10  order requests will be sent via e-mail."
11  Can you tell me what happened with the
12  purchase order request issue?
13    A  I believe that was changed.
14  Sometimes it was maybe accidently sent
15  straight to me, but they rearranged the --
16  Kerry Phillips was no longer the one
17  getting the purchase orders, and when they
18  try to change kind of the system,
19  everything gets out of whack, and so I
20  would get some from him directly or I would
21  have to get invoices from him directly.
22    Q  What do you mean by "directly"?
23    A  Like, the purchase orders from him

Page 308

1  would come to my e-mail.  So, I mean, it
2  was work-related.  It was just almost
3  hindering -- hindering my doing my
4  responsibilities by trying to avoid -- I
5  mean, having to avoid him.
6    Q  Well, I mean, what was your
7  preference, though?  You had complained --
8    A  I mean, I understand.  It was just
9  -- I'm just saying it was hard to do.
10    Q  Okay.  But you understand that they
11  were trying to keep you separate?
12    A  Yes.  Uh-huh.
13    MS. RILEY:  Are you at a breaking
14  point, Grace?
15    MS. GRAHAM:  Sure.
16    (Whereupon, a break was taken.)
17    Q  Now, I want to get back to your
18  complaint about Tim Clark, Ms. Cagle.  Did
19  you ever complain to anyone else about Tim
20  Clark's comment?
21    A  In regards to the -- I'm sorry --
22  the Tim Clark issue with the inmate?
23    Q  Yes.

77 (Pages 305 to 308)

Page 309

1    A  Yes.  So I ended up in person, I
2  went to Personnel, and I talked to Jermie
3  Howell and he had Pam Flory in the room as
4  well.
5    Q  Okay.  And what did you tell Jermie
6  Howell?
7    A  I had to -- I think I had already
8  had the -- I had the conversation with
9  Phillips already, or Kerry Phillips, and so
10  I caught Jermie up to speed on what had
11  transpired and I think I ended up coming to
12  his office twice with the second being that
13  I asked him if they were able to take my
14  cell phone from me.
15    Q  Okay.  So the first time you met
16  with him, what was the purpose of meeting
17  with him?
18    A  I -- I don't -- I went to tell him
19  to make sure that what was going on between
20  Kerry Phillips and Jernigan was going
21  appropriately on my behalf.
22    Q  Okay.  And were you encouraged or
23  directed to go talk with Jermie Howell?

Page 310

1    A  I don't believe so, no.
2    Q  So that was done of your own
3  initiative?
4    A  Yes.
5    Q  Do you know if you contacted him or
6  he contacted you?
7    A  "He" being Jermie?
8    Q  Yes.
9    A  I came up to the -- his office.  He
10  did not contact me.
11    Q  Okay.  And so that first meeting
12  that you had with him after this Tim Clark
13  complaint --
14    A  Uh-huh.
15    Q  -- what was the -- what did you hope
16  to achieve by meeting with him?
17    A  I was just really upset about the
18  statement, and I remember being upset in
19  his office.  I think that I cried a lot,
20  which -- so I just cried a lot and said
21  what had happened and I think that I was
22  just looking for -- I don't think.  I was
23  looking for Personnel to support me and

Page 311

1  make sure that -- that the statement and
2  that the situation was handled
3  appropriately.
4    Q  Okay.  And did you talk with Jermie
5  about any conduct of Tim Clark other than
6  his conversation with the inmate?
7    A  I believe that I told he and Pam
8  that -- just a little bit of the back
9  story, which was that Tim had tried to hit
10  on me -- or solicit dates and stuff before
11  and that he had tried to solicit me and his
12  son maybe going on a date or being a couple
13  and that I thought that that was why he
14  ended up making this statement to the --
15  out of, like, his madness, Tim's madness.
16    Q  Okay.  So just to clarify, were you
17  there to ask Jermie to investigate Tim's
18  conduct regarding soliciting you for dates
19  or setting you up with his son?
20    A  I don't know.  Aside from thinking
21  that I just wanted to make sure that
22  somebody else knew to make sure that --
23  that the incident was handled

Page 312

1  appropriately, I don't know what I -- what
2  I thought aside from that as far as
3  investigating.  He had only -- "he,"
4  Jermie, had only been here -- it was, like,
5  his first week.
6    Q  All right.  And was that all you
7  discussed in that first meeting with
8  Jermie?
9    A  That's all I remember.  I just was
10  kind of -- I was really upset and trying to
11  tell the story and make sure that it was
12  handled correctly.
13    Q  Did you ask him to take any specific
14  action?
15    A  I don't know that I asked him to
16  take any specific action.  I think that he
17  indicated to me that he would look into it
18  or something along those lines, like, he
19  would be contacting the Sheriff's
20  Department or looking into it, looking into
21  the situation.
22    Q  Okay.  Now, you mentioned you met
23  with him a second time.

Page 313

1      A  Yes, because when Kerry Phillips
2   initially said that they were going to take
3   my phone -- or that Jernigan I guess maybe
4   told Kerry Phillips that he was going to
5   take my phone, I immediately came back up
6   here, and I think Pam was in there for that
7   one as well, but I asked about their
8   ability to take my phone away.
9      Q  And what was the conversation?
10     A  He said that he was under the -- he
11  -- the way he understood it was that if I
12  had a phone through the Sheriff's
13  Department's work plan, phone plan, that I
14  did have to give the phone if they asked
15  for it.
16     Q  Did you talk about anything else in
17  that second meeting?
18     A  Not that I can remember.  I don't
19  know if I indicated to him that I was going
20  to ask an attorney or talk to an attorney.
21  I don't know if I -- I don't know if I told
22  him that part.
23     Q  So sitting here today, you don't

Page 314

1   know that you did tell him that?
2      A  I don't know, no, ma'am.
3      Q  All right.  Did you have any other
4   interactions with any supervisor or with
5   members of the Personnel Department about
6   Tim Clark?
7      A  Jermie, Pam -- I don't think so.
8      Q  Okay.  And you got your phone back
9   on that Monday?
10     A  Yes.  The following Monday, yes,
11  ma'am.
12     Q  And was there anything else happened
13  with regard to this particular incident?
14     A  I mean, I had to go have my phone
15  removed, you know, and I kept doing the
16  part-time jobs on my phone.
17     Q  And did you continue to, you know,
18  have an extended lunch at that point?
19     A  Sometimes.
20     Q  And did you continue to sometimes
21  come in late?
22     A  I don't know that that -- coming in
23  late was because of the part-time jobs

Page 315

1   every time.  It was -- if it was, it was
2   noted probably in the new system.
3      Q  All right.  You mean you had to take
4   a leave to come in late?
5      A  No, but he made us fill out, like,
6   timesheets, Kerry Phillips did, still --
7   or, I mean, we had a timesheet, so it
8   should have been noted on there because --
9      Q  Like what time you arrived?
10     A  Yes.
11     Q  Okay.  But you don't recall having
12  to take leave if you came in 20, 30, 40
13  minutes late?
14     A  Not -- I mean, I did over the seven
15  and a half years, yes, there were times
16  that I took actual leave, but there were
17  some times that I would say I worked until
18  X amount extra, can I come in late.  That
19  did happen, yes.
20     Q  And that was granted?
21     A  Yes.
22     Q  Okay.  Do you feel like you were
23  retaliated against for complaining about

Page 316

1   Tim Clark?
2      A  Absolutely.
3      Q  In what ways were you retaliated
4   against?
5      A  My phone was taken away from me
6   almost immediately, and then my phone was
7   removed from the plan of the Sheriff's
8   Department and I continued to do all work
9   from the Sheriff's -- I mean, anybody could
10  contact me, not just for part-time jobs.
11     Q  Any other ways in which you feel you
12  were retaliated against?
13     A  It hindered my job process.  I --
14  having to do different methods of obtaining
15  invoices and stuff, I was the person
16  between the Commission and paying these
17  invoices, so if something wasn't paid and
18  they were contacted, then I was the one
19  they looked for.  So the process of me
20  being on top of getting my own invoices and
21  staying on top of all that was hindered
22  after this.
23     Q  Well, were you ever disciplined for

Page 317

```
 1    any kind of failure to do invoices on time?
 2        A Disciplined, no, not officially.
 3        Q Were you ever verbally counseled
 4    about it?
 5        A They would call and say, why isn't
 6    this in, you know, so -- no.
 7        Q So you just answered them?
 8        A Yes.
 9        Q Okay. Did you make anyone aware of
10    any problems you were having with getting
11    invoices?
12        A Kerry Phillips was aware.
13        Q What did you say to Kerry Phillips?
14        A It was just -- well, and I talked to
15    Jermie about it as well because he
16    indicated to me that it shouldn't be --
17    part of my job -- let me back up. David
18    Jernigan, when he took me off of the plan
19    and he made the new arrangements for
20    obtaining invoices and stuff as far as Tim
21    Clark, he also said that I couldn't go to
22    the fleet services office anymore myself to
23    get those invoices. Well, I let Jermie
```

Page 318

```
 1    know that that was said, and he said that
 2    they couldn't do something to keep me from
 3    doing my job. So although, like, I was
 4    still able to do my job, it hindered me
 5    being as efficient and quick as I was
 6    prior.
 7        Q Well, who complained to you about
 8    that?
 9        A What do you mean?
10        Q I mean, who was complaining about
11    your ability to do your job?
12        A Well, if things were late, the
13    people in the Commission -- the invoices
14    are flagged as being not paid, and so they
15    would say one of the vendors -- we were
16    under their Madison County Commission, so
17    whenever a vendor wanted to know why
18    something was not paid, they contacted the
19    Commission, and the Commission would call
20    me and say, do you not have this invoice
21    that was from months ago?
22        Q Okay. And what would you say?
23        A I would say, it was bought by so and
```

Page 319

```
 1    so, often, you know, the fleet services or
 2    Tim, and either I hadn't gotten the
 3    invoices, it hadn't been given to me, and I
 4    couldn't pay it without the invoice.
 5        Q Did that ever happen before you were
 6    prevented from going to fleet services to
 7    pick up invoices?
 8        A Very rarely.
 9        Q How many times?
10        A I don't know how many times prior.
11        Q And how many times did it happen
12    after you were prevented from going to
13    fleet services to pick up invoices?
14        A It just -- it just happened more
15    frequently, but I don't know exactly how
16    many times.
17        Q More than ten?
18        A More than ten.
19        Q More than 20?
20        A I don't know.
21        Q Okay. In paragraph 41 in your Third
22    Amended Complaint, you talk about, in the
23    middle of that paragraph, experiencing
```

Page 320

```
 1    anxiety attacks, sleeplessness, emotional
 2    and mental distress, depression, fatigue,
 3    fear of the workplace, such that you could
 4    hardly force yourself to go to work.
 5        A Can you tell me which --
 6        Q Paragraph 41.
 7        A 41. I thought you said 31.
 8        Q I'm so sorry.
 9        A That's okay. Okay. 41. Yes,
10    ma'am.
11        Q Was all of those effects as a result
12    of your conditions of employment?
13        A I started not wanting to go to work
14    the way that I used to, and I took it as it
15    taking a toll on me, so that's how I viewed
16    it, yes, ma'am.
17        Q Well, did you have other things
18    going on in your personal life that also
19    caused anxiety, sleeplessness, distress,
20    depression, fatigue?
21        A I had -- I mean, my mom was sick,
22    but that -- I mean, it didn't -- it wasn't
23    that type of anxiety.
```

Page 321

1    Q  Weren't you also dating someone who
2  drank too much?
3    A  That's a matter of opinion.  It
4  didn't affect me.
5    Q  Didn't you complain to your
6  counselor about it?
7    A  I don't recall.
8    Q  Okay.  If it was so bad, why didn't
9  you just quit?
10    A  I attempted to apply at many jobs,
11  but I didn't quit because I had to pay
12  bills and it was my -- paying -- my first
13  real job and I had great insurance.  I
14  didn't -- I wasn't in a position to quit.
15    Q  What jobs did you apply to?
16    A  I applied at different ones on the
17  arsenal, I used Indeed also to apply, and I
18  spoke to different, like, just attorney
19  friends that I knew, if they ever had,
20  like, a clerical-type position come open.
21    Q  So how many inquiries do you think
22  you made about new jobs?
23    A  Over my entire time --

Page 322

1    Q  Well, I'm talking about surrounding
2  the Tim Clark episode.
3    A  Oh, I don't know.
4    Q  Less than ten?
5    A  I don't know.
6    Q  You have no idea?
7    A  I have no idea.
8    Q  Did you ever submit any formal
9  applications?
10    A  I did.
11    Q  To whom?  Did you just say those
12  people?
13    A  Yeah.  It was like -- I think the
14  arsenal uses a certain -- I can't remember
15  what the form -- the website is, and then
16  also, I have Indeed that I used.
17    Q  And is that like a web-based
18  service?
19    A  It's like where you can put your
20  resume on there, and you can just submit to
21  apply at certain places that are listed.
22    Q  Did you ever get any bites on your
23  resume?

Page 323

1    A  I got one after -- no.  No.
2    Q  Okay.  I want to just go to
3  something different here, your education.
4    A  Yes.
5    Q  I think you said you graduated from
6  college?
7    A  Uh-huh.
8    Q  Was that Auburn?
9    A  Yes.
10    Q  And do you have any additional
11  education beyond college?
12    A  Beyond college?
13    Q  Yes.
14    A  No.
15    Q  Did you go to law school?
16    A  Yes.
17    Q  Where?
18    A  At Birmingham School of Law.
19    Q  Did you finish?
20    A  As of today -- I'm done with all my
21  classes, but I don't think that I'm
22  technically graduated, but graduating this
23  month, I guess.

Page 324

1    Q  Congratulations.
2    A  Thank you.
3    Q  And have you passed the Bar?
4    A  No, I have not.
5    Q  Okay.  In paragraph 45 of your Third
6  Amended Complaint, you talk about
7  participating in the complaint by Marina
8  Garcia.  What did you do in her case?
9    A  She asked -- she asked me if I would
10  ask Kerry Phillips to have a meeting with
11  her so that she could go over her
12  complaint, if I would kind of be the person
13  to set that up, which I did.
14    Q  Why would she want to be -- is Kerry
15  Phillips in her chain of command?
16    A  No.  She told -- I think that he
17  used to be her supervisor at some point,
18  and she thought that he -- or she told me
19  that he was somebody that she felt like she
20  could go to.
21    Q  So you set up the meeting?
22    A  Yes.  I asked him if it would be
23  okay if he would meet with her, and he

Page 325

1   agreed.
2      Q  And did you also attend that
3   meeting?
4      A  Yes.
5      Q  Did you contribute to the
6   conversation?
7      A  Probably so, but minimal, and I
8   don't remember anything that I said.
9      Q  Okay.  Did you perform any other
10  action to further Marina Garcia's case?
11     A  I signed a declaratory statement for
12  her attorney at the time.
13     Q  Okay.  Do you feel like you were
14  retaliated against for participating in
15  Marina Garcia's discrimination case?
16     A  Yes.  I feel like that things like
17  the -- for example, Jernigan seemed more
18  agitated towards me, maybe, or just -- just
19  not nice towards me after that, and then he
20  suggested that the 201 files be moved out
21  of my office, which was -- I felt was
22  because of her -- me helping with her
23  complaint and I think that he felt if he

Page 326

1   took those away, he would -- it would limit
2   me from having, like, access to that or
3   something.
4      Q  Were you providing Marina Garcia
5   with any information that was in the 201
6   files?
7      A  No.
8      Q  Were you providing her with copies
9   of the 201 files?
10     A  No.
11     Q  You say in paragraph 45 here that
12  Jernigan displayed a cold and negative
13  attitude towards you.  What do you mean by
14  that?
15     A  Well, he would make fun of my -- the
16  southern accent that I have, and that --
17  that happens a lot, but he would do it and
18  it was just, like, really awkward.  And he
19  would -- I mean, he just wasn't friendly to
20  me, and he -- as it seemed that he was to
21  other people and he -- I mean, it just
22  seemed like his demeanor changed towards
23  me.  I just felt that that's how it was

Page 327

1   when he was around.  I could feel or I felt
2   like he just didn't like me or thought that
3   I was involved with her stuff and -- or
4   knew that I had helped her, and he just --
5   I felt like he didn't like that.
6      Q  How did he know that you had helped
7   her?
8      A  Because Kerry Phillips went to him
9   after the meeting.
10     Q  So he knew you had helped arrange a
11  meeting?
12     A  Yes, and she asked if I could be in
13  the meeting with her and Jernigan, and he
14  said no.
15     Q  How did his cold and negative
16  attitude impact your ability to do your
17  job?
18     A  Well, he's the Chief Deputy, so he's
19  second, you know, in the -- he's second in
20  command, and it just made me feel less
21  protected and less -- I mean, I just felt
22  like the environment was worse than it had
23  already been.

Page 328

1      Q  Well, I mean, were you able to still
2   perform the functions of your job?
3      A  Probably not as well as I had
4   before, but I did it to the best of my
5   ability, yes.
6      Q  Did anyone tell you you weren't
7   doing your job well?
8      A  Not that I can remember.
9      Q  Did moving the 201 files impact your
10  ability to do your job?
11     A  He -- somebody else talked him into
12  not moving those 201 files, so he didn't
13  end up moving them.
14     Q  Oh, so they stayed in your office?
15     A  Yes.
16     Q  So would you say the situation had
17  gotten worse for you and your employment
18  than it was in 2014 with the Tim Clark
19  incident?
20     A  So just having the Chief Deputy or
21  the second Chief Deputy come in and have
22  what I felt like was a -- I felt like he --
23  I don't think he liked me from the

Page 329

```
1    beginning, I don't know why, but it
2    amplified when it came to being involved
3    with Marina's case, and I -- the atmosphere
4    being the way it was and having the second
5    person in command acting that way towards
6    me just made me feel more vulnerable and
7    less protected and just made the atmosphere
8    worse for me.
9        Q  So why didn't you quit then?
10       A  I'm sorry?
11       Q  Why didn't you quit then?
12       A  Again, I was paying bills that
13   didn't care if David Jernigan was not nice
14   to me.
15   (Whereupon, an off-the-record discussion was
16   held.)
17   (Whereupon, Defendant's Exhibit No. 15 was
18   marked for identification and the same is
19   attached hereto.)
20       Q  Do you recognize this document, Ms.
21   Cagle?
22       A  Yes.
23       Q  What is it?
```

Page 330

```
1        A  It was the -- it's the sign-out
2    sheet that was on everybody's 201 file.
3        Q  Okay.  Whose 201 file is that?
4        A  Can I open this?
5        Q  Yes.
6        A  It is Stacey Rutherford.
7        Q  Okay.  Now, I'm going to -- you look
8    -- see that Bates number on each page?  See
9    it's marked "Cagle"?
10       A  Yes.  Yes.
11       Q  So this document was produced to us
12   by your attorney.
13       A  Yes.
14       Q  How did that file come into your
15   personal possession in order to be produced
16   by your counsel in this litigation?
17       A  This came from the last attorney.
18       Q  How did he get it?
19       A  I guess he asked for it.  I don't
20   know.
21       Q  Did you take it out of the office
22   with you?
23       A  I did not have his file with me.  I
```

Page 331

```
1    have made copies of his file for my work
2    because those are my signatures when this
3    was copied.
4        Q  On page 1 there?
5        A  Yes.
6        Q  So it shows you as the authorized
7    signature?
8        A  Yes.  So when -- the person above me
9    was the person who worked in my position
10   before, and so those were done then, and
11   these were done when I was there.
12       Q  So on those dates there, you -- I
13   believe they're 6/24/14 --
14       A  Yes.
15       Q  -- and 9/29/16?
16       A  Yes.
17       Q  And that would have been dates you
18   took that file and made copies of it?
19       A  I didn't -- it was right in the
20   office, the copy machine, so yes, and there
21   was also a copy made for Jeff Rich.
22       Q  Where is that indicated?
23       A  But I don't know why it's not
```

Page 332

```
1    labeled on here.
2        Q  When was that?
3        A  It was -- if we could reference
4    somewhere else in the complaint, it was
5    when I asked about Rutherford being able to
6    get into my Facebook.
7        Q  Okay.  We're going to get into that
8    in just a second.  But I just want to
9    clarify, did you take copies of any 201
10   files with you when you left employment
11   with the Sheriff's Office?
12       A  I did not take 201 files.
13       Q  Did you take copies of any document
14   with you when you left the employment of
15   the Sheriff's Office?
16       A  I didn't take any copies.  I had,
17   like, a little clear carrier that had stuff
18   from me working there, but I don't -- I
19   still have the carrier, and I don't know
20   what's in it.
21       Q  So you --
22       A  It was my own -- like, I did
23   leadership stuff through them, and so I had
```

Page 333

1  different folders of leadership things and
2  -- but I don't think that it was anything
3  like --
4      Q  So you didn't take any 201 files?
5      A  No.
6      Q  Did you take any desk files?
7      A  I didn't even know that he had a
8  desk file.
9      Q  Did you take any complaints or --
10     A  None to my knowledge.
11     Q  Did you take any disciplinary
12  records?
13     A  None to my knowledge.
14     Q  Now, you started to talk about a
15  Facebook -- hacking Facebook issue.
16     A  Yes.
17     Q  Okay.  So what did you think was
18  going on with your Facebook account?
19     A  I had heard several times just from
20  different people that Stacey Rutherford was
21  able to hack into Facebook or other social
22  media, and I was told several times that I
23  was one that he had gotten into.  And I

Page 334

1  didn't have an indication of that, but
2  after hearing it probably three or four
3  times, I e-mailed Jeff and asked him -- I
4  provided that -- something along the lines
5  of would I be notified if I was one of the
6  people that was hacked into.
7      Q  Okay.  So let me -- who told you
8  that they felt Stacey Rutherford was
9  hacking your Facebook?
10     A  Well, the girl that worked with me,
11  Julie, told me that she heard that, and
12  then Chris Stevens, who was then on third
13  shift, told me that he had heard that.  He
14  asked me if -- like, he said, I heard that
15  Stacey was able to get into your Facebook.
16  And after two or three times, I decided to
17  ask about it.
18     Q  Okay.  So all you knew at that point
19  was that there was a rumor that he had
20  hacked into your Facebook account?
21     A  Yes.
22     Q  And so you said you e-mailed Jeff
23  Rich?

Page 335

1      A  Yes.
2      Q  And what did you say in your
3  e-mails?
4      A  I asked if I would be, like, made
5  aware if I was one of the -- there was a
6  few that were said to be -- that he was
7  able to get into or could get into, and I
8  was -- just asked if I would be made aware
9  if that was the case.  Like, was that
10  something I was afforded to know.
11     Q  And was there a response?
12     A  Yes.
13     Q  What was that response?
14     A  He said, come see me.
15     Q  Okay.  Around what time was this,
16  Ms. Cagle?
17     A  What time of the year or the date?
18     Q  Yes, date.
19     A  It was -- I don't know.
20     Q  Okay.  Well, I'm just -- for your
21  reference, the Internal Affairs
22  investigation was run December of 2016.
23  Does that refresh your memory?

Page 336

1      A  Yes.  Yes.  So it was December 2016.
2      Q  That you would have talked to Jeff
3  Rich?
4      A  Yes.
5      Q  Okay.
6      A  And I provided the e-mail.  That
7  would have the date.
8      Q  Okay.  And where did you meet with
9  him?
10     A  In his office.
11     Q  Here in this building?
12     A  Yes.
13     Q  And was anyone else present for the
14  meeting?
15     A  No.  His secretary was right outside
16  of the door.
17     Q  So the door is open?
18     A  Yes.
19     Q  Okay.  And what was the substance of
20  the conversation?
21     A  I just told him what I had heard,
22  that -- that Stacey was able to get into
23  that, and Julie provided me with

Page 337

1  information that she had paid for them to
2  go to a -- like a training that included
3  that and then Brent Patterson had also told
4  me that he was at the training with Stacey
5  and that they did go into a training for
6  that. And so all of that, coupled into me
7  being one of the ones that was told that he
8  got into, I told Jeff that information, and
9  that was why I was asking him that if that
10 did happen, would I be told.
11    Q  Okay. And what was his response to
12 that?
13    A  He said that the Sheriff's
14 Department indicated to him that Stacey was
15 unable to get into -- into social media.
16    Q  Okay. What else occurred in the
17 conversation?
18    A  I told him about Julie saying -- the
19 girl that I worked with saying that -- I
20 told him all the information that I knew,
21 that Brent had told me that he himself went
22 to the class with Stacey to be told that, I
23 told him about the rumors of that Stacey

Page 338

1  was at the investigations building where he
2  worked and was showing people -- I wasn't
3  there. I don't know, but that was what
4  came around in -- all of that and it being
5  that I was told that mine was one of the
6  examples he used to hack into. So I told
7  Jeff everything that I knew at the time.
8     Q  And what did you think was meant by
9  the word "hack"?
10    A  I thought he was able to just get
11 into my Facebook the way that I would as
12 the user.
13    Q  Like be able to post things?
14    A  Post or read messages or just
15 anything.
16    Q  All right. And so you relay all
17 this to Jeff Rich, and what else happened
18 in the conversation?
19    A  He just said that he was going to
20 have to -- have to let Jernigan know about
21 the situation, and said that he was told,
22 you know, that Stacey was not able to do
23 that, so that was it.

Page 339

1     Q  And you left?
2     A  Yes.
3     Q  Did you have any further interaction
4  with Jeff Rich about that issue?
5     A  Not to my knowledge.
6     Q  Okay. With respect to interactions
7  with Jeff Rich, did you talk with him about
8  anything else related to your tenure in the
9  Sheriff's Office that you're complaining
10 about in this litigation?
11    A  No, I didn't.
12    Q  All right. So did you complain to
13 anyone else about this allegation that
14 Stacey Rutherford had hacked your Facebook
15 account?
16    A  Well, I went to Jeff first. I tried
17 that outlet because I thought that if Jeff
18 just said that if it had happened, yes, you
19 would be notified, then I would -- it kind
20 of -- it would have just dropped, you know.
21 I would have thought, well, they would have
22 notified me if it was the case, so that
23 would have been it for me. But he had -- I

Page 340

1  guess he felt an obligation to tell
2  Jernigan, so it ended up that I tell
3  Phillips what's going on because Jernigan
4  is being told what's going on.
5     Q  So you went back and had this
6  conversation with Kerry Phillips?
7     A  I believe that I went back and had
8  to tell him, yes, what was going on.
9     Q  Okay. And did you relay to him all
10 the information that you've talked about
11 here today?
12    A  Yes.
13    Q  And what did he say he would do in
14 response?
15    A  He actually talked to Brent
16 Patterson, who confirmed to him, Kerry,
17 because he was Brent's supervisor -- Brent
18 told Kerry that he, Brent, did indeed go to
19 a class with Stacey that showed them how to
20 hack into social media.
21    Q  And how do you know Brent told him
22 that?
23    A  I was there.

Page 341

1     Q  So he called Brent to the office?
2     A  Yes.  His office was right next to
3  his, yes.
4     Q  Okay.  And he said, hey, this is the
5  allegation --
6     A  And I --
7     Q  -- what say you?
8     A  Right.  I said that Brent had
9  already told me that, and so I had Brent --
10  or either I said, Brent, will you come tell
11  Phillips what you told me or Phillips said,
12  Brent, come tell me what you told me, and
13  he said the same thing.
14     Q  Okay.  He had attended a conference
15  with Stacey Rutherford --
16     A  Yes.
17     Q  -- where there had been part of a
18  class that told you how to hack into
19  Facebook accounts?
20     A  Brent indicated that there were many
21  classes that you could choose from at this
22  conference and that one of the ones that
23  Stacey went to was to -- I don't know

Page 342

1  exactly what the class itself was called,
2  but he chose to go to that block of a class
3  and learn.
4     Q  Okay.  Did Brent also attend that
5  class?
6     A  Brent said to myself and Kerry
7  Phillips that he started to sit there with
8  Stacey and learn the same information but
9  that it was too much for him to understand,
10  and he left.
11     Q  So he really doesn't know what ended
12  up being relayed in that class?
13     A  I don't know how long he was there.
14     Q  Okay.  So was there an investigation
15  after your complaint to Kerry Phillips?
16     A  So a day or so later, maybe, Dave
17  Jernigan called me to his -- me and Kerry
18  Phillips to his office to discuss it.
19     Q  And what happened in that meeting?
20     A  So when I got there, it seemed like
21  he was mad that I had reached out to Jeff
22  instead of coming to them first, and so I
23  explained that I thought that Jeff could

Page 343

1  just maybe say that I would have been given
2  some kind of notification if it had
3  happened and I would have let it go.  Kerry
4  and I sat at a small table in Jernigan's
5  office and Jernigan was at his desk and he
6  was, like, getting upset about it and,
7  like, throwing his arms around.  He said
8  that I wished that the previous Chief was
9  still there instead of him and that -- he
10  just seemed mad that I had reached out to
11  Jeff, who was considered outside of the
12  Department.  And so he initiated it that
13  way, and then he had printed off some
14  papers that maybe was just the description
15  of the overall conference and he came and
16  sat it in front of me and Kerry Phillips
17  and he said, you know, this is what it was
18  and that's not -- he -- Stacey wasn't
19  taught how to hack.  And he showed me the
20  stuff, and I said, Kerry -- Lieutenant
21  Phillips at the time -- or Captain Phillips
22  -- will you tell him what that -- Brent --
23  what Brent said or whatever and Kerry told

Page 344

1  him what Brent said and so then he said,
2  I'll initiate the IA.
3     Q  Okay.  So there was an internal
4  investigation?
5     A  Yes.
6  (Whereupon, Defendant's Exhibit No. 16 was
7  marked for identification and the same is
8  attached hereto.)
9     Q  Okay.  So let me just mark this.
10  You see there at the top, this document is
11  dated December 13th, 2016 to Chief Jernigan
12  from Lieutenant Brian Chaffin?
13     A  Chaffin, yes, ma'am.
14     Q  Chaffin.  Who is Brian Chaffin?
15     A  At the time, he was the Lieutenant
16  for the investigations office.
17     Q  So would he have been responsible
18  for conducting an Internal Affairs
19  investigation?
20     A  He could have been, yes.
21     Q  Okay.  And just on the second page,
22  I wanted to clarify -- second page of this
23  exhibit.

Page 345

```
1       A  Okay.
2       Q  It looks like an e-mail, and it's
3   directed to you, Erica.
4       A  Yes.
5       Q  Do you recall receiving this e-mail?
6       A  Yes, ma'am.
7       Q  Okay.  And that e-mail goes through
8   the things that they investigated and
9   concludes the allegation is classified as
10  rumor and hearsay, the investigation is
11  closed.
12      A  Uh-huh.
13      Q  What criticism, if any, do you have
14  of this investigation?
15      A  I think that it -- you know, I
16  initiated even this being an issue for me
17  by simply asking if I would be notified,
18  and I -- it didn't have to turn into this.
19  I just wanted to know after being told so
20  many times whether or not I would know if
21  that was true.  And so it turned into him
22  just saying things that weren't part of the
23  investigation like about me wishing that
```

Page 346

```
1   the other Chief that was in Jernigan's spot
2   and just being aggressive about the whole
3   thing and being mad that I reached out to
4   Jeff instead of staying in the Department,
5   and so --
6       Q  What did he say about that
7   specifically, about being mad that you
8   reached out to Jeff?
9       A  He didn't say that specifically,
10  aside from why didn't you -- he didn't say
11  you shouldn't have done that.  He said, why
12  did you do that?  He asked me why that I
13  asked Jeff instead of asking them first.
14      Q  Why would you assume he's upset,
15  then?
16      A  Because of how he was acting.  He
17  was, you know, just aggressively throwing
18  his hands around, his voice was very --
19  like he was investigating me for a
20  wrongdoing.  I mean, it was very
21  uncomfortable and not warranted.
22      Q  But he actually sent your complaint
23  to be investigated by IA?
```

Page 347

```
1       A  Yes, because Kerry Phillips
2   corroborated why I would have thought that
3   this would come about.
4       Q  Okay.  So it gets investigated.
5       A  Uh-huh.
6       Q  You have a complaint, it's
7   investigated through --
8       A  Yes.  They say that it was
9   investigated, yes.
10      Q  Okay.  Well, let's look at page 1 of
11  that exhibit, and I'm just going to briefly
12  go through the things that were done, it
13  looks like, signed off by Brian Chaffin.
14         If you look in that second
15  paragraph, it said he met with Investigator
16  Webster.
17      A  Uh-huh.
18      Q  Okay.  The third paragraph, he spoke
19  with Sergeant Brett Patterson.  The fifth
20  paragraph, he contacted Media Sonar and
21  talked with a program representative.
22      A  Uh-huh.
23      Q  And sixth paragraph, he spoke with
```

Page 348

```
1   Stacey Rutherford about it.
2       A  Uh-huh.
3       Q  I mean, what else do you think he
4   should have done?
5       A  It's not what -- it's not what he
6   did.  It's how it was handled.
7       Q  What do you mean?
8       A  That it was handled -- I asked a
9   simple question to Jeff and Jeff felt like
10  he had a responsibility to tell them and it
11  became like a criminal style situation that
12  could have been -- even if Jeff asked
13  Jernigan to just simply answer the question
14  or whatever, it didn't have to be this.  So
15  I'm not saying what he did.  I'm saying how
16  it was handled.
17      Q  Okay.  But I'm a little confused.
18  You bring up a very serious allegation.  I
19  mean, you're talking about someone hacking
20  into someone's personal social media
21  account.
22      A  Yes.
23      Q  I mean, you expect the allegation
```

Page 349

1    not to be relayed to the Sheriff's Office
2    to be investigated?
3        A  Well, it had already been
4    investigated prior.
5        Q  What do you mean?
6        A  Jeff was already aware of this
7    situation before I came up there.
8        Q  Okay.  So what do you mean it was
9    investigated?
10       A  It was a known -- some kind of
11   situation was already alerted about this
12   being the case, that he could get into
13   social media.
14       Q  So perhaps -- do you know if he had
15   all of the information you relayed to him,
16   which is your statement from -- the
17   statement from Brent Patterson?
18       A  Who?
19       Q  Well, you're saying it -- are you
20   saying it was investigated before you
21   raised the issue with Jeff?
22       A  Okay.  I'm going to try to dissect
23   your question.

Page 350

1        MS. RILEY:  The last question I'm
2    not objecting to, but I have to say I'm a
3    little confused.  Can you read it back so
4    we can hear it?
5        Q  Well, I'm just trying to figure
6    out -- you're upset with the way the
7    process worked.  You raised an issue of a
8    serious allegation that was investigated.
9    Why does that upset you?
10       A  Because they made it seem like I was
11   wrong for reaching out to Jeff about it.
12   He -- his demeanor, his voice, the way he
13   -- the way he put stuff down on the table
14   in front of me at the interview, like, the
15   whole thing was in response to me reaching
16   out to Jeff instead of contacting them and
17   that was aggressive and it was uncalled
18   for.  I asked Jeff a simple question, and
19   he had to do what he had to do by telling
20   the Department.
21       Q  Well, are you saying he should not
22   have told the Department?
23       A  Who?  Jeff?

Page 351

1        Q  Jeff.
2        A  No, I'm not -- I'm not saying that.
3    I'm saying that they could have answered it
4    or -- because Jeff reached out to Jernigan
5    didn't mean Jernigan had to throw his hands
6    everywhere and accuse me of not wanting him
7    in his position and that I -- why did I
8    reach out outside of the Department instead
9    of coming to them first.  All of that --
10   that didn't have to happen.  That's common
11   sense that didn't have to happen.
12       Q  So you were just upset with
13   Jernigan's demeanor?
14       A  I didn't just say his demeanor.  I
15   said the way that he treated the entire
16   meeting with him.  He was mad that I
17   reached out to somebody outside of the
18   Department, he was -- because I was already
19   burnt by the way that they had treated
20   other things, so he was mad about it.  So
21   --
22       Q  Were you disciplined for reaching
23   out to Jeff?

Page 352

1        A  Do you call this -- I mean, the way
2    that he treated me was a form of
3    discipline.  I mean, that was --
4        Q  So you're saying in the meeting, you
5    felt like that was your discipline?
6        A  I feel like he was out of line.
7        Q  Okay.  And did you receive any sort
8    of disciplinary action for raising the
9    complaint with Jeff and also raising it
10   with Jernigan?
11       A  Aside from him getting even more
12   sour around me, I suppose not.
13       Q  Okay.  Do you feel like you were
14   retaliated against for raising this
15   complaint with Jeff and then with the
16   Sheriff's Office?
17       A  I was retaliated against anytime I
18   brought up something.  In this particular
19   case, he was mad that I reached out to
20   Jeff.
21       Q  Well, how did he retaliate against
22   you?
23       A  The way that he acted in the

Page 353

1    meeting.
2       Q His demeanor in the meeting?
3       A His hands, his -- the stuff that he
4    said. That's not demeanor. That's verbal.
5       Q How did that alter your ability to
6    do your job?
7       A I felt less -- he's the Chief
8    Deputy, so, I mean, I don't -- you don't
9    feel as confident in the job if your Chief
10   -- if your Chief Deputy is treating people
11   that way for bringing up an issue.
12      Q Did you receive bad reviews after
13   that incident?
14      A He didn't do my reviews.
15      Q So there's no discernable change in
16   terms of your evaluation?
17      A I don't recall.
18      Q How was it -- other than your
19   feelings about the meeting, was it more
20   difficult to --
21      A It wasn't my feelings.
22      Q -- fulfill your duties?
23      A It was the facts of the meeting. I

Page 354

1    gave you facts of the meeting, not how I
2    felt. He threw his arms up --
3       Q You felt a certain way about how he
4    behaved in the meeting --
5       A Because he threw his arms up. I
6    reacted like a reasonable person would.
7       Q So did your response to that make it
8    more difficult for you to perform the
9    duties of your job?
10      A My response to what?
11      Q To his actions in the meeting.
12      A Having the second in line person of
13   the place that you work at again ...
14      Q Well, let me ask it this way.
15      A -- again fail -- no, I'm going to
16   answer the question.
17      Q Sure.
18      A -- again fail you, yes, I felt a
19   different way about my job.
20      Q Okay. What duties were you unable
21   to perform as a result of raising the
22   complaint with Jeff and having --
23      A I didn't allege that I didn't have

Page 355

1       --
2       Q Let me finish my question. What
3    duties were you unable to perform after
4    raising this complaint with Jeff and having
5    the meeting with Jernigan?
6       A I was unable to exercise my ability
7    as an employee to raise issues, but as far
8    as doing -- pushing paperwork at my desk, I
9    was still able to do that.
10      Q All right. Let's look at paragraph
11   46 of your complaint. Now, this paragraph
12   relates to your message or call to Phillips
13   and reporting that Patterson was involved
14   with a married female school administrator.
15   Do you remember that conversation?
16      A Yes. Yes.
17      Q When did you call -- or sorry. How
18   did you communicate with Phillips about
19   that?
20      A I called him.
21      Q And what time did you call him?
22      A It was later in the evening.
23   Probably 7:00 or 8:00 in the evening.

Page 356

1       Q Do you think it could have been
2    after 10:00 p.m.?
3       A It could have been. It was
4    nighttime.
5       Q And what did you tell him in that
6    phone call?
7       A I told him what I -- I told him what
8    had transpired, and I said, I'm sorry for
9    bothering you for what would typically just
10   be out of work drama, but the reason that I
11   was telling him is because he was Brent
12   Patterson's supervisor and Brent was over
13   the school resource officers and this
14   particular lady was a -- I believe at the
15   time, she was an assistant principal --
16   maybe she was a principal at a high school
17   in the county.
18      Q Well, couldn't you have told him
19   they were having a relationship the next
20   day?
21      A Not how -- how this incident was
22   occurring. I thought that -- I felt it was
23   something I needed to tell him now.

Page 357

1    Q What do you mean by that?
2    A I just felt that it was a
3    time-sensitive thing, and I didn't want him
4    to be -- not be prepared for it the next
5    morning.
6    Q Why was it time-sensitive?
7    A Because of the severity, I guess.
8    Q Well, did you fear she would file a
9    complaint?
10   A No, I did not.
11   Q Okay. Well, that's what you say in
12   this paragraph, so let's just see if you
13   agree with it.
14       "Cagle believed that Phillips would
15   want to be notified that the lover was
16   apparently threatening to file a citizen's
17   complaint." Do you agree with that
18   statement?
19       A I don't know when that portion -- I
20   don't know when that portion would have
21   been in that incident because that night
22   when I initially called him, I did not
23   consider the complaint at that time.

Page 358

1    Q I mean, what had happened that night
2    that made you think, I need to call him
3    right now?
4    A Because Morgan had unexpectedly --
5    and I was with her -- found that Brent was
6    with the assistant -- or I don't know if
7    she was a principal or assistant principal
8    -- with that lady.
9    Q Found her with the lady?
10   A Yes.
11   Q Where?
12   A Well, they were at a hotel, but that
13   was -- yes, that --
14   Q So you were with Morgan.
15   A Uh-huh.
16   Q And the two of you found Patterson
17   and the married school administrator at a
18   hotel?
19   A No.
20   Q Okay. Tell me what happened, then.
21   A Morgan and I went to his apartment.
22   Her and -- Morgan and Brent shared their
23   location on their cell phones. It showed

Page 359

1    that Brent was at his apartment. Morgan
2    and I had been studying for an exam, making
3    December seem -- or whenever that was --
4    August the right time. She said, let's go
5    by Brent's because we were studying at a
6    nearby coffee shop, and she said, it shows
7    that he's there. Let's go by and see him.
8    We went there -- I don't know if she had an
9    -- I can't speak for her, but I had no idea
10   what was going to happen when we walked
11   into the door. She had three forms of
12   access to his house. One to get into the
13   garage to park, one to -- a fob to get into
14   the door of the stairwell and the entrance
15   actually to his apartment. When we get in
16   there, his phone is sitting on his counter
17   face up. That's why it showed that he was
18   at his apartment. He left that phone
19   there. And she realized that he wasn't
20   there and she put the code that they had
21   came up with together into the phone and it
22   showed that he had GPS with the other lady
23   as well and it showed them together at a

Page 360

1    hotel.
2    Q I mean, did any of that cause you
3    any concern, like, in terms of your
4    position with the Sheriff's Office?
5    A I mean, I told -- well, she threw
6    some pillows around, and I said, like, it's
7    not -- none of this is worth it. Like,
8    yes, it came across, you know, quickly that
9    I -- I mean, I just had no idea that's what
10   it was going to be when we walked up there.
11   Q Okay. Did you leave after that?
12   A We left very shortly after that. I
13   think she gathered her shampoo, her --
14   something of hers.
15   Q And did you -- what did you do then?
16   A But she started calling the second
17   phone that he has and I guess indicating to
18   him that she knew and I don't -- I think
19   that was probably about the time that -- I
20   don't know when I called Kerry Phillips in
21   the middle of that, but she also found --
22   called the lady's phone that she got out of
23   Brent's phone. So she was making a lot of

Page 361

1    calls, and I called Kerry Phillips.
2        Q  Did you make any phone calls?
3        A  Not that I recall.  I mean, I was in
4    the car with her, so.
5        Q  Did you text Brent Patterson?
6        A  I don't think that I did.
7        Q  Did you tell her, hey, take me home.
8    I don't want to be a part of this?
9        A  I don't remember.  I'm sure -- she
10   was hysterical.
11       Q  Did you go to the hotel where they
12   were located?
13       A  So we -- because she saw that GPS,
14   she rode through the parking lot, and his
15   truck was there.
16       Q  And then what happened?
17       A  I think she just started calling him
18   and her and it was a chain of going back
19   and forth with them arguing about the whole
20   thing.
21       Q  What were you doing?
22       A  Oh, my gosh.  Just listening,
23   supporting.  I mean, I was just there.

Page 362

1        Q  So did either of you ever see
2    another woman at the hotel with Patterson?
3        A  No.
4        Q  So how do you know he was having a
5    relationship with her?
6        A  Well, she talked to the woman on the
7    phone.
8        Q  And the woman confirmed it?
9        A  I mean, they both said that they
10   were there, but then the lady changed and
11   said she was with her mom.
12       Q  And so what else happened that
13   night?
14       A  I ended up at home, and she ended up
15   at home.  I mean, there was a lot of her
16   calling him.  I think they got into an
17   argument a few times.  I was under the
18   impression that he left the hotel.  I don't
19   know because I didn't see him, and I don't
20   know if she saw him, "she," Morgan.
21       Q  Did you ever see the woman there at
22   the hotel?
23       A  No.

Page 363

1        Q  So did you leave the hotel and make
2    this call to Phillips?
3        A  I don't know if I called him
4    immediately after leaving the apartment or
5    -- I don't know when it was in there, but
6    it was in a reasonable amount of time of --
7    because I know that he said, did anything
8    happen in the apartment?  Like, he wanted
9    to make sure that nothing -- like, she
10   didn't, like, damage anything.  He was
11   looking to protect, I think, the situation,
12   and he -- and I said, no.  So it had to
13   have been right after the apartment is what
14   I'd think, but I don't remember the exact
15   times.
16       Q  Is that the first time -- you
17   mentioned Patterson cheating on your friend
18   previously in your testimony.  Is that the
19   first time you were aware that he was
20   cheating on her?
21       A  So there was alleged other people.
22   I never saw it.  They would get in their
23   own arguments about it, so I don't -- I

Page 364

1    don't know because I never saw it.
2        Q  So you called up that night to Kerry
3    Phillips.
4        A  Yes.
5        Q  And you told him, I need to report
6    Patterson for having this relationship with
7    the married female school administrator?
8        A  And -- yes.  And I told him the only
9    reason I was calling him with that is
10   because of the relationship of the
11   Sheriff's Department and Brent's position
12   in the school system.
13       Q  So you reported Patterson for that
14   conduct but not for touching you
15   inappropriately?
16       A  I did.
17       Q  Now, prior to your complaint -- or
18   actually, let me ask this:  Before that
19   phone call to Phillips that night, had you
20   ever called him on the phone after work
21   hours?
22       A  Yes.
23       Q  And how many times do you think

Page 365

1   you've done that?
2       A   Probably a dozen or so.  I mean --
3       Q   Okay.  And had you ever made any
4   calls to him after 10:00 p.m. at night?
5       A   I don't remember any at that late,
6   no, ma'am.
7       Q   Okay.  Did you have any belief that
8   the married female school administrator was
9   going to be making a complaint to the
10  Department?
11      A   When this initially happened and we
12  went into the apartment, I didn't consider
13  that at all.
14      Q   When did you come to believe that --
15      A   I think that Kerry Phillips may have
16  alluded to, you know, something might
17  transpire out of it.  It's -- I mean, it's
18  kind of a blur as far as, like, everything
19  happened so quickly, I don't know, but I
20  did not consider it right at the apartment.
21      Q   Okay.  So you report it to Phillips
22  that night, and then did you talk with him
23  the next morning?

Page 366

1       A   He wasn't at the office the next
2   morning that I got there, and so that was
3   out of his character, and so I asked him if
4   he'd be coming in and he indicated that he
5   would be coming in.
6       Q   So did you talk with him that
7   morning, the next morning after the call?
8       A   Yes.
9       Q   And tell me what happened in that
10  conversation.
11      A   I -- he came in and he just went on
12  past our office and into his office and I
13  gave it like a minute or so to see if he
14  would come talk to me because he had
15  indicated prior that he was, like, talking
16  to the Sheriff before coming over there, so
17  I knew that it was about this subject.  And
18  so I went into his office and asked him if
19  there was anything that we needed to talk
20  about.
21  (Whereupon, Defendant's Exhibit No. 17 was
22  marked for identification and the same is
23  attached hereto.)

Page 367

1       Q   Okay.  I'm going to mark this as the
2   next exhibit, 17, and I'm going to direct
3   your attention to Defendants 774 of this
4   exhibit.
5       A   Okay.
6       Q   Okay.  And I want to direct your
7   attention to the second paragraph on that
8   page beginning, "On August 2nd, 2017 at
9   approximately 1135 hours."  Will you read
10  that to yourself and tell me if you
11  disagree with anything in that paragraph?
12      A   (Witness complies.)
13      Q   Is there anything you disagree with
14  in that paragraph?
15      A   I mean, it's -- it was his point of
16  view, so it's like an overview of what
17  happened.
18      Q   Okay.  Well, do you agree with the
19  statement that "After Erica exited my
20  office, she stated something about me not
21  standing up for my people and something
22  about the fucking redneck police"?
23      A   Yes.

Page 368

1       Q   And do you agree with the statement
2   that, "I advised Erica again to come into
3   my office.  Erica entered my office and
4   stated, don't tell me what the fuck to do"?
5       A   Yes.
6       Q   And do you agree with the statement
7   that after you left the office, he says he
8   "learned that Erica threw her cell phone at
9   the filing cabinets when she entered the
10  Accounting office"?  Is that true?
11      A   I threw my cell phone down, and it
12  -- onto the floor, and it bounced to hit
13  the bottom of the filing cabinet and he was
14  not in there.
15      Q   Okay.  Was anybody else present when
16  you threw your cell phone?
17      A   I believe Julie was in there.
18      Q   Okay.  I want to direct your
19  attention to Defendants 776.
20      A   Uh-huh.
21      Q   And I want you to just quickly read
22  that to yourself and tell me if you
23  disagree with anything in that statement.

Page 369

```
1     A  Yes.
2     Q  You agree or disagree?
3     A  I agree that Sergeant Rice was made
4   to make this statement, yes.
5     Q  Well, the substance of the
6   statement, is there anything that is
7   incorrect in the substance of the
8   statement?
9     A  No.
10    Q  Okay.  Now, you had mentioned
11  earlier, you said that on Defendants 774,
12  Mr. Phillips' statement was from his point
13  of view.  What do you want to add to the
14  statement?
15    A  I -- there was a lot more detail
16  about me asking him to let me know how
17  these complaints worked.  I was -- I've
18  never had a complaint filed against me, so
19  I was asking him not only, like, what was
20  in the complaint or what I was up against.
21  I asked him am I supposed to, like, file a
22  complaint too, did she file it, like -- I
23  had no idea how the process worked, and I
```

Page 370

```
1   asked him as my boss how I was supposed to
2   -- to make sure I got out in front of this.
3   I mean, I was ready to get out in front of
4   this, and I asked him several questions to
5   -- to help me understand this process and
6   what -- you know, could I make a complaint,
7   should I make it through this -- HPD,
8   should I make it through our Department?  I
9   didn't know how that process worked at all.
10    Q  Well, do you disagree that he
11  advised you that you would be able to tell
12  your side when contact is made by CID?
13    A  He did tell me that -- that he went
14  to pick up the complaint from her, which
15  was not what he was supposed to do.
16    Q  What do you mean?  You just said you
17  didn't understand the process.
18    A  No, no, no, no.  He, as my
19  supervisor, in our -- in the policies or
20  whatever, the IA people are supposed to
21  handle complaints.  I don't know how the
22  process works as far as, like, how I would
23  do one.  I've never seen one, like --
```

Page 371

```
1     Q  Okay.  Let's just take those two
2   things separately.  Did he advise you in
3   this meeting that you would have an
4   opportunity to tell your side of the story
5   when contact is made by CID?
6     A  He did.
7     Q  And what is CID?
8     A  Criminal Investigations Division.
9     Q  And would they have been tasked with
10  actually investigating a complaint of the
11  type identified here?
12    A  That's how everything was handled,
13  criminal style.
14    Q  Okay.  So do you -- was there anyone
15  that you could have talked with in CID
16  regarding your questions?
17    A  I don't know.  I don't think that he
18  indicated who he dropped it off with or who
19  would be contacting me.
20    Q  Well, why not wait until they
21  contact you and relay all your questions to
22  them?
23    A  Because any reasonable person that
```

Page 372

```
1   has a complaint filed against them wants to
2   get in front of that and want to know who
3   has the complaint, what it says, what can I
4   do to get out in front of it.
5     Q  Okay.  Well, there's no one that you
6   knew who was in the CID division who you
7   could have spoken to?
8     A  No.  I mean --
9     Q  You worked there over seven years.
10    A  He was my direct boss.  He owed
11  me -- I was not a supervisor.  He owed me
12  the -- the -- the position as being my boss
13  to let me know who I could contact because
14  I didn't know -- IA and all that was
15  established while I was there, so no, I
16  don't -- I didn't know particularly who was
17  given these kind of complaints.
18    Q  Well, where do you think he went
19  wrong in the process?  I mean, is the
20  process for you to get in front of
21  something, or is the process for you to
22  respond to a complaint?
23    A  I don't know, but I was trying to
```

Page 373

1  get in front of it.
2    Q  I mean, is that consistent with the
3  process?
4    A  I don't know.
5    Q  Well, you're an employee of the
6  Sheriff's Office.  It's your responsibility
7  --
8    A  That has never had a complaint nor
9  seen one.
10    Q  But you're an employee of the
11  Sheriff's Office, and your responsibility
12  is to know and follow all policy and
13  procedures; isn't that right?
14    A  Well, it was an investigations
15  policy to -- I don't know if it was even a
16  real policy.  They never followed them
17  anyways.
18    Q  What does that mean, ma'am?
19    A  I mean --
20    Q  Come on.
21    A  -- nothing was ever followed like it
22  was said in the books, or we wouldn't --
23    Q  What are you talking about?

Page 374

1    A  -- be sitting here.
2    Q  What are you talking about?
3    A  The way everything was handled.  You
4  know what I'm talking about.
5    Q  No, I don't.
6    A  Okay.
7    Q  I don't know.  You're saying an
8  investigation was done that was not handled
9  properly?  What?
10    A  In this particular instance, my
11  supervisor was not supposed to be the one
12  to go pick up the complaint from the person
13  making the complaint on me.  He was not
14  supposed to be that person.
15    Q  All right.  Let's look at the --
16    A  So he gets involved, and he takes
17  Brent Patterson with him, the male that
18  works there.  He takes Brent with him
19  that's part of the complaint to get the
20  complaint about me, like --
21    Q  All right.  Well, let's look at the
22  first paragraph in the fourth line at the
23  end.  It says, "Ms. Cantrell --" that would

Page 375

1  be the married school administrator we've
2  been referring to "-- delivered her formal
3  complaint to me in a sealed envelope.  I
4  delivered the sealed envelope to Lieutenant
5  B. Chaffin and briefed him on the alleged
6  allegations."  What's improper about that?
7    A  That he wasn't supposed to be the
8  one to be involved in the picking up,
9  dropping off, gathering, anything of the
10  complaint.
11    Q  Okay.  So you understand the process
12  enough to know he wasn't --
13    A  I had to figure --
14    Q  Let me finish.
15    A  -- it out after.
16    Q  Let me finish.  So you understand
17  the process enough to think that that's
18  improper?
19    A  Now I do.
20    Q  Okay.  But you didn't understand
21  that at the time?
22    A  I did not.
23    Q  Okay.  What particular policy or

Page 376

1  procedure did he violate in doing what he
2  did to deliver the complaint?
3    A  To my understanding, there is a
4  policy of how those -- how those complaints
5  are supposed to be handled and who is
6  supposed to pick them up and who is
7  supposed to contact who, and he was not in
8  that -- that setup.
9    Q  And where is that policy located?
10    A  I guess in their policy book or one
11  of the ones they passed around sometimes by
12  their self.
13    Q  Do you have a specific citation?
14    A  No.
15    Q  Okay.  And did you actually go home
16  that day after you threw your cell phone
17  down to the floor?
18    A  I did.
19    Q  Do you think any of your behavior
20  violated any policy or procedure of the
21  Sheriff's Office or Madison County
22  Handbook?
23    A  Yes.

## Page 377

1    Q  Do you think it was disrespectful
2  conduct toward a supervisor?
3    A  Yes.
4    Q  Do you think it was disorderly or
5  disgraceful conduct while on duty?
6    A  I don't know about disgraceful, but
7  I acted outside of my character.
8    Q  Did you go home that day?
9    A  Yes.
10    Q  Were you placed on administrative
11  leave with pay?
12    A  I didn't -- I was, but I didn't know
13  at that time.
14    Q  How did you find out?
15    A  I text Kerry Phillips the next day
16  and said that I still, like, felt bad about
17  the situation and I didn't feel like coming
18  in, and he -- I think he told me at that
19  point.
20    Q  Let's look at the first page of this
21  document, Defendants 771.  This is Exhibit
22  17.  Can you identify this document, Ms.
23  Cagle?

## Page 378

1    A  How am I supposed to know what it
2  is?
3    Q  Well, it says it was sent to you via
4  hand delivery.  Did you see this letter?
5    A  Oh, it's the disciplinary -- the
6  front letter of the disciplinary.
7    Q  Okay.  And what's the date on that?
8    A  August 4th, 2017.
9    Q  And it says it was delivered via
10  hand delivery.  Did you receive this
11  letter?
12    A  Yes.
13    Q  Did you receive it on August 4th,
14  2017?
15    A  I got it after an interview by
16  Chaffin, so if it was that day, I don't
17  know.
18    Q  And what was Chaffin interviewing
19  you about?
20    A  About the Brent Patterson incident.
21    Q  That was a separate incident from
22  the reason you were put on administrative
23  leave?

## Page 379

1    A  No.  It was the same one.
2    Q  Okay.  Well, then help me
3  understand.  The write-up here says you
4  stormed out of his office, said something
5  about fucking redneck police, told him
6  don't tell me what the fuck to do, and
7  threw your cell phone.
8    A  Uh-huh.
9    Q  So is this letter in relation to
10  that incident, or is it in relation to the
11  complaint made by the married school
12  administrator?
13    A  Oh, the thing from Chaffin was to
14  follow up on that complaint.  He was the IA
15  person.  Yes, you're right.
16    Q  On the complaint about the married
17  school administrator?
18    A  That she made.  The complaint she
19  made, yes.  Yes.
20    Q  Okay.  So you were interviewed by
21  him.
22    A  Yes.
23    Q  And you also received this letter?

## Page 380

1    A  Yes.  After I walked out of that, I
2  was given this letter, yes.
3    Q  Okay.  So you were interviewed at
4  the office?
5    A  At Chaffin's office, and there was
6  another -- there was another deputy in
7  there as well.
8    Q  Where is his office, or where was it
9  at that time?
10    A  It's at -- it was at the Criminal --
11  the CI -- what they're referring to as CID,
12  and it's the one that's kind of connected
13  to the gym, that area.
14    Q  All right.  So they called you in
15  for the interview?
16    A  Yes.
17    Q  Who else was there, you said?
18    A  It was Phillip Keel, and I indicated
19  that I was uncomfortable for several
20  reasons with them being the interviewer.
21  Phillip Keel and Morgan have a child
22  together, so --
23    Q  That's your friend Morgan?

Page 381

1    A  Yes, the one that's in this
2  particular incident.
3    Q  Okay.  And what happened as a result
4  of your concern?
5    A  Chaffin just advised me that he was
6  going to do it, do the interview and all
7  the -- whatever he had to do with it from a
8  fair standpoint.
9    Q  So did Phillip remain in the
10  interview?
11    A  Yes.
12    Q  Was anyone else in there?
13    A  No.
14    Q  And then after that interview, you
15  were handed this letter?
16    A  Yes.
17    Q  Exhibit 17?
18    A  Yes.
19    Q  Okay.  Now, I just want to direct
20  your attention to the second page here,
21  Defendants 772, and I'm going to look in
22  that first full paragraph beginning with
23  "Before I make a decision."  Do you see

Page 382

1  that?
2    A  "Before --" read that paragraph or
3  you're saying before that?
4    Q  No.  I'm just going to talk about
5  that paragraph.
6    A  Okay.
7    Q  Do you see where I'm talking about?
8    A  Yes.
9    Q  So in the middle of that paragraph,
10  it says, you may submit any information or
11  statement in writing to me to consider in
12  reaching a final determination.  This
13  information must be received in the office
14  on or before noon on August 10th, 2017.  Do
15  you see that?
16    A  Yes.
17    Q  And then it also provided an option
18  to submit information in person on the next
19  day, August 11th, 2017.  Do you see that?
20    A  Yes.
21    Q  And this is a letter from Sheriff
22  Dorning?
23    A  Yes.

Page 383

1    Q  Did you avail yourself of either
2  opportunity to respond to the allegations
3  against you?
4    A  I submitted a resignation on that
5  date.
6    Q  What date was that?
7    A  I believe it was the August 11th at
8  10:30.
9    Q  So you did not submit any
10  information in writing about responding to
11  the allegations?
12    A  Correct.
13    Q  And you did not avail yourself of
14  the opportunity to meet in person to the
15  Sheriff to respond to the allegations?
16    A  No.
17  (Whereupon, Defendant's Exhibit No. 18 was
18  marked for identification and the same is
19  attached hereto.)
20  (Whereupon, an off-the-record discussion was
21  held.)
22    Q  Now, in Exhibit 18 here in the third
23  paragraph -- well, first of all, can you

Page 384

1  identify this document?
2    A  I don't --
3    Q  Do you have Exhibit 18?
4    A  Oh, I'm sorry.  It was right here.
5  Okay.  Go ahead.
6    Q  Do you recognize this document?
7    A  Yes.
8    Q  What is it?
9    A  It's my resignation.
10    Q  Okay.  And what's the date on it?
11    A  August 11th, 2017.
12    Q  Okay.  And the third paragraph of
13  this letter, it says, "I have complained
14  numerous times about and reported the
15  horrendous working conditions for females
16  in the Madison County, Alabama Sheriff's
17  Department only to be retaliated against
18  and threatened."
19    A  Yes.
20    Q  Did you draft this letter yourself?
21    A  My attorney drafted it.
22    Q  Okay.  Now, when you say you
23  complained numerous times, we had a lot of

Page 385

1 testimony today about any time you've
2 raised a complaint.
3     A  Uh-huh.
4     Q  Is there any time you've complained
5 that you haven't talked about today in this
6 deposition?
7     A  Not that I can think of.
8     Q  Okay.  Now, in the last paragraph,
9 you said you consider yourself to have been
10 constructively discharged or terminated.
11     A  Yes.
12     Q  What do you mean by that?
13     A  I had started out on the foot of
14 thinking that I had to put up with certain
15 things in the Department and I tried
16 different methods of questioning different
17 incidents, whether it was to go to Jeff
18 first or go to Kerry first or however, and
19 it had resulted in making the atmosphere
20 and the workplace really hostile for me and
21 I felt like it brought out -- the last
22 incident with Kerry Phillips has brought
23 out where I had just reached a point that I

Page 386

1 didn't think that I could go back.
2     Q  So you didn't quit in 2014 after
3 your complaint -- incident regarding Tim
4 Clark; is that right?
5     A  Correct.
6     Q  And you didn't quit in 2016 after
7 you were touched inappropriately,
8 alledgedly, by Jones and Patterson?
9     A  Correct.
10     Q  You quit, didn't you, Ms. Cagle,
11 only after you were facing disciplinary
12 action for insubordinate conduct with
13 Phillips?
14     A  That is not true.
15     Q  You're saying it's not true that you
16 quit after you were facing insubordinate
17 conduct?
18     A  That is not why I quit.
19     Q  Okay.  But it was happening at the
20 time that you quit; isn't that right?
21     A  I don't know what I would have
22 faced.
23     Q  Well, you were facing an

Page 387

1 investigation.
2     A  So I -- no.  It had brought out a
3 bad reaction in front of Kerry and other
4 people, and that's why I quit.
5     Q  Well, let's just go over the letter
6 on Exhibit 17.  That letter is dated August
7 4th.
8     A  Which letter?
9     Q  Exhibit 17.
10     A  Okay.  I don't know where it's at,
11 but go -- I know what you're saying.  Go
12 ahead.
13     Q  So that letter's dated August 4th;
14 is that right?
15     A  Yes.
16     Q  And your termination letter is dated
17 when?
18     A  August 11th.
19     Q  Okay.  So you quit when you were
20 facing an investigation into your conduct
21 regarding Kerry Phillips; isn't that right?
22     A  I'm going to answer it exactly the
23 same as the last three times you've asked.

Page 388

1 I quit because of what happened in the
2 office and what it had pushed me to.
3     Q  Okay.  But that's not responsive.
4 So did you quit when you were facing an
5 investigation into insubordinate conduct?
6     A  From a time point stand -- from time
7 point, yes.
8     Q  Did you have any conversations with
9 Travis Jackson about your tenure at the
10 Sheriff's Office?
11     A  About my tenure?  I talked to him
12 about the cell phone incident.
13     Q  Okay.  Were you talking to him --
14 meaning removing your -- confiscating your
15 cell phone, in your words?
16     A  Yes.  I asked him kind of advice --
17     MS. RILEY:  Let's -- you can say
18 what you --
19     A  Well, is it not privileged?
20     Q  Well, I'm going to ask.  Why did you
21 contact him?
22     MS. RILEY:  Just be careful.
23     A  I contacted him because he was a

Page 389

1  friend of mine that was an attorney.
2      Q  Okay.  And was it your intent to
3  talk with him about -- was it your intent
4  to receive legal advice from him about your
5  employment with the Sheriff's Office?
6      A  Yes.
7      Q  Why did you pick him?
8      A  Because he was an attorney that I
9  knew fairly well.
10     Q  When did you talk to him?
11     A  I talked to him the day that I was
12  told about the Tim Clark thing, the day
13  that the worker from the shop called me and
14  told me the statement that Tim Clark made
15  to the inmate.
16     Q  You said you were friends with him?
17     A  Yes.
18     Q  How were you friends with him?
19     A  He and I volunteered for Leadership
20  Huntsville together.  I substituted for him
21  in different leadership meetings.  We had
22  became friends also because he was an
23  attorney for the County prior to him going

Page 390

1  to his new position at Sirote and -- I
2  mean, at Lanier Ford.
3      Q  So where was he working at the time
4  you spoke to him?
5      A  I believe he had just switched over
6  to Lanier Ford.
7      Q  So before that, he worked for the
8  County as a counsel?
9      A  I don't know exactly what he did.
10  He was just part of the Sirote's office,
11  and I think that he worked for some -- on
12  some of the County things.
13     Q  Did you have one conversation with
14  him or more than one conversation?
15     A  One is all I remember.
16     Q  How long did the conversation last?
17     A  Probably 15 to 20 minutes, and it
18  was -- yeah, 15 to 20 minutes about the --
19  me asking him about my cell phone.
20     Q  Did anyone suggest that you call
21  Travis to talk with him about this?
22     A  No.
23     Q  That was your own idea?

Page 391

1      A  Yes.
2      Q  Did you feel like you were in a
3  client relationship with him?
4      A  I thought that he was telling --
5  well, I know that he was telling me advice
6  as, I guess, an attorney would.  You know,
7  I knew that he had experience from knowing
8  procedures and stuff of the Department and
9  for the County and so I thought that he was
10  giving me advice based on that knowledge
11  and I took that advice based on his
12  experience and his knowledge.
13     Q  And did you retain him as your
14  attorney?
15     A  Did I sign a paper to retain him?
16     Q  Yes.
17     A  No.
18     Q  Did you pay him any money as a
19  retainer?
20     A  No.
21     Q  Pay him any fees whatsoever?
22     A  No.
23         MS. GRAHAM:  Okay.  We're going to

Page 392

1  take a break.
2         (Whereupon, a break was taken.)
3      Q  Have you sought any internal or
4  outside counseling for mental anguish, Ms.
5  Cagle?
6      A  For my medical providers, I provided
7  them on the interrogatories.  I used the
8  County-provided doctor who referred me to
9  Dr. Margaret Bibb.
10     Q  And did you seek out any counseling
11  prior to your -- have you ever sought out
12  any counseling prior to your tenure with
13  the Sheriff's Office?
14     A  Prior -- I don't think I have sought
15  that kind of counseling prior to me working
16  at the Sheriff's Department.
17     Q  Okay.  And how often did you meet
18  with your providers?
19     A  For Dr. Sharp, which is the
20  government employee doctor, I had to go to
21  him several times just because the medicine
22  he started me on, like, it didn't help, and
23  so he would stay on top of giving higher

Page 393

1  does or a different medicine.
2      Q  Did you go to counseling with
3  anyone?
4      A  I went to -- she's a psychologist.
5  Dr. Bibb is a psychologist.
6      Q  Were you diagnosed with any mental
7  illnesses?
8      A  I don't think that she officially
9  made a diagnosis.  I don't -- I'm not
10  aware.
11      Q  There's reference in the records to
12  being abused as a child.
13      A  Uh-huh.
14      Q  And there's reference in the records
15  to dating someone who was an alcoholic.
16      A  Uh-huh.
17      Q  That's obviously very stressful and
18  difficult.  How do you distinguish any
19  anguish you felt from your job from anguish
20  caused by family and relationship trauma?
21      A  Well, I've had other jobs prior to
22  this and not had that -- I mean, I worked
23  in a bigger environment than this and

Page 394

1  didn't have these situations.  But I don't
2  know the -- what they're referencing to as
3  abuse as a child.
4      Q  That doesn't ring a bell with you?
5      A  I mean -- I mean, to an extent, but
6  nothing that was -- nothing that has been
7  something that I think about or lingers for
8  me.
9      Q  They also discuss suicidal ideation.
10  Do you feel like you were -- considered
11  suicide during your tenure with the --
12      A  I think I indicated to her that
13  there were times that I was, like, that
14  sad, yes.
15      Q  Okay.  Did she ever diagnose you
16  with depression?
17      A  I don't know if -- again, I don't
18  know if she made an official diagnosis.
19      Q  Did your counseling continue after
20  your tenure with the Sheriff's Office
21  ended?
22      A  No.
23      Q  How long did it continue?

Page 395

1      A  I think I went to see her probably
2  three or four times, and some of those were
3  tests -- tests that I had to take.
4      Q  And you mentioned some medication.
5  What were you on?
6      A  He prescribed me Cymbalta, I believe
7  was the first one, and then he altered the
8  milligrams of that and then it was switched
9  to Paxil and also Xanax.
10      Q  Are you on those medications today?
11      A  I am on the Paxil, yes.
12      Q  After your tenure with the Sheriff's
13  Office, what efforts did you make to obtain
14  a new job?
15      A  After my -- after I left there, I
16  subbed.  I had the substitute teaching
17  license.  I would pick up some of those as
18  I could.  I tried to -- I mean, I was
19  really depressed and slept a lot, so I
20  tried to sub when I could, and then my
21  local attorney reached out to me and said
22  that he was proud of me for the -- for the
23  claim and said that he knew somebody that

Page 396

1  was looking for a secretary.
2      Q  Who contacted you?
3      A  John Brinkley.
4      Q  Okay.  So you were sleeping a lot,
5  you said.  Did you --
6      A  I was just depressed, so, like, if I
7  couldn't sleep at night, then I'd just find
8  myself taking naps during the day or
9  just --
10      Q  Okay.  And so the first opportunity
11  that you took to find another job was this
12  call from this attorney?
13      A  I may have applied online.  I'm not
14  sure about that.  But I -- that attorney
15  had told me prior to me leaving that he
16  might know of something because I reached
17  out to attorneys that I knew might be
18  looking for somebody before I even left,
19  and I -- he stayed in contact with me and
20  finally had somebody that was interested or
21  needed a secretary.
22      Q  Okay.  So you said you reached out
23  to people before you left.

Page 397

1    A  Yes.
2    Q  About what time period was that?
3    A  The whole time.
4    Q  What do you mean the whole time?
5    A  The whole time I worked at the
6  Sheriff's Department.
7    Q  You were what?
8    A  I -- well, we went over this
9  already, but I applied using Indeed, which
10  I advised to you already, and I used the --
11  whatever the arsenal uses as their --
12    Q  Right, but you mentioned
13  specifically reaching out to specific
14  people.  That's new to me.
15    A  Yes.
16    Q  When did you do that?
17    A  No, it's not new.
18    Q  Okay.
19    A  I indicated to you that I had
20  reached out to people that I knew, mostly
21  attorneys.  I reached out to Nate Wake.  I
22  had conversations with him about hiring --
23  him hiring me.  I reached out to Breck

Page 398

1  Robinson.  I even asked -- I asked Jeff
2  about possibly being -- helping him prior
3  to this.  I asked if there was -- and he
4  just said that -- maybe look into it.  Just
5  something generic.
6    Q  And how long did it take for you to
7  find another position after you left the
8  Sheriff's Office?
9    A  From August to approximately March,
10  so however many months that is.
11    Q  Do you make as much money at the new
12  position as you did at the old one?
13    A  It's -- if it -- I didn't at first.
14  I got a raise after being there a year or
15  so, and it's either right at less or at the
16  same and I don't know the exact number.
17    Q  Can you describe any mental anguish
18  that you felt as a result of working at the
19  Sheriff's Department?
20    A  As far as, like, not sleeping?
21    Q  Yes.
22    A  Anxiety, not sleeping.  When I could
23  sleep, it seemed like it was more in the

Page 399

1  day or in the morning.  I couldn't sleep at
2  night, and then I could sleep in the
3  morning.  It made me miss a lot of work.  I
4  was depressed.  I mean, I was so depressed,
5  I just tried sleeping on the couch, tried
6  sleeping on the bed, didn't eat.  I was
7  eating Pop-Tarts only for a stint of time.
8  Just the sadness and confusion.  I didn't
9  know about getting another job.  I didn't
10  know if it was the right decision.  I
11  didn't -- I mean, just the emotions related
12  to leaving your first job that had good
13  insurance and I knew that it would be
14  around for years, that it wasn't going to
15  go -- it was a stable job as far as it not
16  going away and --
17    Q  Did your mother die during your
18  tenure with the Sheriff's Office?
19    A  Yes.
20    Q  How did your mother's death impact
21  the anxiety, sleeplessness and concern
22  you're describing?
23    A  Well, she was diagnosed with

Page 400

1  pancreatic cancer, and she passed away one
2  year from diagnosis or approximately one
3  year and when someone passes away, it seems
4  to me to be like my answer is given to me
5  at that point, like, there was nothing else
6  I could do, so, I mean, I don't think that
7  she -- her sickness impacted what was going
8  on at work.
9    Q  Well, do you think her passing
10  caused you any anxiety?
11    A  Not anxiety.
12    Q  Sleeplessness?
13    A  No.
14    Q  Grief?
15    A  I was, of course, sad that she was
16  sick, yes.
17    Q  Depression?
18    A  I don't know that I would be
19  depressed, no.
20    Q  Were you -- is that your last -- did
21  you have any siblings?
22    A  Yes.
23    Q  And I understand he passed before

Page 401

1    you took your position with the Sheriff's
2    Office?
3        A  Yes.
4        Q  Okay.  So your mom died?
5        A  Yes.
6        Q  Is your dad already deceased?
7        A  Yes.
8        Q  So when your mom died, it's really
9    your entire immediate family gone.
10       A  Yes.
11       Q  You don't think that contributed to
12   any sleeplessness or depression?
13       A  I mean, I didn't categorize it that
14   way.  I mean, I felt like it was a work
15   thing because I didn't want to go to work,
16   and that's what I was connecting it to, so,
17   I mean, I can just tell you what I know,
18   and that's how I felt, that it was related
19   to work.
20       MS. GRAHAM:  Do we have all of her
21   medical records?
22   (Whereupon, an off-the-record discussion was
23   held.)

Page 402

1        MS. GRAHAM:  All right.  I think
2    that's it.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 403

1        C E R T I F I C A T E
2    State of Alabama
3    Jefferson County
4        I hereby certify that the above and
5    foregoing deposition was taken down by me in
6    stenotype and the questions and answers
7    thereto were transcribed by means of
8    computer-aided transcription, and that the
9    foregoing represents a true and correct
10   transcript of the testimony given by said
11   witness upon said hearing.
12       I further certify that I am neither
13   of counsel, nor of kin to the parties to the
14   action, nor am I in any way interested in
15   the result of said cause named in said
16   caption.
17
18       /s/Joe Paul Moore
19       JOE PAUL MOORE, CCR
20       CCR#322, Expires 9/30/20
21       Commissioner for the State
22       Of Alabama at Large
23       My Commission Expires 9/30/20

**A**

A-l-e-x 10:21
a-r-d 191:23
A.M 1:22
abide 77:15
  79:22 81:20
ability 215:17
  313:8 318:11
  327:16 328:5
  328:10 353:5
  355:6
able 217:6
  238:17 273:12
  309:13 318:4
  328:1 332:5
  333:21 334:15
  335:7 336:22
  338:10,13,22
  355:9 370:11
absolutely
  250:15 316:2
abuse 394:3
abused 393:12
accent 326:16
accept 16:7 21:6
  76:9 165:10,14
  166:14
accepted 21:8
  283:4
accepting 97:3
accepts 241:20
access 115:17
  215:10 326:2
  359:12
accidently
  307:14
account 302:2
  333:18 334:20
  339:15 348:21
accountant
  27:23 28:5
  30:4
accounting
  14:13,16,17
  22:15 28:10
  54:23 368:10
accounts 341:19
accusation
  113:1,5
accusations

114:8
accuse 351:6
accused 112:16
  112:21 113:12
  114:13 156:18
  157:13
accustomed
  228:20
achieve 310:16
acknowledge...
  3:11,12,13,14
  62:16 64:1,20
  65:6 67:1
  71:17 77:12
  79:20 81:19
  84:2
acknowledging
  77:14 79:22
  83:1
acquire 98:13
  101:21 103:5
  104:2
acquired 105:15
  105:16
act 175:11
  186:14 188:18
acted 214:7
  293:2 352:23
  377:7
acting 136:14
  329:5 346:16
action 208:18
  303:15 312:14
  312:16 325:10
  352:8 386:12
  403:14
actions 198:18
  216:21 354:11
active 51:22
  161:10
actively 229:6
  229:15 236:7
activity 81:11
  106:18 116:18
  178:23
acts 132:10
  184:9 185:3
actual 25:20
  27:18 56:20
  92:23 105:19

135:6 147:3
  206:22 275:17
  275:20 315:16
add 10:12
  182:23 186:2
  369:13
addition 173:16
  173:18
additional 53:5
  140:10 286:19
  305:3 323:10
address 9:15,23
  10:5
addressed
  179:14
administer
  115:15
administrative
  377:10 378:22
administrator
  73:16 76:5
  79:4 81:7
  355:14 358:17
  364:7 365:8
  375:1 379:12
  379:17
admitted 100:7
  100:15 290:14
adopt 277:6
adopted 75:1
  78:9 80:14
advancement
  106:8 109:3
  110:8
advances 190:3
  191:13,16
  204:1 275:18
adventure 239:6
advice 207:6
  229:20 230:23
  232:12,14
  388:16 389:4
  391:5,10,11
advise 239:4
  371:2
advised 368:2
  370:11 381:5
  397:10
affair 99:21
Affairs 4:7

335:21 344:18
affect 321:4
affirming 69:5
afforded 335:10
afield 230:2
aggressive 346:2
  350:17
aggressively
  346:17
agitated 325:18
ago 6:18 20:16
  318:21
agree 86:8 89:21
  89:22 90:8
  98:16 106:8
  111:12 175:14
  255:18 357:13
  357:17 367:18
  368:1,6 369:2
  369:3
agreed 1:13 2:1
  2:8,17 81:20
  325:1
agreeing 63:15
  64:20 66:3
agreement 14:1
ahead 230:15
  248:16 384:5
  387:12
air 264:16
al 1:9
Alabama 1:2,8
  1:21 5:7,15
  74:21 384:16
  403:2,22
alcoholic 393:15
alerted 349:11
Alex 10:21
Alexander
  10:21
Alka-Seltzer
  156:23 157:2,6
  158:1
alledgedly 386:8
allegation
  113:21 157:6
  157:20,21
  177:12 263:11
  280:7 281:14
  287:19 289:23

291:5 294:11
  339:13 341:5
  345:9 348:18
  348:23 350:8
allegations 24:8
  77:9 79:18
  81:18 86:6
  89:20 95:11
  199:19 256:4
  262:11 284:14
  289:19 291:4
  294:15 300:18
  375:6 383:2,11
  383:15
allege 173:8
  221:22 290:12
  294:23 354:23
  375:5
allegedly 151:19
  155:21 177:21
  181:9 223:15
alleging 213:6
allocated 28:19
  50:19
allocating 52:13
allocation 59:18
allow 43:17
allowed 108:9
  108:13 175:10
  176:6 271:14
alluded 365:16
alter 353:5
altered 395:7
alternatives
  79:7
amended 12:14
  89:18 172:17
  183:8 255:7
  258:9 269:10
  319:22 324:6
amount 225:12
  315:18 363:6
amplified 329:2
and/or 116:8
  123:12 281:21
  304:17
anguish 392:4
  393:19,19

398:17
**anniversary**
  11:3
**answer** 7:20
  8:16,23 18:7
  27:3,7 42:21
  48:21 52:23
  73:1 76:1 96:2
  219:4 230:7
  231:9,12 232:5
  260:21 278:9
  348:13 354:16
  387:22 400:4
**answered** 40:17
  57:9 171:18
  213:20 219:2
  235:23 260:11
  317:7 351:3
**answering** 56:7
  248:16 284:11
**answers** 7:16
  8:7 158:15,21
  403:6
**anxiety** 320:1,19
  320:23 398:22
  399:21 400:10
  400:11
**anybody** 20:12
  21:15 23:13
  39:17 43:22
  60:11 97:22
  98:4 136:2,4
  141:18 154:3
  158:12 159:23
  161:15 165:2
  167:2,23 174:3
  176:12,15
  180:18 185:8
  198:11 285:20
  316:9 368:15
**anymore** 112:7
  138:17 271:15
  317:22
**anyone's** 20:21
**anytime** 352:17
**anyway** 225:5
**anyways** 135:10
  270:14 277:15
  373:17
**apart** 148:13

**apartment**
  226:18,21
  227:2 238:8
  240:10 358:21
  359:1,15,18
  363:4,8,13
  365:12,20
**apartments** 10:3
  10:5 238:9
**apologize** 78:17
  197:10
**apparently**
  278:5 288:17
  357:16
**appearance**
  126:20 128:17
  166:8 186:8
**APPEARING**
  5:2,9
**appears** 184:5
**apples** 114:4,4
**application** 14:6
  26:8 187:11
**applications**
  26:9 322:9
**applied** 14:8,10
  14:19 321:16
  396:13 397:9
**applies** 267:15
**apply** 321:10,15
  321:17 322:21
**applying** 14:12
**appreciate**
  252:6
**approach** 70:12
**appropriately**
  309:21 311:3
  312:1
**approval** 304:22
**approve** 59:16
  168:18
**approved** 29:15
  29:16 48:15
  55:6
**approximately**
  6:18 10:1,6,10
  11:16 12:1
  51:21 119:8
  180:6 219:15
  367:9 398:9

400:2
**area** 31:8 93:20
  143:7 201:7
  202:15 219:14
  236:4,6 262:12
  272:11,19
  380:13
**arguing** 230:3
  231:18 361:19
**argument**
  362:17
**Argumentative**
  231:9
**arguments**
  244:8 363:23
**arms** 97:1 198:7
  201:4 343:7
  354:2,5
**ARNOLD** 5:11
**arrange** 47:4
  327:10
**arrangement**
  166:12,17
**arrangements**
  53:18 317:19
**arranging** 48:2
  108:11
**arrest** 175:19,19
**arrested** 7:4
**arrestee** 175:10
  176:1
**arrived** 315:9
**arsenal** 256:11
  321:17 322:14
  397:11
**Artisan** 10:3,5
**aside** 98:1
  117:23 189:23
  275:16 311:20
  312:2 346:10
  352:11
**asked** 15:21
  50:6 55:5,5,8
  69:16 85:3
  88:4,16 89:1
  89:13 94:10
  108:5 135:4
  155:4 171:12
  171:14,16,19
  171:22 192:16

193:13 203:15
  205:12 206:2,3
  211:3 222:9
  225:14 233:11
  233:12 236:19
  238:18 239:19
  251:18 270:3
  271:22 277:5
  279:19,19
  285:7 287:20
  288:2,3,12
  291:9 295:17
  297:16,17
  309:13 312:15
  313:7,14 324:9
  324:9,22
  327:12 330:19
  332:5 334:3,14
  335:4,8 346:12
  346:13 348:8
  348:12 350:18
  366:3,18
  369:21 370:1,4
  387:23 388:16
  398:1,1,3
**asking** 13:18
  60:22 61:4
  88:6 119:16
  236:13 237:13
  245:8 248:2
  271:1 276:3
  280:3 283:9,13
  283:17 292:8
  295:5 299:6
  337:9 345:17
  346:13 369:16
  369:19 390:19
**asleep** 247:6
**ass** 120:10 121:9
  164:3
**assaulted** 6:23
**assign** 2:12
  187:2
**assigned** 44:22
  45:2 186:15
  200:20 207:2
**assist** 116:14
**assistant** 26:1
  116:13 356:15
  358:6,7

**assume** 88:9
  188:19 215:20
  246:14 247:2
  346:14
**assumed** 19:13
**ate** 162:16
**atmosphere**
  17:7,14,16,19
  19:5 91:1,20
  92:1,10 193:7
  216:15 329:3,7
  385:19
**attached** 62:13
  63:20 65:2
  66:20 67:21
  74:13 77:23
  80:7 82:4
  85:11 173:2
  210:1 233:1
  303:6 329:19
  344:8 366:23
  383:19
**attacks** 320:1
**attempted**
  107:19 208:15
  209:7 233:11
  274:1 321:10
**attempting**
  245:23 294:4
**attempts** 209:13
  269:16
**attend** 109:19
  110:1 255:3
  325:2 342:4
**attended** 68:6
  341:14
**attention** 8:1
  63:8 64:13
  67:2 71:20
  72:5 73:10
  75:4,12,17
  77:2 78:15
  79:12 80:20
  84:9 85:2
  86:12 87:2
  173:21 190:8
  197:21 200:5
  212:8,19 249:1
  249:2 255:6
  258:8 367:3,7

368:19 381:20
**attitude** 326:13
327:16
**attorney** 7:4
12:10 86:8
210:3,16,23
256:22 258:1,3
287:13 288:16
313:20,20
321:18 325:12
330:12,17
384:21 389:1,8
389:23 391:6
391:14 395:21
396:12,14
**attorneys**
396:17 397:21
**attracted** 248:22
**attractive** 133:7
143:16 148:10
152:10 153:22
168:13
**attractiveness**
174:1
**Auburn** 323:8
**August** 1:21
11:1 234:2,6
359:4 367:8
378:8,13
382:14,19
383:7 384:11
387:6,13,18
398:9
**authorized**
331:6
**avail** 383:1,13
**availability** 90:4
96:18 97:7
**available** 76:13
90:16 97:4
268:18
**Avenue** 5:6
**avoid** 204:18
207:1 308:4,5
**aware** 72:19
92:16,18 167:8
214:3,6 224:23
238:13,14,15
274:11,12
282:11,13

317:9,12 335:5
335:8 349:6
363:19 393:10
**awesome** 107:14
107:14
**awful** 177:14
**awkward** 118:1
187:14,16
192:18 206:23
261:18 326:18

―――――― **B** ――――――

**B** 375:5
**back** 25:3 26:13
30:9 32:18
43:13 46:11
48:21 51:5
82:5 87:2 89:8
89:13 111:8
117:9 127:21
147:22 156:4
173:3 198:5
206:16 212:5
218:14,16,18
218:20 230:19
243:13 244:1
244:19 250:17
251:12 255:6
262:2 273:1
282:12 286:5
291:17 292:14
292:22,22,23
292:23 294:13
299:1,10 301:5
301:13,21
302:1 308:17
311:8 313:5
314:8 317:17
340:5,7 350:3
361:18 386:1
**backed** 235:9
**background**
26:11,12
**backside** 127:23
**bad** 107:10,12
171:8 216:17
245:22 246:2,5
277:10 282:19
321:8 353:12
377:16 387:3

**badge** 117:20
**badly** 110:15
193:11 250:3
**baggy** 137:17
**Baites** 76:7
**band** 225:15
226:6
**Band-Aids**
138:6
**bar** 237:14
238:23 268:14
324:3
**Barbara** 30:19
31:3,4 34:16
35:9 93:22
117:10,13
**bars** 39:14
269:18
**based** 92:1
193:12,14,17
193:17,19
230:23 237:23
391:10,11
**basement** 30:5
31:14 36:3,11
38:6 39:6
40:21,23 42:14
43:23 44:10
268:7,9 270:10
271:12 280:22
285:19 306:3
**basically** 162:15
**basis** 193:4
**Bates** 330:8
**bay** 275:5
**bays** 275:5
**beautiful** 246:8
**becoming**
183:22
**bed** 297:4 399:6
**began** 92:10
**beginning** 1:22
29:19,20 53:14
54:12 212:20
234:20 236:17
329:1 367:8
381:22
**begins** 77:2
78:17
**behalf** 5:2,9

86:7 206:1
309:21
**behaved** 354:4
**behavior** 207:12
208:4 209:16
376:19
**belief** 91:23
255:14 365:7
**believe** 14:9,16
15:12,17 19:8
22:16 25:2
27:16 39:19
46:17 51:3
69:23 77:7
79:15 81:15
88:3 93:17
109:8 113:3
115:1 118:10
136:10 137:21
150:12 159:10
165:20,23
166:5 169:22
211:1,1 219:2
222:17 233:10
234:15 235:6
237:2,5 249:16
254:11 263:14
267:14 279:19
281:18 283:3
284:3 288:2
290:18 307:13
310:1 311:7
331:13 340:7
356:14 365:14
368:17 383:7
390:5 395:6
**believed** 106:18
357:14
**believes** 72:10
**bell** 394:4
**Berry** 99:20
100:18
**best** 18:20 38:2
50:22 52:5
207:1 230:15
246:21 262:5
277:4 300:10
328:4
**bet** 143:11
**Beth** 205:11

207:13 208:5
**better** 100:3
101:9 145:8
224:23 248:18
**beyond** 323:11
323:12
**Bibb** 392:9
393:5
**Bice** 125:2,4,20
140:20,21
**big** 134:10 144:6
145:1 162:16
270:10 280:7
**bigger** 121:9
128:19,22
137:22 393:23
**biggest** 29:8
144:23
**bill** 53:10,14
299:13 300:2
300:13 301:8
301:18 302:8
302:11,14,16
**bills** 321:12
329:12
**binder** 50:5
**Birmingham**
323:18
**birth** 9:9
**birthday** 48:13
**bit** 82:7 128:21
158:6 164:18
205:21 276:23
277:11 297:19
311:8
**bites** 322:22
**black** 107:8
**blackball** 107:9
**blah** 204:12,12
204:13 272:23
273:1,1
**Blake** 5:20
210:5,9,20
212:15 213:9
213:23 214:7
215:11
**blank** 44:4
**block** 342:2
**blown** 157:1
**blur** 365:18

**Board** 21:23
22:8 35:14
60:8 78:10
80:15 83:8,15
120:4 121:3
158:18
**body** 168:12,13
175:21 201:3
202:6 203:16
203:20 206:21
216:12 220:9
**bodybuilding**
134:10
**boobs** 145:1,2
168:14,15
**book** 376:10
**books** 373:22
**Boomers** 41:17
**born** 9:11,12
**boss** 38:19 51:1
242:10 370:1
372:10,12
**bothered** 281:13
**bothering** 356:9
**bottom** 62:18
64:3 65:8,11
67:12,15 71:20
73:11 75:5
78:16 91:8
212:9,19
237:16 249:2
251:22 304:2
368:13
**bought** 318:23
**bounced** 368:12
**Box** 5:14
**boyfriend**
216:13 226:1,4
256:9 274:10
274:21 275:9
**bra** 138:7
**brave** 250:2
**break** 8:13,17
43:6,9 85:22
86:15 102:15
131:15,18,23
132:1 200:2,3
200:7 235:5
263:22 308:16
392:1,2

**breaking** 308:13
**breasts** 133:3
**breathe** 131:15
**Breck** 397:23
**Brent** 151:12,19
152:4,4 164:15
164:19 198:2
200:12 211:7
211:23 219:21
221:3,7,16,19
233:20 234:11
242:6,9,21
245:16 246:16
247:21 251:22
254:21 337:3
337:21 340:15
340:17,18,21
341:1,8,9,10
341:12,20
342:4,6 343:22
343:23 344:1
349:17 356:11
356:12 358:5
358:22 359:1
361:5 374:17
374:18 378:20
**Brent's** 152:10
340:17 359:5
360:23 364:11
**Brett** 347:19
**brevity** 74:16
**Brian** 344:12,14
347:13
**Brief** 16:3
**briefed** 375:5
**briefly** 347:11
**bring** 104:17
265:9 271:14
275:7 294:23
295:19 348:18
**bringing** 267:16
353:11
**Brinkley** 396:3
**Brooks** 27:14,16
27:16 212:21
212:23 213:18
**brought** 14:11
124:14 130:20
256:21 278:10
282:12 352:18

385:21,22
387:2
**Brown** 137:20
137:21
**brush** 123:10
**budget** 28:6,13
28:13,20 29:3
**building** 18:13
29:22 70:10
163:15 222:5
259:9 262:19
264:8,17 269:8
336:11 338:1
**buildings** 238:8
264:9
**built** 289:13
**bulk** 237:9
**bullshit** 242:22
**burial** 49:14
**burnt** 351:19
**business** 36:6,10
36:13,18 39:5
39:6 45:4
202:19 203:2
**butt** 128:19,22
164:3
**butts** 133:3

_____

### C

**C** 5:1 403:1,1
**cabinet** 368:13
**cabinets** 368:9
**Cagle** 1:5,17 3:4
6:1,11,13 9:5
32:11 43:18
47:19 62:14
63:22 65:3
66:21 67:22
74:15 78:16
80:9 82:6 90:3
129:1 191:11
200:5 210:2
212:9 214:17
236:13,17
237:2 239:3
240:11 241:22
244:14 249:1
251:21 280:17
297:11 304:16
304:23 305:8

308:18 329:21
330:9 335:16
357:14 377:23
386:10 392:5
**call** 37:16 49:8
49:15 102:23
148:2 152:13
218:3,8 245:2
279:11 286:9
305:13 306:17
317:5 318:19
352:1 355:12
355:17,21
356:6 358:2
363:2 364:19
366:7 390:20
396:12
**called** 12:18
14:13 34:14
41:17 61:10
70:17 190:10
190:13 213:1
219:20,21
221:5 245:5,6
260:14 267:11
277:1 278:23
279:16,17
281:10,12
297:16 298:3
305:11 341:1
342:1,17
355:20 357:22
360:20,22
361:1 363:3
364:2,20
380:14 389:13
**calling** 49:18
297:23 306:18
360:16 361:17
362:16 364:9
**calls** 27:6 53:5
361:1,2 365:4
**camel** 126:12
**camera** 177:18
**cameras** 175:21
**cancer** 296:15
400:1
**Cantrell** 374:23
**capacity** 267:10
283:5

**captain** 99:3,19
100:18 117:11
146:4,6 165:21
166:20 283:2
343:21
**caption** 403:16
**car** 114:18,20
115:4,7 175:11
175:23 176:2
276:15,18
277:10 361:4
**care** 129:11
228:17 231:6
251:7 252:16
252:22 253:2
329:13
**cared** 228:18
251:6,8 252:18
252:20,23
253:2
**careful** 388:22
**caring** 252:10
**carrier** 332:17
332:19
**cars** 28:21 159:4
276:12
**case** 6:21 7:6
13:19 116:23
179:6 267:9
324:8 325:10
325:15 329:3
335:9 339:22
349:12 352:19
**cashier's** 178:6
**catchall** 191:8
**categorize**
401:13
**category** 144:14
146:8 156:3
159:17 180:19
191:14 198:12
**caught** 177:18
177:22 178:8
309:10
**cause** 360:2
403:15
**caused** 17:10
320:19 393:20
400:10
**CCR** 403:19

**CCR#322**
403:20
cease 42:6
209:16
cell 48:20 53:19
53:23 54:5,11
54:18,21 55:3
55:12 56:2,9
56:12,16,19,23
57:4,16,19,22
58:3,4 296:13
298:19 302:6
309:14 358:23
368:8,11,16
376:16 379:7
388:12,15
390:19
**Center** 184:7
certain 57:23
86:5,6 102:3
130:22 143:15
192:22 247:8
249:11 322:14
322:21 354:3
385:14
certified 89:6
certify 68:5
403:4,12
certifying 69:15
71:3
**Chaffin** 344:12
344:13,14,14
347:13 375:5
378:16,18
379:13 381:5
**Chaffin's** 380:5
chain 19:14
22:21,22 24:5
24:11,18 58:16
58:18,20,22
73:13 74:2
81:10 84:16
91:8 93:2
96:11 117:8
119:10,16,21
120:20 127:9
127:11 146:2
209:15 324:15
361:18
chair 201:8,10

221:3 272:21
**Chairman** 76:14
79:10,13
chance 250:12
change 23:8
30:1,6 46:2,5
51:2 56:14,16
56:21 101:11
158:15,20
217:19 218:9
218:12,14,15
307:18 353:15
changed 23:11
23:23 30:22
51:1 56:18
100:1,5,15,20
101:11 105:5
119:18 215:16
218:17,17,18
218:19,19
307:13 326:22
362:10
changing 258:20
260:10,15,20
260:23
character 366:3
377:7
characteristics
186:9 282:19
characterize
223:14 239:17
251:10
charged 102:7
**Charles** 99:19
195:11 259:6,6
charm 224:21
charming
224:20
cheated 243:17
244:3
cheating 168:7
227:10 363:17
363:20
check 26:11,12
60:9,10 289:14
290:10
cheese 148:12
**Chief** 15:17
16:18 17:9
22:18 23:1,2,6

23:16,18,19
24:16 25:5
31:1,8,10
37:12 39:19
41:8,20,21
46:17 47:17
55:10 57:23
186:12,19
257:12 260:3
327:18 328:20
328:21 343:8
344:11 346:1
353:7,9,10
**Chief's** 26:1
116:13
child 273:15
380:21 393:12
394:3
childhood 277:4
children 11:7
choice 229:14
choose 98:23
229:15 341:21
chose 24:15
229:17 342:2
**Chris** 15:18
16:19 23:4,20
25:8 31:10
334:12
**Christina** 277:9
**Christmas**
237:3 254:22
274:17
**Chuck** 195:11
195:14 259:6
chunk 217:10
church 167:10
257:18
**CI** 380:11
**CID** 370:12
371:5,7,15
372:6 380:11
circumstances
115:20 303:23
citation 376:13
citizen's 357:16
**City** 9:20 229:2
civil 30:12,12
33:10,11,12
44:21,22

160:17
civilly 48:12
claim 73:17
395:23
claimed 185:4
299:10
claiming 112:4
**Clardy** 30:19
clarify 86:16
114:11 172:21
197:1 311:16
332:9 344:22
**Clark** 59:7
208:13 263:20
264:1 266:14
267:19 269:12
273:18 280:20
282:15,23
283:13 285:3,6
290:13,19
291:18 292:16
293:2,3 294:6
295:6 302:20
303:12 305:4
308:18,22
310:12 311:5
314:6 316:1
317:21 322:2
328:18 386:4
389:12,14
**Clark's** 282:8
284:7 286:2
292:7 294:20
308:20
class 337:22
340:19 341:18
342:1,2,5,12
classes 323:21
341:21
classified 345:9
**Clayton** 277:1,2
clean 52:11
276:18
cleaners 276:18
clear 9:2 44:6
75:8,9 81:9
83:13 103:2
105:14 112:10
145:7 158:14
171:21 227:14

232:12 254:18
271:17 277:16
332:17
clearer 294:12
clerical 27:2,7
clerical-type
321:20
clerk 14:13,17
22:16 61:6
156:16 177:19
178:6,23
client 166:1
391:3
clique 106:23
clique-ish
106:15
close 9:18 32:22
144:8 219:16
242:12 253:16
277:13 295:21
closed 345:11
closer 222:13
223:23 224:4,4
clothes 217:23
218:10,20
258:20
clothing 137:16
club 41:17
clue 135:22
**Coats** 163:16
164:11 167:10
code 186:13,21
187:3 359:20
coerced 101:14
coffee 163:17
359:6
cold 326:12
327:15
collect 233:15
**Collecting** 234:8
college 15:2,8
323:6,11,12
color 125:10
**Columbiana**
5:15
combined 290:8
come 11:2 24:11
26:15 33:19,21
35:16 36:5
37:15 45:7

49:12 94:6
96:21,23
108:13,18
111:17 117:1
130:23 162:21
163:17 186:20
198:6 199:1
204:12 209:11
218:14 240:13
243:23 250:17
251:12,18
260:17,19
268:11 270:12
271:6,13,14,23
272:11 291:17
297:18 308:1
314:21 315:4
315:18 321:20
328:21 330:14
335:14 341:10
341:12 347:3
365:14 366:14
368:2 373:20
comes 34:3
73:13 113:18
163:19 206:19
254:2 273:1
comfortable
95:15 208:9
209:3,5 213:8
coming 31:7
38:19 39:5
92:13 117:23
133:11,14
143:9 256:3,13
259:11,12
309:11 314:22
342:22 351:9
366:4,5,16
377:17
command 19:15
22:22,23 24:5
24:12,19 58:16
58:18,20,22
73:13 74:3
81:10 84:16
96:11 117:8
119:10,17,22
120:21 127:10
127:11 146:2

209:15 324:15
327:20 329:5
commander
146:4,4
comment 35:5
35:13 121:15
121:21 127:10
128:15 129:3
132:7,19 139:9
141:11,18
148:15 149:13
150:9,11,17,22
152:5 153:13
155:3 156:3
182:5,12,18
188:15 192:6
196:13 237:19
258:13 284:9
284:19,21
308:20
commentary
132:23 158:9
158:11 159:18
commented
186:13
commenting
160:20
comments 21:9
21:14,19,22
22:7 92:2
104:17 106:19
116:8 117:19
120:20 122:5
123:6,12,15
124:9,19 125:1
125:12,18,23
127:3 128:2,23
129:14,21
130:17,20
131:1 132:14
133:17 136:22
137:23 138:11
138:21 139:12
140:3,10
143:21 144:2
144:14,20
148:9 149:21
151:7 152:7,18
154:1,5,11,15
155:23 156:10

158:3 159:8
161:18,23
162:8 164:2,10
164:23 165:2,5
166:7,11 167:7
167:18 168:20
169:5,8,23
170:10,16
172:3,6,16,18
173:22 174:11
174:15,18
180:15 185:18
189:10 190:19
192:10 198:18
209:21 273:18
303:20
Commission
28:14 58:12
59:17,23 60:1
60:12,21 61:7
61:16 66:10
76:14 79:9
93:6 316:16
318:13,16,19
318:19 403:23
Commissioner
1:20 2:18
27:13 77:3
403:21
Commissioners
76:16
common 171:15
274:14 277:8
351:10
communicate
289:2 296:12
355:18
communicated
289:4 290:16
293:14
communicating
56:5 289:1
297:3
communication
289:10 296:1
communicatio...
271:4
compare 114:4
comparing
111:15 112:11

compensated
52:21 108:5
compensation
53:3,9
complain 38:10
52:12 208:3
282:8,23
291:18 308:19
321:5 339:12
complained
38:9,15 214:14
281:5 283:13
284:17 286:2
290:18 292:6
292:15 295:5
308:7 318:7
384:13,23
385:4
complaining
208:10 213:9
315:23 318:10
339:9
complaint 3:20
12:14 76:9
85:13 89:18,21
101:20 124:3
131:8 172:17
173:14,20
183:8 190:16
255:7 258:9
269:10 276:7
284:8 285:5
291:8 295:14
296:6 308:18
310:13 319:22
324:6,7,12
325:23 332:4
342:15 346:22
347:6 352:9,15
354:22 355:4
355:11 357:9
357:17,23
364:17 365:9
369:18,20,22
370:6,14
371:10 372:1,3
372:22 373:8
374:12,13,19
374:20 375:3
375:10 376:2

379:11,14,16
379:18 385:2
386:3
complaints
76:12 78:23
96:6 199:20
267:3 285:22
288:6 333:9
369:17 370:21
372:17 376:4
complete 8:6
completed 68:6
68:16 69:1
compliance 2:4
13:12
complies 367:12
comply 62:4,8
63:12 64:16
65:22 79:22
96:20 206:7
233:12
computer-aided
403:8
concept 22:21
250:15
concern 17:11
21:8 360:3
381:4 399:21
concerned 280:3
concerns 76:19
concert 225:15
concludes 345:9
conclusion 92:8
conditioners
264:16
conditions
320:12 384:15
condos 238:10
conduct 35:7,10
42:6 119:10
173:8 219:1
282:9,23 283:8
283:17 284:7
284:13 285:15
292:7 294:20
295:6 311:5,18
364:14 377:2,5
386:12,17
387:20 388:5
conducted

290:20
**conducting**
344:18
**conference**
162:17 341:14
341:22 343:15
**confident** 353:9
**configuration**
31:13
**confirm** 294:8
**confirmed**
340:16 362:8
**confiscate**
288:12
**confiscated**
296:2
**confiscating**
388:14
**confronted**
285:3
**confused** 112:19
208:21 291:19
291:20 348:17
350:3
**confusing** 259:2
**confusion** 399:8
**Congratulatio...**
11:3 324:1
**connected**
155:11 217:1
380:12
**connecting**
401:16
**consequently**
110:14
**consider** 58:9
357:23 365:12
365:20 382:11
385:9
**considered** 9:19
50:16 53:9
58:11 264:7
271:5 343:11
394:10
**consisted** 60:20
**consistent** 16:11
84:20 85:5
373:2
**constant** 61:3
123:16 157:5

201:19
**constantly** 40:5
61:4 174:21
184:23 191:11
**constructively**
385:10
**contact** 76:18
228:23 301:9
304:16,18
305:3,15,20
307:4 310:10
316:10 370:12
371:5,21
372:13 376:7
388:21 396:19
**contacted** 76:17
310:5,6 316:18
318:18 347:20
388:23 396:2
**contacting**
73:16 312:19
350:16 371:19
**contacts** 53:22
237:6
**contained** 63:13
64:16 65:22
**context** 59:2
**contingent**
247:18,20
**continue** 229:7
237:10 314:17
314:20 394:19
394:23
**continued** 4:1,3
230:21 233:20
316:8
**contribute**
325:5
**contributed**
401:11
**control** 160:14
**convenience**
177:22 178:5
**conversation**
20:9,11 46:16
70:4,7,21 90:5
92:23 93:11
94:3,7,17 95:4
95:9 96:4
97:17 101:3,5

101:12 117:16
129:15 131:3
136:5,8,11
138:18 152:1
157:5,19 159:6
159:15 161:2,5
161:7 167:16
178:12,22
179:7,8,12
189:6 206:17
207:9,14,22
248:4 261:2,16
272:17 273:17
277:12 279:9
281:9,17
286:15,21
287:8 292:16
293:4,11
294:21 295:8
309:8 311:6
313:9 325:6
336:20 337:17
338:18 340:6
355:15 366:10
390:13,14,16
**conversations**
54:18 123:15
129:22 151:4
151:21 152:16
152:23 153:3
159:2 180:21
181:5,11
215:11 248:6,8
282:21 388:8
397:22
**conveyed** 263:6
**convince** 269:16
**cooked** 193:1
**cooperation**
106:4
**copied** 331:3
**copies** 326:8
331:1,18 332:9
332:13,16
**copy** 67:5
331:20,21
**Corey** 241:23
242:8,9
**corner** 294:13
**correct** 11:19

22:9 38:7
44:11 58:7
69:11 82:9
146:21 254:3
258:13 292:13
383:12 386:5,9
403:9
**correction** 16:14
**Corrective**
303:15
**correctly** 264:6
312:12
**correspond**
173:13,15
**corroborated**
347:2
**cost** 55:11
**couch** 399:5
**counsel** 1:15 2:9
2:11 13:19
146:17 330:16
390:8 403:13
**counseled** 317:3
**counseling** 3:14
4:5 66:23
303:8,9,11,13
303:18 304:4
392:4,10,12,15
393:2 394:19
**counselor** 321:6
**counter** 178:7
359:16
**county** 1:8 3:16
21:20,23 22:8
26:17 35:11,14
58:12,12,17
60:7 62:9 67:5
68:6 73:16
74:21 78:8,9
79:4,9 80:13
80:14 81:7
82:19 83:7,15
83:20 84:21
85:6 86:19
96:14,14 120:2
120:4,7 121:1
121:3,5 158:18
158:18,19
177:23 267:5
285:21 299:13

300:2,13
318:16 356:17
376:21 384:16
389:23 390:8
390:12 391:9
403:3
**County-provi...**
392:8
**couple** 16:22
111:17 118:12
132:21 153:20
154:6 169:11
203:4 207:20
217:13 222:9
226:11 238:16
262:7 273:12
282:4 286:17
287:5 311:12
**coupled** 42:7
337:6
**course** 228:19
400:15
**court** 1:1 6:5
7:15 8:19 13:4
143:5 243:8
**courthouse**
18:12 30:5
35:18 43:14
44:23 45:1,2,3
104:8,12
116:23 138:16
143:2 144:1
160:19 170:8
200:21 202:18
203:22 204:14
205:16,18,20
207:3 212:6
306:4,4
**courtroom** 7:17
**cousin** 277:11
**cover** 138:6
225:15 226:6
**coworker** 186:7
186:15 223:19
**coworker's**
185:22
**coworkers**
179:17 205:23
**crazy** 190:1,7,10
190:13,16,17

created 98:23
creates 99:13
cried 301:1
  310:19,20
criminal 290:23
  299:22 348:11
  371:8,13
  380:10
criticism 345:13
Cross 104:23
  118:8 120:12
  122:6,15,20
  123:6 127:15
  134:23 136:9
  136:12 140:18
  144:22 152:8
  152:21 154:12
  163:23 164:17
  164:20 166:6
  166:19,23
  168:19 178:2
  178:13 179:1
  184:4,11 185:9
  194:9 195:20
  196:1 204:20
  204:21 206:17
  208:2,5,10,16
  208:17,22
  210:21 219:2
Cross' 207:4
Cullman 123:4
current 9:15
  38:12
currently 10:18
  10:19 11:9
  112:9
custody 293:19
cut 52:11 134:11
  150:7 203:8
  220:14 275:23
cute 273:12
cycles 171:7
Cymbalta 395:6

        D
D 3:1 4:1
D-a-n 181:22
D-a-y-u-m
  252:8
D-e 181:22

DA's 39:4
dad 223:20
  228:21 401:6
dad's 272:23
Dale 79:10,13
damage 363:10
Dan 181:21
data 55:21
date 9:9 34:15
  34:22 63:5
  64:7 65:15
  67:17 68:15,16
  70:3 72:2
  74:23 191:18
  192:1 223:5,11
  224:14 229:7
  231:7 234:13
  234:17 245:23
  269:17 271:8
  283:17 311:12
  335:17,18
  336:7 378:7
  383:5,6 384:10
dated 194:2
  225:5,12,13
  254:20 344:11
  387:6,13,16
dates 19:21,23
  20:4 39:13
  40:2 41:15,16
  92:14 229:12
  235:7 254:15
  271:8 311:10
  311:18 331:12
  331:17
dating 192:4,7
  221:18 222:21
  223:3 224:6
  240:3,9 245:21
  321:1 393:15
daughter 32:6,7
  186:23
Dave 259:8
  342:16
David 317:17
  329:13
day 25:23 45:12
  45:12 61:19
  121:20 214:11
  214:13,15

234:14,16,17
244:22 283:7,7
283:12,15,16
284:8,16 286:1
286:11,18
287:6 288:10
289:5 290:6
295:10,13,13
295:14,20,21
296:5 299:5
342:16 356:20
376:16 377:8
377:15 378:16
382:19 389:11
389:12 396:8
399:1
days 16:22
  35:23 294:16
  300:12
Dayum 252:7
De 181:22
deal 74:17 80:10
  266:10
dealing 60:21
  74:17
dealt 265:21
  266:9
death 399:20
decade 20:16
  124:11
deceased 401:6
December 80:15
  235:6,8 236:11
  236:12,17
  335:22 336:1
  344:11 359:3
decent 245:20
decide 49:23
  50:21 231:14
decided 334:16
decision 381:23
  399:10
declaratory
  325:11
decline 34:22
declined 203:11
deemed 141:23
Defendant's 3:9
  4:3 62:11
  63:18 64:23

66:18,22 67:19
74:11 77:21
80:5 82:2 85:9
172:23 209:22
232:22 303:4
329:17 344:6
366:21 383:17
DEFENDAN...
  5:9
Defendants 1:10
  75:6,13,17
  80:20 84:9
  302:4 367:3
  368:19 369:11
  377:21 381:21
defense 11:6
degree 250:15
delete 235:13,18
deliver 376:2
delivered 375:2
  375:4 378:9
delivery 378:4
  378:10
demeaning
  106:6
demeanor 90:5
  326:22 350:12
  351:13,14
  353:2,4
demonstrated
  81:21
deniability 91:4
  91:13 92:16,19
  93:1,7 94:9
  95:17
denied 109:4
deny 94:13
department
  11:18 19:1
  26:11 27:5
  28:7 29:11
  30:11 34:18
  38:17 39:2
  48:16 49:19
  55:7 58:21
  59:4,10,15,22
  60:11 66:12
  68:7 82:15,17
  86:20 87:6
  90:12,15 91:3

93:3 95:15
96:15 99:4,6
102:5,5,6
108:3 113:23
120:2 121:1
132:6 133:14
141:6,22
151:11 154:22
154:23 155:16
156:21 158:19
159:7 165:9,11
176:5 179:20
180:2 181:1
229:1 246:11
256:3,13,20
266:3,6 269:6
274:10,18
275:1,10
276:12 282:17
298:2,13,16,17
312:20 314:5
316:8 337:14
343:12 346:4
350:20,22
351:8,18
364:11 365:10
370:8 384:17
385:15 391:8
392:16 397:6
398:19
Department's
  217:5 313:13
depending
  128:13
depends 210:17
depicts 188:21
depose 199:9
deposed 7:5
deposition 1:15
  2:2,3,14,18
  6:14,20 8:21
  12:9 13:21
  44:7 85:14
  199:8 231:16
  385:6 403:5
depositions 2:6
depressed
  395:19 396:6
  399:4,4 400:19
depression

320:2,20
394:16 400:17
401:12
**depth** 167:9
**deputies** 19:4,13
33:14 35:22
36:5 42:23
43:1,19 44:2
44:19,22 45:1
49:10,11 50:15
51:4 57:19
90:14 92:13
95:20 117:1
132:5,15 133:9
143:22 145:13
148:22 149:17
160:4 161:2
164:1 165:15
168:11 171:2
175:21 177:2,3
180:2 195:15
217:2 224:2
238:11,18
**deputies'** 190:2
**deputy** 15:18
16:19 17:9
23:1,2,6,16,18
23:19 24:16
25:5 33:19
37:12 43:3
44:8 46:17
48:4,5,22 58:1
59:20 60:2
61:5 79:3 81:6
99:15 107:6
114:13 116:12
116:21 117:8
117:14,22
127:5,7 132:10
141:2 143:8
145:9,10
153:16 165:19
168:4,6,6
177:17,20
186:12,19
203:5 237:23
242:4 258:16
259:5 260:3
327:18 328:20
328:21 353:8

353:10 380:6
**deputy's** 22:18
54:7
**derive** 294:5
**derogatory**
106:5 190:1,7
190:14
**describe** 25:18
143:17 180:3
398:17
**described** 30:14
60:23 112:15
113:22 178:8
229:19
**describes** 90:8
**describing**
399:22
**description** 3:10
4:4 103:9
175:9 177:17
343:14
**descriptions**
179:16,23
181:18 185:21
**designated**
285:21
**designation**
23:16 24:18
**desirability**
186:6
**desire** 247:11
**desk** 70:16
178:7 198:3
201:8 220:18
220:19 272:3
333:6,8 343:5
355:8
**desks** 260:12
**despite** 21:8
191:12
**detail** 151:16
198:9 369:15
**detailed** 175:8
176:5 177:16
179:15 183:12
186:5
**details** 55:19
110:21 151:23
152:3 176:3
178:10 294:16

303:18 304:3
**detention** 44:3
133:10,21,22
134:2,5
**determent**
105:18
**determination**
382:12
**determine**
210:22
**deterrent** 36:9
**diagnose** 394:15
**diagnosed** 393:6
399:23
**diagnosis** 393:9
394:18 400:2
**dick** 147:18
148:5 149:11
152:14 153:15
**die** 399:17
**died** 401:4,8
**differed** 115:20
**difference**
115:22 144:6
**different** 19:15
25:12 27:6,21
28:22 32:17
39:14 44:13
111:18 123:19
129:23 138:9
143:18 146:19
151:17,18
165:15 167:13
180:1,2,23
190:21 196:18
211:8 222:5
255:2 278:16
282:16,19
292:4 294:14
294:15,15,16
294:16,17
302:10 316:14
321:16,18
323:3 333:1,20
354:19 385:16
385:16 389:21
393:1
**differently**
127:20
**difficult** 159:3

353:20 354:8
393:18
**dinner** 222:18
226:8,10,15,18
254:18
**direct** 63:7
64:12 67:2
71:19 72:4
73:9,15,21
75:3,16 77:1
78:14,22 79:11
80:19 84:8
85:1 200:4
208:15 209:7
209:13 212:7
212:18 214:1
232:4 248:23
249:2 255:5
280:16 284:14
367:2,6 368:18
372:10 381:19
**directed** 40:6
75:20 76:12
84:5 88:13
116:9 123:13
124:2,6,9,20
126:1,19,21
232:10 303:10
309:23 345:3
**direction** 48:17
48:18
**directions**
304:12
**directly** 138:3
190:10 202:17
213:20,22
222:6 307:20
307:21,22
**Director** 73:17
76:4 79:2,3
81:5,6
**disagree** 367:11
367:13 368:23
369:2 370:10
**disappointment**
252:1
**disaster** 128:5
**discernable**
353:15
**discharged**

385:10
**disciplinary** 4:8
302:22 333:11
352:8 378:5,6
386:11
**discipline** 113:3
113:8 140:11
302:20 352:3,5
**disciplined**
111:10,22
112:1,3,14
113:13 316:23
317:2 351:22
**discomfort**
129:18 144:16
181:14
**discount** 238:12
**discouraged**
91:11
**discovery** 210:4
**discretionary**
28:11 46:10
**discrimination**
325:15
**discuss** 129:9
130:2,11,16
161:14 163:20
168:16 177:6
196:19 205:4,7
228:3 257:9
282:15,19
286:20 304:1
342:18 394:9
**discussed** 77:16
100:11,12
101:6 127:21
127:22 136:13
136:18 137:5
141:3 159:9,13
161:20 163:1
170:22 173:13
174:5 176:23
177:2 179:21
182:21 183:1,3
184:2,11,16,20
184:22 185:1,7
185:14 186:11
189:17,19
190:4,5 191:13
196:16,16

198:21 205:3
254:10,11
256:18 257:19
258:12 275:16
275:21 283:8
283:16 284:15
285:8 288:13
292:10 312:7
**discussing** 177:9
177:13 284:13
**discussion** 28:23
77:19 86:1,13
159:21 183:12
197:15 232:20
244:16 257:4
285:1 286:2
292:12 329:15
383:20 401:22
**discussions**
159:17 161:14
169:12 176:20
176:23 185:18
186:6
**disgraceful**
377:5,6
**disgusted**
143:14 164:21
**disgusting**
127:23
**disorderly** 377:4
**Dispatch** 168:5
183:18,19
**dispatcher** 61:5
139:23
**displayed**
326:12
**disregarding**
92:14
**disrespectful**
377:1
**dissect** 349:22
**disseminate**
133:8 134:12
135:18
**distinguish**
393:18
**distress** 320:2
320:19
**distribute**
205:15

**distributed** 87:4
87:5,14
**DISTRICT** 1:1
1:2
**divide** 221:20
**divided** 123:20
124:3
**division** 1:3
30:12 33:10,11
44:21,23
109:12 160:18
242:5 371:8
372:6
**divisions** 255:2
**divorced** 48:9
224:10 239:20
246:9 273:15
**docket** 12:19
**doctor** 160:6,6
160:11,23
161:3,8 392:8
392:20
**document** 3:15
3:19 13:6,10
13:16 64:7,10
65:4,13,16
66:2,22 67:17
68:2 70:3
71:13 74:16,23
75:5 78:2,22
80:10 83:19
303:7 329:20
330:11 332:13
344:10 377:21
377:22 384:1,6
**documented**
20:23
**documents** 4:8
12:11,17,20
258:5
**doing** 53:2 55:4
107:17 112:16
154:20 184:10
187:8 216:1
227:9 243:14
248:20 299:23
306:6 308:3
314:15 318:3
328:7 355:8
361:21 376:1

**dominant** 17:15
17:18 19:1
197:22
**door** 37:9,17,22
42:7,16 105:23
178:1,3,4
198:6 227:13
272:10 336:16
336:17 359:11
359:14
**doors** 275:6
**Dorning** 5:20
16:15 17:1,4
17:10,14 18:10
22:12 24:15,17
24:20 37:11
46:1 60:22
92:3 93:11
94:18 95:7
210:5,9,20
212:4 215:11
218:23 219:21
220:22,23
260:8 382:22
**Dorning's** 46:9
92:21 186:23
**doubt** 42:2
**downtown** 10:3
10:4 226:22
**dozen** 120:15
129:6 154:7
156:4,6 365:2
**Dozens** 138:22
**Dr** 392:9,19
393:5
**draft** 384:20
**drafted** 384:21
**drama** 356:10
**drank** 321:2
**drawer** 272:14
**drawing** 44:4
**Drew** 34:3
**drink** 195:9
**drinks** 40:13
222:20 254:18
270:22
**driven** 102:7
216:18
**dropped** 339:20
371:18

**dropping** 375:9
**due** 38:8
**duly** 6:2
**Dustin** 279:3
281:11,12
286:22
**duties** 22:14
25:4,15 28:4
47:3 115:15
265:3 353:22
354:9,20 355:3
**duty** 22:17
377:5
**Dyer** 76:16 77:3
**dying** 296:15
297:4

_____
E
_____

**E** 3:1 4:1 5:1,1
182:21 403:1,1
**E-l-l-i-f-f** 32:15
**e-mail** 304:18,21
307:4,10 308:1
336:6 345:2,5
345:7
**e-mailed** 334:3
334:22
**e-mails** 335:3
**earlier** 45:18
46:13 77:13
82:8 85:14
104:20 108:5
119:18 136:18
175:1 239:11
369:11
**early** 92:16
108:14,19
117:5 188:1,4
**ease** 86:4
**easier** 244:11
**east** 31:16,17
117:12
**easy** 150:10
**eat** 399:6
**eating** 226:18
272:5,16,22
399:7
**education** 323:3
323:11
**EEOC** 12:15

**effect** 2:4 7:16
**effects** 320:11
**efficient** 318:5
**effort** 88:18
177:7 230:22
**efforts** 252:10
395:13
**either** 17:9
137:17 171:22
217:16 236:14
251:20 257:9
287:2 319:2
341:10 362:1
383:1 398:15
**Elliff** 32:14
**ELLIS** 5:11
**else's** 47:14
**emotional** 320:1
**emotions** 399:11
**employed** 11:9
14:3 47:22
**employee** 39:1
62:3,9,16 63:3
64:2 65:6,7
66:23 68:5
72:6 73:6,20
74:21 76:10
78:8 80:13
81:10 85:3
217:7 242:12
267:19 278:22
280:5 293:20
294:2 303:8,11
303:19 304:1
304:15 355:7
373:5,10
392:20
**employee's**
57:16
**employees** 59:17
72:21 73:14
75:20 77:6
78:22 79:15
81:1,15 87:6
90:14 101:2
165:11 303:21
**employer** 58:10
255:16
**employment**
11:18,21 34:21

53:12 63:23
78:4,11 90:9
92:11,17 93:14
97:21 118:13
127:8 157:16
176:19 200:19
202:22 205:2
320:12 328:17
332:10,14
389:5
**encounters**
180:1
**encouraged**
309:22
**ended** 16:14
23:12,12,14
25:13 47:13
49:20 54:6
103:21 104:7
107:16 110:20
113:1 156:20
170:8 211:14
211:22 227:12
249:17 257:14
264:14 270:17
282:3 286:16
288:10,21
289:3 298:21
309:1,11
311:14 340:2
342:11 362:14
362:14 394:21
**ends** 260:12
**endure** 17:17,18
19:11 196:5
**enforcement**
102:22 103:1
269:5
**enjoy** 203:20
**ensure** 229:6
**enter** 172:11
**entered** 368:3,9
**entire** 16:12
55:11 249:6
265:21 266:5
321:23 351:15
401:9
**entirely** 97:16
**entitled** 231:21
**entrance** 359:14

**envelope** 297:20
375:3,4
**environment**
18:21 21:10
95:21 99:13
106:21 216:17
216:18 228:19
327:22 393:23
**episode** 322:2
**equal** 78:4
**erect** 138:5
185:22
**Erica** 1:5,17 3:4
6:1,11,13 9:5
146:9 260:19
267:2 278:19
280:11 304:16
304:23 345:3
367:19 368:2,3
368:8
**escalated** 213:14
**escort** 48:2,23
51:8 107:17
236:14
**escorts** 47:4
48:7 50:9,11
53:17 54:15
108:11 236:23
**especially** 54:7
303:22
**established**
96:12 372:15
**estimating**
267:22
**et** 1:9
**evaluate** 143:9
168:17
**evaluated** 133:4
135:19 174:9
**evaluating**
147:12 170:20
175:1,3
**evaluation**
100:21 143:13
143:19 144:9
150:5,19 153:8
153:11 154:6
174:20 183:1
353:16
**evaluations**

100:1,6 143:6
**evaluators**
144:23
**evening** 355:22
355:23
**events** 194:22
**eventually** 49:16
53:10
**everybody**
135:4 141:21
162:18 229:1
256:20 270:12
**everybody's**
54:4 75:8
330:2
**evidence** 2:14
291:2 294:5
**ex-wife** 152:10
**exact** 146:12
268:22 363:14
398:16
**exactly** 17:22
18:19 95:12
117:18 126:18
132:17 141:7
162:14 179:3
196:20 236:3
281:1,3,12
300:7,9 319:15
342:1 387:22
390:9
**exacts** 114:22
**exam** 359:2
**EXAMINATI...**
3:6 6:9
**examined** 6:2
**example** 59:19
91:10 93:4
96:21 99:1,18
114:13 115:20
130:8 133:18
205:14 325:17
**examples** 61:1
338:6
**excerpted** 74:16
78:2 80:10
**exchange**
166:18
**excited** 157:4
177:4

**exclusion**
267:12
**Excuse** 85:19
218:6
**exercise** 258:21
355:6
**exhibit** 62:11,14
63:18,21 64:23
65:4 66:18
67:19,23 74:11
74:19 77:13,21
78:6 79:21
80:1,5,12
81:20,21 82:2
83:18 85:9
86:4 87:2 88:2
88:2 89:19
172:12,23
173:4,10
209:22 210:8
232:22 233:3
255:7 303:4,7
329:17 344:6
344:23 347:11
366:21 367:2,4
377:21 381:17
383:17,22
384:3 387:6,9
**exhibits** 3:9 4:3
85:7 302:22
**exit** 42:15
**exited** 367:19
**expect** 250:4
252:15 348:23
**expectations**
252:2
**expected** 76:2
90:3,13
**experience**
101:23 159:11
189:22 231:2,4
231:5 391:7,12
**experienced**
98:2 191:11
193:17,20
**experiences**
180:8 192:12
**experiencing**
319:23
**Expires** 403:20

403:23
**explain** 22:21
26:6 54:22
229:10 259:3
264:3
**explained** 84:6
119:17 161:8
342:23
**explicit** 173:22
175:8 177:17
179:15,23
180:14 183:12
185:21 186:6
**exposed** 174:18
**express** 195:19
**expression**
116:18
**extended** 108:18
314:18
**extent** 196:21
253:12 394:5
**extra** 50:16
117:2 315:18
**eye** 102:13

**F**

**F** 183:3,11 403:1
**face** 359:17
**face-to-face**
304:15 305:20
**Facebook** 332:6
333:15,15,18
333:21 334:9
334:15,20
338:11 339:14
341:19
**faced** 386:22
**faces** 133:4
**facial** 116:17
**facilitated** 83:7
83:14 86:19
**facing** 386:11,16
386:23 387:20
388:4
**fact** 69:20 71:4
74:2 155:7
233:14 242:15
**Factory** 268:13
270:1,6
**facts** 353:23

354:1
fail 354:15,18
failure 317:1
fair 101:7
    146:17 236:8
    305:1,5 381:8
fairly 50:19
    52:13 194:4
    244:8 265:8
    297:14 389:9
fake 224:21
fall 247:6 289:23
    290:2
false 280:7
familiar 19:14
    302:21
family 166:4
    277:14 393:20
    401:9
fan 250:16
far 26:1 28:21
    31:15,19
    129:13 171:10
    191:15 202:13
    230:2 293:16
    307:8 312:2
    317:20 355:7
    365:18 370:22
    398:20 399:15
Farm 239:12
faster 27:15
fat 143:12
fatigue 320:2,20
favor 238:19
favorably
    209:11
favorite 113:22
    268:12
favors 165:10
    166:3,18 167:1
Faye 76:16 77:3
FBI 256:2
fear 320:3 357:8
February 75:1
    241:19
feel 34:11 37:3
    41:12 42:12
    43:23 44:9
    89:4 97:11
    101:17 102:1,2

102:13 105:16
107:7 109:3
110:13 131:20
151:14 161:10
167:17 190:17
192:21 206:23
208:9 209:3
213:8 214:23
216:7,16
233:11 244:9
253:13 275:15
315:22 316:11
325:13,16
327:1,20 329:6
352:6,13 353:9
377:17 391:2
394:10
feeling 42:10
    95:15 97:15
    161:11 193:4
    193:12 196:22
feelings 353:19
    353:21
fees 391:21
feet 125:11,11
    125:12,13
Felicia 76:7
fell 44:23 208:12
felt 41:18 42:16
97:9 101:20
103:20,22
104:3 107:14
123:8 129:10
130:21 139:6
153:22 154:23
184:17 192:15
196:4,13
198:21 209:5,6
247:11 248:18
248:19 279:20
279:23 287:17
289:10 324:19
325:21,23
326:23 327:1,5
327:21 328:22
328:22 334:8
340:1 348:9
352:5 353:7
354:2,3,18
356:22 357:2

377:16 385:21
393:19 398:18
401:14,18
female 90:15
    99:8,9,12
    100:16 107:6
    113:12 114:12
    114:17,22
    126:15 133:3,5
    133:6,13,18,21
    137:18,19
    139:20,22
    145:1 153:21
    155:16 170:20
    174:8 175:9,19
    176:1,3 178:5
    185:21 205:10
    254:13 355:14
    364:7 365:8
female's 100:16
    150:4 157:6
    173:23
females 90:3,12
    91:20 92:8
    98:13,21,22
    99:17 102:9,10
    102:20,22
    103:5 104:15
    105:2,2,11
    106:2 110:12
    111:4,9,18
    112:12,13
    133:13 143:13
    175:2 185:12
    190:13 249:13
    384:15
fetish 125:8
fewer 106:6
fiasco 168:4
fifth 347:19
fight 178:11
figure 43:16
    54:3 137:22
    284:2 350:5
    375:13
file 4:6 26:4
    59:23 73:17
    115:12,13
    330:2,3,14,23
    331:1,18 333:8

357:8,16
369:21,22
filed 115:16
    369:18 372:1
files 115:15
    325:20 326:6,9
    328:9,12
    332:10,12
    333:4,6
filing 2:17 12:23
    13:5 27:3,8
    49:21 368:9,13
fill 108:20 315:5
filled 23:19
final 382:12
finalized 13:13
finally 396:20
Finance 11:6
find 77:4 131:16
    142:13 178:18
    377:14 396:7
    396:11 398:7
fine 42:20 216:2
finish 8:22 105:9
    144:13 175:11
    234:4 248:5
    323:19 355:2
    375:14,16
finished 11:17
    176:7
fired 112:7,8
Firm 11:12,22
first 6:2 14:3
    15:7 16:20
    19:13 25:9,15
    26:22 30:13,17
    31:6 33:13
    34:3,20 37:16
    47:8,15 50:21
    62:21 66:9
    68:2,3 73:22
    76:22 79:1
    83:19 90:23
    93:13 103:19
    116:11 117:6
    145:21,23
    191:7 194:23
    195:1 197:14
    200:16 233:3
    233:19 234:22

240:9 258:3
266:11,11
267:20,22,23
277:10 283:22
284:4 289:10
291:15 304:2
309:15 310:11
312:5,7 321:12
339:16 342:22
346:13 351:9
363:16,19
374:22 377:20
381:22 383:23
385:18,18
395:7 396:10
398:13 399:12
fist 184:4,5
fit 103:9 127:19
    156:3 171:1
    174:23 180:18
    198:11
five 27:1 35:22
    40:3,17 51:17
    51:18 119:8
    134:18,21
    148:19 149:15
    152:20 182:15
    196:17 203:7
    203:14 225:13
    226:15 270:4
    271:11,19
    300:12
fixed 264:11
flagged 318:14
flat 127:23
fleet 28:17 29:9
    29:10,13 217:3
    271:22 272:6
    273:2 276:13
    288:20 306:1
    317:22 319:1,6
    319:13
flip 235:2
flirt 90:4,11
floor 18:12
    25:21 29:21
    30:10 32:18
    44:15,17 70:10
    186:18 188:6
    264:15 265:6

368:12 376:17
**Florida** 6:21
**Flory** 62:20
  72:15,16 79:3
  81:6 309:3
**flying** 257:12
**fob** 359:13
**focus** 113:6
  122:6
**folders** 333:1
**folds** 250:18
  251:12
**folks** 254:9
**follow** 18:6 67:8
  148:8 169:22
  373:12 379:14
**follow-up** 18:3
  92:5 124:9
**followed** 373:16
  373:21
**following** 75:17
  81:8 297:12
  314:10
**follows** 6:3
**fond** 257:6
**fondly** 282:14
**foot** 125:8 182:1
  385:13
**footage** 175:9
  177:21
**force** 2:3 7:16
  320:4
**forced** 256:1
**Ford** 390:2,6
**foregoing** 403:5
  403:9
**forget** 293:10
**forgot** 129:20
**form** 2:10 3:11
  3:12,13 62:16
  63:9 64:1 65:6
  70:13 72:23
  77:17 80:3
  81:23 82:20
  88:1,4,6,14,20
  91:6 97:19
  135:6 193:15
  204:11 230:9
  231:8 248:14
  293:23 299:17

**formal** 131:8
  322:8 375:2
**formed** 91:2
  142:14
**Former** 210:5
**forms** 301:23
  359:11
**forth** 361:19
**forward** 13:14
**forwarding**
  304:23
**foul** 146:18
**found** 14:8
  134:6 224:22
  253:17 288:21
  358:5,9,16
  360:21
**four** 10:10 49:9
  49:10 196:17
  226:13 266:12
  267:20,23
  334:2 395:2
**fourth** 374:22
**frequently**
  319:15
**Friday** 16:10
  51:13,20
  295:22 296:3
**friend** 34:5,8
  110:19 163:16
  221:18 222:22
  223:4 224:7,14
  228:4 229:6,10
  229:18 231:7
  232:13 240:3
  245:19 246:9
  247:19 248:6
  251:14 253:3
  277:4 363:17
  380:23 389:1
**friendly** 326:19
**friends** 20:18
  21:1 193:1
  194:13 223:11
  229:1 289:12
  321:19 389:16
  389:18,22
**friendship**
  195:23

**front** 63:22
  104:18,19
  126:15 127:20
  142:3,17
  149:23 187:8
  343:16 350:14
  370:2,3 372:2
  372:4,20 373:1
  378:6 387:3
**fruition** 109:14
  109:23 110:6
  256:5
**fruits** 184:3
  185:2
**frustrated**
  131:20
**fuck** 368:4 379:6
**fucking** 155:2
  278:19 280:11
  295:1 367:22
  379:5
**fulfill** 47:12
  353:22
**full** 2:4 6:12 8:1
  8:6 203:16,20
  206:21 207:17
  381:22
**fun** 326:15
**function** 54:14
**functions** 328:2
**fund** 28:6,11
  29:3
**funds** 46:10
**funeral** 48:6
  49:7,8,12,13
  51:9 236:14,20
  236:23 241:19
**funerals** 47:4
**Furniture**
  268:13 270:1,5
**further** 1:23 2:7
  2:16 203:12,18
  325:10 339:3
  403:12
**future** 304:14

────────
**G**
────────
**G** 189:21
**G-o-r-n** 10:22
**gagging** 174:2,7

**gained** 128:12
  128:21
**game** 106:3
**gap** 235:16
**gaps** 210:14
  211:11
**garage** 272:7,11
  276:15,16
  278:11 288:20
  359:13
**Garcia** 110:16
  113:19 324:8
  326:4
**Garcia's** 325:10
  325:15
**Gary** 104:23
  118:8 120:12
  122:6,15,20
  123:5 127:15
  134:23 136:8
  136:12 140:18
  144:22 152:8
  152:21 153:13
  154:1 163:23
  164:17,20
  166:19,22,23
  168:9,19 178:2
  178:13 179:1
  184:4,11 185:3
  185:3,9 194:8
  194:9,13,18
  195:15,20
  196:1,6,19,23
  204:20,21
  205:2,9 206:17
  207:4 208:16
  208:17,22
  210:21 219:2
**gas** 61:11,12
**gathered** 360:13
**gathering** 375:9
**gatherings**
  195:7
**general** 28:6
  29:3 136:5
  146:12 155:15
**generic** 398:5
**gentleman**
  246:10
**getting** 100:2

112:18 121:9
  143:5 178:11
  224:22 227:11
  230:2 250:13
  307:17 316:20
  317:10 343:6
  352:11 399:9
**giant** 123:17
**Gillespie** 76:15
**girl** 109:7
  127:16 134:13
  135:5,9 161:16
  168:5 334:10
  337:19
**girlfriend** 168:6
  168:17
**girlier** 133:22
**girls** 109:17
  157:3 219:6
**give** 43:8 59:19
  84:12 97:2
  102:3 130:8
  146:9 158:14
  179:22 189:1
  203:16 204:15
  207:6 210:23
  210:23 247:5
  268:9 272:12
  301:13 313:14
**given** 28:14
  48:17,19 50:4
  50:23 85:17
  87:18 103:8
  106:6 109:5
  173:7 211:9
  233:2 298:1,12
  298:14 301:22
  319:3 343:1
  372:17 380:2
  400:4 403:10
**giving** 8:1,6 86:3
  174:6 203:20
  229:20 231:23
  299:9 301:18
  391:10 392:23
**glance** 210:7
**go** 29:8,12 36:14
  41:16 44:19
  46:11 48:7,12
  50:7,20,22

51:6 73:21
78:19 85:15
87:21 89:19
91:16 94:22
95:2 109:15
111:8 131:11
132:3 137:14
142:23 145:11
146:7 147:22
173:19 179:20
183:3,23
185:20 191:5,7
194:21 195:4
199:15 205:19
205:22 208:15
209:18 217:9
217:14,16,19
218:18 225:14
227:1,2 230:15
244:4 245:10
248:16 254:15
255:6 259:12
260:10 262:2
268:11,17,18
270:22 271:23
275:6 277:19
286:5 290:23
299:11 301:11
309:23 314:14
317:21 320:4
320:13 323:2
323:15 324:11
324:20 337:2,5
340:18 342:2
343:3 347:12
359:4,7 361:11
374:12 376:15
377:8 384:5
385:17,18
386:1 387:5,11
387:11 392:20
393:2 399:15
401:15
**go-between**
244:10
**God** 138:22
139:23
**goes** 145:9 146:5
254:19 345:7
**going** 8:9 17:16

18:22,23 19:2
19:10 22:20
24:7 28:3 51:7
55:15 63:7,9
64:12 65:3,18
66:14 67:3
68:3 71:19
72:4 74:14,18
75:4,10,16
78:1,14,19,21
79:11,14 80:8
80:19,21 81:13
81:18 84:9,13
85:1,12,14
86:11 89:19
91:16 94:14
95:22 110:5
111:5 116:4
124:10,15,17
126:4,8 128:6
135:22 141:7
146:9,18 160:5
161:3 169:17
169:19,22
172:21 173:3
173:21 183:4
184:8 189:15
193:21 198:8
199:17,22
204:7 207:1,19
209:4,10 212:8
226:12,18,21
228:21 230:1
231:15 242:22
243:6,8 245:1
251:3 252:23
255:5,6 257:13
257:22 281:19
282:22 287:13
291:16 309:19
309:20 311:12
313:2,4,19
319:6,12
320:18 330:7
332:7 333:18
338:19 340:3,4
340:8 347:11
349:22 354:15
359:10 360:10
361:18 365:9

367:1,2 381:6
381:21 382:4
387:22 388:20
389:23 391:23
399:14,16
400:7
**good** 85:20
125:11,11
133:11 134:5
155:17 192:23
200:2 204:9
215:2 229:12
239:17 243:13
250:3 252:5
273:16 289:12
305:17 399:12
**goodness** 176:11
181:6
**Goose** 163:22
**Gornik** 10:21
**gosh** 13:11
102:12 148:17
158:5 171:18
180:5 184:13
194:7 361:22
**gossip** 176:5
**gotten** 175:20,21
224:10 319:2
328:17 333:23
**government**
392:20
**GPS** 359:22
361:13
**Grace** 5:12
266:20 308:14
**graces** 243:13
**graded** 262:14
**graduate** 15:1
**graduated** 323:5
323:22
**graduating**
323:22
**Graham** 3:7
5:12 6:6,9
131:22 140:20
147:19 200:1
230:4,10,13,19
231:15,20
232:9 267:4
308:15 391:23

401:20 402:1
**granted** 315:20
**great** 230:10
241:7 321:13
**Grief** 400:14
**grilled** 148:12
**gross** 144:11
**grounds** 2:12
**group** 123:1
254:19
**guess** 25:7 29:9
31:16 32:20
38:2 41:19
48:12 93:23
98:22 99:22
107:3 126:8
129:10,14
134:11 142:11
145:22 146:21
155:8 164:4
171:1 191:1
195:1 201:19
218:3,7 221:1
223:22 239:14
251:4 276:14
278:5,12
279:22 288:11
301:16 313:3
323:23 330:19
340:1 357:7
360:17 376:10
391:6
**guessing** 150:19
176:19
**Gurley** 9:16
**guy** 184:13
228:21 281:10
**guy's** 168:7
**gym** 122:13
213:13,20
214:5 216:9,22
216:23 217:4,5
217:12,20,22
217:23 218:2
218:11,12,14
218:19,20
254:14 259:10
259:12,13
260:11 262:19
306:2 380:13

**H**

**H** 191:5
**H-o-c-k-e-n**
183:21
**hack** 333:21
338:6,9 340:20
341:18 343:19
**hacked** 334:6,20
339:14
**hacking** 333:15
334:9 348:19
**hair** 97:1 118:4
150:4,5,6,7,13
153:12 202:8
**hairy** 143:11
**half** 157:16
188:11 194:10
197:9 205:2
315:15
**hall** 153:10
205:10
**hallway** 31:17
**Hancock** 103:18
**hand** 70:12
85:12 149:9
173:3 201:12
378:4,10
**handbook** 3:16
3:17,18 62:9
63:10,13 64:14
64:17 65:20,23
74:22 78:9
80:13 81:1
83:2 84:21
285:21 376:22
**Handbooks** 85:6
**handed** 381:15
**handful** 149:14
**handing** 67:22
**handle** 370:21
**handled** 35:6
311:2,23
312:12 348:6,8
348:16 371:12
374:3,8 376:5
**hands** 149:9
346:18 351:5
353:3
**handwritten**
3:21 173:5

hang 268:15,23
  270:3 276:1
hanging 225:19
  227:8 270:23
happen 34:19
  101:7 117:3
  162:23 176:17
  187:18 196:18
  215:3 295:16
  315:19 319:5
  319:11 337:10
  351:10,11
  359:10 363:8
happened 39:22
  54:22 70:3,15
  117:4 118:17
  146:23 155:18
  164:11 165:22
  169:10 174:21
  179:8 181:3
  185:16 188:15
  195:17 196:11
  208:20 213:13
  221:8 235:12
  244:22 259:4
  261:15 279:15
  279:22 281:8
  281:16 282:6
  286:22 290:5,6
  292:12 299:3,7
  300:6 301:4,8
  302:19 307:11
  310:21 314:12
  319:14 338:17
  339:18 342:19
  343:3 358:1,20
  361:16 362:12
  365:11,19
  366:9 367:17
  381:3 388:1
happening
  91:14 94:8
  95:19 106:19
  136:6 205:1
  288:14 386:19
happens 326:17
happy 230:22
  247:9
harass 236:1
harassed 77:8

79:16 81:16
harassers
  242:17
harassing
  110:21 227:6
  228:15 231:3
  232:17 240:18
  247:12
harassment
  3:15,19 66:16
  67:6 68:7 69:6
  69:9 71:18
  72:8,22 73:7
  73:14,18,23
  74:4,18 75:14
  75:21 76:3,12
  78:4,23 80:11
  81:2,11 82:11
  82:14,19,23
  83:9,14,21
  84:15,17 86:22
  95:11,20 96:6
  96:8 112:4,23
  114:6,9 156:19
  157:15,23
  177:12 255:15
  256:4 262:12
  263:10 285:22
  293:16
hard 17:20
  52:23 201:16
  207:17 229:9
  308:9
harp 131:5
harshly 111:10
  111:22 112:1
  112:14 113:13
hate 56:5 188:17
head 5:11 97:1
  105:13 116:3
  142:14 181:2
  198:7 202:7
  220:11
hear 15:10 96:5
  123:22 132:19
  138:20 142:5
  142:21 144:2
  148:14 149:12
  150:17 156:2
  158:3 159:16

169:8 170:1
  179:2 207:18
  248:15 267:7
  350:4
heard 93:1
  94:10 106:19
  142:6 148:19
  153:20 169:12
  181:4 187:7,12
  190:9 244:7
  256:20 257:10
  257:16,16
  279:5 333:19
  334:11,13,14
  336:21
hearing 141:12
  176:21 334:2
  403:11
hearsay 345:10
heels 289:23
  290:3
hefty 287:19
held 27:21 29:1
  77:20 86:2,14
  197:16 232:21
  252:3 329:16
  383:21 401:23
hell 250:3
help 222:11
  238:20 239:13
  370:5 379:2
  392:22
helped 107:5,7
  327:4,6,10
helpful 8:22
helping 116:22
  325:22 398:2
hereto 62:13
  63:20 65:2
  66:20 67:21
  74:13 77:23
  80:7 82:4
  85:11 173:2
  210:1 233:1
  303:6 329:19
  344:8 366:23
  383:19
hey 47:18 89:14
  142:16,20
  205:15 241:1

266:20 341:4
  361:7
hide 164:18,20
high 356:16
higher 392:23
higher-up 91:10
  99:15
higher-ups 91:7
  91:12 95:16
hindered 316:13
  316:21 318:4
hindering 308:3
  308:3
hire 92:6 133:5
  133:6 135:12
  136:14 153:10
hired 22:15
  47:10 66:9
  90:23 133:21
  134:2,13 135:9
  281:2,4
hires 189:19
hiring 60:4 61:4
  61:18 135:7
  281:3 397:22
  397:23
Hispanic 190:20
  190:20
history 255:15
hit 19:20,22
  41:16 191:11
  191:15 216:15
  250:16 311:9
  368:12
Hocken 183:20
hold 176:15
Holmes 5:6
Holt 111:20
  112:16 115:1
  258:16 259:5
  259:15
home 10:8 49:7
  49:14 238:7
  264:18 361:7
  362:14,15
  376:15 377:8
honeymoon
  186:16 187:1
  187:20 189:2
hood 175:10

176:1,4
hook 275:18
hooked 180:22
hope 183:11
  310:15
hormone 160:6
  160:6,21 161:8
horrendous
  384:15
Hose 165:22
  166:22,23
hospital 14:21
  242:1
hostile 95:21
  102:8 385:20
hot 141:3,9,23
  142:1 169:15
hotel 358:12,18
  360:1 361:11
  362:2,18,22
  363:1
hour 18:18
hours 16:9
  51:10 52:2
  53:6,7 107:19
  122:7,8,12
  211:6 243:5
  254:5,8,13
  268:15 270:4
  276:2 364:21
  367:9
house 48:8
  204:12 289:13
  296:20 359:12
Howard 76:7
Howell 5:18
  79:2 81:5
  309:3,6,23
HPD 370:7
Hunt 279:3
Huntsville 1:21
  5:7 9:12,18,19
  10:8 14:20
  296:21 389:20
husband 225:16
  225:20
hysterical
  361:10

I

i-k 10:22
IA 344:2 346:23
  370:20 372:14
  379:14
idea 302:7 322:6
  322:7 359:9
  360:9 369:23
  390:23
ideation 394:9
identification
  62:12 63:19
  65:1 66:19
  67:20 74:12
  77:22 80:6
  82:3 85:10
  173:1 209:23
  232:23 303:5
  329:18 344:7
  366:22 383:18
identified 76:11
  79:8,13,21,23
  183:10 208:22
  371:11
identify 62:14
  65:4 66:21
  81:4 212:14
  377:22 384:1
illnesses 393:7
imagine 147:16
  179:5
imagining
  178:20
immediate
  401:9
immediately
  84:16 278:23
  313:5 316:6
  363:4
impact 195:23
  327:16 328:9
  399:20
impacted 196:3
  400:7
imply 155:14
impression
  362:18
improper
  269:18 270:7
  271:5 375:6,18
in-person 87:18

inappropriate
  187:15 221:7
  293:4 303:20
inappropriately
  213:6,11 214:8
  223:16 224:12
  225:3 227:15
  293:2 364:15
  386:7
incestuous
  179:18
incidence
  209:10 271:13
incident 59:7
  91:14 147:7
  178:15 208:14
  215:12 216:16
  216:19 259:23
  260:6 271:20
  275:17,20
  276:7 286:17
  288:19 299:18
  299:21 302:23
  311:23 314:13
  328:19 353:13
  356:21 357:21
  378:20,21
  379:10 381:2
  385:22 386:3
  388:12
incidents 59:3
  93:8 173:12
  196:18 219:20
  290:9 385:17
include 55:15
  78:3
included 55:14
  157:23 337:2
including 90:3
  269:17 290:21
income 12:5
incorrect 283:10
  283:19,21
  284:5 369:7
indicate 240:20
  240:21 283:7
  283:22
indicated
  203:17,18
  283:15 286:23

287:12 312:17
  313:19 317:16
  331:22 337:14
  341:20 366:4
  366:15 371:18
  380:18 394:12
  397:19
indicating 182:3
  360:17
indication 334:1
individual 33:19
  43:16
individuals 79:7
inferring 196:9
inform 72:6
  73:5 81:1
  242:15
informal 7:14
information
  13:12 94:15
  131:17 133:9
  157:22 178:17
  180:13 250:11
  255:14 326:5
  337:1,8,20
  340:10 342:8
  349:15 382:10
  382:13,18
  383:10
informed 73:20
  88:14
informing
  116:12 213:12
  213:17
infraction
  114:14,17
infractions
  111:11
initial 113:21
  117:5 264:6
  282:5 286:20
initially 18:4
  39:3 46:1
  163:12 166:19
  227:7 245:17
  264:4 268:6,10
  288:18 301:12
  313:2 357:22
  365:11
initials 67:8

initiate 272:17
  344:2
initiated 48:22
  159:13 161:1
  170:10 277:11
  299:21 343:12
  345:16
initiating 190:16
initiative 310:3
inmate 277:17
  277:22 278:10
  279:5,14 280:4
  283:14 284:9
  284:19,21
  285:3 286:3
  288:19 289:1
  290:7 292:17
  293:5 294:21
  294:23 295:8
  303:22 304:1
  308:22 311:6
  389:15
inmates 276:11
  276:17,20
innuendo 116:9
  123:13
inquiries 321:21
insecure 139:6
inside 184:3
instance 49:7
  131:21 133:7
  137:19 154:19
  374:10
instances 73:6
  269:21
instantly 134:4
  265:21
instructions
  231:23
insubordinate
  386:12,16
  388:5
insurance
  321:13 399:13
intended 233:8
intent 389:2,3
intentional
  235:15
interact 269:3
interacted 26:19

203:1
interaction
  200:21 268:2
  304:13 339:3
interactions
  19:3 268:5
  314:4 339:6
interested
  203:22 204:5
  241:15 245:19
  268:20,23
  396:20 403:14
interim 23:17
  24:14
intern 14:20
internal 4:7
  335:21 344:3
  344:18 392:3
interrogatories
  57:10 392:7
interrupt 56:5
interruption
  16:3
intervene 206:1
interview 15:22
  16:14,23 17:3
  17:9 20:3,7
  22:11 92:3,5
  97:14,18
  350:14 378:15
  380:15 381:6
  381:10,14
interviewed
  15:14,16 16:18
  18:5 379:20
  380:3
interviewer
  380:20
interviewing
  18:1 378:18
investigate
  291:17 293:1
  294:5,19,22
  295:6,10
  311:17
investigated
  345:8 346:23
  347:4,7,9
  349:2,4,9,20
  350:8

**investigating**
291:15 312:3
346:19 371:10
**investigation**
290:23 299:22
335:22 342:14
344:4,19
345:10,14,23
374:8 387:1,20
388:5
**investigations**
259:9 262:18
306:2 338:1
344:16 371:8
373:14
**Investigator**
347:15
**investigator's**
12:15
**investigators**
217:2
**invitations**
269:17
**invite** 40:12
240:23
**invited** 194:23
195:4 269:23
271:11
**invites** 203:12
203:13
**invoice** 29:9,14
272:12 318:20
319:4
**invoices** 29:4,6
265:7 272:1
306:20 307:21
316:15,17,20
317:1,11,20,23
318:13 319:3,7
319:13
**involve** 48:1
**involved** 85:3
99:11 151:3,20
151:22 152:22
154:11 155:22
158:8 159:20
162:5 169:2
327:3 329:2
355:13 374:16
375:8

**involving**
271:21
**iPads** 302:10
**iPod** 288:21
289:3
**issue** 42:9 56:23
57:3 60:10
147:11 230:12
288:9 307:12
308:22 333:15
339:4 345:16
349:21 350:7
353:11
**issued** 57:19,22
58:2
**issues** 72:7
75:20 80:11
81:2 82:6
247:19 355:7
**it'll** 83:12
**item** 84:10

_____
**J**
**J** 173:14
**J-e-r-m-a-i-n-e**
39:10
**J-o-n-g** 181:23
**Jackie** 117:12
**Jackson** 388:9
**jail** 103:1,15,16
104:3 135:8
264:5,23
276:11 277:17
277:18,21
**January** 30:3
233:6,15 234:9
239:5
**Jeff** 5:19 266:20
267:13 331:21
334:3,22 336:2
337:8 338:7,17
339:4,7,16,17
342:21,23
343:11 346:4,8
346:13 348:9,9
348:12 349:6
349:21 350:11
350:16,18,23
351:1,4,23
352:9,15,20

354:22 355:4
385:17 398:1
**Jefferson** 403:3
**jeopardized**
279:21
**Jermaine** 38:23
39:10 42:6,10
43:3
**Jermie** 5:18
72:15 79:2
81:5 309:2,5
309:10,23
310:7 311:4,17
312:4,8 314:7
317:15,23
**Jernigan** 24:9
24:15,19
186:12 187:23
255:14,22
256:12 257:7,8
258:12 259:8
259:13,17
260:3 281:21
287:3 288:11
295:17 297:14
299:15 309:20
313:3 317:18
325:17 326:12
327:13 329:13
338:20 340:2,3
342:17 343:5
344:11 348:13
351:4,5 352:10
355:5
**Jernigan's**
343:4 346:1
351:13
**job** 15:6,7,10
17:6 18:8
21:13 22:10,14
22:23 23:12
25:3,15 28:4
39:4 50:1 51:9
59:11 60:20
192:17,18,20
193:5 205:22
223:3 236:15
238:1,6,21
239:1 241:18
247:15,17,20

247:23 265:3
277:19 306:5,9
316:13 317:17
318:3,4,11
321:13 327:17
328:2,7,10
353:6,9 354:9
354:19 393:19
395:14 396:11
399:9,12,15
**job-related**
239:8
**jobs** 48:3 49:6
50:7,10,16
52:13 54:9,15
55:4 108:11
314:16,23
316:10 321:10
321:15,22
393:21
**Joe** 1:19 33:9
45:19,20
160:14 161:6
161:14 162:2
164:14,15,18
212:1,2 403:19
**John** 184:14
185:9,11 396:3
**Johnson** 5:4,5
**joke** 141:4
142:11 221:9
**jokes** 148:18
**Jones** 72:16 79:4
81:7,9 150:12
192:9,22 198:2
200:12,16
203:5 206:11
209:9,9 213:2
213:5,10 214:4
214:7 215:12
215:17 216:7
216:19 218:22
239:12 386:8
**Jones'** 207:12
209:16 219:1
**Jong** 181:22
**judge** 7:17 13:13
163:15,16
164:11 165:3
165:12 167:10

169:23 170:6
170:15 231:14
**judge's** 166:7
**Julie** 103:12
109:8,18
130:11 137:1,2
137:2,3 161:16
162:10 170:22
182:6 206:2,13
207:13 208:6
211:22 334:11
336:23 337:18
368:17
**Julie's** 103:13
163:9
**July** 74:8 83:21
83:23 244:22
249:3
**June** 78:10
212:15,17
214:11 233:6
233:16 234:10
235:4,5,8
236:8
**JUSTICE** 5:11

_____
**K**
**Keel** 380:18,21
**keep** 51:23 52:7
52:8 94:12
95:23 199:8
229:16 231:16
247:16 251:15
308:11 318:2
**keeper** 115:12
**Kellum** 155:6
**Kellum's** 156:13
**Ken** 115:3,21
**kept** 56:2 100:2
314:15
**Kerri** 5:4,5
**Kerry** 5:21
23:14,15,21
24:13 33:8
51:1 52:16
64:11 65:14
69:18 88:4
100:10 101:2,8
130:1 136:7,19
142:5 167:8

176:23 207:14
207:23 211:22
256:18 257:4,6
257:7,16 280:2
281:7,10,12,17
281:18 282:11
282:17,22
283:2,6 284:7
284:10 285:15
286:6 287:15
288:8,11,13,14
288:18,22
291:8 292:6,15
293:6,11 295:9
295:17,18
297:16,16,17
297:17 304:22
305:10 307:16
309:9,20 313:1
313:4 315:6
317:12,13
324:10,14
327:8 340:6,16
340:18 342:6
342:15,17
343:3,16,20,23
347:1 360:20
361:1 364:2
365:15 377:15
385:18,22
387:3,21
**Kerry's** 283:12
**Kevin** 38:20
39:16 41:23
42:3 72:16
79:4 81:7,8
**kin** 403:13
**kind** 17:19 18:5
20:23 27:9
28:16 31:2
42:18 50:14
55:18 60:10
73:14 82:21
84:4 86:21
87:8 90:17
95:14 96:20
97:2 103:17
125:8 130:23
133:8 136:11
149:13 152:17

154:23 155:23
158:9 161:23
162:12,21
163:6 168:19
169:11 174:11
181:13 196:4
204:1,15 221:9
222:7 227:12
235:2 237:20
251:3,17
254:15,19
257:15 259:10
264:9 268:10
271:3 272:6,21
275:19 277:7,8
284:23 285:5
301:13,18
307:18 312:10
317:1 324:12
339:19 343:2
349:10 365:18
372:17 380:12
388:16 392:15
**kinds** 116:13
154:1 172:6
228:6 243:22
**knew** 19:10,16
50:10 96:1
193:21 203:21
223:19 243:5
245:20 246:11
249:17 255:16
275:12 311:22
321:19 327:4
327:10 334:18
337:20 338:7
360:18 366:17
372:6 389:9
391:7 395:23
396:17 397:20
399:13
**know** 8:11,14,20
12:18 18:19
19:21 20:19,19
22:3 23:22
32:4,13 34:6
34:17 37:21
38:1 39:23,23
47:16 49:5,15
52:6,18 55:19

56:20 57:14,17
58:2,2,4,7
70:16 71:6,8,9
71:11 72:16
83:1 87:4,5,14
88:10 89:7,11
89:12 91:11
93:7,8 95:8
99:11 100:1,3
100:5,23 101:8
101:23 102:17
102:20 103:12
103:14 104:13
106:17,20
107:4,12
109:12 110:11
110:11 112:7
113:2 114:3,11
114:22 115:8
115:23 117:10
119:18 123:23
124:20 125:19
127:16 128:19
129:9,12,15
130:4,13 131:4
132:9 133:12
133:19 134:1
134:20 140:3,4
140:5,7 141:4
142:6 143:3,4
143:18 145:4,8
146:2,3,11,23
147:2 150:20
150:20,23
151:5,14
152:14 156:20
157:3 159:1
160:7,23
162:11 163:3,8
164:2,6,7,9,10
164:23 166:2
167:3 168:11
168:12,13
170:6 176:3
184:22 185:11
187:10 188:18
188:19 189:18
190:12,15
191:16 192:4
192:16 194:18

195:17 196:20
198:19 199:1,3
199:10 204:10
205:13 206:9
207:15,18
208:17,19,19
215:14 216:18
220:6 221:13
223:21 224:22
232:1 233:19
235:11 236:3
239:9,9,10
241:1,10,12
242:16 243:20
245:17 246:4
247:10 248:18
249:18,20,21
250:8,21 251:2
252:3,4 255:19
256:1,5 257:1
257:21 260:18
263:4,7,13
264:21 266:21
267:8,8 268:21
269:1 270:5,22
272:9,23 273:5
274:12 275:11
277:14 278:18
278:20 279:4
279:11,22,23
280:10,23
281:1,3,14,19
282:12 283:20
285:12 286:13
287:2,11
288:14 290:4,7
292:20,21
294:11 295:22
298:7 299:5
300:7,9,16
302:12,19
306:6,8,10
310:5 311:20
312:1,15
313:19,21,21
314:1,2,15,17
314:22 317:6
318:1,17 319:1
319:10,15,20
322:3,5 327:6

327:19 329:1
330:20 331:23
332:19 333:7
335:10,19
338:3,20,22
339:20 340:21
341:23 342:11
342:13 343:17
345:15,19,20
346:17 349:14
357:19,20
358:6 359:8
360:8,20 362:4
362:19,20
363:3,5,7
364:1 365:16
365:19 369:16
370:6,9,21
371:17 372:2
372:13,14,16
372:23 373:4
373:12,15
374:4,7 375:12
377:6,12 378:1
378:17 386:21
387:10,11
390:9 391:5,6
394:2,17,18
396:16 398:16
399:9,10
400:18 401:17
**knowing** 249:18
295:23 391:7
**knowledge**
37:11 120:8
211:12 234:7
235:20 333:10
333:13 339:5
391:10,12
**known** 91:3
100:7 129:7
138:2 238:9
255:16 258:20
274:9,16 275:8
275:9 349:10
**knows** 181:10
**knuckles** 126:13

───────
**L**
───────
**L** 1:11

**labeled** 190:6
332:1
**labels** 189:23
190:1
**lack** 106:4
**lady** 28:10 31:20
55:2 155:4
285:18 356:14
358:8,9 359:22
362:10
**lady's** 360:22
**Lane** 34:4
**language** 210:4
251:17
**Lanier** 390:2,6
**large** 182:13
403:22
**late** 108:13,18
314:21,23
315:4,13,18
318:12 365:5
**Laura** 187:6
**law** 11:12,22
323:15,18
**laws** 2:5
**lawsuit** 24:9
229:11
**lead** 111:18
**leader** 193:23
**leadership**
332:23 333:1
389:19,21
**leading** 2:10
**learn** 342:3,8
**learned** 368:8
**leave** 60:3 70:15
108:14,17,19
108:20 199:16
315:4,12,16
360:11 363:1
377:11 378:23
**leaves** 59:20
193:8
**leaving** 205:21
273:2 363:4
396:15 399:12
**led** 92:23 276:7
**left** 32:4,5 34:15
43:14 156:14
156:14 160:4

184:15 201:5,6
201:9 219:15
240:8 272:20
332:10,14
339:1 342:10
359:18 360:12
362:18 368:7
395:15 396:18
396:23 398:7
**leg** 141:9 201:5
201:6,9,12,22
202:3
**legal** 389:4
**leggings** 218:2
**legitimate**
269:20
**legs** 133:3 182:4
182:14
**let's** 25:14 27:21
28:17 29:2
71:12 88:1
89:17 93:4
105:9 106:12
111:8 131:22
137:14,15
142:23 143:1
146:7 149:9
153:6 159:1
172:20 173:19
183:3 185:20
187:4 189:13
191:5 195:10
209:10 219:8
221:21 234:19
244:19 251:21
262:9 269:9
276:6 287:7
291:21 303:1
347:10 355:10
357:12 359:4,7
371:1 374:15
374:21 377:20
387:5 388:17
**letter** 4:7 27:14
27:18 378:4,6
378:11 379:9
379:23 380:2
381:15 382:21
384:13,20
387:5,6,8,16

**letter's** 387:13
**letting** 250:21
267:8
**level** 245:18
246:4
**license** 12:1
395:17
**lick** 39:15 40:4
**lie** 69:15
**lieu** 88:7 165:13
299:18
**lieutenant** 24:1
145:16,19,22
146:1,5 165:23
212:21,23
213:18 262:17
304:22 343:20
344:12,15
375:4
**life** 129:13 249:6
320:18
**light** 264:10
**lights** 264:16
**liked** 108:1
125:9,12,13,15
164:5 226:12
228:16 229:18
248:18 328:23
**likes** 195:9
247:13
**liking** 35:6
107:16 238:23
257:8
**limit** 326:1
**limits** 177:23
**limp** 152:14
**Linda** 163:16
**line** 61:10,10,11
63:3 68:15
171:11 250:2
251:15 252:11
352:6 354:12
374:22
**lines** 28:22
114:20 117:18
162:15 170:21
171:3,4 250:4
273:13 312:18
334:4
**lingers** 394:7

**lips** 39:15 40:4
**list** 34:2 43:19
50:4,5,8,20,22
51:7 52:1,3,4
53:21 54:4
104:17 107:8,9
111:19 123:17
131:10,11
132:2,3 137:14
170:3 172:9
198:23 266:21
267:11
**listed** 53:21 68:5
102:9 116:11
322:21
**listen** 131:5
274:8
**listened** 207:6
**listening** 361:22
**lists** 79:1
**literally** 249:6
**litigation** 44:7
124:14 330:16
339:10
**little** 9:20 27:17
31:2 32:19
66:15 82:7
128:21 149:9,9
149:11 150:8
158:6 164:18
164:19 205:21
208:21 225:15
259:2 272:10
272:19 276:23
277:11 297:19
311:8 332:17
348:17 350:3
**live** 10:2,7,9,13
238:11
**lived** 9:22 10:11
226:22
**living** 98:2 278:2
**loan** 277:20
**local** 395:21
**located** 29:18
30:15 31:18
44:10 220:16
262:16,17
361:12 376:9
**location** 30:14

32:3,17 33:13
33:14 36:3
38:5 44:13,20
45:5,11 47:8
118:11 239:15
262:22 358:23
**locations** 39:14
46:23 306:9
**lock** 186:22
**locked** 37:9,18
37:22 38:8
42:8 178:1,3,4
**logistics** 70:19
**long** 9:22 10:4,9
18:15 40:23
108:10 127:23
133:20 150:5
182:4 188:1,6
189:18 192:1
201:21 277:12
290:7 342:13
390:16 394:23
398:6
**longer** 181:23
307:16
**look** 31:14 57:11
68:1 71:12
75:5 78:18
80:21 81:13
83:18 89:17
104:21 126:15
150:6 212:8
234:19 240:4
251:21 255:10
269:9 303:1,17
312:17 330:7
347:10,14
355:10 374:15
374:21 377:20
381:21 398:4
**looked** 41:18,19
89:8 128:12,22
133:14 210:11
260:12,13,13
261:14,17
272:14 316:19
**looking** 128:19
133:11 134:6
187:10 310:22
310:23 312:20

312:20 363:11
396:1,18
**looks** 19:21
118:4 134:14
145:1 212:10
305:16 345:2
347:13
**loop** 94:12
**lose** 192:17,18
192:20
**lost** 128:12
**lot** 22:19 27:3
39:15 60:20
91:5,15 95:1
125:12 126:17
127:21,22
129:22 130:3,6
130:12 133:22
139:10 143:3
151:10 152:8
153:6 160:4
161:2 164:11
164:12 170:22
178:19 179:4
179:18,20
180:13,20,21
181:3,3 184:16
195:12,13
196:11 197:17
198:4,23
207:15 211:15
228:11,12
238:12 250:11
257:19 259:9
265:4 275:1,4
306:1,20
310:19,20
326:17 360:23
361:14 362:15
369:15 384:23
395:19 396:4
399:3
**loud** 75:22 142:5
**love** 252:7
**lover** 357:15
**lower** 220:11
**loyalty** 250:5
**luck** 239:17
**lucky** 192:10
**lunch** 108:10,18

131:19 217:16
217:18 226:10
226:11,11,14
254:18 275:7
314:18

## M

**M-e-g-h-i-n**
32:9
**ma'am** 7:7,22
8:3,8 9:3 10:15
14:2,23 15:9
45:15 50:17
52:20 54:13
55:13 56:15
63:17 64:22
65:12 67:7,13
67:16 68:9
70:11 72:11
74:10 77:5
78:13 79:19
80:18 83:10
84:19 86:23
90:7 94:4
96:16 97:21
98:15 104:10
104:14 108:23
115:16,18
116:10,16,19
118:1,23 119:3
126:22 127:13
131:9 133:1
141:19 149:2,4
149:7,20
150:23 151:8
153:4 154:16
156:11 158:22
160:1 162:1
167:21 168:1
169:3,6 170:17
172:4 173:6,11
173:15 175:3
175:13,15
179:13 181:15
183:14 186:1,4
186:11 188:16
189:12 190:23
192:13 199:21
202:7,11
212:12,17,22

255:20 258:6
261:4 268:3
284:20 302:15
314:2,11
320:10,16
344:13 345:6
365:6 373:18
**machine** 331:20
**mad** 228:11,13
243:4,10 244:6
247:5 252:7
342:21 343:10
346:3,7 351:16
351:20 352:19
**Madison** 1:8
3:16 21:20,23
22:8 26:17
35:11,14 58:11
58:12,17 60:7
62:9 67:5 68:6
74:21 78:8,9
79:9 80:13,14
82:19 83:7,15
83:20 84:21
85:5 86:19
96:13,14 120:2
120:4,7,23
121:3,5 158:17
158:18,19
285:21 318:16
376:21 384:16
**madness** 311:15
311:15
**mail** 205:15
**main** 5:13 27:4
195:9,10
272:11
**maintain** 51:7
**maintained**
28:13,15 29:3
**maintenance**
31:19 264:8,17
269:8
**major** 43:15
**majority** 192:2
204:2
**makeup** 102:14
**making** 42:22
86:4 114:8
117:19 152:7

160:8 161:9
166:7 177:11
190:18,19
195:20 208:23
243:9 311:14
359:2 360:23
365:9 374:13
385:19
**male** 19:1,12
43:1 90:14,14
98:13,18,19
99:19 101:21
103:6 105:15
105:17 111:5,9
111:22 113:11
113:14,20
114:2,12,16
127:6,8 132:5
132:6 149:17
154:22 165:11
171:1 174:6
190:2,8 374:17
**male-dominant**
18:21 19:3
**male-dominat...**
21:10
**males** 106:3
111:11 112:12
114:3,5 138:11
141:22 161:12
191:12
**man** 150:7 172:7
239:20 258:16
259:14
**Manager** 271:23
**manila** 297:20
**manner** 99:5
140:3 190:7,14
291:10,12
**March** 11:16
14:5 234:21
236:8 398:9
**Margaret** 392:9
**Marie** 1:5 6:13
9:5
**Marina** 110:16
113:19 190:15
191:2 263:5
324:7 325:10
325:15 326:4

**Marina's** 329:3
**mark** 126:5,5
172:20 344:9
367:1
**marked** 62:12
63:19 65:1
66:19,22 67:20
67:23 74:12
77:22 80:6
82:3 85:10
173:1 209:23
232:23 233:2
303:5,16
329:18 330:9
344:7 366:22
383:18
**marriage** 251:3
**married** 10:16
10:18,19,23
32:14 35:2
92:15 99:16,20
143:5 168:4
190:20 223:12
225:22 249:13
250:9 355:14
358:17 364:7
365:8 375:1
379:11,16
**massage** 6:23
7:2 96:23
150:14 198:6
203:16,17,20
204:5,8,15
206:12,21
219:18 220:10
**massages** 204:2
206:20
**massaging**
203:11 206:22
221:4
**Massey** 110:18
**materials**
210:11
**Matt** 192:9
194:13 195:3,8
195:14 196:4,8
196:20 216:13
254:20,20
256:8 274:23
275:6,9

matter 321:3
Matthew 191:22
  192:11 195:20
McDonald 76:7
McMurray 99:2
  99:18 101:13
  159:9 179:22
McNair 205:11
me's 281:11
mean 19:10
  20:15,16 27:2
  27:6 28:8
  33:16 34:1,2
  36:22 38:10,11
  38:14 41:17
  42:15,23 43:19
  48:12 51:23
  52:5,10 53:1,8
  58:14,20,23
  59:13 72:17
  89:23 90:11
  92:12 96:19
  97:20 98:2
  99:14 100:14
  100:18 102:17
  106:14 107:13
  114:2,7 118:17
  123:15 124:4,8
  125:9,17
  126:12,14
  128:4,16 130:4
  130:5,19 131:6
  131:12,13
  133:23 134:10
  134:14 135:19
  135:20 139:5
  141:20 142:4
  144:4,9,21,22
  149:10 150:23
  153:6 154:7
  155:15,17
  157:4 158:16
  159:2,5,14
  165:4 174:20
  176:22 177:1,3
  177:9 181:10
  185:1 190:3
  192:8,10,15,21
  193:6 195:19
  202:21 204:9

207:5 213:15
213:16 215:2,4
215:5 221:7
224:20 225:16
226:19,20
227:14 228:16
228:18 229:9
233:10 235:20
237:7,8 241:3
241:5 242:16
243:15 247:1
247:14 249:8
249:19,21
250:7,22 251:9
251:13 254:1
254:12,14,16
261:14 267:4
268:21 271:6,7
273:10,13
274:16,18
275:2,3,13
288:1 290:2
292:20 296:12
298:15 299:19
299:20,20
300:2 301:15
305:7 307:22
308:1,5,6,8
314:14 315:3,7
315:14 316:9
318:9,10
320:21,22
326:13,19,21
327:21 328:1
346:20 348:3,7
348:19,23
349:5,8 351:5
352:1,3 353:8
357:1 358:1
360:2,5,9
361:3,23 362:9
362:15 365:2
365:17 367:15
370:3,16 372:8
372:19 373:2
373:18,19
385:12 390:2
393:22 394:5,5
395:18 397:4
399:4,11 400:6

401:13,14,17
meanest 252:15
meaning 226:20
  388:14
means 7:11
  81:20 130:5
  209:8 296:16
  297:2 403:7
meant 19:6,9
  91:6 94:11,12
  94:23 197:11
  241:11,13,15
  246:13 250:8
  338:8
mechanic
  276:15
mechanics
  276:10,18
media 93:5
  134:9,19
  228:23 333:22
  337:15 340:20
  347:20 348:20
  349:13
medical 392:6
  401:21
medication
  395:4
medications 8:4
  395:10
medicine 392:21
  393:1
meet 195:2,16
  245:2,8 324:23
  336:8 383:14
  392:17
meeting 18:9,15
  20:12 21:4
  46:12 282:2,5
  299:4,7,8
  300:21 309:16
  310:11,16
  312:7 313:17
  324:10,21
  325:3 327:9,11
  327:13 336:14
  342:19 351:16
  352:4 353:1,2
  353:19,23
  354:1,4,11

355:5 371:3
meetings 389:21
Megan 46:6
  254:13 260:7
  261:13
Meghin 32:8
  33:1,1,2,3 46:1
  46:9 187:2,20
  188:5,7 260:8
Melissa 99:9
  100:17,20
  101:14
Melody 137:20
  137:21
member 26:19
  217:11
members 314:5
memory 18:20
  22:4 60:16
  68:19 124:17
  174:18 239:13
  253:23 262:5
  300:10 335:23
men 18:22 139:9
  190:2,20,21,21
men's 17:15,18
  147:15
menstrual 171:7
mental 320:2
  392:4 393:6
  398:17
mention 77:3
  130:1
mentioned
  20:18 25:4
  27:20 41:3
  44:12 55:9
  147:15 160:10
  164:13 199:11
  199:14 219:7
  271:20 273:23
  312:22 363:17
  369:10 395:4
  397:12
Merry 237:3
mess 118:4
message 21:1
  49:4 52:9
  135:10 163:2
  205:8 212:15

214:16,19
240:23 245:10
247:3 249:9
250:1 252:13
355:12
messages 3:22
  3:23 48:20
  53:6,16 185:5
  205:12 210:2,8
  210:13,15,22
  233:5,15 234:1
  234:8,11,20
  235:3,14,16,19
  240:5 245:8
  250:22 253:12
  269:19 270:8
  273:7 289:15
  290:11 291:3
  294:8 307:1
  338:14
messaging
  162:18,20
  211:11 304:17
messing 249:6
met 195:2
  309:15 312:22
  347:15
methods 316:14
  385:16
middle 53:11
  67:3 145:12
  239:4 240:12
  242:19 243:12
  319:23 360:21
  382:9
Mike 76:15
  150:12 192:9
  192:22,23
  198:2 200:12
  200:15 205:13
  206:11,19
  207:11 209:9,9
  209:16 213:1,5
  213:9,14,19,20
  214:3,7 215:6
  215:12,16
  216:7,19
  218:21 219:1
Mike's 209:6
milligrams

395:8
mimic 174:7
mimicking
   174:1,5
mind 34:3
   111:17 113:19
   146:17
mine 12:23
   32:12 55:23
   67:10 70:8
   101:9 127:20
   163:17 211:15
   216:12 301:12
   338:5 389:1
minimal 325:7
minimize
   304:16 305:14
minute 46:12
   68:1 78:20
   122:7 182:22
   202:1 366:13
minutes 18:17
   55:15,20
   300:20 315:13
   390:17,18
miraculously
   272:4
missile 11:6
misstate 82:9
mistake 235:10
mixed 152:11
Mo 27:13,15,16
mom 277:5
   296:14,18,23
   297:3,4,7,8,23
   298:4 320:21
   362:11 401:4,8
moment 60:15
   104:16 140:1
   167:5 169:1
   198:14 199:2
   246:18
Monday 16:10
   51:13,19
   297:12 299:1
   314:9,10
money 28:12,19
   28:21,22 36:14
   36:16 59:18
   61:8,9,9,12,13

282:18 302:3
391:18 398:11
month 84:1
   132:21 220:5
   302:6 323:23
months 38:4
   41:3 93:13
   225:13 292:21
   318:21 398:10
mood 171:8
Moore 1:19
   403:18,19
Mooring 31:23
moose 126:13
Morgan 228:4
   240:3 243:3,14
   245:14,18
   250:10 251:8
   254:22 358:4
   358:14,21,22
   359:1 362:20
   380:21,23
morning 163:18
   297:15 357:5
   365:23 366:2,7
   366:7 399:1,3
mother 34:17
   163:22 399:17
mother's 399:20
motion 12:17
mountain 9:21
move 13:13
   32:17 44:13
   52:10 61:13
   116:5 189:13
   196:6,14 219:8
   262:9
moved 25:12
   30:5,9 32:18
   32:20 54:23
   61:9 113:21
   114:1 203:10
   211:18 212:2,5
   219:14 220:6
   224:9 236:4,5
   240:6,7,9
   280:22 325:20
moving 181:16
   239:12,15
   264:19 265:1

328:9,12,13
multiple 45:12
   269:16

N

N 1:11 3:1 4:1
   5:1
N-a-t-i-o-n
   11:12
naked 203:19
name 6:10,12
   10:20 13:6,8
   20:21 32:8,10
   39:8 43:12
   44:8 46:7
   62:17,19,22,23
   64:2,4 65:7,9
   67:11 68:10,12
   71:20,22
   103:18,19
   105:22 116:22
   123:4 137:21
   138:7 140:1
   155:5 163:10
   166:21 183:20
   185:13 191:22
   195:12 273:4
   276:21,22
   277:2,3,6,8
   298:10 303:11
name's 277:9
named 45:17
   59:22 99:8,9
   137:20 241:23
   250:22 253:19
   403:15
names 9:5 43:12
   43:16 44:4
   76:6 104:20
naming 128:17
Nancy 10:22
naps 396:8
nasty 148:9
Nate 397:21
Nation 11:12,22
near 222:12
nearby 359:6
necessarily
   60:22 107:18
   167:19 209:6

253:1
necessary 2:8
   278:7
neck 220:10
   245:12,15
   246:6,12,16
need 8:13 43:6
   47:19 49:9,11
   85:22 89:15
   102:15 103:5
   121:8 131:15
   131:16 141:10
   147:1,4 158:20
   198:19 199:9
   204:14 205:15
   240:13 242:6
   243:23 252:4,5
   263:22 291:2
   293:17 300:1
   358:2 364:5
needed 28:18
   29:11 61:8,9
   69:23 71:5
   89:2,2 90:19
   97:22 98:5,13
   101:10,20
   103:20 219:23
   260:16,19
   279:23 280:14
   287:18 296:15
   356:23 366:19
   396:21
negative 326:12
   327:15
neither 403:12
Nettles 38:23
   39:10 41:11
networking
   108:2
never 82:10 89:8
   89:13 93:1
   94:9 105:14
   109:13,23
   110:6 122:23
   135:5 137:9
   152:4,5 157:20
   164:8,9,22
   186:20,22
   190:9,9 204:8
   204:8 222:18

257:2 264:20
264:20 285:7
287:23 363:22
364:1 369:18
370:23 373:8
373:16
new 24:15 28:18
   28:20 51:3
   59:14 66:23
   133:5,10 135:5
   135:9,12
   136:14 153:9,9
   155:17 160:5
   186:17 189:19
   212:4 239:6,15
   315:2 317:19
   321:22 390:1
   395:14 397:14
   397:17 398:11
nice 120:10
   229:17,21
   240:23 242:16
   242:18 250:22
   251:1,7,10
   276:19 306:16
   325:19 329:13
nicer 164:19
nicknames 9:7
night 247:7
   357:21 358:1
   362:13 364:2
   364:19 365:4
   365:22 396:7
   399:2
nighttime 356:4
nipples 138:5,12
non-inmate
   278:22
non-stop 157:1
noon 382:14
normal 48:5
   101:7 152:1
   276:23
normally 134:2
   260:21
North 1:20 5:13
NORTHEAS...
   1:3
NORTHERN
   1:2

note 69:19
noted 230:6,14
    231:22 315:2,8
notes 3:21 20:6
    173:5 283:6,12
    283:15,19
notice 2:17
    139:9 262:12
noticeably 182:1
noticed 139:8
notification
    343:2
notified 334:5
    339:19,22
    345:17 357:15
notify 73:15
number 12:19
    27:4 28:1 54:5
    54:7 56:13,14
    75:6,9 78:15
    84:11 85:2
    120:9 212:9
    273:3 300:13
    301:12,14,17
    301:19,19,21
    302:1 330:8
    398:16
numbered 59:21
numbers 14:15
    302:9
numerous
    143:22 384:14
    384:23
nuts 141:9

——— O ———
O 1:11
o'clock 51:12,19
    297:15
oath 7:9
object 72:23
    77:17 80:3
    81:23 193:15
    230:1,4,8
    231:8 232:4
    245:21 248:14
    293:23
objected 107:21
objecting 350:2
objection 230:6

230:13 231:22
objections 2:9
    2:12 232:3
Objet 97:19
obligated 73:15
    73:21 89:4
obligation 62:4
    340:1
obtain 395:13
obtaining
    316:14 317:20
obtuse 188:17
obviously
    241:14 250:23
    260:2 291:12
    297:1 393:17
occasions 259:1
    270:5 271:11
occupation 11:5
occur 202:10
occurred 47:21
    173:8 178:15
    198:5 200:22
    209:8 219:18
    220:17 236:5
    295:7 299:18
    299:20 337:16
occurrence
    158:6
occurring 91:14
    93:9 356:22
off-the-record
    28:23 77:19
    86:1,13 197:15
    232:20 329:15
    383:20 401:22
offended 129:11
    135:17 155:6
    155:11 161:19
    163:3 167:17
    190:18 192:15
    196:10 216:14
    216:20 282:7
offending
    247:13
offense 112:2
offenses 113:12
offensive 19:12
    97:9,11 116:8
    123:12 128:16

129:16 131:5
135:20 142:13
146:13,15
152:2 178:18
187:17 197:22
198:1,18,22
200:7,11
219:12 220:1
253:17
offer 21:3
    137:11 241:7
    241:18 285:11
    285:13 288:5
offered 2:14
    16:1,5 17:6
    86:18 110:4,5
    110:8 150:14
offering 158:1
office 1:9 11:22
    14:4 15:7,11
    18:11 21:15
    23:20,22 25:1
    25:20 26:16
    28:14 29:13,18
    29:21 33:4,5,6
    33:7,9 34:14
    35:8,17 36:8
    39:4,18 40:11
    44:10 47:1
    53:22 56:11,23
    57:8,15,20
    58:6,9,13 62:4
    66:7 69:10
    70:17 71:7
    78:12 80:17
    82:12,16 83:21
    84:15 86:18
    90:9 92:20
    93:17,18,19
    95:2 101:2
    105:19,20
    109:18 117:9
    117:12 118:1
    122:11 123:14
    123:21 124:7
    127:17 129:5
    130:7 158:17
    161:17 163:18
    170:14 173:9
    182:7,15 184:6

185:2,2 191:19
197:3 198:4
202:10,12,14
202:17,20,21
206:3 207:16
211:4,14,20
212:3 215:18
217:7,19
218:11,15,16
218:17,18
219:14 221:2
224:3 227:22
233:22 236:5
243:4 244:12
253:6,10,18
254:6 260:9
261:5 262:18
262:20 264:4,5
264:6,14,18,21
265:10 266:15
267:20 268:9
269:19 270:13
270:13,17
272:9 276:14
278:12 279:8
279:12 280:21
280:23 297:18
301:5 302:5
305:12,14
306:3,18,21
309:12 310:9
310:19 317:22
325:21 328:14
330:21 331:20
332:11,15
336:10 339:9
341:1,2 342:18
343:5 344:16
349:1 352:16
360:4 366:1,12
366:12,18
367:20 368:3,3
368:7,10 373:6
373:11 376:21
379:4 380:4,5
380:8 382:13
388:2,10 389:5
390:10 392:13
394:20 395:13
398:8 399:18

401:2
office's 62:5
officer 133:10
    133:21 134:3,5
    246:10
officers 44:3
    133:22 164:6
    224:2 356:13
offices 30:11,16
    31:7 32:20
    70:8 93:20
    142:4 164:12
    186:18 212:4,6
    264:12 265:5
official 36:18
    39:6 202:19
    203:2 218:8
    394:18
officially 317:2
    393:8
oh 13:11 16:16
    62:23 105:4
    122:23 137:1
    137:16 138:22
    139:23 143:11
    146:14 148:16
    158:5 164:8
    171:18 172:7
    176:11 180:5
    181:6 183:6
    184:13 194:7
    197:6 198:13
    225:11 234:5
    239:14 242:9
    259:16 263:9
    274:8 277:4
    298:3 299:12
    322:3 328:14
    361:22 378:5
    379:13 384:4
okay 8:18 9:1,22
    12:21 13:2,15
    16:16,21 17:2
    17:21,23 22:10
    22:20 23:5,15
    24:7,17 25:11
    25:14,17 26:6
    26:8 27:20
    28:3 30:1,13
    31:10 32:16

36:2 44:11,18
45:16 46:11,22
47:21 48:1
49:5 52:18,21
53:13 54:10,20
56:2,9,14 57:3
60:6,23 62:1
62:21 63:7,21
64:2 65:3
66:14 69:3
70:2 71:12,14
71:19 74:7,14
75:3,10,11
76:4 77:1,6
78:5,14 79:5
80:8,19,22
82:5,16,18
83:6,17 84:8
85:1,12,16,23
86:9,10,11
87:1,3,15
88:13 89:17,23
90:1 91:17,18
92:7 93:10,21
94:16,20,21
95:5,10 97:6
97:15 98:12,20
102:16,18,19
103:4 104:23
105:4,10 106:1
106:11 108:9
109:2,19 110:1
110:12,17
111:3,6,7,15
112:10,20
113:6,9,15,18
113:18 114:10
114:15 115:19
116:1,4,6
118:2 119:9,16
120:9,13 121:7
121:12,19
122:5,10,15,19
123:11,23
124:1,4,18,23
125:5,13,23
126:12 127:9
127:14 128:10
129:20 131:10
132:3,4 133:2

135:23 137:3
137:14,15
139:14 141:1
141:17 142:8
142:16,23
143:1 144:15
145:7,15,20
146:11 147:11
147:19,20
148:7 149:8
150:3 151:9
152:7 153:5
154:4,10,17
158:14,19,23
160:2,20
161:22 163:5
163:14 167:6
167:15,22
168:2 170:3,11
170:18 171:16
172:9,13,20,22
173:12,19
174:10,17
175:4,7,16
177:11 179:11
179:14 180:18
181:16,17
182:21 183:3,6
183:17 185:20
186:5,12
188:12 189:21
190:12 191:1,5
191:7,9,18
192:1 197:6,8
197:11 198:8
198:15 199:18
199:23 200:10
200:15,16,17
201:2 202:9
206:16 207:20
208:2,7,9
210:21 211:13
212:7,13
213:22 214:23
215:7 216:2,6
218:9,13 219:8
219:10 220:2,8
221:21,23
222:1,22
223:13 224:6

225:22 226:3,6
230:21 233:14
233:19 234:19
235:18,22
236:11,19,22
237:1,10
238:22 239:19
240:11,22
241:3,18
243:22 244:20
245:4,10
246:15 248:23
249:11 252:14
253:15 255:5,9
255:12,21
258:7,15 259:3
259:22 260:2,5
261:7 262:3,9
263:16,19,21
264:1 265:2
266:4,10,14,19
267:18 268:4
269:11,22
270:7 271:3,10
271:16,20
277:23 278:18
278:20 280:13
280:17 281:5
281:22 284:6
284:21 285:14
285:23 286:1
286:10,13
289:8 291:14
291:23 292:1
292:11,14
294:18 295:3
295:11 298:3
298:11 299:16
300:3 301:3
302:1 303:3,17
303:23 304:5
305:7,16
306:17,22
307:9 308:10
309:5,15,22
310:11 311:4
311:16 312:22
314:8 315:11
315:22 317:9
318:22 319:21

320:9,9 321:8
323:2 324:5,23
325:9,13 330:3
330:7 332:7
333:17 334:7
334:18 335:15
335:20 336:5,8
336:19 337:11
337:16 339:6
340:9 341:4,14
342:4,14 344:3
344:9,21 345:1
345:7 347:4,10
347:18 348:17
349:8,22 352:7
352:13 354:20
357:11 358:20
360:11 365:3,7
365:21 367:1,5
367:6,18
368:15,18
369:10 371:1
371:14 372:5
374:6 375:11
375:20,23
376:15 378:7
379:2,20 380:3
381:3,19 382:6
384:5,10,12,22
385:8 386:19
387:10,19
388:3,13 389:2
391:23 392:17
394:15 396:4
396:10,22
397:18 401:4
old 9:13 398:12
older 246:9
once 27:12
29:14 43:14
118:22 120:13
120:14 179:9,9
179:10 182:10
255:4
ones 29:11 43:2
50:6 54:8
115:1 116:2
132:17 133:14
195:9,10 238:9
253:19,20

297:21 321:16
337:7 341:22
376:11
online 14:8,9,10
15:13 87:8
396:13
open 31:4,8
59:14 60:4,5
93:20 95:3
143:7 199:9
231:16 257:11
275:6 321:20
330:4 336:17
opening 59:16
238:15
openings 238:14
238:16
opens 59:21
opinion 321:3
opportunities
106:7 109:2
110:8
opportunity
22:2 42:18
126:11 158:15
199:6 371:4
383:2,14
396:10
opposed 115:21
opposite 260:12
option 280:16
382:17
oral 174:6
order 99:21
108:14 269:7
282:22 304:20
307:10,12
330:15
ordered 162:17
orders 265:7,13
269:7 305:10
306:19 307:17
307:23
ostracization
106:4 107:8
ostracized
106:12,13
outlet 339:17
outside 15:8
40:10 48:5,10

108:1,2 211:15
213:16 222:23
227:21 236:14
253:6 268:15
269:1 270:3
271:1 336:15
343:11 351:8
351:17 377:7
392:4
overall 343:15
overheard 34:16
177:16 261:9
279:13,14
overly 189:18
overnight 278:3
oversaw 278:5
oversized 33:5
overview 367:16
owe 270:21
owed 270:21,23
372:10,11
OWENS 5:11
owned 10:8
ownership
214:21 301:19

**P**

P 1:11 5:1,1
147:3,4
P.C 5:4
p.m 212:16
356:2 365:4
pad 240:13,17
240:20 241:16
page 3:6,10 4:4
67:3,15 68:2,4
71:12,15 72:2
72:6 75:9,17
83:19 84:11
175:7 197:21
198:17 214:17
234:22 237:1,4
237:11 239:3,4
240:11,12
241:22 242:19
244:14 249:3
330:8 331:4
344:21,22
347:10 367:8
377:20 381:20

paid 14:22 15:7
29:15 50:9
53:4,10 54:21
55:3,6,12
56:10 57:15
58:3 316:17
318:14,18
337:1
Pam 62:20
72:15,16 79:3
81:6 309:3
311:7 313:6
314:7
pancreatic
296:15 400:1
pants 120:10
126:14 127:19
138:1 170:23
218:5,7
panty 170:21
171:3,4
paper 87:11
88:16 391:15
papers 33:12,12
343:14
paperwork 26:2
27:9 59:23
355:8
paragraph 63:8
64:13 65:18
72:5,9 73:5,10
74:5 75:18,19
78:18 80:21
86:12 89:17
90:2 96:18
98:12 106:2
111:3,8 113:7
116:5 118:3
173:13 179:17
183:7 197:21
255:10 258:8
262:1,10 269:9
269:13 304:3
304:14 319:21
319:23 320:6
324:5 326:11
347:15,18,20
347:23 355:10
355:11 357:12
367:7,11,14

374:22 381:22
382:2,5,9
383:23 384:12
385:8
paragraphs
86:6
paralegal 11:14
parents 10:11
park 114:20
115:4,6 359:13
parking 259:9
306:1 361:14
part 31:4 104:1
106:14,22
115:14 150:4
150:18,20
151:13 153:7
153:11 154:6
170:20 173:22
220:11 229:11
236:16 238:1
238:22,23
249:5 250:2
260:7 266:7,11
281:2 289:18
294:10 302:7
306:5,8 313:22
317:17 341:17
345:22 361:8
374:19 390:10
part-time 30:21
48:3 54:8
187:5 223:3
238:1 314:16
314:23 316:10
partake 106:17
participated
172:6
participating
324:7 325:14
particular 38:15
59:11 61:17
116:2 119:6
141:23 144:13
149:1,19
160:10 164:1
174:3,13
176:12 181:21
183:16 198:4
205:14 247:3

249:14 270:2
276:20 289:22
300:22 314:13
352:18 356:14
374:10 375:23
381:2
particularly
34:3 43:2
100:10 111:4,9
142:9 143:14
143:23 144:10
151:2,11,14
161:10 165:20
172:1 179:21
181:1 198:2
216:11 249:18
293:7 372:16
parties 1:14
2:11 48:13
254:23 274:17
403:13
partners 151:18
parts 133:3
143:20 145:1
181:19 185:22
186:9
passed 157:22
165:20 166:20
324:3 376:11
400:1,23
passes 400:3
passing 400:9
passionate
245:12
pat 201:17,18
patrol 117:11
145:6,14 146:3
159:4 217:1
276:12 304:21
patterns 138:9
Patterson
151:12,19
152:4 164:15
164:19 166:7
198:3 200:12
211:7,23 219:9
219:11 221:17
233:20 234:11
242:7 245:16
246:16 247:21

251:23 337:3
340:16 347:19
349:17 355:13
358:16 361:5
362:2 363:17
364:6,13
374:17 378:20
386:8
Patterson's
356:12
Paul 1:19
403:18,19
Paxil 395:9,11
pay 26:15 29:4
36:16 272:2
302:13 319:4
321:11 377:11
391:18,21
paying 53:14
302:4,5 316:16
321:12 329:12
payment 57:7
165:13
payroll 36:17
60:10 61:17
PD 91:5 94:9
pending 8:17
penis 132:8,11
132:12 147:17
147:23 148:5
152:13 182:3
182:13
penises 147:16
people 29:6 50:2
52:8 76:8,11
76:19 93:2
95:5 96:13
97:7 102:4
107:18 108:1
114:5 130:10
130:21 133:5
137:22 138:19
139:8 142:19
143:3,4 166:1
169:16 180:1
180:13,23
184:17,18,18
192:4,22
194:17 195:2
207:18 217:8

242:14 247:21
250:3,8,17
251:11 252:15
252:21 254:5
254:12,14,21
256:11 257:15
297:8 318:13
322:12 326:21
333:20 334:6
338:2 353:10
363:21 367:21
370:20 387:4
396:23 397:14
397:20
**perceive** 300:4,8
**perceived**
  173:23 252:10
**percent** 25:19
  26:21 27:1
  147:9 211:2
**perform** 325:9
  328:2 354:8,21
  355:3
**performing**
  175:11
**period** 40:19
  41:3 119:2
  120:16 121:12
  171:6,9,11,20
  203:3 210:13
  210:14 222:16
  223:10,15
  263:8 265:15
  285:2 397:2
**periods** 222:3
**permission**
  59:17
**permit** 26:7,14
  26:17 187:5,9
**permits** 22:19
  25:19,23 26:5
  27:8,19
**permitted** 232:1
  232:2,3,5
**person** 26:13,18
  38:16 48:15
  79:6 120:12
  121:11,23
  126:8 131:21
  136:6 138:21

143:16 153:8
153:17 155:19
157:12 160:10
174:13 187:9
205:5,6 210:17
216:15 225:21
241:23 243:11
243:13 252:4
259:20 264:8
271:6,15 274:5
301:9 309:1
316:15 324:12
329:5 331:8,9
354:6,12
371:23 374:12
374:14 379:15
382:18 383:14
**personal** 53:19
  54:10,11,17
  56:9 57:16
  245:18 246:4
  298:18 302:2
  302:17 320:18
  330:15 348:20
**personally** 56:3
  263:1
**personnel** 21:23
  22:8 35:14
  58:21 59:15,22
  60:2,8,21 61:7
  62:19 66:9
  72:13 73:17
  76:4 78:10
  79:2,3 80:14
  81:5,6 83:8,15
  84:15 86:19
  89:3 96:14
  120:2,4 121:1
  121:3 152:22
  158:18,19
  163:7 205:17
  209:11 281:20
  287:3 309:2
  310:23 314:5
**perspective**
  110:10
**pertaining**
  202:16
**Pete** 165:22
  166:22,23

177:20 178:19
179:5
**Phillip** 380:18
  380:21 381:9
**Phillips** 5:21
  23:14,21 24:13
  24:19 25:7
  33:8 45:14
  51:1 52:16
  64:11 65:14
  69:18 70:4
  88:4 100:11,13
  101:3 130:2
  136:7,19 142:5
  167:8 177:1
  207:15,23
  211:23 256:18
  257:5,6,7,16
  280:2 281:7,17
  282:22 283:2
  285:16 286:7
  287:15 288:8
  288:18,22
  291:8 292:6,15
  293:6,12 295:9
  304:22 305:10
  307:16 309:9,9
  309:20 313:1,4
  315:6 317:12
  317:13 324:10
  324:15 327:8
  340:3,6 341:11
  341:11 342:7
  342:15,18
  343:16,21,21
  347:1 355:12
  355:18 357:14
  360:20 361:1
  363:2 364:3,19
  365:15,21
  377:15 385:22
  386:13 387:21
**Phillips'** 23:15
  283:6 369:12
**phone** 27:3,4,7
  34:14 48:20
  53:5,10,14,19
  53:23 54:5,7
  54:11,18,21
  55:3,12 56:2

56:10,12,16,19
56:21 57:1,4
57:16,19 108:6
171:18 213:16
245:6,7 260:11
261:15,17
273:3 286:9
288:12 289:7
290:15 293:13
293:17,22
295:3,12,18
296:2,9,13
297:10,20,23
298:1,4,11,12
298:14,15,17
298:17,18,20
298:23 299:10
299:11,13
301:7 302:6,14
302:16,17
305:12 309:14
313:3,5,8,12
313:13,14
314:8,14,16
316:5,6 356:6
359:16,18,21
360:17,22,23
361:2 362:7
364:19,20
368:8,11,16
376:16 379:7
388:12,15
390:19
**phones** 55:23
  57:22 58:3,5
  211:8 301:10
  302:9 358:23
**photographs**
  183:13
**phrase** 153:19
**physical** 206:3
**physically**
  146:21 201:3
  203:10,10
  220:9,16
**pick** 29:12 319:7
  319:13 370:14
  374:12 376:6
  389:7 395:17
**picked** 134:19

**picking** 375:8
**picks** 229:13
**picture** 142:14
**pictures** 52:3
  134:6,7,15
  135:6,11,14,16
  135:18 136:1
  136:15 184:3,8
  184:19 185:1
**pillows** 360:6
**pistol** 22:19
  25:19,23 26:5
  26:7,14,17
  27:8,19 187:5
  187:8
**place** 18:10 71:7
  93:15 123:1
  157:19 203:21
  237:17,23
  238:20 268:12
  270:2 354:13
**placed** 377:10
**places** 322:21
**Plaintiff** 1:6
**PLAINTIFF(S)**
  5:2
**plan** 55:18,22
  313:13,13
  316:7 317:18
**plausible** 91:3
  91:12 92:15,18
  93:1,7 94:9
**plausibly** 94:13
**play** 106:3,21
**please** 6:10
  44:15 77:4
  121:19 179:1
  180:10 230:7
  248:5 294:1
**pleasure** 176:6
**pleasuring**
  176:7
**plot** 49:14 53:11
**pneumonia**
  242:1
**PO** 5:14
**pocket** 9:20
**pod** 31:2
**point** 24:12 37:7
  37:8 54:20

104:9 160:3
169:16 170:11
175:18 202:22
211:21 213:14
219:17 228:23
231:19 245:20
246:2,3 267:6
272:18 282:18
307:2,5 308:14
314:18 324:17
334:18 367:15
369:12 377:19
385:23 388:6,7
400:5
police 164:5
  246:10 367:22
  379:5
policies 62:5
  63:12 64:16
  65:22 74:22
  79:23 81:21
  370:19
policy 37:8,10
  37:14,23 67:6
  77:16 83:21
  91:2 114:19
  115:6 285:8
  301:16 373:12
  373:15,16
  375:23 376:4,9
  376:10,20
polish 125:2,6
  125:10,15
  139:16
Pop-Tarts 399:7
portion 70:20
  80:23 265:5
  302:11 357:19
  357:20
position 14:9,12
  16:1,5 18:2
  21:3 23:11
  25:13,15,16
  26:22 27:22,23
  30:4,17 55:1
  61:5,20,21
  113:23 114:1
  116:12 117:5
  156:13 206:10
  241:19 256:15

257:11 265:20
  321:14,20
  331:9 351:7
  360:4 364:11
  372:12 390:1
  398:7,12 401:1
positions 19:15
  27:21 59:18
  159:3
positive 239:5
possession
  330:15
possible 206:5
possibly 12:23
  398:2
post 338:13,14
poster 262:11
pot 193:10
PowerPoint
  84:4 222:11
practice 165:12
pre-2016 222:8
  222:16 223:10
precisely 41:13
preference
  308:7
prep 17:5
preparation
  13:21
prepare 12:8
  250:17 251:11
prepared 7:20
  12:10 357:4
preparing 19:4
prescribed
  395:6
presence 105:21
  141:20 170:5
  173:17 176:10
  263:13
present 5:17
  46:15 93:21
  94:2 259:19
  336:13 368:15
Preston 276:21
  277:3,6 278:6
presumably
  243:2
pretty 47:9
  171:14 174:4

188:1 211:9
  230:2,3 273:22
prevent 7:23 8:5
prevented
  297:22 319:6
  319:12
previous 185:23
  223:20 228:22
  256:15 293:11
  343:8
previously 10:2
  30:10 290:18
  363:18
primarily 97:16
  97:20
principal 356:15
  356:16 358:7,7
print 71:21
printed 14:10
  62:17,22 63:1
  64:3 65:7
  67:11 68:10
  233:18 234:14
  234:16,18
  235:9 343:13
prior 2:14
  183:21 191:12
  209:9 223:3,15
  256:3,12
  275:20 282:21
  285:23 294:20
  295:10 318:6
  319:10 349:4
  364:17 366:15
  389:23 392:11
  392:12,14,15
  393:21 396:15
  398:2
prisoner 277:20
private 165:12
  181:19 185:22
  186:9
privileged
  388:19
pro 166:12
probably 10:10
  17:17,17 18:18
  19:2,20 20:13
  20:17 34:20
  38:1 41:5

49:18 51:17
  55:9 72:18
  101:8 117:6
  121:15 127:1,7
  129:6,9 132:10
  132:21 134:18
  139:5 144:4
  147:9 148:12
  148:19 149:14
  152:19 156:7
  157:15 158:7
  159:19 160:3
  164:4 169:12
  171:20 180:5
  182:12,14
  183:23 188:10
  194:10 196:17
  199:3 201:5,23
  203:14 207:10
  220:1,11 221:6
  226:12 238:16
  240:5 245:5,6
  265:18 270:4
  271:19,22
  278:1 284:12
  298:21 315:2
  325:7 328:3
  334:2 355:23
  360:19 365:2
  390:17 395:1
problem 60:9
  138:4
problems
  117:21 317:10
procedure 376:1
  376:20
procedures 62:6
  74:22 79:23
  373:13 391:8
process 14:6
  17:9 26:9,12
  71:17 74:8
  299:21 305:9
  305:18 316:13
  316:19 350:7
  369:23 370:5,9
  370:17,22
  372:19,20,21
  373:3 375:11
  375:17

produced
  330:11,15
producer 29:9
program 347:21
promoted 61:6
  145:5 154:19
  155:1,5
promotion
  61:22 154:18
  155:9
proof 136:1
  257:23
properly 374:9
property 48:11
  58:5 90:18
  97:5
protect 93:2
  287:18 363:11
protected 99:4
  99:23 102:4
  106:23 327:21
  329:7
protection
  106:15
protector 98:14
  98:18,19 99:1
  99:13 101:21
  102:3 103:6
  104:3,11
  105:15,17
  110:14,23
  111:20 112:18
  113:20 155:19
protectors 111:5
  111:10
proud 395:22
provide 85:4
  233:9,11
provided 60:1
  84:5 205:12
  209:21 210:3
  273:6 334:4
  336:6,23
  382:17 392:6
providers 392:6
  392:18
providing 326:4
  326:8
provisions 74:17
  78:3

proximity 31:18
  32:22 45:14
  219:16 222:14
  244:13
psychologist
  393:4,5
PTSD 43:15
public 26:19
  31:6 143:8
  175:12
pulled 150:5,10
  150:13 272:13
pulling 148:13
  242:21
punishment
  114:16
purchase 29:17
  265:7,13 269:7
  304:20 305:10
  306:19 307:9
  307:12,17,23
purchased 56:3
purchases
  306:20
purported
  166:11
purpose 6:19
  36:19 72:20
  86:3 269:20
  309:16
purposes 8:19
  74:15 114:11
pushed 388:2
pushing 355:8
pussy 147:10
  148:16
put 23:21 84:13
  107:7 132:4
  136:16 137:7,9
  137:11 155:7,9
  155:10 158:1
  172:18 173:18
  176:1,4 194:4
  194:11 201:12
  206:9 234:12
  235:16 265:20
  273:4 284:23
  285:5 322:19
  350:13 359:20
  378:22 385:14

putting 95:14
  156:22

Q
question 8:10,17
  8:22 16:4 28:4
  36:16,20 43:10
  43:11 52:23
  56:7,8 68:22
  69:2,4 73:2
  76:1 78:20
  82:7 103:2
  105:2 124:10
  128:7 137:4
  198:15 230:7,9
  230:17 231:21
  248:15 280:8
  280:12 283:11
  284:12 348:9
  348:13 349:23
  350:1,18
  354:16 355:2
questioned 93:4
  192:21
questioning
  385:16
questions 2:10
  2:11 7:21 8:7
  61:17 221:20
  370:4 371:16
  371:21 403:6
quick 201:20
  261:16 318:5
quickly 47:9
  194:4,4 273:22
  360:8 365:19
  368:21
quid 166:11
quit 321:9,11,14
  329:9,11 386:2
  386:6,10,16,18
  386:20 387:4
  387:19 388:1,4
quite 232:9
quo 166:12
quote 116:13,14
  118:3,5 120:9
  120:10 121:8,9
  278:16
quotes 278:13

R
R 5:1 403:1
radar 244:4
raise 61:23
  355:7 398:14
raised 349:21
  350:7 385:2
raising 352:8,9
  352:14 354:21
  355:4
rampant 181:12
ran 306:11
random 27:5
range 234:16
rank 145:3,8
  160:16
rare 27:18
rarely 147:6
  264:23 319:8
reach 351:8
reached 92:8
  342:21 343:10
  346:3,8 351:4
  351:17 352:19
  385:23 395:21
  396:16,22
  397:20,21,23
reaching 350:11
  350:15 351:22
  382:12 397:13
reacted 354:6
reaction 387:3
read 6:7 43:11
  63:9,12 64:16
  65:19,21 67:4
  72:12 73:11
  74:5,9 75:18
  75:22 77:14
  79:14 81:14
  83:2 84:13
  89:12 111:6
  113:16 182:22
  183:4 189:15
  230:19,20
  249:9 262:11
  263:7 278:15
  338:14 350:3
  367:9 368:21
  382:2
reading 2:1 73:5

183:11
reads 63:23
  73:12
ready 370:3
real 50:21
  224:21 241:17
  277:13 321:13
  373:16
realize 252:4
realized 359:19
really 37:13
  52:11,17 76:22
  107:16 117:5
  129:7 145:12
  157:3 188:4
  195:21 198:19
  207:5 244:15
  261:18 276:14
  280:11 282:7
  291:19 299:12
  310:17 312:10
  326:18 342:11
  385:20 395:19
  401:8
rearranged
  307:15
reason 33:20
  42:2 44:18
  45:8 68:22
  69:3 76:8 79:5
  92:7 115:22
  194:12 289:7
  356:10 364:9
  378:22
reasonable
  354:6 363:6
  371:23
reasons 35:19
  36:6 380:20
Rebecca 99:2,18
  99:21 101:13
  159:9 179:21
reborn 160:13
recall 21:2 28:1
  41:1 46:19,21
  47:13,20 55:5
  66:13 70:14
  84:4 87:7 96:7
  98:6 104:13
  116:22 129:2

144:21 147:7
  148:5 176:21
  179:3 188:9
  189:4 200:8
  201:15,23
  202:4 215:9
  216:1 226:17
  233:13 236:2
  246:17 274:22
  276:5 292:23
  315:11 321:7
  345:5 353:17
  361:3
receive 19:2
  53:17 66:5,16
  69:9,20 82:13
  83:6 107:10
  134:15 285:22
  352:7 353:12
  378:10,13
  389:4
received 30:4
  63:10 64:14
  65:20 66:8,10
  67:4 68:20
  69:5 71:9
  82:10,18 83:13
  84:2 134:16
  136:1 233:5
  234:9 379:23
  382:13
receiving 26:13
  345:5
recognize
  329:20 384:6
recommended
  55:1 231:1
reconstruction
  264:13 270:16
record 9:2 20:9
  63:10 65:19
  79:14 81:14
  84:14 146:10
  230:20
record's 75:9
recorded 175:22
recording
  175:23
records 26:11
  30:10 49:19

61:6 156:16,16
217:2 333:12
393:11,14
401:21
**redneck** 367:22
379:5
**refer** 75:4,10,12
84:10 86:5,11
87:1 91:5
173:21 182:2
185:23 197:20
258:7
**reference** 85:18
86:5 104:20
126:2 127:22
171:6 332:3
335:21 393:11
393:14
**referenced**
32:16 85:13
91:23 97:8
126:13
**references**
137:16
**referencing**
186:14 244:23
249:22 394:2
**referred** 106:5
128:11 149:10
190:7,13,15
392:8
**referring** 87:11
87:12 113:10
118:5 174:19
188:18 203:13
234:10 239:11
242:3 243:1,16
243:18,20
249:12 266:1
375:2 380:11
**refers** 188:20,21
197:22 262:10
**refresh** 22:4
60:16 68:19
124:17 239:13
253:22 335:23
**regard** 258:15
314:13
**regarding** 21:9
59:6 156:22

173:23 186:8
283:9 311:18
371:16 386:3
387:21
**regards** 136:14
152:19 245:3
259:15 308:21
**regret** 242:22
243:6,8,9,11
245:1
**regular** 159:6,14
159:15
**rejected** 190:2
191:17
**rejecting** 190:8
**rejection** 191:12
**relate** 154:20
**related** 36:16
78:3 80:11
128:18 164:10
339:8 399:11
401:18
**relates** 355:12
**relating** 2:5
**relation** 150:14
253:3 264:2
379:9,10
**relations** 179:16
181:8
**relationship**
99:3,16 101:15
103:17 104:2
155:20 222:8
223:8,14 224:1
224:4 227:8
228:4 229:21
247:19 249:23
280:4 356:19
362:5 364:6,10
391:3 393:20
**relationships**
165:15 179:19
180:23 249:13
250:9
**relay** 20:11
338:16 340:9
371:21
**relayed** 342:12
349:1,15
**released** 255:23

**relevancy**
230:12
**relying** 173:9
**remain** 16:11
229:20 381:9
**remainder**
209:19,20
**remember** 12:3
13:6,8,9,15
15:20,21 17:2
17:5 18:16
20:8,15,16,21
22:1 26:3
27:10,10 43:22
44:8 46:6
47:17 48:18
50:4 55:8 57:6
57:12 60:19
68:21 70:1,6
70:18,20,22
82:22 86:23
92:22 94:2,4
95:6,12 98:9
101:12 103:19
108:7 112:8
117:17 121:6
123:3 124:6,8
124:11 126:7
126:18 127:2
129:21 131:21
132:16 136:20
136:21 148:23
149:18 150:2
150:22 151:1
153:1 154:13
156:1 158:10
159:22 162:6
162:14 165:8
165:16 166:21
171:22 172:5,7
174:10,12,14
176:11 185:8
185:13 194:12
201:1 202:13
207:22 208:8
213:19 230:17
253:20,20
264:5 270:3
286:8,10
300:15,16,22

310:18 312:9
313:18 322:14
325:8 328:8
355:15 361:9
363:14 365:5
390:15
**remind** 44:16
45:13
**remodel** 32:19
**remodeling**
265:5
**remove** 299:13
**removed** 300:13
314:15 316:7
**removing**
388:14
**repair** 264:10
**repeat** 126:6
139:17
**repeatedly**
208:22
**report** 12:15
21:14,16,19,22
35:7,10,13
39:17 41:10
60:12 72:7,21
73:6,22 75:20
76:2 79:6 81:1
84:14 96:10
115:9,11 117:7
119:9,12,21
120:1,6,19
121:17 122:3
125:20 128:1,8
129:17 130:1
132:22 135:23
136:2,4 139:11
140:15 141:17
144:16 149:3
149:21 151:6
153:2 154:14
156:9 158:11
158:16 159:23
162:7 167:6,22
169:4 172:2
175:4 179:11
180:15 181:13
182:18 185:17
189:10 193:13
208:3 218:23

253:11 261:21
263:12 285:14
285:20 364:5
365:21
**reported** 12:5
22:7 24:2,23
39:19 41:7
58:23 59:3,6,8
96:13 98:10
107:4 130:5
163:3 191:2,2
218:22 262:13
263:17 291:9
364:13 384:14
**reporter** 6:5
7:15 8:20
43:11 243:8
**reporters** 14:1
**reporting** 60:7
71:18 73:13
74:3 81:11
167:20 285:17
355:13
**represent** 74:14
78:1 80:9
166:4 167:1
**representative**
267:10 347:21
**represents**
267:5 403:9
**reprimand**
140:6,11
**request** 28:19
37:17 51:19
206:7 265:7,12
307:12
**requested** 48:4
77:8 79:16
81:16
**requests** 304:20
307:10
**required** 49:10
60:1 137:9
**requirement**
82:22 84:17
**resay** 148:18
**reserve** 116:21
117:1,7,14,20
117:22 195:14
**residence** 238:4

residences 10:14
resign 256:1
resignation 4:9
   383:4 384:9
resolve 140:9
   247:18
resolved 42:9
resource 356:13
respect 186:3
   339:6
respective 1:15
respond 49:1
   52:9 214:18
   240:15 252:14
   261:13 268:16
   273:6 372:22
   383:2,15
responded
   135:15 237:16
   241:16
responding
   245:7 383:10
response 41:22
   43:5 69:22
   70:1 123:5
   131:3 135:13
   207:4 208:18
   215:1 239:22
   274:3 289:8
   335:11,13
   337:11 340:14
   350:15 354:7
   354:10
responsibilities
   48:6 59:12
   238:2 308:4
responsibility
   47:15 51:22
   63:11 64:15
   65:21 348:10
   373:6,11
responsible
   344:17
responsive
   388:3
rest 202:5 254:2
   299:5
restaurant
   123:3
restaurants

269:18
result 193:2,10
   292:12 320:11
   354:21 381:3
   398:18 403:15
resulted 385:19
resulting 193:18
resume 322:20
   322:23
retain 391:13,15
retainer 391:19
retaliate 352:21
retaliated 107:5
   193:3 315:23
   316:3,12
   325:14 352:14
   352:17 384:17
retaliation
   95:22 289:11
retired 32:5
   156:15
retires 59:20
returned 297:10
reunite 232:13
review 12:11
   107:11
reviewed 12:12
   85:13
reviews 353:12
   353:14
revisions 63:14
   64:17 65:23
Rhoda 155:5,5
   155:13 156:12
Rhoda's 156:12
Rice 33:9 45:19
   45:20 160:14
   161:6,14
   163:22 164:14
   164:15 166:6
   212:1,2 369:3
Rich 5:19
   266:22 267:1,6
   267:14 331:21
   334:23 336:3
   338:17 339:4,7
rid 138:9
ride 114:21
   115:5
right 24:2 44:5

44:12 45:21
55:20 57:14
60:18 75:5
78:16 79:12
88:2 92:4,10
96:3 105:13
116:4 124:2
139:19 146:7
147:14 153:23
156:17 162:3
177:15 181:1
183:11 189:13
190:6 198:10
199:7,12 200:1
200:7 201:8
212:9 216:2,3
216:5 222:15
226:22 229:5
232:11 235:13
236:15 238:5
244:16 250:19
251:19 253:6
257:20 262:1
262:19 266:16
275:22 276:6
281:6 287:7
295:15 298:23
312:6 314:3
315:3 331:19
336:15 338:16
339:12 341:2,8
355:10 358:3
359:4 363:13
365:20 373:13
374:15,21
379:15 380:14
384:4 386:4,20
387:14,21
397:12 398:15
399:10 402:1
rights 301:14
Riley 5:4,5 6:7
   12:22 13:4
   43:8 56:4
   72:23 77:17
   80:3 81:23
   85:19 97:19
   105:5 126:4
   131:14 140:17
   140:21,23

146:9,16 147:2
147:15,21
163:9 193:15
230:1,8,11,15
231:8,13,17
232:7 243:7
248:14 266:20
266:23 267:2,7
267:16 293:23
294:3 308:13
350:1 388:17
388:22
ring 394:4
risk 193:5,6
   229:3
Robinson 398:1
rode 361:14
role 46:8 167:17
   242:13
room 42:15
   272:10 309:3
Rosenberg
   103:12 109:9
   163:11 170:22
Roth 177:20
   178:20 179:5
route 208:15
rub 201:14
rubbing 201:15
rule 267:12,12
rules 2:5 74:22
   111:12
rumor 256:19
   257:16,20
   334:19 345:10
rumors 257:10
   257:12 337:23
run 217:4
   305:23 335:22
running 142:11
   142:12
rush 131:16
Rutherford
   111:23 112:22
   156:19 157:14
   330:6 332:5
   333:20 334:8
   339:14 341:15
   348:1

         S
S 1:11,11 5:1
s/Joe 403:18
sad 394:14
   400:15
sadness 399:8
safe 270:14
Salamonski's
   262:18
sandwich
   148:12
sat 45:14 343:4
   343:16
Saturday 49:9
   298:22
saw 31:6 35:22
   82:20 135:5
   157:21 223:17
   257:2 263:6
   278:6 361:13
   362:20 363:22
   364:1
saying 17:15
   56:20 60:2
   69:8 88:13
   96:8 112:13,17
   130:14 146:14
   148:21 149:16
   159:12 160:5
   162:13 169:16
   177:8 187:7,7
   227:18 228:8
   239:16 244:21
   244:23 246:3
   247:3,17
   248:10 250:23
   251:5 261:9
   266:14 281:15
   290:4,14 292:3
   292:5,11
   300:15 308:9
   337:18,19
   345:22 348:15
   348:15 349:19
   349:20 350:21
   351:2,3 352:4
   374:7 382:3
   386:15 387:11
says 64:14 68:4
   76:14 77:6

84:14 85:2
90:2 106:1
114:19 191:10
198:17 212:23
233:4 234:8
240:12 241:8,9
251:23 284:4
285:9 300:4
304:14 305:14
307:9 368:7
372:3 374:23
378:3,9 379:3
382:10 384:13
scared 134:3
school 14:15
36:15 323:15
323:18 355:14
356:13,16
358:17 364:7
364:12 365:8
375:1 379:11
379:17
Schools 9:20
Scratch 191:23
Scratchard
191:23
scream 214:10
215:7
screamed 213:2
213:19 214:9
screaming
213:10,15
215:21,22
218:22
screenshots 52:4
sealed 375:3,4
searched 176:2
288:20
searching 15:12
second 18:11
23:11 25:21
27:22,23 29:21
30:9 32:18
36:3 43:8
44:17 61:20,21
70:10 71:12,16
72:5,9 84:12
87:2 97:14,18
113:15 186:18
188:6 260:6,7

264:15 265:6
268:7 287:8
304:13 309:12
312:23 313:17
327:19,19
328:21 329:4
332:8 344:21
344:22 347:14
354:12 360:16
367:7 381:20
secondary 51:9
54:15 108:11
secretary 22:18
25:4,22 30:21
34:16 117:11
336:15 396:1
396:21
section 278:11
279:10
security 45:3
48:14 53:17
117:2 186:13
186:17,21
187:3 202:18
238:11
see 45:7 67:6
68:8 74:5 75:6
75:13 77:10
79:18 84:12,17
90:6 98:14
116:9 121:20
133:6 137:15
143:1 153:6
159:1 170:21
171:3 176:14
177:21 187:19
189:16 191:6
195:5,6,10
206:11 210:4
212:21 226:23
234:20,21
235:3,4 236:12
237:13 239:6
240:13,17,20
263:1 265:2
287:4 290:11
290:15 293:14
293:17 297:7
303:1 304:2
330:8,8 335:14

344:10 357:12
359:7 362:1,19
362:21 366:13
378:4 381:23
382:7,15,19
395:1
seeing 241:15
260:16
seek 392:10
seen 40:10
138:18 264:20
274:23 370:23
373:9
select 49:23
210:15
selected 109:16
self 182:2
226:13 376:12
Semi 34:9
send 26:10
28:18 48:20
135:3 210:16
237:9
sending 305:9
sense 105:17
274:14 351:11
sent 51:3 53:18
134:21 135:1
135:10,12
136:15 184:3
214:15 233:5
234:9 236:23
241:10 249:3
250:23 291:3
294:7 304:21
307:10,14
346:22 378:3
sentence 77:2
79:12 81:8,14
212:20 245:11
255:13
separate 28:11
33:7,9 231:5
232:18 247:15
248:21 258:23
262:22 272:10
278:11 279:10
290:9 308:11
378:21
separately 371:2

sergeant 45:17
145:5 154:12
160:17 162:3
208:2,5,10
219:8,11
347:19 369:3
Sergeants 58:1
serious 348:18
350:8
seriously 240:13
242:21
serve 33:12
service 55:12
57:16 271:23
322:18
services 28:17
29:10,13 272:6
273:2 276:13
288:20 306:2
317:22 319:1,6
319:13
set 17:14 28:18
51:8 97:20
109:6 166:10
167:11 193:7
264:11 273:9
283:18 289:20
294:6 324:13
324:21
setting 7:14
20:17 225:19
283:9 290:21
292:8 311:19
setup 273:16
376:8
seven 182:1
192:3 197:9
203:15 315:14
372:9
severity 357:7
sex 118:5 153:9
153:12,14
164:9,22
166:15 174:6
175:11 177:18
178:6,9 185:4
185:6 186:7,14
188:18 283:14
sexual 3:15
66:16 67:5

69:9 72:7,21
73:7,22 74:3
74:18 75:14,21
76:2,11 78:3
78:23 80:11
81:2 82:10,14
82:18,23 83:9
83:14 86:22
90:4 95:11,20
96:6,8,18 97:6
99:16 101:15
104:1 106:18
106:20 112:4
112:22 114:6,8
116:8,8,18
123:12,12
128:14 156:19
157:15,23
159:3 162:13
164:10 165:10
165:14,14
166:3,18 167:1
173:23 177:12
178:21,22
179:16,23
180:7,22 181:8
181:11 184:9
185:3 198:18
223:7 255:15
256:4 262:12
263:10 285:22
293:15
sexually 77:7
79:16 81:16
98:22 102:7,7
102:8 106:5
110:20 128:17
150:6,10
154:21 155:12
157:14 160:9
160:13 161:9
161:10 162:22
166:13 168:9
173:22 177:16
179:15 183:12
185:20 186:5
216:18 227:6
228:15 231:3
232:16 236:1
240:18 242:17

247:12
**sexually-driven**
106:20
**shampoo** 360:13
**share** 180:7
**shared** 260:10
358:22
**Sharp** 392:19
**she'd** 244:6
**sheet** 68:21,23
69:7 71:5
108:20 330:2
**sheets** 51:4
**Sheila** 31:23
36:14 55:2
285:19
**Shelby** 111:20
112:16 115:1,6
115:21 156:18
157:13 258:16
259:5,11,15
**Sheldon** 184:14
185:10,11
**shell** 17:20
**Sheriff** 16:15,23
17:3,10,14
18:10 22:11
23:1,6 24:6,15
24:17,20 27:12
31:1,9 36:8
37:11 38:12,20
46:12 55:10
60:22 92:2,21
93:11 94:18
95:7 97:14,17
97:23 186:22
192:23 193:1
193:16 210:5
210:19 212:3
212:15 213:9
213:21,23
214:7,14,18
215:11 218:23
219:19,21
220:21,23
221:1,5,10
223:20 228:22
289:13 366:16
382:21 383:15
**Sheriff's** 1:9

11:18,21 14:4
15:6,11 21:15
25:1,20,22
27:4 28:7,10
29:10,21 30:20
30:21 32:6,7
34:16,18 35:8
36:8 38:11,17
39:2,18 47:1
53:22 56:10,23
57:8,15,20
58:5,9,13 62:3
66:7,12 68:7
69:10 71:7
78:12 80:17
82:11,16,17
83:20 86:18
87:6 90:9 91:3
92:20 105:19
117:10 123:14
124:7 129:5
141:5 158:17
165:10 170:14
173:9 179:20
191:19 197:3
212:2 217:5,7
224:2 233:21
253:18 254:6
266:2,6,15
267:20 269:6
270:13 280:20
302:5 312:19
313:12 316:7,9
332:11,15
337:13 339:9
349:1 352:16
360:4 364:11
373:6,11
376:21 384:16
388:10 389:5
392:13,16
394:20 395:12
397:6 398:8,19
399:18 401:1
**shift** 145:14,19
145:21,23
334:13
**shirt** 138:12
**shirts** 138:6
**shit** 250:16

252:6
**shitty** 250:17
251:11
**shocked** 151:22
**shook** 193:8,9
**shop** 275:4
359:6 389:13
**short** 91:6 150:6
225:12
**shorter** 150:8
**shortly** 22:11
47:22 280:19
360:12
**shorts** 121:20
218:2
**shoulder** 206:22
**shoulders** 97:1
198:7 201:4
202:6 219:18
220:10 221:4
**show** 49:2 138:8
169:18 216:10
258:5
**showed** 162:12
163:2 184:5
297:9 340:19
343:19 358:23
359:17,22,23
**showing** 233:5
297:5 338:2
**shown** 138:12
**shows** 331:6
359:6
**shrug** 203:10
**shrugged** 203:9
**siblings** 400:21
**sick** 256:23
320:21 400:16
**sickness** 400:7
**side** 1:20 30:23
31:1,7,16,17
31:20 33:4,6
102:22 103:1,1
103:15,16
104:10 135:8
209:12 269:5
281:2 370:12
371:4
**sign** 6:7 50:15
51:5 69:16

70:16,18,23
71:2 88:4,6,14
88:16,22 89:1
263:2,13
301:13 391:15
**sign-out** 330:1
**sign-up** 51:3
**signal** 90:4
96:18 97:2
**signalling** 97:6
**signature** 2:1
63:2,4 64:5,6
65:10 67:14
68:13 69:4
71:23 72:1
331:7
**signatures** 331:2
**signed** 13:23
50:2 54:8
63:16 68:23
69:7 70:3 74:9
77:8 79:17
81:17,19 82:20
83:1 84:1 88:1
88:19 260:18
301:23 325:11
347:13
**signing** 64:19
66:2 74:7
77:12 79:20
88:11 267:9
**similar** 78:21
99:10 111:11
113:12
**simple** 348:9
350:18
**simply** 345:17
348:13
**simultaneously**
288:17
**single** 44:8 54:6
61:19 104:6
**Sirote** 390:1
**Sirote's** 390:10
**sit** 48:10 175:10
201:10 211:5
342:7
**sitting** 20:20
22:6 43:21
44:6 57:12

60:18 95:6
98:8 249:20
272:20 313:23
359:16 374:1
**situation** 28:12
31:2 58:6 99:1
99:10,19
103:13 106:16
112:15 114:12
136:19 232:18
232:19 252:20
311:2 312:21
328:16 338:21
348:11 349:7
349:11 363:11
377:17
**situational**
229:12
**situations**
113:10 116:1
209:8 247:8
394:1
**six** 38:3 41:3
93:13
**sixth** 347:23
**size** 181:18
**sleep** 396:7
398:23 399:1,2
**sleeping** 396:4
398:20,22
399:5,6
**sleeplessness**
320:1,19
399:21 400:12
401:12
**slept** 395:19
**slot** 59:14,21,21
60:5
**small** 123:21
132:8,11,12
145:1 147:23
273:15 343:4
**smaller** 128:19
**social** 134:8,19
333:21 337:15
340:20 348:20
349:13
**socialize** 36:23
122:19 194:15
194:19 221:16

222:15 225:7 254:8,17
socializing 226:16 227:17 254:5,16
socially 271:18
solicit 34:15 39:13 41:15 204:3 271:8 311:10,11
solicitation 35:4
solicitations 104:5
solicited 19:23 40:2
soliciting 92:14 185:3 206:20 206:21 311:18
somebody 27:12 36:21 47:14 48:14 61:6 89:14 93:5 94:8,12 114:21 115:5 133:6 134:19 135:8 144:11 148:10 154:21 155:8 156:19 157:21 159:11 167:12 227:6 257:17 277:1 289:12 300:4 311:22 324:19 328:11 351:17 395:23 396:18,20
someone's 12:22 290:15 348:20
son 269:17 271:9,21 272:4 272:8,15,18,20 273:3,3,9,14 273:23 274:1,7 274:9 275:19 283:10,18 289:16,20,20 290:1,3,4,16 290:21 292:9 293:14,18 294:7,7 311:12 311:19

son's 272:22 273:22
Sonar 347:20
Sonya 110:18
soon 110:5 214:20 263:5
sorry 39:8 45:20 54:2 62:23 73:3 83:10 105:4,7 112:18 137:2 140:23 185:9 191:10 197:7,7,14 218:7 219:4 226:2,2 228:8 234:5 236:16 248:7 251:23 262:2 266:16 299:19 308:21 320:8 329:10 355:17 356:8 384:4
sort 36:9 84:10 101:14 191:7 215:10 275:8 352:7
sought 392:3,11 392:14
sounds 215:2
sour 352:12
South 10:8
Southeast 9:16
Southerland 187:6
southern 326:16
span 156:8
spatula 141:10
speak 59:10 101:22 359:9
speakerphone 260:20 261:3 261:11
speaking 82:23 232:3
specific 19:17 26:4 43:12 61:1 66:15 103:3 118:15 124:15 144:7 157:11 184:21

185:15 187:21 312:13,16 376:13 397:13
specifically 28:16 38:22 59:13 96:4,8 111:16 224:19 249:19 270:6 346:7,9 397:13
specifics 94:5 156:21
speculation 186:7
speed 309:10
spelled 181:22
spend 227:5
spending 227:16
spent 108:11
split 48:11
splitting 48:9
spoke 97:23 267:2 321:18 347:18,23 390:4
spoken 13:20,23 372:7
sporadic 222:13
sporadically 223:18 225:17
spot 46:9 60:3 346:1
spouse's 10:20 11:5
spurts 196:2
Square 1:20
squat 216:11
stable 399:15
Stacey 111:23 112:22 156:18 157:13 330:6 333:20 334:8 334:15 336:22 337:4,14,22,23 338:22 339:14 340:19 341:15 341:23 342:8 343:18 348:1
stack 272:2
staff 57:23
stage 97:21

stairs 143:10
stairwell 359:14
Stan 125:2,3,4 140:19,20,21
stand 388:6
standards 252:3
standing 107:9 143:7 187:8,9 187:12 367:21
standpoint 22:17 113:3 248:20,21 381:8
start 11:15 22:10 53:13 106:12 157:9 194:3 200:18 224:6 234:13 234:17,17
started 14:5 22:23 30:13 34:6 47:6,7,7 49:20 53:2 57:7 76:22 92:20 141:4,5 157:11 161:3 163:12 168:7 170:16 178:15 195:1 200:6 212:3 220:2 221:18,22 222:21 224:12 227:9,11 251:3 268:8 280:20 320:13 333:14 342:7 360:16 361:17 385:13 392:22
starting 72:9 227:8
starts 49:9 236:12
state 6:10 98:12 403:2,21
stated 367:20 368:4
statement 4:5 64:21 66:3 67:9 68:8,11 69:14 77:9

79:17 81:17 84:20 85:4,5 98:16 106:9 111:13,16 112:13 113:7 113:11 118:19 118:20,21 119:5,6 121:7 121:10 175:14 207:21 220:21 236:9 251:10 255:18 261:22 262:5 280:12 282:7 287:19 287:21 288:6 290:13 293:7,9 294:6 303:8,9 303:12,13 310:18 311:1 311:14 325:11 349:16,17 357:18 367:19 368:1,6,23 369:4,6,8,12 369:14 382:11 389:14
statements 98:9 208:23 282:1
STATES 1:1
stature 134:1 164:2
stay 206:5 239:5 250:4 392:23
stayed 52:6 201:18 328:14 396:19
staying 316:21 346:4
Steak-Out 162:18
stems 97:16
stenotype 403:6
stepped 23:21 31:12
steps 204:17
Steve 298:10
Stevens 15:18 16:19 17:10 23:4,20 25:8 31:11 39:20

41:8,20 47:18
334:12
**Stevens'** 41:21
**stick** 105:8
245:12,15
248:11
**sticking** 246:6
**stinky** 143:12
**stint** 399:7
**STIPULATED**
1:13,23 2:7,16
**stipulations** 6:5
**stirred** 193:10
**stole** 282:18
**Stone** 163:12
**stood** 216:9
**stools** 237:14
238:23
**stop** 35:19 36:21
36:23 41:12
42:23 95:14
144:12 226:23
276:3
**stopped** 40:18
243:10
**store** 177:18,22
178:5,23
**stormed** 379:4
**story** 178:2
311:9 312:11
371:4
**straight** 214:13
222:3 286:8
307:15
**strange** 143:3
**stranger** 143:9
153:10
**stream** 162:11
**street** 5:13 10:11
212:4
**stressful** 393:17
**strip** 41:17
**striving** 214:21
**strong** 79:10,13
99:3
**stuck** 141:9
171:10 246:12
246:15,20,23
247:7 248:13
248:17

**studying** 359:2,5
**stuff** 27:17
70:16 107:19
115:16 129:23
130:6 143:19
166:5 196:11
198:5 205:17
206:22 209:14
219:19 254:23
264:17 302:10
311:10 316:15
317:20 327:3
332:17,23
343:20 350:13
353:3 391:8
**style** 299:22
348:11 371:13
**sub** 395:20
**subbed** 12:2
395:16
**subject** 6:22
95:9,13,23
129:8,12 158:5
169:11 198:16
200:5 219:12
228:7 287:6
366:17
**subjects** 104:18
105:6 123:17
**submissive**
90:13,17 91:21
92:9
**submit** 322:8,20
382:10,18
383:9
**submitted** 134:7
134:22 210:12
383:4
**substance** 13:9
13:16 336:19
369:5,7
**substances** 8:5
**substitute** 11:23
395:16
**substituted**
389:20
**suffered** 106:3
**suggest** 126:4
228:10 390:20
**suggested**

288:14,16,22
289:6 325:20
**suggesting**
247:22
**suggestive**
116:18
**suicidal** 394:9
**suicide** 394:11
**suing** 7:2
**Suite** 5:6
**Summerlyn**
9:16
**superior** 103:18
**supervision**
102:12 141:20
**supervisor**
25:13 45:6,8
73:15,22
110:19 112:5
112:22 119:13
119:14 127:14
136:9 144:22
145:13 150:1
157:14 160:15
172:5 182:8
183:18,20,22
193:23 196:7
196:23 204:19
208:16 209:7
209:14 214:2
219:3 253:8,9
280:16 281:11
285:18 291:11
298:2 314:4
324:17 340:17
356:12 370:19
372:11 374:11
377:2
**supervisors**
142:2 144:19
151:3 154:10
155:22 158:8
159:20 162:2,5
169:2 174:15
190:19
**supervisory**
152:22 283:5
**support** 310:23
**supporting**
361:23

**suppose** 352:12
**supposed** 109:9
109:13,17
115:10 271:14
285:12 298:6
369:21 370:1
370:15,20
374:11,14
375:7 376:5,6
376:7 378:1
**sure** 8:12 37:13
48:10 50:18
52:17 60:14
76:23 87:8
93:22 104:21
104:22 110:21
113:17 126:3
145:12 150:15
168:14 175:23
188:4 199:1
202:22 208:14
211:3,9 231:7
232:11 240:10
249:10,10
253:15 264:22
275:11 278:8
286:19 305:2
308:15 309:19
311:1,21,22
312:11 354:17
361:9 363:9
370:2 396:14
**surely** 242:14
**surprised**
239:23
**surrounding**
159:17 322:1
**swap** 168:3
169:10
**swapped** 168:8
**swapping**
168:16 169:18
169:20
**SWAT** 168:10
193:23 194:1,5
194:6,9,17
195:3,15,17
196:6,7
**swing** 152:12,15
**swingers** 151:11

151:13,15
152:19
**swinging** 151:17
151:20,23
**switched** 212:5
390:5 395:8
**sworn** 6:2 7:11
**system** 12:23
50:23 186:17
233:17 235:9
307:18 315:2
364:12

**T**

**T** 1:11,11 403:1
403:1
**T-shirts** 169:17
169:20
**table** 162:17,21
343:4 350:13
**tacky** 297:6
**take** 8:13,17
18:10 20:6
43:6 49:13
52:4 53:5,6
68:1 78:20
83:18 85:22
89:15 93:15
97:10,12,16,23
98:7 102:15
108:9,17
113:15 117:20
128:14 131:14
131:18,22
155:8 182:22
200:2 204:17
205:17 229:3
234:19 242:13
246:9 248:19
252:9 263:15
295:11,18,18
301:11 302:1
303:1 309:13
312:13,16
313:2,5,8
315:3,12
330:21 332:9
332:12,13,16
333:4,6,9,11
361:7 371:1

392:1 395:3
398:6
**taken** 1:19 6:15
43:9 86:15
88:15 107:20
132:1 200:3
289:7 291:12
293:17 298:12
308:16 316:5
392:2 403:5
**takes** 374:16,18
**talk** 25:14 29:2
33:21 36:14
39:13 42:3
55:16 72:13
74:18 76:10
113:8 117:14
118:2,12 126:5
128:6 130:6,19
132:12 138:19
142:17 147:23
149:11 151:10
166:13 167:2
168:8 199:17
199:22 200:6
200:15 214:20
216:22 221:10
221:22 228:6
243:5 245:9
251:18 263:19
269:12,21
275:17 276:6
276:22 284:6
285:1 286:17
287:4,7,13,14
288:8 291:21
296:16 306:12
306:13,14
309:23 311:4
313:16,20
319:22 324:6
333:14 339:7
365:22 366:6
366:14,19
382:4 389:3,10
390:21
**talked** 10:14
41:23 43:2
61:18 72:15,17
77:13 93:16

108:6 123:18
124:19 126:17
130:7,9,11
139:15 142:20
144:14 152:8
152:21 157:1
159:5 165:6
166:17 167:9,9
167:12 172:14
176:9 181:2,19
183:15,21
184:7 185:12
197:17 215:14
254:4 282:9
283:23 284:10
285:18 287:5
288:11,15
293:17 297:18
309:2 317:14
328:11 336:2
340:10,15
347:21 362:6
371:15 385:5
388:11 389:11
**talking** 38:21
40:20 46:3
94:17 95:2,10
107:17 108:1
112:11 118:20
123:19 124:1
135:4 140:17
153:18 166:11
167:16 175:16
197:2 215:19
215:21 228:22
229:4,5 238:3
243:10 244:18
245:13 247:23
248:5 249:15
258:11 259:8
274:6 278:6
282:3 285:2
288:17 296:17
303:2 322:1
348:19 366:15
373:23 374:2,4
382:7 388:13
**talks** 116:7
252:21
**tall** 182:1

**taller** 297:21
**tampon** 171:10
**target** 52:7,8
**task** 47:11
**tasked** 371:9
**taught** 343:19
**taxes** 12:6
**teaching** 11:23
395:16
**team** 168:10
193:23 194:1,5
194:6,9
**technical** 13:3
97:13
**technically**
301:20 323:22
**teenager** 160:9
160:12
**telephone**
304:17 305:15
**tell** 7:11 21:16
38:14 41:18
47:6 72:20
75:19 78:6
90:22 91:7,10
96:4 97:22
98:4 99:22
124:18 126:10
131:7,18
142:16,19
147:1,4 149:5
167:20 179:1
180:10 182:23
183:4,8 186:16
192:11 196:8
196:12 203:8
204:21 205:20
206:18 207:11
220:14,22
228:21 238:17
240:5 242:6,11
249:5 250:13
251:14 256:17
268:19 271:21
272:8 274:20
275:22 276:3,8
278:15,17
279:18 281:9
281:19,20
287:1 295:3

299:16 303:19
307:11 309:5
309:18 312:11
314:1 320:5
328:6 340:1,2
340:8 341:10
341:12 343:22
348:10 356:5
356:23 358:20
361:7 366:9
367:10 368:4
368:22 370:11
370:13 371:4
379:6 401:17
**telling** 42:20
70:22 95:15
139:7 159:10
178:14 193:18
228:12 229:4
246:8 247:21
247:23 252:18
286:21 304:6
350:19 356:11
391:4,5
**ten** 40:3,17
132:16,18
141:13 148:19
149:15 152:20
156:5 174:21
181:7 184:1,23
191:16 193:20
197:2 203:7
220:13 250:18
251:12 270:4
271:11,19
278:1 319:17
319:18 322:4
**tenure** 16:12
24:23 46:23
51:16 66:6
80:16 86:17
105:12 107:2
109:4 123:13
124:7 129:4
138:23 141:15
144:3 148:20
150:17 152:20
154:5 170:1,5
182:16 188:9
197:5,6,11,13

199:4 209:18
209:19 233:21
253:18 266:11
339:8 388:9,11
392:12 394:11
394:20 395:12
399:18
**term** 13:3
146:13,21
147:8 148:4
**terminated**
385:10
**termination**
387:16
**terms** 47:3 60:6
106:6 126:19
146:12 152:2
265:3 292:7
302:20 304:12
353:16 360:3
**terribly** 114:9
**testified** 6:3
46:13 82:8
92:2
**testify** 126:11
147:19 173:10
**testimony** 88:3
136:20 173:7
175:1 215:23
216:4 290:17
363:18 385:1
403:10
**tests** 395:3,3
**text** 3:22,23 21:1
48:20 49:4
52:9 53:6,16
122:15,16
135:10 162:11
185:5 205:7
210:2,8,13,15
210:22 211:5
211:11 212:14
212:19 214:16
214:18 227:21
234:1 235:14
235:19 241:10
242:20 243:19
243:21 246:13
246:19 247:7
251:22 252:13

253:1,4,12
269:18 270:7
273:4,6 274:1
289:15 290:11
291:3 294:7
304:17 307:1
361:5 377:15
**texted** 222:23
235:7 289:21
**texter** 210:19
**texting** 233:20
236:7 253:5
**texts** 55:21
209:21,21
273:4
**Thank** 11:4
214:20 324:2
**Thanks** 240:23
**theirs** 293:22
**therapist** 7:1,3
**therapy** 160:21
**Theresa** 183:20
**thereto** 2:15
403:7
**they'd** 36:23
143:18
**thick** 302:9
**thigh** 201:7
**thing** 19:22 52:6
56:18 86:16
91:16 118:2
123:20 132:17
133:23 141:21
146:19 155:15
169:10 174:20
196:6 204:16
218:8 248:9,10
251:15 272:3,7
273:22 294:14
301:3 341:13
346:3 350:15
357:3 361:20
379:13 389:12
401:15
**things** 19:11
20:1 27:6,11
28:16 40:13
102:3 107:4,15
107:16 116:14
130:3,9,15,16

151:18,20
162:13 167:13
170:19 173:16
173:20 193:13
197:18 207:21
222:10 227:10
228:6 232:8
243:22 245:20
247:4,15 271:1
273:11 275:19
282:16 286:19
290:19 292:4
303:19 318:12
320:17 325:16
333:1 338:13
345:8,22
347:12 351:20
371:2 385:15
390:12
**think** 14:14 16:4
19:9,18 22:7
22:17 23:13,17
23:23 24:1
35:22 36:20
40:1,6 41:2
47:21,23 49:10
49:16,17,18
50:5 60:14
76:20 82:8
91:19 95:3
96:22 101:13
101:19 103:9
104:16,23
105:5,10
108:23 110:18
111:2 116:2
118:15,17
128:3 129:19
131:4 134:9,20
135:15 136:7
136:13 140:1
142:9 143:23
145:10,11
146:6 152:9
153:19 154:3
156:15 163:23
167:4 168:23
171:13 173:17
174:3,19 178:9
181:3,4 182:21

186:19 188:15
196:4,12 197:5
198:13,16
199:2,12,13
200:2,14
206:15 207:8
207:13 221:6
222:10 224:8
225:11 234:13
235:12 236:13
240:8,19
241:14 242:20
244:11 250:8
250:10 251:13
251:19 252:12
254:1 255:4,8
257:17 258:12
259:1 262:7
267:18 270:19
273:8 277:15
280:13 282:3,5
282:14 286:23
288:1 289:17
290:14 296:5
298:16 300:12
301:1 306:15
307:3,8 309:7
309:11 310:19
310:21,22
312:16 313:6
314:7 321:21
322:13 323:5
323:21 324:16
325:23 328:23
333:2,17 338:8
345:15 348:3
356:1 358:2
360:13,18
361:6,17
362:16 363:11
363:14 364:23
365:15 371:17
372:18 375:17
376:19 377:1,4
377:18 385:7
386:1 390:11
392:14 393:8
394:7,12 395:1
400:6,9 401:11
402:1

**thinking** 41:5
311:20 385:14
**third** 12:14
89:18 118:10
172:17 183:7
245:11 250:2
258:8 269:10
280:23 319:21
324:5 334:12
347:18 383:22
384:12
**thong** 171:5
**thought** 13:2
87:7 88:9 89:1
101:9 110:18
171:2 178:1,4
178:19 179:4
193:6 215:23
225:22 264:22
276:21 277:2
278:7,8 279:7
282:17 288:23
292:5 311:13
312:2 320:7
324:18 327:2
338:10 339:17
339:21 342:23
347:2 356:22
391:4,9
**threatened**
384:18
**threatening**
250:20 251:16
357:16
**three** 6:18 10:1
84:22 85:7
127:1 134:22
149:14 176:18
182:14,14
207:10 217:12
225:8,13
226:13,13
265:19 266:8
274:1 284:15
334:2,16
359:11 387:23
395:2
**three-ring** 50:4
**threw** 354:2,5
360:5 368:8,11

368:16 376:16
379:7
**throw** 351:5
**throwing** 343:7
346:17
**tick** 40:9
**tied** 128:20
**ties** 111:21
**tight** 137:17
138:1
**Tim** 59:6 208:13
263:19 264:1
266:14 267:19
269:12 272:5
272:19,19
273:2,18
274:11,12,20
274:23 275:4
275:11,14
277:15 278:5
280:20 282:8
282:14,16,17
282:20,23
283:13 284:7
284:11 285:3,6
285:17 286:2
290:13,19
291:18 292:7
292:15 293:2,3
294:6,19 295:6
302:19 303:12
305:3 308:18
308:19,22
310:12 311:5,9
314:6 316:1
317:20 319:2
322:2 328:18
386:3 389:12
389:14
**Tim's** 272:4
283:8,16
284:13 311:15
311:17
**time** 2:13,13
12:3 14:19
15:17 23:3,8
23:19,20 24:1
26:16 27:13
28:2 30:2,6
31:23 32:11

36:9 38:18
40:19 42:13
43:4,20 45:13
46:2,18,19
53:11 55:2
57:6 58:8
76:15 102:21
104:6 108:10
108:15 109:8
111:23 121:12
121:16 130:4
131:14 138:5
138:13 144:1,9
147:9 168:10
170:7,12 174:9
176:13 184:20
185:14 187:1
192:2 194:10
194:19,23
196:7 200:2,23
202:2,5 203:3
204:20,23
210:13,14
213:21 217:10
222:2,11,16
223:10,15
224:8,11
225:12,14
226:5 227:5,15
227:16 243:3
243:15 247:2
249:16 253:21
256:9 263:8,9
265:15,17,22
266:5 270:6
272:4 278:2,3
283:3,22 284:4
285:19 286:10
288:9 291:6,15
292:18 293:9
294:1,3 295:20
296:19 297:13
301:10 306:16
309:15 312:23
315:1,9 317:1
321:23 325:12
335:15,17
338:7 343:21
344:15 355:21
356:15 357:23

359:4 360:19
363:6,16,19
375:21 377:13
380:9 385:1,4
386:20 388:6,6
390:3 397:2,3
397:4,5 399:7
time-sensitive
357:3,6
timeframe
39:23 128:13
268:10
times 33:17,18
35:20 40:1,4
40:12,17 45:12
51:17,18 107:4
119:4,8 120:15
126:23 129:3,6
132:21 138:20
141:11,13
144:2,5,8
148:14,19
149:12,15
150:16 152:20
153:20 154:7
156:2,7 158:7
159:16,19
169:8,13,23
170:2 171:7,20
174:17 180:3,5
182:11,15
195:13 196:2
196:17 202:23
203:4,15 205:3
205:14 207:8
207:10 208:12
217:12 220:12
220:13 221:2
224:17 226:9
226:11,14,15
256:21 271:17
271:19 273:21
274:1 275:5
282:4 284:6,12
284:15 286:17
287:5 294:15
315:15,17
319:9,10,11,16
333:19,22
334:3,16

345:20 362:17
363:15 364:23
384:14,23
387:23 392:21
394:13 395:2
timesheet 315:7
timesheets
315:6
tiny 133:23,23
tires 28:18,20,21
61:11,12
title 23:22 71:15
74:19 78:6
80:12 83:19
titties 168:15
TMI 180:12,14
today 7:8,21 8:2
9:13 12:9
13:21 20:20
22:3,6 32:13
43:21 44:6
57:12 95:6
98:8 236:20
282:10 313:23
323:20 340:11
385:1,5 395:10
toenail 125:1,6
125:10,15
139:16
toes 125:2,6
126:12 139:15
told 17:7 41:11
41:20,23 42:5
88:10,17 90:19
90:23 91:5
92:3,22 94:11
94:14 97:12
98:7 100:16
101:1 103:20
103:22 110:3
117:13,17
134:4 138:3,3
138:8 161:19
162:19 163:7
165:7,8,9
166:19,23
178:2,2,3,9
180:12,13
189:22 192:9
193:16 204:10

204:19,23
205:9,11
206:19 213:18
219:19,22
221:5,9 225:2
255:20,21,23
256:7,8,9,11
259:7,11 260:9
260:22 272:23
276:1 278:12
278:23 279:6
279:15 280:2
281:7,12,13,18
282:5 286:14
286:23 291:10
295:17 296:14
298:8 311:7
313:4,21
324:16,18
333:22 334:7
334:11,13
336:21 337:3,7
337:8,10,18,20
337:21,22,23
338:5,6,21
340:4,18,21
341:9,11,12,18
343:23 345:19
350:22 356:7,7
356:18 360:5
364:5,8 377:18
379:5 389:12
389:14 396:15
tolerated 303:21
toll 320:15
tomorrow
239:12
tone 116:17
tons 124:8
164:23
top 58:21 68:4
78:19 80:21
84:11 91:8
105:13 116:3
172:16,19
181:2 233:4
234:22 237:3
244:15 316:20
316:21 344:10
392:23

topic 176:13
tornado 270:11
total 134:18
totally 292:4
touch 201:2,19
201:20,20,21
203:5 220:8
253:16
touched 197:23
200:10 201:4
202:2 213:6
223:16 225:2
386:7
touching 197:23
199:17 200:7
200:18 202:9
203:1 213:11
216:12 219:13
220:17 221:22
224:12 227:16
364:14
touchy 227:11
tough 252:6
town 268:13
trade 168:12
training 3:19
36:15 66:6,8
66:10,11,16
68:7,16,20
69:1,5,9,20
71:1,3,6,10
82:6,11,13,15
82:19 83:3,4,5
83:7,9,13,21
84:2 86:18,21
87:13,16,19,22
88:8,11,15,17
88:19 89:5,14
106:7 109:3,5
109:6,11,11,15
109:16,20
110:2,7 242:5
256:10 337:2,4
337:5
transcribed
403:7
transcript
403:10
transcription
403:8

**transferred**
104:9
**transferring**
49:21
**transpire**
365:17
**transpired**
286:18 287:9
309:11 356:8
**trauma** 393:20
**Travis** 388:9
390:21
**treat** 97:4 250:3
**treated** 100:4
110:15 113:4
114:9 290:22
351:15,19
352:2
**treating** 353:10
**trees** 193:9
**trial** 2:13
**tricycle** 182:3
**tried** 34:15 51:6
52:7,7 138:6,7
198:23 209:12
209:13 272:16
280:15 289:19
294:6 306:15
311:9,11
339:16 385:15
395:18,20
399:5,5
**trip** 66:11
**trouble** 56:6
100:2
**truck** 361:15
**true** 166:2
221:13 227:19
227:20 257:23
345:21 368:10
386:14,15
403:9
**trusted** 250:10
**truth** 7:12
**truthful** 8:6
**try** 41:16 164:17
164:20 207:1
228:13,14
238:20 243:4
243:12 244:1

268:14 306:14
307:18 349:22
**trying** 54:3
139:18 145:17
177:4 216:10
229:6 231:20
245:2 247:18
251:2 252:11
271:8 273:8
275:18 283:18
284:1 287:11
289:2 294:12
305:2 308:4,11
312:10 350:5
372:23
**turn** 26:9 69:23
71:5 89:2,3
111:6 128:4
139:20 216:16
265:6 345:18
**turned** 30:11
128:5 140:2
290:13 345:21
**Turner** 38:20
39:17 42:1,3
**turning** 110:20
114:5,8 289:11
**turnover** 61:3
276:17
**TV** 270:10,15,19
**twice** 182:10
255:4 309:12
**two** 10:6 27:20
28:9 31:7
34:21 41:6
48:11 60:23
76:13 96:22
97:7 100:14
102:9 103:8
111:18 114:21
117:6 127:1
157:16 160:3
169:14 188:11
188:11,13
190:21 205:2
211:8 217:12
219:6 222:2
232:7 247:14
258:23 273:23
276:10 278:2

284:15 290:8,9
334:16 358:16
371:1
**type** 17:15,18
18:3 19:3,5,22
27:14 28:12
84:14 106:15
130:22 174:20
183:1 204:6
244:16 264:17
272:7 273:16
276:16 303:13
320:23 371:11
**typed** 27:11,15
305:5
**typically** 356:9
**typing** 27:10

**U**

**U** 1:11
**ugly** 152:13
153:11
**uh-huh** 35:21
54:16 86:10
103:10 118:6
122:2 189:14
192:13 213:4
227:4 240:16
240:16 241:21
244:17 249:7
250:6 252:17
254:7 267:1
269:14 281:23
285:4 292:10
299:2 302:18
304:8,19
308:12 310:14
323:7 345:12
347:5,17,22
348:2 358:15
368:20 379:8
385:3 393:13
393:16
**ultimate** 18:6
**ultimately** 24:14
92:6 112:6
229:22 264:14
**unable** 79:6
337:15 354:20
355:3,6

**unattracted**
174:8
**unattractive**
163:21
**uncalled** 350:17
**uncomfortable**
19:12,19 34:11
37:4 39:12
40:14 41:12,14
42:10,13,17,22
43:23 44:9
149:6 177:8,10
195:21 209:1
216:8 253:13
275:15 305:3
346:21 380:19
**underground**
270:14
**understand** 7:8
7:18 8:10
17:21 54:2
56:8 63:11
64:15 65:20
74:8 94:16
185:15 227:18
231:21 252:2
283:11 286:6
308:8,10 342:9
370:5,17
375:11,16,20
379:3 400:23
**understanding**
55:17 57:18
125:7 135:21
177:23 183:19
376:3
**understood** 74:9
90:22 95:13
136:6 161:1,4
267:18 313:11
**unexpectedly**
358:4
**unfortunately**
124:13 195:8
199:5
**uniform** 142:1
**uniforms** 141:2
**UNITED** 1:1
**Unlawful** 75:14
**unlimited** 55:18

**unlock** 186:21
**unprotected**
107:1
**unwanted**
197:22 198:17
198:21 200:6
219:12
**unwelcome**
116:7 123:11
203:6
**upgraded** 56:19
56:21
**upper** 202:5
**upper-level**
57:23
**upset** 250:13
291:14,16
310:17,18
312:10 343:6
346:14 350:6,9
351:12
**use** 91:12 99:18
217:6 243:12
278:12
**user** 338:12
**uses** 322:14
397:11
**Usual** 6:5
**usually** 228:8
276:9

**V**

**v** 1:7
**vacation** 186:23
213:1
**vagina** 143:11
143:12,12
146:15,20
147:8 148:11
156:23 157:7
184:4
**vaginas** 148:9
157:2
**validated** 88:20
**vendor** 318:17
**vendors** 318:15
**verbal** 140:6,11
211:16 353:4
**verbally** 90:22
205:5,6 317:3

verified 257:1
258:2
Verizon 301:11
301:16
victim 7:6
video 87:21
175:9 176:13
176:14,14
177:4
view 87:15 89:5
89:11 106:13
142:12 367:16
369:13
viewed 320:15
viewing 88:7
violate 376:1
violated 376:20
visible 170:9
visibly 196:10
visit 33:14 40:15
visited 36:11
296:23
visits 269:19
vivid 179:22
vocal 257:8
voice 346:18
350:12
volunteered
389:19
volunteering
178:16
vomiting 174:1
174:6
vulnerable
104:4 329:6
vultures 134:14

_____ W _____
wait 115:5 191:6
371:20
waived 2:2,18
Wake 397:21
walked 31:5
187:13 189:8
258:21 261:1
272:19 359:10
360:10 380:1
walking 242:1
272:18 275:3
wall 260:13

262:10
walls 207:17
want 16:13
17:21 18:19
25:3 44:5
46:11 50:9
67:2 75:3,22
77:1 82:5,6
83:17 84:8
86:16 87:1
94:16 96:5
103:2 105:8
114:10 122:6
123:23 124:20
130:13 131:11
131:17,18
134:17 142:20
144:13 146:23
154:19 163:6
178:21 179:2
189:17 192:17
197:1,20 200:4
200:15 205:19
206:16 212:7
212:18 232:4
233:3,19
240:17 242:8
244:15 248:23
251:14 253:15
255:10 258:7
263:19 268:23
269:20 273:14
276:1 285:1
286:5,13,20
290:10 293:1
294:19 300:7,9
308:17 323:2
324:14 332:8
357:3,15 361:8
367:6 368:18
368:21 369:13
372:2 381:19
401:15
wanted 21:13
48:14 50:6
57:10 61:8
73:9 91:9,12
95:16 107:23
131:7 162:20
181:8 185:4

196:5,14 197:4
203:18 226:23
231:1 232:15
240:20 289:14
293:8,10
294:22 295:2
311:21 318:17
344:22 345:19
363:8
wanting 162:16
185:6 203:15
320:13 351:6
wants 147:2
229:23 239:19
372:1
warn 224:14
warned 224:17
warranted
346:21
wasn't 19:14
36:21 38:8,10
43:3 48:17
50:21 101:6
106:14 107:12
107:13 109:5
109:22 134:10
143:16 148:10
150:10 153:21
170:6 187:9,23
206:6 209:5
223:18 226:1
228:20 251:16
253:9 264:23
265:17 268:17
268:22 278:9
281:1,2 289:19
290:5 291:5
293:22 297:2
300:21 306:8
316:17 320:22
321:14 326:19
338:2 343:18
353:21 359:19
366:1 375:7,12
399:14
watch 28:20
177:5
watched 176:15
Watson 298:10
wave 306:16

way 9:2,16
48:16 50:21
52:11 56:22
60:17 73:4
128:17,20
130:22 132:11
132:18 143:17
151:15 161:11
171:1,19 176:6
188:20 193:8
193:18 197:23
200:10 203:5
216:6 241:6
251:20 253:17
263:5 313:11
320:14 329:4,5
338:11 343:13
350:6,12,13
351:15,19
352:1,23
353:11 354:3
354:14,19
374:3 401:14
403:14
ways 61:2
228:10 246:15
275:14 316:3
316:11
we'll 99:17
107:3 147:22
208:14 214:20
we're 7:14 74:18
78:19 80:20
85:14 91:16
97:13 112:11
112:11 116:4
118:20 124:1
128:6 139:18
146:17 181:16
198:8 199:17
199:22 230:2
231:18 232:12
258:11 285:2
332:7 391:23
we've 77:16
96:11 124:19
130:9 142:20
166:6 182:21
183:1 186:11
189:19 190:4

196:16 197:17
254:9,11
257:10 258:12
275:20 282:9
375:1
wear 102:14
121:19 137:18
138:1,9 141:22
171:5 217:22
218:10
web-based
322:17
website 60:4,5
322:15
Webster 99:9
100:17 101:14
347:16
Webster's
100:20
wedding 193:2
weddings 48:13
50:12
week 16:23
33:17,18 34:21
35:20,23 51:5
51:17,18 117:6
217:13 300:11
300:12 312:5
weekday 163:18
weekend 296:1
296:9 298:19
298:22
weekly 194:18
194:21
weeks 34:21
114:21 169:12
169:14
weight 128:11
128:21,22
129:4 136:23
welcome 43:7
230:5
went 14:15 36:2
61:7,18 66:11
82:21 84:22
85:6 89:8,13
109:10 115:11
117:13 134:17
134:20 151:16
151:23 163:7

167:10 176:4
187:20 194:18
213:22 214:13
217:18 222:18
226:6,11 237:5
237:6 255:4
256:10 257:15
272:3 274:16
276:20 280:16
281:7 286:6,8
287:2,4 292:6
292:14 293:6,8
301:5 305:6,11
305:18 306:21
309:2,18 327:8
337:21 339:16
340:5,7 341:23
358:21 359:8
365:12 366:11
366:18 370:13
372:18 393:4
395:1 397:8
**weren't** 52:13
53:4 87:18
94:14 102:19
102:21 106:22
114:5 257:6
268:19 292:22
321:1 328:6
345:22
**whack** 307:19
**whatsoever**
223:8 391:21
**whichever**
243:16
**whispered**
258:19
**wife** 99:22
167:11 168:3,7
168:16 169:10
178:10
**Williams** 115:3
**willing** 77:15
**Wimms** 254:13
260:8
**windows** 31:15
42:16
**wish** 246:20
**wished** 258:19
260:22 343:8

**wishing** 237:2
345:23
**witness** 2:2 3:3
13:2 64:9
65:13 85:21
140:19,22
146:14,22
163:11 230:3
231:18,23
266:21 267:11
367:12 403:11
**witnessed** 187:6
219:22
**witnesses**
267:13
**wives** 169:18,20
**woman** 45:22
46:3 143:10
362:2,6,8,21
**woman's** 48:8
143:20
**women** 114:7
147:12 171:23
244:4 250:10
251:4
**women's** 171:6
**word** 19:23
146:20 147:3,5
147:8,16
156:20,21
179:19 338:9
**words** 101:20
268:22 388:15
**wore** 138:2
**work** 11:20 16:9
27:2 32:2
38:16 48:13
51:10 52:22
55:23 76:21
95:21 108:6
112:6 121:8
122:7,8,13
145:9 157:3
188:5 192:19
200:20 213:16
216:10,11
217:14,14,15
217:17 218:4
222:3 223:1,2
228:1 229:15

245:6 248:20
248:21 254:18
254:23 264:1
266:6,13,15
268:1,15 269:1
270:4 271:1,2
275:6 276:11
276:17 313:13
316:8 320:4,13
331:1 354:13
356:10 364:20
399:3 400:8
401:14,15,19
**work-related**
237:19 253:7
306:22 307:6,7
308:2
**work-wise** 269:4
**worked** 25:20
31:21 32:6
34:17 55:2
58:8,17 76:21
99:23 103:21
105:18 109:7
110:13 143:2
161:16 168:5
170:7,23
184:14 194:11
202:17 205:10
206:2 214:22
218:13 222:5
254:12 256:2
256:12,14
264:2 265:18
265:19,22
266:2,5,8
267:21 268:6
278:22 285:18
301:6 315:17
331:9 334:10
337:19 338:2
350:7 369:17
369:23 370:9
372:9 390:7,11
393:22 397:5
**worker** 62:20
127:6 187:6
389:13
**workers** 30:22
132:6

**working** 11:15
14:18 34:7
103:21 104:7
112:9 113:1
129:7,9,13
144:1 178:16
195:1 205:13
266:17 268:8
280:20 300:12
332:18 384:15
390:3 392:15
398:18
**workout** 121:20
218:5,7
**workplace**
20:17 111:12
320:3 385:20
**works** 109:10
133:19 137:20
181:23 370:22
374:18
**worse** 327:22
328:17 329:8
**worth** 360:7
**wouldn't** 52:9
152:12 153:14
166:15 168:12
181:9 249:20
283:21 295:23
373:22
**wreck** 114:23
115:2,4,11
277:10
**wrecks** 95:19
114:18
**write** 140:5
184:17,18
**write-up** 379:3
**writing** 21:1
49:1 136:16
137:8,10,12
285:1,6 305:17
382:11 383:10
**written** 77:9
79:17 81:17
85:4 188:20
259:2 287:20
288:2,5
**wrong** 171:19
248:12 304:7

350:11 372:19
**wrongdoing**
346:20
**wrote** 148:6
172:15 185:5
187:4

─────────
**X**
─────────
**X** 3:1 4:1 315:18
**Xanax** 395:9

─────────
**Y**
─────────
**y'all** 225:7
260:16
**yeah** 32:12 41:5
102:16 119:20
125:11,14
138:15 139:17
146:3,14,22
147:6 148:2
160:22 169:15
185:11 197:13
226:10 240:22
241:1,6 243:9
260:7 322:13
390:18
**year** 38:3,4 41:3
41:4,6,6 205:1
219:15,16
240:7 290:5
335:17 398:14
400:2,3
**years** 6:18 10:1
10:6,10 41:6
118:13 132:16
132:18 149:15
156:5 157:16
160:3 174:22
176:18 181:7
184:1,23
188:11,13
191:17 192:3
193:20 197:2
197:10 200:19
203:4 205:2
217:13 262:7
265:19 266:8
266:12,18
267:21 277:13
315:15 372:9

399:14
**yep** 240:15,19
241:2,3,9,13
**young** 246:8

**Z**

**Zeissler** 195:11
195:11 259:6,7
259:11,14

**0**

**1**

**1** 3:11 62:11,15
77:13 84:11
331:4 347:10
**10** 3:20 85:9
89:19 150:18
175:8 255:8,9
**10:00** 356:2
365:4
**10:18** 1:22
**10:30** 383:8
**100** 1:20 44:2
144:5,8 147:9
181:7 211:2
**10th** 382:14
**11** 3:21 172:23
173:4,10
197:21
**113** 5:13
**1135** 367:9
**11th** 78:10
382:19 383:7
384:11 387:18
**12** 3:22 198:17
209:22 210:8
**120** 5:6
**13** 3:23 232:22
233:3 234:20
**13th** 244:22
344:11
**14** 4:5 303:4,7
**1437** 236:13,17
**1438** 237:2
**1439** 239:3
**1440** 240:12
**1441** 241:22
**1442** 244:14
**1444** 249:1

**1445** 251:21
**15** 4:6 159:19
180:5 220:13
329:17 390:17
390:18
**15th** 80:15
**16** 4:7 344:6
**17** 4:8 212:9
366:21 367:2
377:22 381:17
387:6,9
**171** 212:10,11
**172** 214:17
**173** 3:21
**18** 4:9 383:17,22
384:3
**19th** 233:6,16
234:10
**1st** 14:5 233:6
233:15 234:9

**2**

**2** 3:12 63:18,21
79:21 85:2
173:22
**2/9/2017** 65:17
**2:20** 236:20
**20** 139:2,3
141:13 150:18
154:8,9,9
158:7 159:19
169:13 284:12
315:12 319:19
390:17,18
**2006** 75:2
**2008** 12:1 15:5
**2009** 12:1
**201** 4:6 115:12
115:13,15
325:20 326:5,9
328:9,12 330:2
330:3 332:9,12
333:4
**2010** 3:11 14:5
47:8 222:4
**2012** 30:3 55:1
**2014** 263:11
280:18 328:18
386:2
**2015** 3:12,17

64:8 78:10
118:13 119:2
120:17 122:1
233:6,15 234:9
263:11,11
**2016** 3:18 74:8
80:15 83:22,23
188:3 220:3
221:21 222:4
224:10 234:21
235:4,4,5,6,23
236:8,18 262:6
335:22 336:1
344:11 386:6
**2017** 3:13
118:14 119:2
120:17 122:1
212:16,17
214:11 234:6
237:11 239:5
240:7 241:20
249:3 367:8
378:8,14
382:14,19
384:11
**2018** 11:1,16
225:23
**2020** 1:21 233:6
233:16 234:10
**209** 3:22
**20th** 249:3
**21st** 1:21
**232** 3:23
**24th** 241:19
**25** 86:12 89:17
90:2 96:19
98:13 106:2
**27** 111:3,8 113:7
**28A** 116:5 118:3
124:20 173:14
**28B** 173:22
175:8
**28C** 177:15
179:17
**28D** 181:16
**28F** 183:7
**28G** 189:13
**28H** 197:21
**28J** 198:16
**28th** 239:5

**29** 255:11
**2nd** 75:1 234:21
367:8

**3**

**3** 3:13 64:23
65:5 81:20
120:9
**3/11/10** 63:6
**3/11/2010** 67:18
**3:00** 49:9
**3:30** 49:12
**30** 18:17 139:4
154:9 258:8
284:12 315:12
**303** 4:5
**31** 262:1,10
320:7
**31st** 11:1
**32** 269:9
**329** 4:6
**344** 4:7
**35** 9:14
**35051** 5:15
**35748** 9:17
**35801** 5:7
**366** 4:8
**383** 4:9

**4**

**4** 3:14 66:18,22
**4:00** 16:10 51:12
51:19
**40** 156:7 315:12
**400** 44:3
**403** 5:6
**41** 319:21 320:6
320:7,9
**45** 324:5 326:11
**46** 355:11
**47-year-old**
239:20
**4th** 378:8,13
387:7,13

**5**

**5** 3:15 67:19,23
88:2
**5/21/1985** 9:10
**5:18-CV-0020...**

**1:7**
**50** 144:5 156:7
170:2 171:20
**55** 9:16
**584** 75:13
**585** 75:18
**587** 5:14

**6**

**6** 3:7,16 74:11
74:20
**6/24/14** 331:13
**6:52** 212:16
**60** 170:2 171:20
**62** 3:11
**63** 3:12
**64** 3:13
**66** 3:14
**668** 80:20
**67** 3:15
**69** 188:19,20
**6969** 186:14
187:5 188:23
189:1 258:13
**6th** 212:16,17
214:11 236:12
236:18

**7**

**7** 3:17 77:21
78:7 80:1
**7/13/2016** 68:18
72:3
**7/21** 64:8
**7:00** 355:23
**703** 75:13
**720** 84:9
**74** 3:16 12:17,20
13:7,10
**76** 12:17,20
13:16
**77** 3:17
**771** 377:21
**772** 381:21
**774** 367:3
369:11
**776** 368:19

**8**

**8** 3:18 80:5,12

81:22
**8:00** 16:10
355:23
**8:30** 297:15
**80** 3:18
**82** 3:19
**85** 3:20

**9**

**9** 3:19 82:2
83:18 87:2
**9/29/16** 331:15
**9/30/20** 403:20
403:23
**9:00** 297:15
**911** 184:6
**912** 78:17,19
**913** 78:16,20
**95** 25:19 26:21